# 25-1428

*To Be Argued By*:
GILBERT REIN

# United States Court of Appeals

## For the Second Circuit

◆◆◆

UNITED STATES OF AMERICA,

*Appellant,*

—against—

JASON ROBINSON,

*Defendant-Appellee.*

_____

**On Appeal From The United States District Court
For The Eastern District of New York**

**BRIEF AND APPENDIX FOR THE UNITED STATES**

JOSEPH NOCELLA, JR.,
*United States Attorney*,
*Eastern District of New York*
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

SARITHA KOMATIREDDY,
GILBERT REIN,
*Assistant United States Attorneys*,
    *Of Counsel*.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................iii

PRELIMINARY STATEMENT ................................................... 1

JURISDICTIONAL STATEMENT ............................................. 3

QUESTIONS PRESENTED ....................................................... 3

STATEMENT OF THE CASE ................................................... 4

STATEMENT OF FACTS ........................................................... 6

    I.    Robinson's Criminal Conduct ............................. 6

        A.    The Border Search of Robinson's Cellphone.................................................. 6

        B.    The Search Warrant ..................................... 9

    II.    The Motion to Suppress ..................................... 12

    III.    The Challenged Suppression Order.................... 15

SUMMARY OF ARGUMENT ................................................... 17

ARGUMENT ............................................................................ 20

    I.    Standard of Review ............................................ 20

    II.    The District Court Erred in Holding that a Warrant and Probable Cause Were Required to Search Robinson's iPhone at the Border ......................... 21

        A.    The Border Search Doctrine ....................... 21

        B.    The Search of Robinson's iPhone Did Not Require Probable Cause or a Warrant ...................... 25

III. The District Court Erred in Holding that the Good Faith Exception to the Warrant Requirement Did Not Apply ................................ 29

A. The Good Faith Exception ............................. 30

B. The Good Faith Exception Does Not Require Suppression of Evidence from the Border Search or Search Warrant ............................. 34

1. The Border Officers and Agents Reasonably Believed They Could Conduct a Limited Manual Search of Robinson's iPhone In These Circumstances .......................................... 34

2. The Search of the iPhone Was Supported by Reasonable Suspicion .................. 43

3. Agent Stepien Did Not Mislead the Magistrate Judge ............................ 48

a. Information Regarding the TECS Lookout Report was Unnecessary ................................ 49

b. The Warrant Did Not Mislead the Magistrate Judge Regarding Robinson's Consent to a Search ................................ 59

CONCLUSION .................................................. 66

iii

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Alabama v. White*,
  496 U.S. 325 (1990)................................................................44

*Alasaad v. Mayorkas*,
  988 F.3d 8 (1st Cir. 2021) ...........................................passim

*Bumper v. North Carolina*,
  391 U.S. 543 (1968)................................................................64

*Davis v. United States*,
  564 U.S. 229 (2011)..........................................................30, 31

*Herring v. United States*,
  555 U.S. 135 (2009)................................................................33

*Hudson v. Michigan*,
  547 U.S. 586 (2d Cir. 2006)...................................................30

*Illinois v. Gates*,
  462 U.S. 213 (1983)................................................................31

*Michigan v. Fisher*,
  558 U.S. 45 (2009)..................................................................21

*Riley v. California*,
  573 U.S. 373 (2014)........................................................passim

*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973)................................................................64

*Scott v. United States*,
  436 U.S. 128 (1978)................................................................47

*Tabbaa v. Chertoff*,
  509 F.3d 89 (2d Cir. 2007) ..............................................10, 56

iv

*United States v. Aguiar,*
  737 F.3d 251 (2d Cir. 2013) .............................................................. 31

*United States v. Arnold,*
  533 F.3d 1003 (9th Cir. 2008)................................................ 35, 36, 37

*United States v. Awadallah,*
  349 F.3d 42 (2d Cir. 2003) ............................................................... 52

*United States v. Bershchansky,*
  788 F.3d 102 (2d Cir. 2015) ............................................................. 21

*United States v. Bold,*
  19 F.3d 99 (2d Cir. 1994) ................................................................. 44

*United States v. Cano,*
  934 F.3d 1002 (9th Cir. 2019)................................................... passim

*United States v. Caraher,*
  973 F.3d 57 (2d Cir. 2020) ............................................................... 20

*United States v. Castillo,*
  70 F.4th 894 (5th Cir. 2023) ...................................................... 25, 42

*United States v. Clark,*
  638 F.3d 89 (2d Cir. 2001) ............................................................... 33

*United States v. Colasuonno,*
  697 F.3d 164 (2d Cir. 2012) ............................................................. 20

*United States v. Coon,*
  No. 10-CR-110A, 2011 WL 1871165 (W.D.N.Y. May 16, 2011) ......... 46

*United States v. Cox,*
  190 F. Supp. 2d 330 (N.D.N.Y. 2002) ............................................... 46

*United States v. Felder,*
  993 F.3d 57 (2d Cir. 2021) ........................................................ passim

*United States v. Flores-Montano,*
  541 U.S. 149 (2004).................................................................... 18, 22

v

*United States v. FNU LNU*,
653 F.3d 144 (2d Cir. 2011) ................................................................ 22

*United States v. Freeman*,
735 F.3d 92 (2d Cir. 2013) ................................................................... 21

*United States v. Ganias*,
824 F.3d 199 (2d Cir. 2016) ......................................................... passim

*United States v. George*,
975 F.2d 72 (2d Cir. 1992) ................................................................... 33

*United States v. Iodice*,
525 F.3d 179 (2d Cir. 2008) ................................................................ 20

*United States v. Irving*,
452 F.3d 110 (2d Cir. 2006) ........................................................ passim

*United States v. Keith*,
183 F. Supp. 3d 427 (S.D.N.Y. 2016) ................................................ 47

*United States v. Kolsuz*,
890 F.3d 133 (4th Cir. 2018) ........................................................ 23, 42

*United States v. Leon*,
468 U.S. 897 (1984) ............................................................................ 31

*United States v. Levy*,
803 F.3d 120 (2d Cir. 2015) ........................................................ passim

*United States v. Maher*,
120 F.4th 297 (2d Cir. 2024) ....................................................... passim

*United States v. Marchand*,
564 F.2d 983 (2d Cir. 1977) ................................................................ 51

*United States v. Mast*,
735 F.2d 745 (2d Cir 1984) ................................................................. 63

*United States v. Mendez*,
103 F.4th 1303 (7th Cir. 2024) .................................................... passim

*United States v. Montoya de Hernandez,*
    473 U.S. 531 (1985) ..................................................... passim

*United States v. Nkongho,*
    107 F.4th 373 (4th Cir. 2024) ........................................ 27

*United States v. Okwumabua,*
    828 F.2d 950 (2d Cir. 1987) ........................................... 63

*United States v. Rajaratnam,*
    719 F.3d 139 (2d Cir. 2013) ................................. 33, 55, 58

*United States v. Ramsey,*
    431 U.S. 606 (1977) ..................................................... passim

*United States v. Raymonda,*
    780 F.3d 105 (2d Cir. 2015) .................................. 21, 30, 32

*United States v. Reilly,*
    76 F.3d 1271 (2d Cir. 1996) ...................................... passim

*United States v. Ricciardelli,*
    998 F.2d 8 (1st Cir. 1993) ............................................. 46

*United States v. Salazar,*
    945 F.2d 47 (2d Cir. 1991) ........................................... 47

*United States v. Sultanov,*
    742 F. Supp. 3d 258 (E.D.N.Y. 2024).......................... 15

*United States v. Thomas,*
    757 F.2d 1359 (2d Cir. 1985) ....................................... 57

*United States v. Touset,*
    890 F.3d 1227 (11th Cir. 2018)................................. passim

*United States v. Whitted,*
    541 F.3d 480 (3d Cir. 2008) ......................................... 45

## <u>STATUTES</u>

18 U.S.C. § 2252 ........................................................................5

18 U.S.C. § 3231 ........................................................................3

18 U.S.C. § 3731 ........................................................................3

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 25-1428

_____

UNITED STATES OF AMERICA,

*Appellant*,

-against-

JASON ROBINSON,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

The United States of America appeals from a memorandum
and order entered on May 9, 2025, in the United States District Court for
the Eastern District of New York (Morrison, J.), granting Defendant-
Appellee Jason Robinson's motion to suppress evidence—specifically, the
contents of Robinson's iPhone searched manually at the border  at John
F. Kennedy International Airport and forensically one week later

pursuant to a search warrant.  The iPhone contained hundreds of images of children, including toddlers and infants, being raped and abused.

The district court suppressed the iPhone evidence, concluding that all searches of electronic devices at the border require a warrant and probable cause.  The court further found that the good faith exception to the warrant requirement did not apply because, in its view, at the time of the search no reasonably well-trained Customs and Border Protection ("CBP") officer would have believed that, under existing binding precedent, an iPhone could be searched at the border without reasonable suspicion, which the court found was not present.  Further, the court found that the government could not rely on the warranted search of the device because the Homeland Security Investigations ("HSI") agent who obtained the warrant intentionally misled the issuing magistrate judge about the reasons why Robinson's devices were searched at the border and about whether the search was on consent.

Each of these conclusions was erroneous and rests on a misapplication of the law.  Accordingly, and for the reasons set forth below, the Court should reverse the district court's order suppressing the contents of the iPhone.

3

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction pursuant to 18 U.S.C. § 3231. The jurisdiction of this Court is invoked pursuant to 18 U.S.C. § 3731. (DE:57; A:381).[1] The government filed a timely notice of appeal on June 3, 2025.

## QUESTIONS PRESENTED

1. Whether the district court erroneously concluded that the manual search of Robinson's iPhone at an international border by CBP officers required a warrant supported by probable cause?

2. Whether the district court erroneously concluded that the good faith exception to the warrant requirement did not apply because a reasonably well-trained CBP officer at the time of the search of Robinson's iPhone would have believed, under then-existing binding precedent, that the search was nonroutine and therefore could not be conducted absent reasonable suspicion?

---

[1] "A" refers to the government's appendix, and "DE" refers to entries on the district court's docket. Unless otherwise noted, all quotations have adopted alterations and omitted citations, internal quotation marks, and footnotes.

4

3.    Whether the district court erroneously concluded that the search of Robinson's iPhone by CBP officers was not supported by reasonable suspicion?

4.    Whether the district court erroneously concluded that the good faith exception to the warrant requirement was inapplicable because the warrant affiant intentionally or recklessly misled the issuing magistrate judge about the reason Robinson's devices were searched at the border and whether the search was on consent?

## STATEMENT OF THE CASE

On November 14, 2022, Robinson arrived at JFK Airport after an international trip to Egypt. When he went through passport control, he triggered an alert in CBP's TECS system,[2] which linked him to the purchase of child sexual abuse material and directed that his electronic devices be inspected. CBP officers took Robinson for secondary inspection, conducted a manual search of his iPhone, and found child sexual abuse material. Law enforcement agents subsequently obtained a search warrant, conducted a forensic search of the iPhone, and found

---

[2]    "TECS" is not an acronym but is the name for a system formerly known as the Treasury Enforcement Communications System.

5

additional child sexual abuse material.  On May 1, 2023, a grand jury in the Eastern District of New York indicted Robinson, charging him with transportation of child pornography, in violation of 18 U.S.C. § 2252(a)(1), and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  (DE:1).

On July 10, 2024, Robinson moved to suppress the contents of his cellphone, arguing that a search of his iPhone required a warrant supported by probable cause.  (DE:25).  He further argued that, at minimum, a search of the device required reasonable suspicion and CBP lacked the requisite level of suspicion.  (*Id.*).  On October 10, 2024, in reply to the government's opposition, Robinson asserted that the good faith exception to the warrant requirement did not apply.[3]  (DE:31).  On January 8, 2025, the district court held a hearing at which three witnesses—CBP Officer Shahamin Nunes, Special Agent Egbert Simon of the United States Attorney's Office, and HSI Special Agent Richard Stepien—testified.  (A:73-232).

---

[3]    Robinson's reply is dated August 21, 2024.  Due to a ministerial error, the reply was not filed until October 10, 2024.  (DE:32).

6

On May 9, 2025, the district court issued a memorandum and order granting Robinson's motion. (A:320-79 (the "Order")). On June 3, 2025, the government timely filed a notice of appeal. (A:380-81).

## STATEMENT OF FACTS

I.  Robinson's Criminal Conduct

    A.  The Border Search of Robinson's Cellphone

On November 14, 2022, Robinson arrived at JFK Airport and went through passport control. (A:13, 95-96, 111-13). He spoke with CBP officers and told them that he was traveling back from a vacation in Egypt and had not previously visited any other countries. (A:119, 124).

During Robinson's initial screening at passport control, the CBP officer whom he initially encountered became aware of a lookout in CBP's TECS system which warned that Robinson was linked to the purchase of child pornography. (A:113-18). In pertinent part, the lookout stated the following:

> Subj linked to the purchase of child sexual exploitation material via FinCEN. Refer to secondary for interview & media device exam to include cell phones and laptops…. Notify local HSI/local police if evidence of CSEM is discovered or suspected.

(A:234). The TECS lookout, first generated in November 2019, was placed by CBP staff at the National Targeting Center ("NTC").[4] (A:120-22). The NTC is "an intelligence hub for frontline personnel" staffed by "[CBP] officers, border patrol agents, intel analysts," and liaisons from HSI and other agencies. (A:185). Lookouts placed by staff at the NTC are given extra weight, and CBP personnel who encounter those lookouts view them as based on sound research and analysis. (A:120-21, 185-86).

Upon observing the lookout, the primary CBP screening officer referred Robinson for a secondary inspection. (A:113). The officer directed Robinson to the secondary inspection room, which additional CBP officers staffed. (*Id.*). During the secondary inspection, Robinson met with Nunes, who asked Robinson if he had any electronic devices with him. (A:113, 119). Robinson responded affirmatively and provided Nunes with his iPhone and laptop. (A:119, 126). Nunes asked Robinson for the passwords for the devices, Robinson provided them, and Nunes wrote them down. (A:126-27). Nunes also told Robinson about CBP's

---

[4] At the suppression hearing, Nunes testified that she believed the lookout may have been updated a year before the border encounter occurred. (A:123).

authority to detain and search his electronic devices, and she gave him a "tear sheet," which was a document explaining that authority. (A:124-25).

Nunes searched Robinson's laptop and cellphone. She first manually searched Robinson's laptop, without the aid of any forensic tools or software. (A:131). Upon inspection, Nunes observed some material she believed could be child pornography, but she was not certain that the material was properly classified as such. (A:133). She therefore determined that the laptop was "negative" for child sexual abuse material. (*Id.*).

Next, Nunes searched Robinson's iPhone for approximately fifteen minutes. (A:133-35). As she had done with the laptop, Nunes only manually searched the cellphone and did not use any forensic tools or software. (A:133-34). Instead, she manually opened the iPhone, put it in airplane mode, and searched the photos and files applications. (A:106, 108, 133-34). In the files application, she clicked on the "My Favorites" folder, and found multiple videos and photos of child sexual abuse. (A:134). One video Nunes observed depicted a small boy performing oral sex on an adult man. (*Id.*). In addition, Nunes observed other videos of

9

young boys engaging in various sex acts. (*Id.*). After observing these images, Nunes contacted HSI. (A:135-36).

HSI Agent Allen Anstee responded, reviewed Robinson's cellphone, and confirmed the presence of child pornography. (A:13-14, 137-38). During his review, Anstee saw "images of what appeared to be a minor male, approximately 13 to 16 years old, engaged in...anal sex and oral sex, with an adult male." (A:13-14, 208-09). Other images showed the minor's genitals. (A:14). After making these observations, HSI detained Robinson's iPhone to apply for a search warrant. (A:210). After law enforcement agents determined that Robinson did not have children, or access to children, he was released and allowed to enter the country. (A:209). Stepien, a special agent with HSI's Child Exploitation Team, was assigned to the investigation. (A:208).

B.   The Search Warrant

On November 21, 2022, approximately seven days after the detention of Robinson's cellphone, Stepien applied for and obtained a warrant to search the device. (A:22, 211). In his application, Stepien stated, in relevant part, the following:

10

>On November 14, 2022, ROBINSON landed at John F. Kennedy International Airport ("JFK Airport"), traveling from Cairo, Egypt, via British Airways flight BA 115 arriving from London, United Kingdom. He was stopped by United States Customs and Border Protection ("CBP") at JFK Airport for a secondary inspection. A border search was conducted. During the search, ROBINSON voluntarily gave CBP officers the password for the Subject Device. Upon manually reviewing the Subject Device, CBP officers identified that there was child sexual abuse material on the Subject Device.

(A:13).

The warrant application also contained a footnote after the words "A border search was conducted" in the above paragraph which noted as follows:

>The federal government has "broad plenary powers to conduct so-called 'routine' searches at the border without 'reasonable suspicion that the prospective entrant has committed a crime.'" *United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015) (quoting *Tabbaa v. Chertoff*, 509 F.3d 89, 97-98 (2d Cir. 2007)).

(*Id.*).

The application also detailed Anstee's observations of five child sexual abuse images contained in the cellphone. (A:13-14).

After reviewing the application, The Honorable James R. Cho, United States Magistrate Judge for the Eastern District of New York, issued a warrant authorizing the search of Robinson's iPhone. (A:26-30). Stepien then searched the device pursuant to the warrant. (A:211).

Upon executing the warrant, Stepien found hundreds of images showing child pornography. (A:212-13). The iPhone contained at least 235 images and 457 videos showing child abuse material. (A:213). The images and videos showed young boys and adult men engaged in sexual acts, including anal sex and oral sex. (A:212). The device also contained 2,363 images which were characterized as "age difficult," meaning the images could possibly contain child sexual abuse material, but Stepien was not able to determine the ages of the individuals in these images with specificity. (A:213).

On May 1, 2023, a grand jury in the Eastern District of New York returned an indictment charging Robinson with transportation of child pornography and possession of child pornography. (DE:1). On May 16, 2023, Robinson was arrested at his home in Pittsburgh, Pennsylvania. (A:219; DE:27 at 5).

12

II.    <u>The Motion to Suppress</u>

Robinson moved to suppress any evidence recovered from his iPhone, arguing that, even at the border, the Fourth Amendment required a warrant supported by probable cause to conduct a manual search of his device. (DE:25-1). He also argued that, at minimum, CBP needed reasonable suspicion before it could search his iPhone at the border. (*Id*.). The government opposed, arguing that the officers' manual search of a phone at the border did not require a warrant. (A:31-72). The government also argued that reasonable suspicion supported the search because the CBP officers who conducted the search relied on a report linking Robinson to the purchase of child sexual abuse material. (A:45, 53). In addition, the government argued that the good faith exception to the warrant requirement applied because (1) at the time of the search in November 2022, a reasonable officer could have believed that the manual search of Robinson's iPhone was a routine search, which could be conducted without a warrant or any level of suspicion, and (2) law enforcement agents eventually obtained a warrant and relied in good faith on the warrant to conduct a search of the device. (A:46-57).

In reply, Robinson claimed the government could not rely on the good faith exception to the warrant requirement for two reasons. (DE:31). First, Robinson argued that CBP's initial search of Robinson's iPhone was "nonroutine" and required reasonable suspicion, which Robinson claimed was lacking. (DE:31). Second, Robinson argued that although the government obtained a warrant to search the iPhone, the warrant application "deliberately misrepresented the nature of the border search" by citing binding case law stating that "routine" searches can be conducted without reasonable suspicion and giving the misimpression that Robinson had provided consent for the search. (DE:31 at 4-6).

The district court held an evidentiary hearing on January 8, 2025.[5] Nunes testified about conducting the initial search of Robinson's iPhone upon Robinson's arrival at JFK and discovering child sexual

---

[5] Prior to the hearing, the government filed a letter stating that it would not seek to introduce at trial any evidence recovered from Robinson's laptop or a statement he made to an HSI agent during the border search. (DE:38). Accordingly, the district court agreed to narrow the scope of the hearing to focus solely on the search of Robinson's phone. (Docket Entry dated Jan. 2, 2025; A:8).

abuse material. (A:133-34). Simon testified about the placement of lookouts in CBP's computer system and reliance upon them by CBP officers. (A:182-85). Stepien testified about applying for the warrant to search Robinson's iPhone, searching the iPhone, and discovering child sexual abuse material. (A:211-13)

The district court heard oral argument on January 15, 2025. (A:237-314). Following oral argument, the government filed supplemental briefing to address arguments raised by Robinson and the district court's concern—as expressed at oral argument—that the warrant application did not state that Robinson was the subject of a CBP TECS lookout report, which triggered the secondary inspection by CBP. (A:315-19). The government asserted that information about the TECS lookout was unnecessary to support a finding of probable cause and, if anything, would have further supported the issuance of the warrant. (A:317-18). The government also explained that Robinson's arguments, claiming that the magistrate judge substituted Stepien's legal determinations for his own, were misplaced. (A:318).

III.   The Challenged Suppression Order

The district court granted Robinson's motion on May 9, 2025. (A:320-79). The court's decision rested on several conclusions.

*First*, the district court held that the search of electronic devices at the border always requires a search warrant supported by probable cause. (A:335-36). The court, relying on its own decision in *Sultanov*, extended the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), to the border search context and held that a warrant was always required to search a cellphone at the border, including Robinson's iPhone. (A:340). In the absence of a search warrant, the district court concluded a Fourth Amendment violation had occurred and turned to the application of the good faith exception to the warrant requirement. (*Id.*).

*Second*, the district court held that at the time of the search of Robinson's iPhone in November 2022, no reasonably well-trained CBP officer would have believed that binding precedent—meaning a decision from this Court or the Supreme Court—authorized a search of an electronic device at the border in the absence of at least reasonable suspicion. (A:363-64). The court concluded that the search of Robinson's

cellphone was nonroutine and therefore a reasonable officer would have believed that at least reasonable suspicion was required to support the search. (A:345-50). It further stated that the question of whether the search of a cellphone was routine or nonroutine—which would determine the level of suspicion necessary to conduct a border search—was "at the very most, unsettled." (A:348). Therefore, application of the good faith exception to the warrant requirement hinged, in part, on whether reasonable suspicion existed for the search of Robinson's iPhone.

*Third*, the district court held that CBP officers did not have reasonable suspicion justifying the search of Robinson's iPhone. (A:351). In support of this finding, the court discounted the TECS lookout report on which officers relied. (A:356). The court cited the age of the report— which was initially generated three years before the search—and the fact that the report only stated that Robinson was "linked to the purchase of" child sexual abuse material, information which the court claimed did not, by itself, indicate that Robinson possessed such material. (DE:56, 37-38).

*Fourth*, the district court held that the government could not rely on the search of Robinson's iPhone, conducted pursuant to a warrant, for two reasons. (A:378). First, it concluded that the warrant's affiant,

17

Stepien, had misled the magistrate judge by characterizing the search as "routine" and failing to include information about the TECS lookout report in the application, (A:376, 378). Second, it found that by stating in the warrant application that Robinson had voluntarily given the device's passcode to CBP officers, the warrant falsely implied that the search had been on consent. (A:376).

Ultimately, the court held that Robinson's Fourth Amendment rights were violated when CBP conducted a warrantless search of his iPhone and that, because the good faith exception to the warrant requirement was inapplicable, evidence from Robinson's iPhone must be suppressed. (A:376, 378). This appeal followed.

## SUMMARY OF ARGUMENT

The district court erred in suppressing the contents of Robinson's iPhone, and its Order should be reversed.

*First*, the district court erred in requiring agents to establish probable cause and obtain a warrant to conduct a manual search of a cellphone at the border. The "border search exception" is a "longstanding, historically recognized exception to the Fourth Amendment's" warrant requirement. *United States* v. *Ramsey*, 431 U.S. 606, 621 (1977). "Time

18

and again, [the Supreme Court] ha[s] stated that searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States* v. *Flores-Montano*, 541 U.S. 149, 152-153 (2004) (quoting *Ramsey*, 431 U.S. at 616). The district court suggested that the Supreme Court's decision in *Riley v. California* supported special treatment of cellphones, which "differ in both a quantitative and qualitative sense from other objects." (A:337 (quoting *Riley*, 573 U.S. at 393)). *Riley*, however, dealt with a separate exception to the warrant requirement—the search-incident-to-arrest doctrine—and the same reasoning does not extend to border searches. Every court of appeals to address the issue has said so.

*Second*, the officers and agents who searched Robinson's iPhone at the border had a good faith belief that they could conduct a limited manual search of the phone for digital contraband (child pornography) when they had well-documented suspicion that Robinson was a downloader of child pornography. This Court's decision in *United States v. Levy* and the precedents of other circuit courts informed and

supported that good faith belief. The district court failed to recognize that even if the CBP officers mistakenly believed that a warrant or reasonable suspicion were not required, in assessing the reasonableness of their belief, this Court looks to out-of-circuit precedent in addition to its own.

*Third*, the district court erred in holding that the search of Robinson's iPhone was not supported by reasonable suspicion. Here, the TECS lookout report provided reasonable suspicion by informing agents that Robinson was linked to the purchase of child sexual abuse material and directing that his electronic devices be searched. Further, the lookout dealt with child pornography, and this Court has recognized that in cases involving such material the staleness inquiry is unique because child pornography is often hoarded by those who collect it.

*Fourth*, the district court erred in concluding that the government was not entitled to rely in good faith on the search warrant because the affiant, Stepien, had knowingly and intentionally misled the issuing magistrate judge. The court's findings have no support in the record and are inconsistent with this Court's prior border search precedents. The court's conclusion that Stepien intentionally omitted

information about the TECS lookout to deceive the magistrate judge and prevent him from "ask[ing] questions" is clearly erroneous. The court failed to recognize that the terms "routine" and "nonroutine" in the border search context refer to the invasiveness of the search, not whether a passenger was randomly selected (or not) for secondary inspection. The district court also wrongly concluded that the warrant application misled the magistrate judge by implying that Robinson had consented to the search of his iPhone. The warrant application is clear that the initial search of Robinson's iPhone was a border search.

## ARGUMENT

### I.   Standard of Review

This Court "review[s] legal conclusions on a motion to suppress evidence de novo and findings of fact for clear error." *United States v. Caraher*, 973 F.3d 57, 61 (2d Cir. 2020). A factual finding is clearly erroneous when "the record as a whole leaves [the reviewing court] with 'the definite and firm conviction that a mistake has been committed.'" *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012) (quoting *United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008)). The court's legal determinations—including the necessity of obtaining a

warrant and the application of the good faith exception—are reviewed de novo. *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015). Mixed questions of law and fact are reviewed de novo. *See United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015) (citing *United States v. Freeman*, 735 F.3d 92, 95 (2d Cir. 2013)).

II. The District Court Erred in Holding that a Warrant and Probable Cause Were Required to Search Robinson's iPhone at the Border

A. The Border Search Doctrine

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. As the Supreme Court has often said, "[t]he ultimate touchstone of the Fourth Amendment...is reasonableness." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam). "[S]earches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border...." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). Therefore, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is...struck much more favorably to the Government at the border." *United States v. Montoya de Hernandez*, 473 U.S. 531, 540 (1985). An

international airport is the "functional equivalent" of the international border, and the rationale underpinning the reasonableness of warrantless searches at the border applies in full force. *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006); *see also United States v. FNU LNU*, 653 F.3d 144, 148 n.3 (2d Cir. 2011) ("The international arrivals section and Customs area of a U.S. airport undisputedly constitute the 'border' for constitutional purposes.").

"The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). In recognition of the government's broad interest in this area, "the Executive [has] plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Montoya de Hernandez*, 473 U.S. at 537. The Supreme Court has been clear on this point and reaffirmed that "[t]here has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause." *Ramsey*, 431 U.S. at 619. And no court of appeals "has ever required a warrant for any border

search or seizure." *United States v. Wanjiku*, 919 F.3d 472, 481 (7th Cir. 2019); *accord, e.g.*, *United States v. Xiang*, 67 F.4th 895, 899-900 (8th Cir. 2023); *Alasaad v. Mayorkas*, 988 F.3d 8, 16-18 (1st Cir. 2021); *Kolsuz*, 890 F.3d at 147; *United States v. Vergara*, 884 F.3d 1309, 1312-13 (11th Cir. 2018); *United States v. Molina-Isidoro*, 884 F.3d 287, 292 (5th Cir. 2018).

In light of the prevailing case law, even invasive searches of property at the border are lawful in the absence of a warrant and probable cause. "The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Montoya de Hernandez*, 473 U.S. at 537. Although a warrant is never required for a search at the border, the Supreme Court has held that individualized suspicion is required to conduct nonroutine customs searches. *Id.* at 541. Reasonable suspicion, not probable cause, is the applicable standard in cases involving the most invasive of privacy intrusions, including strip searches conducted at the border. *See Irving*, 452 F.3d at 123. "[T]he level of intrusion into a person's privacy is what determines whether a border search is routine." *Id.* As this Court has

24

held, the search "of a person's luggage or personal belongings are routine searches." *Id.* at 123-24.

Although the Supreme Court and this Court have yet to squarely address the issue, there is a "consensus among circuits that brief, manual searches of a traveler's electronic device are 'routine' border searches requiring no individualized suspicion." *United States v. Mendez*, 103 F.4th 1303, 1310 (7th Cir. 2024) (collecting cases). Where appellate courts disagree is the level of suspicion needed for "more intrusive, forensic electronic device searches." *Id.* Some courts require reasonable suspicion for these more invasive searches, while others require no suspicion at all. *Compare United States v. Cano*, 934 F.3d 1002, 1016 (9th Cir. 2019) ("[W]e hold that manual searches of cell phones at the border are reasonable without individualized suspicion, whereas the forensic examination of a cell phone requires a showing of reasonable suspicion.") *with Touset*, 890 F.3d at 1233 ("We see no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property.").

B.   The Search of Robinson's iPhone Did
     <u>Not Require Probable Cause or a Warrant</u>

The district court's holding—that even a limited manual search of an iPhone at the border requires probable cause and a warrant—is wrong.  It conflicts with applicable border search precedent from the Supreme Court and is out of step with every court of appeals to have considered the issue.  *See*, *e.g.*, *Mendez*, 103 F.4th at 1310; *United States v. Castillo*, 70 F.4th 894, 898 (5th Cir. 2023); *Alasaad v. Mayorkas*, 988 F.3d 8, 19 (1st Cir. 2021); *Cano*, 934 F.3d at 1016, 1018; *Touset*, 890 F.3d at 1233.

The district court looked to *Riley v. California*, 573 U.S. 373 (2014)—which addressed the search of cellphones recovered incident to arrest—to suggest that the capacity of modern cellphones to store immense amounts of data and personal information is a basis to accord them special treatment, even in the setting of a border search.  (A:337-39).  However, as the various appellate courts to examine this issue have recognized, *Riley*'s rationale is inapplicable in the border search context.  *See*, *e.g.*, *Mendez*, 103 F.4th at 1308 ("*Riley* involved the search incident to arrest exception and 'carefully tailored its analysis to that context.'");

26

*Alasaad*, 988 F.3d at 18 ("*Riley*'s warrant requirement…does not extend to border searches."); *Cano*, 934 F.3d at 1015 ("[H]ere we deal with the border search exception—not the search incident to arrest exception— and the difference in context is critical.").  Although the district court relied on *Riley* for the proposition that the search of a modern cellphone would be a great intrusion into its user's privacy, (A:337), it failed to recognize the difference between searches incident to arrest and those at the border.  *Riley*'s logic simply does not transfer to the border search context.

In *Riley*, the Supreme Court considered the narrow issue of whether the search incident to arrest exception to the Fourth Amendment's warrant requirement applied to a cellphone seized from an arrestee's person.  573 U.S. at 378, 385.  The Supreme Court's analysis recognized that the two risks attendant to searches incident to arrest— officer safety and the destruction of evidence—are not present "when the search is of digital data." *Id.* at 386.  As the Supreme Court recognized, a cellphone's digital data "cannot itself be used as a weapon to harm an arresting officer," defeating the safety rationale for a search incident to arrest.  *Id.* at 387.  As for the destruction of evidence rationale, the

27

Supreme Court was skeptical of the ability of criminals to remotely delete data from a device and pointed toward tools, like Faraday bags, that can prevent data from being deleted. *Id.* at 390. The Supreme Court was careful to recognize that, despite the privacy interests and sensitivity of data contained in a cellphone, law enforcement officers genuinely concerned about the destruction of evidence might "be able to rely on exigent circumstances to search the phone immediately." *Id.* at 391.

*Riley* did not hold that a warrant is always needed to search a cellphone. *See id.* at 388 (noting the continued viability of "case-specific exceptions to the warrant requirement"). This makes sense because the rationales underpinning different warrant requirement exceptions— including the border search doctrine—are different than those justifying searches incident to arrest. In the border search context, these rationales include, among other things, enforcing customs duties and preventing the entry of contraband into the country. *Montoya de Hernandez*, 473 U.S. at 537. Border searches of electronic devices "are critical for preventing cross-border crime and the importation of contraband." *United States v. Nkongho*, 107 F.4th 373, 381 (4th Cir. 2024).

28

In applying *Riley* to the border search context, the district court improperly balanced the interests of individual travelers and the government—and failed to properly weigh the import of the fact that a search of property occurred at the border. *See Ramsey*, 431 U.S. at 616. "What is unreasonable after arrest may be perfectly reasonable at customs." *See Mendez*, 103 F.4th at 1308. This is because at the border, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is struck much more favorably to the Government." *Montoya de Hernandez*, 473 U.S. at 540. Searches at the border therefore "never require…a warrant," and the fact that the property to be searched is a cellphone does not change the analysis. *Touset* 890 F.3d at 1232; *see id.* at 1233. Cellphones, just like other personal property, can store not only contraband but also evidence of contraband and other border crimes. *Alasaad*, 988 F.3d at 20. Given this fact, it follows that when applying the border search doctrine to electronic devices, a traveler's privacy interests in their cellphone's contents would yield to the government's interest "in protecting its territorial integrity." *See Touset*, 890 F.3d at 1235.

29

III.  The District Court Erred in Holding that the Good Faith
      Exception to the Warrant Requirement Did Not Apply

        After erroneously holding that the manual search of a

cellphone at the border always requires probable cause and a warrant,

the district court considered the application of the good faith exception.

(A:340).  In opposition to Robinson's motion, the government asserted

that under then-existing law "a reasonable officer or agent could believe

that the search in question was routine, or even if it was nonroutine, that

there was sufficient reasonable suspicion to sustain their actions."  (A:47-

48).  The government also argued that law enforcement agents were

permitted to rely in good faith on the warrant that was obtained following

the border search.  (A:48).  The district court disagreed, stating that (1)

"there was no binding precedent that authorized a so-called 'routine'

search of Robinson's iPhone on which a reasonable officer could have

relied"; (2) "even if the agents had a good faith basis to believe" they could

search the iPhone with "only reasonable suspicion," that level of

suspicion was not present because the TECS lookout report was stale and

limited; and (3) the later search conducted pursuant to a warrant was not

conducted in good faith because "the magistrate judge was not provided

with critical facts" and the warrant "falsely suggested" the search was conducted with Robinson's consent. (A:343-44). These conclusions are erroneous.

    A.    <u>The Good Faith Exception</u>

        Suppression is not required in every case where a Fourth Amendment violation occurs. *See United States v. Felder*, 993 F.3d 57, 75 (2d Cir. 2021). The Fourth Amendment "says nothing about suppressing evidence obtained in violation of" its requirements; rather, suppression is a remedy created by the Supreme Court to deter future constitutional violations. *Davis v. United States*, 564 U.S. 229, 236-37 (2011). Suppression of evidence must be a court's "last resort, not...[its] first impulse." *See Hudson v. Michigan*, 547 U.S. 586, 591 (2d Cir. 2006). The exclusionary rule, applied to suppress evidence obtained in violation of the Constitution, should only be implemented "where its deterrence benefits outweigh its 'substantial social costs.'" *Id.* It is reserved for those circumstances where law enforcement officers "exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Raymonda*, 780 F.3d at 117-18.

Evidence obtained in violation of the Fourth Amendment during both warrantless searches and searches pursuant to a warrant need not be suppressed when law enforcement officers reasonably believed their actions complied with the law. *United States v. Leon*, 468 U.S. 897, 909 (1984) (citing *Illinois v. Gates*, 462 U.S. 213, 255 (1983) (White, J., concurring)). The reasonable belief in the lawfulness of law enforcement agents' actions exemplifies the purpose of the exclusionary rule, which is to deter wrongful conduct, not punish otherwise law-abiding agents. *See Davis*, 564 U.S. at 240. Suppressing evidence based on a Fourth Amendment violation, without genuine regard for the reasonable beliefs of the law enforcement officials involved in a search, risks converting the exclusionary rule into "a strict-liability regime." *Id.*

A search conducted in violation of the Fourth Amendment is nevertheless entitled to the safe harbor of the good faith exception in several circumstances. As the district court in this case recognized, an officer acts reasonably and in good faith in relying on "binding appellate precedent" when conducting a search. (A:341 (quoting *Davis*, 564 U.S. at 249-50)). Here, "binding precedent refers to the precedent of this Circuit and the Supreme Court." *United States v. Aguiar*, 737 F.3d 251, 261 (2d

Cir. 2013). However, as this Court has explained—which the district court failed to recognize or consider—in "assessing the reasonableness of an officer's mistaken belief that no warrant was required in a particular circumstance, we consider not only our own precedents but also those of other courts." *United States v. Maher*, 120 F.4th 297, 321 (2d Cir. 2024) (citing *Felder*, 993 F.3d at 75-76). Such a situation arises "where prior to [a] Supreme Court ruling, those courts of appeals to have considered [a Fourth Amendment] question had concluded no warrant [was] required." *Id.* (citing *Felder*, 993 F.3d at 75-76).

Further, the good faith exception applies where a law enforcement officer "genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith." *Raymonda*, 780 F.3d at 118. In such circumstances, the good faith exception is only inapplicable:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Id.* (quoting *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011)). These requirements apply in situations of deliberate misconduct and where a law enforcement officer was "reckless or grossly negligent in seeking or executing a warrant." *Id.* (citing *Herring v. United States*, 555 U.S. 135, 144 (2009)). Importantly, "the good faith exception's requirement that an officer act with 'objective reliance' on a magistrate's warrant demands only that the officer exhibit 'reasonable knowledge of what the law prohibits.'" *Id.* at 119 (quoting *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992)). A warrant affiant's "failure to recognize [a legal] deficiency cannot vitiate good faith," where the "legal deficiency was not previously established in precedent." *Id.* (quoting *Clark*, 638 F.3d at 105).

To suppress evidence on the grounds that "an affidavit contain[ed] erroneous information, a defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause or necessity finding." *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013). When a defendant alleges that a material omission

34

caused a warrant to be defective, a reviewing court should correct material omissions and then determine whether it would have been lawful for the warrant to issue. *Id.*

   B.  **The Good Faith Exception Does Not Require Suppression of Evidence from the Border Search or Search Warrant**

      1.  **The Border Officers and Agents Reasonably and In Good Faith Believed They Could Conduct a Limited Manual Search of Robinson's iPhone In These Circumstances**

"In assessing the reasonableness of an officer's mistaken belief that no warrant was required in a particular circumstance, we consider not only our own precedents but also those of other courts." *Maher*, 120 F.4th at 321 (citing *Felder*, 993 F.3d at 75-76). As discussed above, every court of appeals to have considered the issue has determined that a warrant is not required to search a phone at the border, and there is a "consensus among circuits that brief, manual searches of a traveler's electronic device are 'routine' border searches requiring no individualized suspicion." *Mendez*, 103 F.4th at 1310. In light of this legal landscape, and in light of the TECS alert linking Robinson to the purchase of child pornography, CBP officers acted reasonably and in good faith in

proceeding to conduct a brief manual review of Robinson's devices as he entered the country to ensure they did not admit contraband.

Moreover, while this Court has not yet addressed the issue, its most relevant precedent—*United States v. Levy*—also supports the officers' good faith belief. In *Levy*, the Court considered the copying of a defendant's notebook at the border and stated, "[h]ad the CBP officer merely skimmed the notebook and returned it to Levy without copying it, we have no doubt that the inspection would have been routine." *Id.* at 122. The Court ultimately found it unnecessary to reach the issue of whether the inspection and copying of a notebook page was a "routine" or "non-routine" search because it found that reasonable suspicion existed to justify the CBP officer's actions. *Id.* at 122-23. Although the *Levy* Court did not decide whether the facts before it involved a "routine" or nonroutine search, several aspects of its decision are important in the present context of the manual search of a cellphone at the border.

First, in stating, "[h]ad the CBP officer merely skimmed the notebook and returned it to Levy without copying it, we have no doubt that the inspection would have been routine," the Court relied on *United States v. Arnold*, 533 F.3d 1003, 1009 (9th Cir. 2008). In a parenthetical,

the Court stated that *Arnold* held a "border search of an electronic device [is] permissible even without reasonable suspicion where 'CBP officers simply had the traveler boot the laptop up, and looked at what he had inside.'" *Levy*, 803 F.3d at 122-23. Second, the *Levy* Court expressed concern over the copying of data, suggesting that copying was "somewhat more debatable" than mere examination. *Id.* Third, the *Levy* Court reviewed prior Supreme Court and Second Circuit precedents and "suggested that the label 'non-routine' should generally be reserved for intrusive border searches of the *person* (such as body-cavity searches and strip searches), not belongings." *Id.* (emphasis added) (collecting cases). Finally, and importantly, *Levy* was decided in 2015, one year after the Supreme Court's decision in *Riley*, and nevertheless reiterates the breadth of the government's search powers at the border. Thus, CBP officers could reasonably rely on *Levy* to believe that a manual review of Robinson's iPhone, without the assistance of technology or the forensic copying of the device, fell comfortably within CBP's border search authority.

The district court's efforts to distinguish *Levy* fall short. The district court discounted *Levy* because it "did not involve any sort of

electronic evidence." (A:348). Nevertheless, given its citation of *Arnold*, and given similar precedents in the electronic evidence context from other courts of appeals, it is reasonable for officers and agents to apply and rely on *Levy*, in combination with uniform out-of-circuit authority, in the present context.

The district court improperly relied on *United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016) (en banc), to suggest that "all binding appellate precedent in 2022 strongly supported the…conclusion" that the search of a cellphone would be "nonroutine." In *Ganias*, a case involving the government's retention of lawfully acquired electronic data from three hard drives and its subsequent search pursuant to a warrant several years later, this Court found the good faith exception applied and did not reach the issue of whether a Fourth Amendment violation occurred. *Id.* at 200. Although the Court's decision upheld the government's search, it recognized the important privacy interest implicated by electronic devices' immense storage capacity. *Id.* at 217.

*Ganias* does not undermine the good faith belief of the officers in this case that their actions were lawful. First, although *Ganias* discusses the unique status of digital devices, as discussed above, other

precedent suggested that manual reviews of devices were constitutionally permissible. A reasonable CBP officer could have been aware of the particular privacy interests implicated by a search of a device, as discussed in *Ganias*, and still believed that a warrantless search of an electronic device was lawful under certain warrant exceptions alluded to in *Riley*. Second, like *Riley*, *Ganias* had nothing to do with the border and the unique governmental interests in interdicting contraband and investigating border crimes which underpin the border search exception. Third, *Ganias* involved the copying and retention of electronic data. Here, agents searched Robinson's iPhone for approximately fifteen minutes and did not copy or retain its data.

The district court also erred in concluding that "[i]t is important to note that all an officer may rely on in good faith is binding precedent." (A:349). This statement fails to acknowledge this Court's guidance that, "[i]n assessing the reasonableness of an officer's mistaken belief that no warrant was required in a particular circumstance, we consider not only our own precedents but also those of other courts." *Maher*, 120 F.4th at 321 (citing *Felder*, 993 F.3d at 75-76).

On this point, *Maher* is especially instructive. In *Maher*, the defendant uploaded a file containing child pornography to his Google email account and Google, using an algorithm and without any employee viewing the file, determined that it matched another file previously found to contain child pornography. *Id.* at 303. Google then sent it to the National Center for Missing and Exploited Children, which forwarded the report to the New York State Police. *Id.* at 303-04. Then, without obtaining a search warrant, a police investigator opened the file and saw that it contained child pornography. *Id.* at 304. Only after opening and viewing the contents of the file did law enforcement agents obtain a search warrant for the defendant's Google accounts. *Id.* Upon executing the warrant, investigators found the same file containing child pornography in one of the defendant's accounts. *Id.* They then obtained a warrant for the defendant's residence and seized thousands of images containing child pornography. *Id.*

Following his indictment for child pornography offenses, Maher moved to suppress the evidence against him, arguing it was the fruits of law enforcement agents' illegal search of the electronic file provided by Google. *Id.* The *Maher* district court denied the motion

based on the private search doctrine—which authorizes law enforcement agents to repeat, without a warrant, a search already conducted by a private party—and the good faith exception. *Id.* at 305. The district court found that, even if the initial warrantless search of the file provided by Google was unconstitutional, the state police investigator who conducted it "had an objectively good faith basis to believe that no warrant was necessary." *Id.*

This Court affirmed the district court's denial of Maher's suppression motion—it found that the private search doctrine did not justify the state police investigator's warrantless search of the file because Google had never actually conducted a search, but upheld the search under the good faith exception. *Id.* at 318-20. In so doing, this Court recognized that, at the time of the search, "neither the Supreme Court nor this [C]ourt had considered whether a warrant [wa]s required to open and visually examine a digital image that the service provider has reported depicts child pornography" based on a hash value comparison alone. *Id.* at 321. However, the court of appeals that had considered the issue prior to the search—the Fifth Circuit—"had held that no warrant was required"; another appellate court—the Sixth

Circuit—later reached the same conclusion. *Id.* Only a year after the challenged search did the Ninth Circuit reach the opposite conclusion. *Id.* Given these circumstances—the lack of precedent from both this Court and the Supreme Court and the supportive precedent from other circuits—this Court held that "it was objectively reasonable for [the investigator] to think that she did not need a warrant to visually examine the Maher file image reported by Google." *Id.*

*Maher*'s rationale justifies the manual border search conducted by Nunes and establishes that she conducted it in good faith. At the time of Nunes's search of Robinson's iPhone in November 2022, the only courts of appeal to consider whether the Fourth Amendment permitted suspicionless manual border searches of cellphones had held that such searches were "routine" and therefore constitutional. *See*, *e.g. Alasaad*, 988 F.3d at 19 ("We thus agree with the holdings of the Ninth and Eleventh Circuits that basic border searches are routine searches and need not be supported by reasonable suspicion."); *Cano* 934 F.3d at 1016, 1018 ("[W]e hold that manual searches of cell phones [for contraband] at the border are reasonable without individualized suspicion."); *Touset*, 890 F.3d at 1233 (holding that both basic and

forensic searches of cellphones at the border can be conducted without individualized suspicion); *see also United States v. Kolsuz*, 890 F.3d 133, 140, 144 (4th Cir. 2018) (holding that a forensic search of a cellphone was nonroutine but discussing prior circuit precedent stating a manual search was routine). Following the November 2022 search, the Fifth and Seventh Circuits held the same. *See e.g., Mendez*, 103 F.4th at 1310 ("We therefore agree with the consensus among circuits that brief, manual searches of a traveler's electronic device are 'routine' border searches requiring no individualized suspicion."); *Castillo*, 70 F.4th at 898 ("[W]e hold that no reasonable suspicion is necessary to conduct the sort of routine manual cell phone search at the border that occurred here."). Indeed, to date, not a single court of appeals has held otherwise.[6]

Against the backdrop of this precedent, Nunes acted reasonably and in good faith in conducting a limited manual search of Robinson's iPhone at the border. Therefore, even were her manual

---

[6] The Ninth Circuit has limited the use of border searches of electronic devices by explaining that the search must be for contraband. *See Cano*, 934 F.3d at 1018.

search later found to be a Fourth Amendment violation, suppression is not warranted.

### 2. The Search of the iPhone Was Supported by Reasonable Suspicion

After finding that the search of Robinson's iPhone was nonroutine, the district court concluded that a reasonable CBP officer would have believed that, at minimum, such a search required reasonable suspicion. (A:350-51). The district court, citing the general nature and age of the TECS lookout report, concluded that reasonable suspicion for the search was not present. (A:357-58). In the court's view, because reasonable suspicion was absent and the corrective value of suppression outweighed the costs to society, the search was not entitled to the good faith exception's protections. (A:364, 366-67). This was wrong.

Even if the search of Robinson's phone was "nonroutine" and required reasonable suspicion, the CBP officers involved in the search had the requisite level of suspicion. The CBP officers were permitted to rely on the TECS lookout, which stated that Robinson was linked to the

44

purchase of child pornography and his electronic devices should be searched.

"Reasonable suspicion requires only a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Levy*, 803 F.3d at 123. "A reasonable suspicion inquiry simply considers, after taking into account all of the facts of a particular case, whether the border official had a reasonable basis on which to conduct the search." *Irving*, 452 F.3d at 124. It "depends upon both the content of the information possessed and its degree of reliability." *United States v. Bold*, 19 F.3d 99, 102 (2d Cir. 1994) (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)).

Here, the TECS report provided CBP with a reasonable basis upon which to conduct the search. It stated that Robinson was linked to the purchase of child pornography. In addition, the TECS lookout was placed by the NTC, which serves as CBP's intelligence hub and is staffed by analysts who investigate criminal activity and disseminate their findings throughout the agency. As discussed at the hearing before the district court, a TECS lookout placed by an NTC analyst is entitled to

45

greater weight than a lookout placed by another source. (A:120-21, 185).

As the Third Circuit recognized in *United States v. Whitted*,

> As a general matter, customs officers should be able to rely on data provided by computer reports to create reasonable suspicion for a search. If they cannot, their hands would be tied until they either independently investigated the individual or contacted each source for the report to confirm its validity. Just as a customs officer is entitled to rely on unconfirmed information relayed to him by his supervisor in order to look out for and search an individual at the border, so too is a customs official permitted to rely on TECS information entered by other customs officials to create reasonable suspicion for a search.

541 F.3d 480, 490 (3d Cir. 2008).

Although the district court criticized the fact that CBP officers only had the TECS report on which to rely, and criticized the passage of time between the creation of the lookout and the search of Robinson's iPhone, this criticism overlooks the nature of child sexual abuse material. As Stepien testified, people who collect this material do so over the course of years and, in his experience, they usually collect it until they get caught. (A:203). Stepien explained that he has examined devices where child sexual abuse material had been shared "like trading cards" between collectors. (A:204). This testimony aligns with this Court's reflection in

*Irving* about the nature of child pornography, that "the staleness determination is unique because it is well known that 'images of child pornography are likely to be hoarded by persons interested in those materials.'" 452 F.3d at 125. The *Irving* Court further remarked that "[t]he age of the supporting facts and the nature of the unlawful conduct is helpful in determining whether the information is stale…." *Id.*

"[N]umerous courts have recognized that digital files remain on computers for extensive periods of time, even if they have been deleted…[and] many courts have suggested that the staleness issue in the context of digital evidence is somewhat unique, and the passage of time does not necessarily render the evidence stale." *United States v. Coon*, No. 10-CR-110A, 2011 WL 1871165, at *3 (W.D.N.Y. May 16, 2011); *see also United States v. Ricciardelli,* 998 F.2d 8, 12 n.4 (1st Cir. 1993) ("[H]istory teaches that collectors [of child pornography] prefer not to dispose of their dross, typically retaining obscene materials for years."), *overruled on other grounds*; *United States v. Cox*, 190 F. Supp. 2d 330, 333 (N.D.N.Y. 2002) ("In child pornography cases, courts have repeatedly recognized that collectors of child pornography tend to retain this material."). Therefore, in this case, the passage of only three years since

47

the initial entry of the TECS report does not defeat Nunes's reasonable suspicion upon viewing the lookout.

Further, the fact that Nunes, the CBP officer who searched Robinson's iPhone after viewing the TECS lookout, may not have had the same level of expertise as Stepien, does not alter the reasonable suspicion analysis. As the Supreme Court has held, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138 (1978). A reviewing court must consider "the totality of the circumstances." *United States v. Salazar*, 945 F.2d 47, 50 (2d Cir. 1991) (collecting cases). Further, whether evidence is stale is a legal question. *United States v. Keith*, 183 F. Supp. 3d 427, 432 (S.D.N.Y. 2016) (citing *Irving*, 452 F.3d at 125).

Here, Nunes based her search on an objective piece of information—the TECS report entered by the NTC—which stated that Robinson was linked via FinCEN to the purchase of child sexual abuse material. She then encountered Robinson, who was carrying multiple

electronic devices, and conducted manual searches of them. Objectively, the search was justified by reasonable suspicion because the officer was looking for child sexual abuse images which were likely to have remained on Robinson's devices for an extended period.

### 3. Agent Stepien Did Not Mislead the Magistrate Judge

The district court held that the warrant affidavit misled the magistrate judge and, as a result, the government could not rely in good faith on the search warrant. (A:376). The court believed that the warrant affiant, Stepien, intentionally omitted background information regarding the TECS lookout report to prevent the magistrate judge from "ask[ing] questions." (A:375-76). It further held that the use of the word "voluntarily," to describe Robinson's provision of his password to the CBP officers, was intended to trick the court into believing that Robinson had consented to the search. (A:376). This was wrong.

The Court's conclusion that Stepien intentionally or recklessly misled the magistrate judge is erroneous, with no basis in the record. At the outset, the district court's conclusion regarding the magistrate judge being misled rests entirely on Robinson's unfounded suggestion and the court's own speculation. Other than a vague reference

49

to "Stepien's demeanor at the hearing" (A:374)—a comment which the district court failed to explain or clarify by way of example—the court's opinion neither cites nor relies upon Stepien's testimony as the basis for its decision. Instead, the court focused on what Stepien's warrant application did or did not say and concludes that Stepien must have been intending to mislead the magistrate judge.[7] The district court's analysis is undermined by this Court's prior precedents and explanation of the parameters of the border search doctrine.

a. Information Regarding the TECS
Lookout Report was Unnecessary

The district court's decision states that Stepien "notably omitted from the search warrant affidavit…any mention of the November 2019 TECS hit: *i.e.*, the very reason why Robinson was referred to secondary inspection to have his devices searched." (A:372). The court

---

[7] In support of its conclusion that Stepien lacked good faith, the district court cited his affidavit's statement that he was applying for the warrant "out of an abundance of caution to be certain that an examination of the Subject Device will comply with the Fourth Amendment." (A:375). This, according to the district court, was evidence that Stepien sought to "sanitize the earlier warrantless search." (*Id.*). This conclusion is erroneous. Stepien's efforts—seeking a warrant—evince an effort to comply with the Fourth Amendment, not disregard it.

stated that this information has "Fourth Amendment implications" because, according to the court, Stepien knew that the "established caselaw distinguishes between 'routine' and 'nonroutine' searches, and limits the circumstances under which border agents may conduct a search" that is nonroutine. (A:373). Further, the court claims that by "citing to the Second Circuit case *Levy* for the general propositions of law regarding 'routine' border searches, and describing the search only in generic, passive-voice terminology...Stepien falsely indicated to the magistrate judge that what occurred was nothing more than a routine, suspicionless search of a randomly selected traveler." (*Id.*).

The district court's characterization of the warrant affidavit is incorrect. At the outset, there is nothing inherently suspicious about omitting information from a search warrant—especially information, like the lookout here, that *augments* rather than detracts from probable cause. Information may be omitted from an application in the interest of protecting other concerns. For example, in national security cases, the government may possess classified information which, although highly relevant to an investigation, cannot lawfully be included in an unclassified search warrant application. In cases involving civilian

witnesses or victims, applications may intentionally omit relevant information provided by a witness to protect their identity and the fact that they cooperated with law enforcement investigators. An affiant might also withhold information from a search warrant if there are concerns that the information was illegally obtained. By including only lawfully obtained information which by itself establishes probable cause, an affiant may both avoid a constitutional violation and a later suppression challenge. *See United States v. Marchand*, 564 F.2d 983, 992-94 (2d Cir. 1977) (discussing the denial of suppression motions when an independent basis, separate from illegally obtained evidence, supported a search). Further, information might be omitted from an application to protect law enforcement sources and methods. As relevant here, such methods include the use of TECS lookouts to guide CBP officers in conducting secondary inspections and interdicting contraband. Avoiding widespread publicity of investigative sources and methods, whenever possible, better preserves them for future use and effectiveness. Indeed, Stepien testified at the hearing that it was not his practice to direct targets of investigations to the methods used by law enforcement agents to identify them. (A:223).

A warrant affiant is never expected to include every bit of information gathered during an investigation in a warrant affidavit. *See United States v. Awadallah*, 349 F.3d 42, 67-68 (2d Cir. 2003). An intentional decision not to include certain material in an application is perfectly acceptable. If it were not, every warrant application would risk a constitutional violation. *Id.* at 68. An omission must have been "designed to mislead" for there to have been a Fourth Amendment violation. *Id.*

In finding that the warrant application omitted information with "Fourth Amendment implications," the district court relied on *United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996). (A:373). In *Reilly*, a case involving the search of real property and the unlawful search of the property's curtilage, this Court considered a premises warrant application which contained information obtained during a prior search of the property. 76 F.3d at 1280. There, the warrant application failed to include information this Court deemed "crucial" because without it, the issuing court could not possibly determine whether the information in the warrant was obtained from within the property's curtilage, in violation of the Fourth Amendment. *Id.* at 1280-81. Therefore, the *Reilly*

court found the omission of this information prevented a good faith finding and affirmed suppression of evidence obtained following the execution of a search warrant. *Id.* at 1283.

Here, the district court's decision suggests that Stepien intentionally withheld information about why Robinson was stopped to mislead the magistrate judge into thinking the search was "routine" and to prevent the magistrate judge from "ask[ing] questions" about whether law enforcement agents had reasonable suspicion for the search. (A:373, 375). As discussed below, there was no likelihood that the magistrate judge reviewing the warrant application could have been misled.

First, the district court appears to conflate a "routine" search for the purposes of the border search doctrine and a "routine" or "random" secondary inspection, *i.e.*: one in which a traveler is chosen at random to be searched. This conflation is wrong and incorrectly compares two different issues. This Court explained this important distinction in *United States v. Irving*, and why the reason for the search does not matter:

> [W]e reason that the validity of a border search does not depend on whether it is prompted by a criminal investigative motive.

> As pretext should not determine the validity of a border search, it also should not determine whether a border search is routine (meaning it does not require reasonable suspicion). Rather, as we have earlier held, the level of intrusion into a person's privacy is what determines whether a border search is routine.

452 F.3d at 123. Therefore, whether the border search in this case was "routine" for purposes of the border search exception has nothing to do with why the search was conducted. Rather, this search was routine because of how it was conducted and what was searched. The court's decision completely ignores this distinction, suggesting that the pretext for the search somehow rendered it nonroutine and that the agent sought to hide this fact.

This misapplication of the border search doctrine explains why the court placed such heavy reliance on *Reilly*. If it was true—which it is not—that pretextual searches violated the Fourth Amendment, then failing to provide the magistrate judge with any information about why a search was initiated would risk a constitutional violation. Here, the district court suggests that if Robinson had not been suspected of any criminality at all, then it would have been proper to label the search as "routine," but because he was suspected of criminality, the search was

55

nonroutine. (*See* A:373 ("Agent Stepien falsely indicated to the magistrate judge that what occurred was nothing more than a routine, suspicionless search of a randomly selected traveler.")). But as *Irving* explains, in the border search context, the level of intrusion of the search itself, not the reason why the subject was stopped, determines what level of suspicion—if any—was necessary. 452 F.3d at 123. Evidently, "it would make little sense to allow random searches of any incoming passenger, without reasonable suspicion, but require reasonable suspicion for searches of passengers that are suspected of criminal activity." *Id*. Since the reason why Robinson was stopped has no bearing on whether the search of his iPhone violated the Fourth Amendment, its omission from the search warrant application should have no impact on the Fourth Amendment analysis and was not material. *See Rajaratnam*, 719 F.3d at 146 (explaining that only material omissions are of concern when considering the validity of a warrant).

Second, the citation to *Levy* in the warrant affidavit is accurate (and demonstrates the officers' and agents' good faith reliance on binding precedent). As *Levy* states, "we recognize the Federal Government's broad plenary powers to conduct so-called 'routine'

searches at the border even without 'reasonable suspicion that the prospective entrant has committed a crime.'" 803 F.3d at 122 (citing *Tabbaa v. Chertoff*, 509 F.3d 89, 97-98 (2d Cir. 2007)). Here, the warrant application states that CBP "manually" reviewed the device. (A:13). The agent—in light with several circuit courts as discussed at length above—reasonably believed a manual review was a "routine" search for purposes of the border search doctrine. The district court's Order suggests that Stepien—in the face of multiple favorable precedents from other circuits and within this Circuit—concluded that the courts that had examined the issue were possibly wrong on the law, a change was afoot, and he would have to convince the court that the border search was lawful. Under this view, despite no precedent to the contrary, Stepien had recognized a potential future problem and strategically drafted his application to prevent questions which might undermine the search. Such speculation is unfounded. Stepien cannot be said to have intentionally misled the court if he genuinely believed what was in the warrant application was accurate. In this case, the information was objectively accurate. There is no suggestion—nor could there be—that Stepien misstated what this Court said in *Levy* or misrepresented that

57

the search was a manual search as opposed to an advanced forensic search.

Third, the district court's decision erroneously failed to give the issuing magistrate judge the deference to which he was entitled. There can be no doubt that on its face the warrant application sought to search a cellphone seized at the border which had already been manually reviewed by CBP. (*See* A:11-22). The magistrate judge was clearly on notice that the affiant believed the manual search was a routine search. If the magistrate judge—tasked with knowing and applying the law— believed that manual searches could not be conducted without reasonable suspicion, he would have had little trouble rejecting the warrant. The district court's decision implies the magistrate judge would have been misled into approving the search because Stepien stated a legal conclusion, labeling the search as "routine." But search warrant applications by nature advocate that the correct legal ingredients— including the existence of probable cause—are present and permit a search. It is always the magistrate judge's duty—not the affiant's—to interpret the law, make legal conclusions, and ensure that a search will be lawful. *See United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir.

58

1985) (explaining that magistrate judges interpret the law in the context of a warrant application).

Fourth, given the state of the law in November 2022, it was erroneous to conclude that a magistrate judge who signed a warrant, which on its face provided no indicia of prior suspicion, would have refused to sign the warrant had he known the underlying reason (*i.e.*: the suspicion) for the border search. If anything, had the affidavit included information about the TECS lookout, the magistrate judge would have been more likely to sign the warrant. *Cf. Rajaratnam*, 719 F.3d at 155 ("On a more fundamental level, we cannot conclude that the government omitted certain information about the SEC investigation with 'reckless disregard for the truth' when it is clear that fully disclosing the details of that investigation would have *strengthened* the wiretap application's 'necessity' showing."). The court based its finding not on evidence developed at the hearing but on inappropriate speculation about why the TECS report was not discussed in the warrant application. Its decision—aside from a negative stray remark about on Stepien's demeanor at the

59

hearing[8]—does not rest on hearing testimony.[9]  Instead, the court surmised reasons why Stepien would have misled the court.  In engaging in this inappropriate speculation—based upon assumption, not fact—the court reached the unreasonable conclusion that the magistrate judge was tricked into approving a search based on no suspicion but may not have signed a warrant which discussed a search based on at least some suspicion.  This tortured logic simply does not follow.  It is clearly erroneous.

> **b.    The Warrant Did Not Mislead the Magistrate Judge Regarding Robinson's Consent to a Search**

The district court concluded that the warrant application's

---

[8]    The court's comment on the agent's demeanor finds no basis in the record.  Stepien testified very briefly, in comparison to Nunes.  Nothing in the record suggests his answers to questions posed by defense counsel or the court were evasive or misleading.  In many circumstances, he quickly agreed with defense counsel about certain facts.  (*See* A:215 (agreeing that there was no mention of the TECS report in the search warrant affidavit)).  The record does not reflect any incidents in which the court admonished him or otherwise instructed him to give a more forthcoming answer.

[9]    The only relevant testimony was that of Stepien, who stated that at the time he applied for the search warrant he believed that CBP's observations of the contents of the defendant's phone were lawfully obtained.  (A:222).

statement that "Robinson 'voluntarily gave CBP officers the password' for his phone…strongly implied that, even if the search was not valid under the border search exception, it was a 'consent search.'" (A:376). It further concluded that "it is a fair inference that this information was included to falsely imply that the search was performed only because Robinson 'voluntarily' consented to it." (A:378). This conclusion—that stating Robinson "voluntarily" provided the password was an attempt to deceive the magistrate judge into believing Robinson consented to the search—is unreasonable, erroneous, and finds no support in the record.

First, in the context of this case, which clearly hinges upon the application of the border search doctrine, the suggestion that the magistrate judge would have been so easily deceived fails to give proper deference to the magistrate judge's decision to issue the warrant. The warrant is clear that the device was searched under the border search exception to the warrant requirement. The border search doctrine and consent are two distinct exceptions to the Fourth Amendment's warrant requirement. The application's reliance on *Levy* and the border search exception negates any serious argument that Stepien intended to suggest

that agents performed a search simply because Robinson had consented to it.

Not only were the statements in the warrant affidavit clear, but Stepien testified consistently with the affidavit at the hearing and his narrative was uncontroverted. When asked how CBP learned about the images on Robinson's iPhone of children being raped, Stepien testified, "[t]hey had done a border search and they did a manual review of the devices[,] and they witnessed what they believed to be…CSEM and that's when they called HSI to confirm." (*See* A:207). Nothing in Stepien's testimony suggests he believed the border search was a flawed basis to review the contents of Robinson's iPhone. Rather, Stepien affirmed that he believed CBP's border search was lawful. (A:222). On this record, there was no basis to conclude that Stepien believed the warrant he sought could only be obtained if he "falsely impl[ied] that the search was performed only because Robinson 'voluntarily' consented to it." (A:378). Indeed, the opposite is true. The search warrant and record show that Stepien believed the search performed was a lawful border search and had no reason to believe any sort of deception would be necessary. Any other conclusion is based not on the facts as stated in the

62

record and established at the hearing but rather on unsupported speculation.

Second, a plain reading of the warrant affidavit does not imply that Robinson gave consent for the agents to search his iPhone. The application does not speak in terms of consent, and the word "consent" appears nowhere on its face. By contrast, the word "border" appears throughout the application. (*See* A:11-22). Although not discussed by the district court, the application only cites a border search as the method for which the iPhone came into law enforcement agents' possession. (*See* A:14). It states, "[t]he Subject Device came into HSI's possession in the following way: it was detained pursuant to a border search of ROBINSON." (*Id.*). The application does not say—and does not imply— that Robinson consented to HSI's search or detention of the device. It does not "imply that the search was performed *only* because Robinson 'voluntarily' consented to it," as the court concluded. (A:378). The insinuation that the warrant implied the search was a consent search was made from whole cloth.

Third, the language at issue used in the search warrant refers to how law enforcement agents obtained the iPhone's password. The

63

terms "voluntary" and "voluntariness" are properly associated with statements made by defendants in criminal cases. *See, e.g.*, *United States v. Okwumabua*, 828 F.2d 950, 952-53 (2d Cir. 1987) (examination whether a defendant's statements were voluntarily made). As this Court has held:

> the test of voluntariness of a confession is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear the defendant's will to resist and bring about confessions not freely self-determined.

*Id.* Traditionally, a defendant's statements are considered involuntary when he has been subjected to "threats, physical coercion, or protracted interrogation." *Id.* at 953 (citing *United States v. Mast*, 735 F.2d 745, 749 (2d Cir 1984)). Importantly, a defendant's statement can still be voluntary even when he has not been informed of facts that might be "useful" in his decision about whether to speak with or provide information to law enforcement officers. *See id.* A magistrate judge, who is tasked with knowing and applying the law, would understand that in the warrant application, the term "voluntary" referred to Robinson's

statement providing the password, not the ensuing search of his device which, as stated in the warrant affidavit, was a border search.[10]

Here, there was no suggestion that Robinson's giving the password to Nunes was anything other than "voluntary" within the legal meaning of that word. Therefore, the affidavit's description of the Robinson voluntarily providing the password is factually accurate. Nunes's testimony in this matter further corroborates this point. At the hearing, she testified that she neither threatened Robinson nor promised him anything before he gave her the passwords for his devices. (*See*

---

[10] The district court's citation to *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), (A:377), is inapt. The Order claims "a search is not voluntary if 'granted only in submission to lawful authority'" and cites *Schnekloth*. (A:377). However, *Schneckloth* states that consent is involuntary when "granted only in submission to a *claim* of lawful authority." *Schneckloth*, 412 U.S. at 233 (emphasis added). This distinction is critical. *Schneckloth*'s discussion of "a *claim* of lawful authority" focuses on *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968), a case where law enforcement officers lied to a home's occupant and claimed they had a warrant when they did not. Such an egregious scenario is not present in this case.

A:127).  Including a truthful statement in a warrant application could hardly be the basis for concluding that the application was misleading.[11]

In the final analysis, the question of whether Robinson consented to the search was of no moment at the time the search warrant issued.  Robinson's consent was not necessary because under its border search powers and existing precedent, the officers and agents reasonably, and in good faith, believed that they had the authority to conduct a limited manual search of Robinson's iPhone pursuant to the TECS alert.

---

[11]  Notably, Robinson did not challenge the voluntariness of his statement providing the password or move to suppress the contents of his iPhone on the basis that it was the fruit of a constitutional violation.

## CONCLUSION

For the reasons stated above, the district court's suppression order should be reversed.

Dated:      Brooklyn, New York
            September 5, 2025

                        Respectfully submitted,

                        JOSEPH NOCELLA, JR.,
                        *United States Attorney*,
                        *Eastern District of New York*.

            By:   /s/ GILBERT REIN
                        GILBERT REIN
                        Assistant U.S. Attorney


SARITHA KOMATIREDDY,
GILBERT REIN,
*Assistant United States Attorneys*,
        (*Of Counsel*).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 12,438 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
            September 5, 2025

                                        /s/ SARITHA KOMATIREDDY
                                        SARITHA KOMATIREDDY
                                        Assistant U.S. Attorney

APPENDIX

# TABLE OF CONTENTS

Page

Docket Sheet,
*United States v. Jason Robinson*, No. 23-CR-192 (NRM) ................... A1

Application for a Search Warrant,
*United States v. Jason Robinson*, No. 23-CR-192 (NRM)
November 21, 2022 ................................................................. A11

Search Warrant,
*United States v. Jason Robinson*, No. 23-CR-192 (NRM)
November 21, 2022 ................................................................. A26

Government Memorandum in Opposition to Motion to Suppress,
*United States v. Jason Robinson*, No. 23-CR-192 (NRM)
August 9, 2024 ...................................................................... A31

Transcript of Suppression Hearing,
*United States v. Jason Robinson*, No. 23-CR-192 (NRM)
January 8, 2025 ..................................................................... A73

Suppression Hearing Exhibit,
*United States v. Jason Robinson*, No. 23-CR-192 (NRM)
GX101 ................................................................................. A233

Transcript of Oral Argument on Motion to Suppress,
*United States v. Jason Robinson*, No. 23-CR-192 (NRM)
January 15, 2025 .................................................................... A237

Government Letter Regarding Authorities Raised at Oral Argument,
*United States v. Jason Robinson*, No. 23-CR-192 (NRM)
February 19, 2025 .................................................................. A315

Memorandum and Order Granting Motion to Suppress,
*United States v. Jason Robinson*, No. 23-CR-192 (NRM)
May 9, 2025 .......................................................................... A320

Notice of Appeal,
*United States v. Jason Robinson*, No. 23-CR-192 (NRM)
June 3, 2025 ......................................................................... A380

Query    Reports    Utilities    Help    Log Out

APPEAL

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:23-cr-00192-NRM All Defendants

Case title: USA v. Robinson                    Date Filed: 05/01/2023

---

Assigned to: Judge Nina R. Morrison

**Defendant (1)**

**Jason Robinson**                 represented by    **Benjamin Zev Yaster**
                                                     Federal Defenders of New York, Inc.
                                                     One Pierrepont Plaza, 16th Floor
                                                     Brooklyn, NY 11201
                                                     718-330-1291
                                                     Fax: 718-855-0760
                                                     Email: benjamin_yaster@fd.org
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: Public Defender or*
                                                     *Community Defender Appointment*

**Pending Counts**                                   **Disposition**

18:2252(a)(1), 2252(b)(1) and 3551 et
seq. - TRANSPORTATION OF CHILD
PORNOGRAPHY
(1)

18:2252(A)(4)(B),2252(b)(2) AND 3551
seq. - POSSESSION OF CHILD
PORNOGRAPHY
(2)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                **Disposition**

None

**Highest Offense Level (Terminated)**

None

| Complaints | Disposition |
|---|---|
| None | |

**Plaintiff**

**USA**        represented by **Gilbert Rein**
DOJ-USAO
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6407
Email: gilbert.rein@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

**Sean Michael Fern**
United States Attorney's Office for the
Eastern Distric
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6195
Email: sean.fern2@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/01/2023 | 1 | SEALED INDICTMENT as to Jason Robinson (1) count(s) 1, 2. (Attachments: # 1 Criminal Information Sheet) (FP) (Additional attachment(s) added on 5/2/2023: # 2 Sealing Cover Sheet) (FP). (Entered: 05/02/2023) |
| 05/17/2023 | 3 | Order to Unseal Indictment as to Jason Robinson. It is ordered that the indictment and arrest warrant be unsealed in their entirety. Ordered by Magistrate Judge Ramon E. Reyes, Jr on 5/17/2023.(Attachments: # 1 Application) (FP) (Entered: 05/17/2023) |
| 05/31/2023 | 4 | Minute Entry for proceedings held before Magistrate Judge Taryn A. Merkl: Arraignment as to Jason Robinson (1) Count 1,2 held on 5/31/2023. AUSA Joshua Dugan for Gilbert Rein; Federal Defender Benjamin Yaster and Clerk Michele Sica. Initial Appearance as to Jason Robinson held on 5/31/2023. Bond Set at $50,000.00, Defendant released. 1 Surety sworn, advised of bond obligations by the Court and signed the bond. Order of Excludable Delay/Speedy Trial entered Start 5/31/2023 Stop 7/11/2023. Brady Act Ordered on the record. Plea entered by Jason Robinson (1) Count 1,2. by Jason Robinson Not Guilty To all counts., ( Status Conference set for 7/11/2023 02:30 PM in Courtroom 6E North before Judge Nina R. Morrison.) (FTR Log #11:45-12:12.) (JC) (Entered: 06/01/2023) |
| 05/31/2023 | 5 | CJA 23 Financial Affidavit by Jason Robinson. (JC) (Entered: 06/01/2023) |

| 05/31/2023 | 6 | ORDER TO CONTINUE - Ends of Justice as to Jason Robinson Time excluded from 5/31/2023 until 7/11/2023. Ordered by Magistrate Judge Taryn A. Merkl on 5/31/2023. (JC) (Entered: 06/01/2023) |
|---|---|---|
| 05/31/2023 | 7 | ORDER Setting Conditions of Release as to Jason Robinson (1) $50,000.00. Ordered by Magistrate Judge Taryn A. Merkl on 5/31/2023. (JC) (Entered: 06/01/2023) |
| 05/31/2023 | 8 | REDACTION by Jason Robinson to 7 1 - Sealed Document CR, Order Setting Conditions of Release. (JC) (Entered: 06/01/2023) |
| 05/31/2023 | 9 | ORDER: This order is entered pursuant to Federal Rule of Criminal Procedure 5(f) to confirm the prosecution's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations as to Jason Robinson. Ordered by Magistrate Judge Taryn A. Merkl on 5/31/2023. (JC) (Entered: 06/02/2023) |
| 06/06/2023 | 10 | Rule 5(c)(3) Documents Received as to Jason Robinson. (JC) (Entered: 06/06/2023) |
| 06/06/2023 | | Arrest of Jason Robinson in Pennsylvania on May 16, 2023. (JC) (Entered: 06/06/2023) |
| 06/06/2023 | 11 | CJA 23 Financial Affidavit by Jason Robinson. (JC) (Entered: 06/06/2023) |
| 07/06/2023 | 12 | Consent MOTION for Protective Order by USA as to Jason Robinson. (Attachments: # 1 Stipulation and Proposed Order) (Rein, Gilbert) (Entered: 07/06/2023) |
| 07/06/2023 | 13 | Consent MOTION for Special Appearance *to convert July 11, 2023 in-person status conference to remote proceeding* by Jason Robinson. (Yaster, Benjamin) (Entered: 07/06/2023) |
| 07/07/2023 | | ORDER granting 13 Motion for Special Appearance as to Jason Robinson. The in-person status conference scheduled for July 11 at 2:30 p.m. has been modified to a video conference. The parties will be provided a video access link via email in advance of the conference. Ordered by Judge Nina R. Morrison on 7/7/2023. (FV) (Entered: 07/07/2023) |
| 07/07/2023 | 14 | Letter *Regarding Rule 16 Discovery* as to Jason Robinson (Rein, Gilbert) (Entered: 07/07/2023) |
| 07/07/2023 | 15 | ORDER granting 12 Motion for Protective Order as to Jason Robinson. Ordered by Judge Nina R. Morrison on 7/7/2023. (FV) (Entered: 07/07/2023) |
| 07/11/2023 | | SCHEDULING ORDER: The status conference previously scheduled for July 11, 2023 has been adjourned to July 14, 2023, at 2:00PM via video conference. Time is excluded in furtherance of ends of justice from July 11, 2023 to July 14, 2023. Ordered by Judge Nina R. Morrison on 7/11/2023. (FV) (Entered: 07/11/2023) |
| 07/14/2023 | | Minute Entry for proceedings held before Judge Nina R. Morrison: Video Status Conference as to Jason Robinson held on 7/14/2023. AUSA Gilbert Rein appeared. Federal Defender Benjamin Yaster appeared along with Defendant. Parties informed the court that initial discovery productions have been made. The Government confirmed its understanding of its continuing obligation to seek out and disclose Brady material to the defense during this time. The next status will be held on September 13, 2023 at 10:30AM. In light of the ongoing discovery productions and |

| | | |
|---|---|---|
| | | discussion of resolution short of trial, the governments application to exclude time under the Speedy Trial Act is granted. In the interest of justice, time is excluded through September 13, 2023. (Court Reporter Linda Danelczyk) (FV) (Entered: 07/14/2023) |
| 09/12/2023 | 16 | Letter *Regarding Rule 16 Discovery* as to Jason Robinson (Rein, Gilbert) (Entered: 09/12/2023) |
| 09/13/2023 | | Minute Entry for proceedings held before Judge Nina R. Morrison: Video Status conference as to Jason Robnson held on 9/13/2023. AUSA Gilbert Rein appeared. Federal Defender Benjamin Yaster appeared along with Defendant. Parties informed the court as to the status of discovery and discussions of resolutions short of trial. The parties shall advise the court by a status letter on or before December 12 as to the status of the defenses counter-proposal, the status of review of discovery, and the parties requested date for the next status conference. In the interest of justice and for the reasons stated on the record, time is excluded through December 12, 2023. (Court Reporter Avery Armstrong) (FV) (Entered: 09/13/2023) |
| 09/13/2023 | | ORDER TO CONTINUE - Ends of Justice as to Jason Robinson. Time excluded from 9/13/2023 until 12/12/2023. Ordered by Judge Nina R. Morrison on 9/13/2023. (FV) (Entered: 09/13/2023) |
| 12/11/2023 | 18 | STATUS REPORT *and request for 60-day exclusion of time* by Jason Robinson (Yaster, Benjamin) (Entered: 12/11/2023) |
| 12/12/2023 | | ORDER: The Court is in receipt of 18 STATUS REPORT *and request for 60-day exclusion of time*. A video status conference is scheduled for January 30, 2024 at 11:00AM. The parties will be provided a video access link via email in advance of the conference. In light of the ongoing discovery productions and discussion of resolution short of trial, the parties' application to exclude time under the Speedy Trial Act is granted. In the interest of justice, time is excluded through January 30, 2024. Ordered by Judge Nina R. Morrison on 12/12/2023. (FV) (Modified on 12/12/2023 to update proceeding to a video conference) (FV). (Entered: 12/12/2023) |
| 01/24/2024 | | SCHEDULING ORDER: The status conference scheduled for January 30, 2024 at 11:00 AM shall now take place in person before Hon. Ramon E. Reyes in Courtroom 2E North. Ordered by Judge Nina R. Morrison on 1/24/2024. (AD) (Entered: 01/24/2024) |
| 01/25/2024 | 19 | Consent MOTION to Continue *status conference to March 2024*, Consent MOTION to Exclude *speedy trial time* by Jason Robinson. (Yaster, Benjamin) (Entered: 01/25/2024) |
| 01/25/2024 | | ORDER granting 19 MOTION to Continue. The status conference scheduled for January 30, 2024 at 11:00 AM shall now take place on March 14, 2024 at 11:00 AM in courtroom 6E North. To allow the parties to continue their plea negotiations, time is excluded under the Speedy Trial Act in the interest of justice and on consent of the parties until March 14, 2024. Ordered by Judge Nina R. Morrison on 1/25/2024. (AD) (Entered: 01/25/2024) |
| 02/15/2024 | | Status Conference set for 3/14/2024 at 11:00 AM in Courtroom 6E North before Judge Nina R. Morrison. Ordered by Judge Nina R. Morrison on 2/15/2024. (AD) (Entered: 02/15/2024) |

| 02/21/2024 | 20 | Consent MOTION to Modify Conditions of Release *to permit travel to Ohio to attend funeral* by Jason Robinson. (Yaster, Benjamin) (Entered: 02/21/2024) |
|---|---|---|
| 02/22/2024 | | ORDER granting the unopposed 20 Motion to Modify Conditions of Release as to Jason Robinson (1). Pretrial Services is ordered to adjust the defendant's curfew to allow the defendant to travel from Pittsburgh, PA, to Lima, Ohio, on 2/24/2024 to attend his grandmother's funeral. Ordered by Judge Nina R. Morrison on 2/22/2024. (TC) (Entered: 02/22/2024) |
| 02/23/2024 | 21 | NOTICE OF ATTORNEY APPEARANCE Sean Michael Fern appearing for USA. (Fern, Sean) (Entered: 02/23/2024) |
| 03/14/2024 | | Minute Entry for proceedings held before Judge Nina R. Morrison: A status conference was held before Judge Morrison on March 14, 2024. AUSAs Gilbert Rein and Sean Michael Fern present. Federal Defender Benjamin Zev Yaster appeared on behalf of Mr. Robinson. Mr. Robinson appeared via videoconference. The parties informed the Court that the government is reviewing the defense's mitigation package, and the parties are actively engaged in plea negotiations. An in-person status conference will be held on May 15, 2024 at 10:00 AM in Courtroom 6E North. For the reasons stated on the record, time is excluded until that date. (Court Reporter Anthony Frisolone.) (TC) (Entered: 03/14/2024) |
| 05/02/2024 | 22 | Letter *Regarding Rule 16 Discovery* as to Jason Robinson (Rein, Gilbert) (Entered: 05/02/2024) |
| 05/09/2024 | 23 | Letter *regarding May 15, 2024 status conference* as to Jason Robinson (Yaster, Benjamin) (Entered: 05/09/2024) |
| 05/15/2024 | | Minute Entry for proceedings held before Judge Nina R. Morrison: A status conference was held before Judge Morrison on May 15, 2024. AUSAs Gilbert Rein and Sean Michael Fern present. Federal Defender Benjamin Zev Yaster appeared on behalf of Mr. Robinson. Mr. Robinson appeared via videoconference. Probation Officer Christian Berzak also present. The parties updated the Court on the status of plea negotiations, which remain ongoing. The Court heard argument on Defendant's application for a modification of his conditions of release and, for the reasons stated on the record, denied Defendant's application. Additionally, the parties informed the Court that discovery is substantially complete and proposed a schedule for pre-trial motions. In accordance with the parties proposed schedule, Defendants motion is due on or before July 5, 2024, the government's response is due on or before July 26, 2024, and any reply is due on or before August 2, 2024. The parties are directed to submit a status report on or before August 9, 2024. For the reasons stated on the record, time is excluded until August 31, 2024. (Court Reporter Leeann Musolf) (FV) (Entered: 05/16/2024) |
| 05/15/2024 | | ORDER TO CONTINUE - Ends of Justice as to Jason Robinson. Time excluded from 05/15/2024 until 08/31/2024. Ordered by Judge Nina R. Morrison on 5/15/2024. (FV) (Entered: 05/16/2024) |
| 06/27/2024 | 24 | Consent MOTION for Extension of Time to File *pretrial motions* by Jason Robinson. (Yaster, Benjamin) (Entered: 06/27/2024) |
| 07/01/2024 | | ORDER granting 24 Motion for Extension of Time to File as to Jason Robinson. Ordered by Judge Nina R. Morrison on 7/1/2024. (FV) (Entered: 07/01/2024) |

| 07/10/2024 | 25 | MOTION to Suppress by Jason Robinson. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Benjamin Yaster, # 3 Exhibit A (Declaration of Jason Robinson), # 4 Exhibit B (HSI ROI), # 5 Exhibit C (Nov. 21, 2022 search warrant app), # 6 Exhibit D (Jan. 17, 2023 search warrant app)) (Yaster, Benjamin) (Entered: 07/10/2024) |
|---|---|---|
| 07/30/2024 | 26 | Consent MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Suppress* by USA as to Jason Robinson. (Rein, Gilbert) (Entered: 07/30/2024) |
| 07/31/2024 | | ORDER granting 26 Motion for Extension of Time to File Response/Reply as to Jason Robinson. Ordered by Judge Nina R. Morrison on 7/31/2024. (FV) (Entered: 07/31/2024) |
| 08/09/2024 | 27 | RESPONSE in Opposition re 25 MOTION to Suppress (Rein, Gilbert) (Entered: 08/09/2024) |
| 08/13/2024 | 28 | Consent MOTION for Extension of Time to File Response/Reply as to 27 Response in Opposition *until August 21, 2024* by Jason Robinson. (Yaster, Benjamin) (Entered: 08/13/2024) |
| 08/16/2024 | | ORDER granting 28 Motion for Extension of Time to File Response/Reply as to Jason Robinson. Ordered by Judge Nina R. Morrison on 8/16/2024. (FV) (Entered: 08/16/2024) |
| 08/21/2024 | 29 | REPLY TO RESPONSE to Motion re 25 MOTION to Suppress (Attachments: # 1 Exhibit F (supplemental declaration by Jason Robinson)) (Yaster, Benjamin) (Entered: 08/21/2024) |
| 08/22/2024 | 30 | STATUS REPORT by Jason Robinson (Yaster, Benjamin) (Entered: 08/22/2024) |
| 08/26/2024 | | SCHEDULING ORDER as to Jason Robinson: A status conference is scheduled for October 15, 2024 at 11:00AM in Courtroom 6E North before Judge Nina R. Morrison. Ordered by Judge Nina R. Morrison on 8/26/2024. (FV) (Entered: 08/26/2024) |
| 08/26/2024 | | ORDER TO CONTINUE - Ends of Justice as to Jason Robinson. To allow the parties to continue their plea negotiations, time is excluded under the Speedy Trial Act in the interest of justice and on consent of the parties until October 15, 2024. Ordered by Judge Nina R. Morrison on 8/26/2024. (FV) (Entered: 08/26/2024) |
| 10/10/2024 | 31 | REPLY TO RESPONSE to Motion re 25 MOTION to Suppress *CORRECTED* (Attachments: # 1 Exhibit F (supplemental declaration by Jason Robinson)) (Yaster, Benjamin) (Entered: 10/10/2024) |
| 10/10/2024 | 32 | Letter *regarding corrected reply brief in support of pretrial motions* as to Jason Robinson (Yaster, Benjamin) (Entered: 10/10/2024) |
| 10/11/2024 | | RESCHEDULING ORDER as to Jason Robinson: With consent of the parties, the status conference previously scheduled for October 15, 2024 has been cancelled. The parties are directed to file a joint status letter on or before November 22, 2024. To allow the parties to continue their plea negotiations, time is excluded under the Speedy Trial Act in the interest of justice and on consent of the parties until November 22, 2024. Ordered by Judge Nina R. Morrison on 10/11/2024. (FV) (Entered: 10/11/2024) |

| | | |
|---|---|---|
| 11/05/2024 | | ORDER: The Court will hold an evidentiary hearing on defense's 25 Motion to Suppress evidence on November 20, 2024, at 11 a.m. in Courtroom 6E North before Judge Morrison. In advance of the hearing, the government is respectfully requested to provide the following materials to the Court and defense on or before November 12, 2024: (1) the government is to provide a copy of the "TECS report" referenced at page 8 in their 27 Opposition. *See* Government Opposition 8, ECF No. 27. Defense counsel indicated that, as of the date the motion was filed, they had not received a copy of the report in discovery. If the government has not already provided the defense with a copy of the report and objects to doing so, the government shall file it with the court *in camera*, along with a letter explaining the basis for its position that the report should not be disclosed at this time; (2) in his declaration, Mr. Robinson indicated that he was given "a paper stating that Customs had the legal authority to demand and inspect my electronic devices." Declaration of Jason Robinson paragraph 5, ECF No. 25-3. The government shall confer the border agents who interacted with Mr. Robinson or any other agents who may be aware of such a document and provide the Court and defense with a copy of said document; and (3) if HSI made any recordings of the interview with Mr. Robinson, the government shall provide those to the Court and, if not previously provided to the defense, to the defense. Ordered by Judge Nina R. Morrison on 11/5/2024. (FV) (Entered: 11/05/2024) |
| 11/08/2024 | 33 | Consent MOTION to Continue *suppression hearing until December 10 or 6* by Jason Robinson. (Yaster, Benjamin) (Entered: 11/08/2024) |
| 11/11/2024 | 34 | Letter *Regarding Discovery* as to Jason Robinson (Rein, Gilbert) (Entered: 11/11/2024) |
| 11/12/2024 | | ORDER granting 33 Motion to Continue as to Jason Robinson. The Suppression Hearing previously scheduled for November 20, 2024 has been rescheduled to January 8, 2025 at 10:30AM in courtroom 6E North before Judge Nina R. Morrison. In light of ongoing discovery and plea negotiations, time is excluded until January 8, 2025, in furtherance of the ends of justice. Ordered by Judge Nina R. Morrison on 11/12/2024. (FV) (Entered: 11/12/2024) |
| 11/12/2024 | 35 | Letter *Regarding the Court's November 5, 2024 Order* as to Jason Robinson (Attachments: # 1 Exhibit Inspection of Electronic Devices Form) (Rein, Gilbert) (Entered: 11/12/2024) |
| 12/09/2024 | 36 | Letter *Regarding Discovery* as to Jason Robinson (Rein, Gilbert) (Entered: 12/09/2024) |
| 12/26/2024 | 37 | Letter *Regarding Discovery* as to Jason Robinson (Rein, Gilbert) (Entered: 12/26/2024) |
| 12/27/2024 | 38 | Letter *Regarding the Scope of the January 8, 2025 Suppression Hearing* as to Jason Robinson (Rein, Gilbert) (Entered: 12/27/2024) |
| 12/28/2024 | | ORDER: The Court is in receipt of the government's 38 letter regarding the January 8, 2025 suppression hearing. On or before December 31, 2024, defense counsel may respond to the government's request to limit the scope of the hearing and/or its request to modify the evidentiary hearing to oral argument based on the its claim that an evidentiary hearing is unnecessary. Ordered by Judge Nina R. Morrison on 12/28/2024. (AH) (Entered: 12/28/2024) |

| 12/31/2024 | 39 | Letter *in response to December 28, 2024 docket order* as to Jason Robinson (Yaster, Benjamin) (Entered: 12/31/2024) |
|---|---|---|
| 01/02/2025 | | ORDER: The government's request dated December 27, 2024 to cancel the evidentiary hearing scheduled for January 8, 2025 (which the Court scheduled for that date on November 12, 2024, after conferring with both parties) and convert the proceeding into oral argument on the motion is denied. However, in light of the government's stipulation that it will not seek to offer certain evidence that was the subject of the defendant's motion into evidence at trial, the Court will narrow the scope of the hearing accordingly. The hearing and any subsequent oral argument shall be limited to the issues as outlined in defense counsel's letter in response to the government's request dated December 31, 2024. Ordered by Judge Nina R. Morrison on 1/2/2025. (AH) (Entered: 01/02/2025) |
| 01/02/2025 | 40 | Letter *Regarding the Production of 3500 Material* as to Jason Robinson (Rein, Gilbert) (Entered: 01/02/2025) |
| 01/04/2025 | | Order: The Court is in receipt of the TECS report and audit history provided by the government on November 12, 2024, in response to this Court's order on November 5, 2024. The government provided a redacted copy of the TECS report and audit history. The letter accompanying the filing did not indicate why such redactions were made. Before 5pm on Monday, January 6, 2025, the government shall file a letter on the docket indicating whether the redacted portions of the TECS report and audit history relate to Mr. Robinson or persons unrelated to this case. If the redacted portions do relate to Mr. Robinson, the government is to provide an unredacted version to the court *ex parte*, along with an explanation as to why an unredacted version of the TECS report and audit history should not be provided to defense counsel. Ordered by Judge Nina R. Morrison on 1/4/2025. (AH) (Entered: 01/04/2025) |
| 01/05/2025 | 41 | MOTION to Exclude *and Limit Cross-Examination* by USA as to Jason Robinson. (Rein, Gilbert) (Entered: 01/05/2025) |
| 01/05/2025 | 42 | Letter *in Response to the Court's January 4 Order* as to Jason Robinson (Rein, Gilbert) (Entered: 01/05/2025) |
| 01/05/2025 | | ORDER: The Court is in receipt of the government's 42 January 5, 2025 letter in response to the Court's January 4, 2025 order. The government shall continue its efforts to obtain an unredacted version of the TECS report and audit history and provide them to the Court *ex parte* as soon as possible, along with a letter indicating whether it has any objection to providing the unredacted documents to the defense under an appropriate protective order. Ordered by Judge Nina R. Morrison on 1/5/2025. (AH) (Entered: 01/05/2025) |
| 01/06/2025 | | RESCHEDULING ORDER: With consent of the parties, the suppression hearing scheduled for 10:30AM has been rescheduled to 11:00AM on January 8, 2025. Ordered by Judge Nina R. Morrison on 1/6/2025. (FV) (Entered: 01/06/2025) |
| 01/06/2025 | 43 | Letter *Regarding the Court's January 5, 2025 Order* as to Jason Robinson (Attachments: # 1 Exhibit Unredacted Lookout, # 2 Exhibit Unredacted Audit) (Rein, Gilbert) (Entered: 01/06/2025) |
| 01/06/2025 | 44 | Letter *Regarding the Court's January 5, 2025 Order (without attachments)* as to Jason Robinson (Rein, Gilbert) (Entered: 01/06/2025) |

| 01/06/2025 | 45 | Letter *Regarding Discovery* as to Jason Robinson (Rein, Gilbert) (Entered: 01/06/2025) |
|---|---|---|
| 01/07/2025 | 46 | Letter *Regarding TECS Report (Lookout) and Audit History* as to Jason Robinson (Rein, Gilbert) (Entered: 01/07/2025) |
| 01/07/2025 | 47 | Consent MOTION for Protective Order by USA as to Jason Robinson. (Attachments: # 1 Proposed Order Protective Order) (Rein, Gilbert) (Entered: 01/07/2025) |
| 01/07/2025 | 48 | ORDER granting 47 Consent MOTION for Protective Order by USA as to Jason Robinson. Ordered by Judge Nina R. Morrison on 1/7/2025. (FV) (Entered: 01/07/2025) |
| 01/07/2025 | 49 | Letter *Regarding Discovery* as to Jason Robinson (Rein, Gilbert) (Entered: 01/07/2025) |
| 01/08/2025 | | Minute Entry for proceedings held before Judge Nina R. Morrison: Evidentiary hearing regarding Jason Robinson's 25 motion to suppress held on January 8, 2025. Assistant United States Attorneys Gilbert Rein and Nicolas Moscow appeared for the government, along with paralegal Emma Tavangari and Homeland Security Investigations Special Agent Richard Stepien. Federal Defender Benjamin Yaster along with investigator Jessica Hernandez appeared for Jason Robinson, who was also present. For the reasons stated on the record, the Court granted the government's unopposed 41 motion to limit cross-examination. Additionally, the Court denied without prejudice as moot the motion to suppress as it relates to any devices other than Mr. Robinson's iPhone and any statements made to an HSI agent by Mr. Robinson on November 14, 2022. The Court reviewed the government's proposed redactions to certain law enforcement materials and inquired about those redactions with the government at sidebar. For the reasons stated in the ex parte sidebar conference, the record of which shall remain sealed, but which were summarized in the public portion of the hearing, the Court granted the government's application to include those redactions in the copies of the materials disclosed to defense counsel. Testimony was heard from Customs and Border Patrol Agent Officer Shahamin Nunes, Special Agent Egbert Simon of the United States Attorney's Officer (formerly of Customs and Border Patrol), and Special Agent Richard Stepien. Oral argument will be heard at 2:00PM on Wednesday, January 15, 2025, in Courtroom 6E North. In light of ongoing discovery and plea negotiations, time is excluded until January 15, 2025, in furtherance of the ends of justice. (Court Reporter Jamie Stanton) (FV) (Entered: 01/14/2025) |
| 01/14/2025 | 50 | Letter *providing supplemental authority* as to Jason Robinson (Yaster, Benjamin) (Entered: 01/14/2025) |
| 01/15/2025 | | Minute Entry for proceedings held before Judge Nina R. Morrison: Oral argument regarding Jason Robinson's 25 motion to suppress held on January 15, 2025. Assistant United States Attorneys Gilbert Rein, Nicolas Moscow, and Sean Fern appeared for the government, along with paralegal Emma Tavangari. Federal Defender Benjamin Yaster along with investigator Jessica Hernandez and paralegal Chase Lito appeared for Jason Robinson, who appeared by video. The Court heard oral argument and reserved decision on the motion. For the reasons stated on the record, time is excluded until April 16, 2025. (Court Reporter Anthony Frisolone) (FV) (Entered: 01/16/2025) |

| 01/15/2025 | | ORDER TO CONTINUE - Ends of Justice as to Jason Robinson. Time excluded from 1/15/2025 until 4/16/2025. Ordered by Judge Nina R. Morrison on 1/15/2025. (FV) (Entered: 01/16/2025) |
|---|---|---|
| 01/16/2025 | 51 | Letter *responding to government supplemental authority cited at oral argument* as to Jason Robinson (Yaster, Benjamin) (Entered: 01/16/2025) |
| 02/14/2025 | 52 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Jason Robinson held on 1/15/26, for hearing type oral argument/suppression hearing, before Judge Morrison. Court Reporter/Transcriber Anthony D. Frisolone, Telephone number 718 613 2487. Email address: anthony.frisolone@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/7/2025. Redacted Transcript Deadline set for 3/17/2025. Release of Transcript Restriction set for 5/15/2025. (Frisolone, Anthony) (Entered: 02/14/2025) |
| 02/19/2025 | 53 | Letter *Regarding Authority and Argument Relevant to the Suppression Hearing* as to Jason Robinson (Rein, Gilbert) (Entered: 02/19/2025) |
| 02/21/2025 | 54 | Letter *regarding government's Feb. 19 supplemental brief* as to Jason Robinson (Yaster, Benjamin) (Entered: 02/21/2025) |
| 02/22/2025 | | ORDER: The Court is in receipt of Defendant's 54 letter. At this time, the Court does not believe a response from Defendant is necessary, but will advise the parties if that changes. Ordered by Judge Nina R. Morrison on 2/22/2025. (AH) (Entered: 02/22/2025) |
| 04/14/2025 | 55 | MOTION to Exclude *Speedy Trial Time for an Additional 45 Days* by USA as to Jason Robinson. (Rein, Gilbert) (Entered: 04/14/2025) |
| 04/15/2025 | | ORDER granting 55 Motion to Exclude Time as to Jason Robinson. Time is excluded until May 31, 2025. Ordered by Judge Nina R. Morrison on 4/15/2025. (AH) (Entered: 04/15/2025) |
| 05/09/2025 | 56 | ORDER: For the reasons stated in the attached memorandum and order, Jason Robinson's 25 motion to suppress the evidence recovered from his iPhone is GRANTED. Ordered by Judge Nina R. Morrison on 5/9/2025. (AH) (Entered: 05/09/2025) |
| 06/03/2025 | 57 | NOTICE OF APPEAL (Interlocutory) by USA as to Jason Robinson re 56 Memorandum Opinion. Appeal Record due by 6/17/2025. (Rein, Gilbert) (Entered: 06/03/2025) |
| 06/03/2025 | | Electronic Index to Record on Appeal as to Jason Robinson sent to US Court of Appeals 57 Notice of Appeal - Interlocutory Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 06/04/2025) |

AB:NCG

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

IN THE MATTER OF THE SEARCH OF
APPLE IPHONE XS, MODEL MTAG2LL/A
WITH SERIAL NUMBER
G0NXKM66KPFP AND IMEI NUMBER
357208094638804 CURRENTLY LOCATED
IN THE EASTERN DISTRICT OF NEW
YORK

**TO BE FILED UNDER SEAL**

**APPLICATION FOR A
SEARCH WARRANT FOR AN
ELECTRONIC DEVICE**

Case No. 22-MJ-1241

---

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, RICHARD STEPIEN, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a search warrant authorizing the examination of

property—an electronic device—which is currently in law enforcement possession, and the

extraction from that property of electronically stored information described in Attachment B.

2.       I am a Special Agent with the Department of Homeland Security,

Homeland Security Investigations ("HSI"), and have been since December 2019.  I am currently

assigned to the Child Exploitation Investigations Unit.  During my tenure with HSI, I have

participated in the investigation of cases involving crimes against children. Specifically, I have

experience investigating cases involving the sexual exploitation of minors, child sex tourism, and

the production, receipt, distribution, and possession of child pornography. I have conducted

physical and electronic surveillance, executed search warrants, reviewed and analyzed electronic devices, and interviewed witnesses.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in child exploitation crimes to conceal their actions from detection by law enforcement.

3.     This affidavit is based upon my personal participation in the investigation of this matter, as well as on my conversations with other law enforcement officers and my examination of documents, reports, and records. This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Where the contents of documents or the actions, statements, or conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.     The property to be searched is an Apple iPhone XS, Model Number MTAG2LL/A, with serial number G0NXKM66KPFP and International Mobile Equipment Identity ("IMEI") number 357208094638804, hereinafter, the "Subject Device."  The Subject Device is currently located in the Eastern District of New York.

5.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.     HSI is currently investigating JASON ANTHONY ROBINSON for certain sex offenses, including possession, access with intent to view, and receipt of sexually

2

explicit material relating to children, in violation of Title 18, United States Code, Section 2252 ("the SUBJECT OFFENSES").

7.    On November 14, 2022, ROBINSON landed at John F. Kennedy International Airport ("JFK Airport"), traveling from Cairo, Egypt, via British Airways flight BA 115 arriving from London, United Kingdom.  He was stopped by United States Customs and Border Protection ("CBP") at JFK Airport for secondary inspection.  A border search was conducted.[1]  During the search, ROBINSON voluntarily gave CBP officers the password for the Subject Device.  Upon manually reviewing the Subject Device, CBP officers identified that there was child sexual abuse material[2] on the Subject Device.

8.    At the border, a law enforcement agent with HSI conducted a preliminary review of the Subject Device and confirmed that it contained at least five photos containing child sex abuse material. Specifically, the law enforcement agent with HSI reviewed several images of what appeared to be a minor male, approximately age 13 to 16 years old, engaged in sexual

_____

[1] The federal government has "broad plenary powers to conduct so-called 'routine' searches at the border even without 'reasonable suspicion that the prospective entrant has committed a crime.'" United States v. Levy, 803 F.3d 120, 122 (2d Cir. 2015) (quoting Tabbaa v. Chertoff, 509 F.3d 89, 97-98 (2d Cir. 2007)).

[2] Child sexual abuse material, or child pornography is defined "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." 18 U.S.C. § 2256(8).

JR000109

activity, including anal sex and oral sex, with an adult male.  There were also several images of the minor male naked, as well as close-up images of the minor male's genitalia.

9.      Based on my training and experience, individuals with intent to view and/or possess, collect, receive, or distribute child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. I am aware, based on my training and experience, that if an individual has several images depicting child pornography on one device, that individual likely has a larger collection; therefore, there may be additional child sex abuse material on the device or other devices, including in deleted files.  Based on the fact that images depicting minor children engaged in sexual acts were found on the Subject Device, there is probable cause to believe that there is additional evidence of the SUBJECT OFFENSES on the Subject Device.

10.     The Subject Device is currently in the lawful possession of HSI.  The Subject Device came into HSI's possession in the following way: it was detained pursuant to a border search of ROBINSON. Therefore, while HSI might already have all necessary authority to examine the Subject Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Subject Device will comply with the Fourth Amendment and other applicable laws.

11.     The Subject Device is currently in law enforcement possession in the Eastern District of New York.  In my training and experience, I know that the Subject Device has been stored in a manner in which its contents are, to the extent material to this investigation, in

4

substantially the same state as they were when the Subject Device first came into the possession of HSI.

## TECHNICAL TERMS

12.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.    Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a

JR000111

variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

6

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet

7

through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international

8

borders, even when the devices communicating with each other are in the same state.

13.     Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

14.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

15.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

j.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

9

k.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

l.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

m.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

n.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

o.  I know that when an individual uses an electronic device to access child pornography, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime

10

because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

16.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

17.     *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

18.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

19.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application

JR000117

and search warrant.  I believe that sealing this document is necessary because the warrant is

relevant to an ongoing investigation into the criminal organizations as not all of the targets of this

investigation will be searched at this time.  Based upon my training and experience, I have

learned that, online criminals actively search for criminal affidavits and search warrants via the

internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them

publicly online through the carding forums.  Premature disclosure of the contents of this affidavit

and related documents may have a significant and negative impact on the continuing

investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

RICHARD C STEPIEN
Digitally signed by RICHARD C STEPIEN
Date: 2022.11.21 14:48:50 -05'00'

RICHARD STEPIEN
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me by telephone
on November 21, 2022:

s/ James R. Cho

HONORABLE JAMES R. CHO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

12

**ATTACHMENT A**

The property to be searched is an Apple iPhone XS, Model Number MTAG2LL/A, with serial number G0NXKM66KPFP and International Mobile Equipment Identity ("IMEI") number 357208094638804, hereinafter, the "Subject Device."  The Subject Device is currently located in the Eastern District of New York.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the Subject Device described in Attachment A that relate to violations of Title 18, United States Code, Section 2252 and involve JASON ANTHONY ROBINSON including:

    a.  images of child pornography and files containing images of child pornography and records, images, information or correspondence pertaining to the possession, access with intent to view, and receipt of sexually explicit material relating to children, in violation 18 U.S.C. § 2252, in any form wherever they may be stored or found;

    b.  motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2252;

    c.  correspondence and records pertaining to violation of the SUBJECT OFFENSES including, but not limited to, electronic mail, chat logs, electronic messages, books, ledgers, and records bearing on the receipt, shipment, orders, requests, trades, purchases, or transactions involving any visual depiction of minors engaged in sexually explicit conduct or other obscene material;

    a.  records and information concerning any Internet accounts used to possess, receive or distribute child pornography; and

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

  3.  Records of Internet Protocol addresses used;

  4.  Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

  This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

JR000121

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.    22-MJ-1241 |
| APPLE IPHONE XS, MODEL MTAG2LL/A WITH SERIAL NUMBER | ) |
| G0NXKM66KPFP AND IMEI NUMBER 357208094638804 CURRENTLY | ) |
| LOCATED IN THE EASTERN DISTRICT OF NEW YORK | ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ New York _____
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ the Duty Magistrate Judge _____.
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for ____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____.

| | |
|---|---|
| Date and time issued:    11/21/2022 at 4:42 p.m. | s/ James R. Cho |
| | *Judge's signature* |
| City and state:    Brooklyn, New York | Hon. James R. Cho        U.S.M.J. |
| | *Printed name and title* |

JR000122

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>  22-MJ-1241 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*

JR000123

## ATTACHMENT A

The property to be searched is an Apple iPhone XS, Model Number MTAG2LL/A, with serial number G0NXKM66KPFP and International Mobile Equipment Identity ("IMEI") number 357208094638804, hereinafter, the "Subject Device." The Subject Device is currently located in the Eastern District of New York.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.       All records on the Subject Device described in Attachment A that relate to

violations of Title 18, United States Code, Section 2252 and involve JASON ANTHONY

ROBINSON including:

      a.   images of child pornography and files containing images of child pornography

         and records, images, information or correspondence pertaining to the possession,

         access with intent to view, and receipt of sexually explicit material relating to

         children, in violation 18 U.S.C. § 2252, in any form wherever they may be stored

         or found;

      b.   motion pictures, films, videos, and other recordings of visual depictions of minors

         engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2252;

      c.   correspondence and records pertaining to violation of the SUBJECT OFFENSES

         including, but not limited to, electronic mail, chat logs, electronic messages,

         books, ledgers, and records bearing on the receipt, shipment, orders, requests,

         trades, purchases, or transactions involving any visual depiction of minors

         engaged in sexually explicit conduct or other obscene material;

      a.   records and information concerning any Internet accounts used to possess, receive

         or distribute child pornography; and

2.       Evidence of user attribution showing who used or owned the Devices at the time

the things described in this warrant were created, edited, or deleted, such as logs, phonebooks,

saved usernames and passwords, documents, and browsing history;

3.      Records of Internet Protocol addresses used;

4.      Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2

DMP:GMR
F. # 2023R00004

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                          Docket No. 23-CR-192 (NRM)

JASON ROBINSON,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Gilbert M. Rein
Assistant U.S. Attorney
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ................................................................................. 1

ARGUMENT ..................................................................................................... 6

I.   THE BORDER SEARCH OF THE DEFENDANT'S PHONE CONDUCTED BY CBP
     DID NOT VIOLATE THE FOURTH AMENDMENT .................................................. 7

     A.  Searches of Electronic Devices During a Border Search ............................. 7

     B.  The Search of the Defendant's Cell Phone Was a Routine Border Search Which Did
         Not Require a Warrant ............................................................................. 9

     C.  The Search of the Defendant's Cell Phone Was Supported by Reasonable Suspicion ..
         ............................................................................................................... 14

     D.  The Good Faith Exception Applies and the Contents of the Defendant's Phone Should
         Not be Suppressed .................................................................................. 16

II.  THE STATEMENT TO THE HSI SPECIAL AGENT DID NOT VIOLATE THE FIFTH
     AMENDMENT .......................................................................................... 20

     A.  Statements Made During a Border Search ............................................. 20

     B.  The Defendant Was Not In Custody at the Time of His Statements to HSI and
         Miranda Warnings Were Not Required ................................................... 23

     C.  The Defendant's Statements Were Voluntary ......................................... 25

III. THE SEARCH OF THE DEFENDANT'S LAPTOP, USB THUMB DRIVE, AND
     MEMORY CARD WAS REASONABLE AND DID NOT VIOLATE THE FOURTH
     AMENDMENT .......................................................................................... 27

     A.  Law Enforcement Must Promptly Obtain a Warrant to Search a Seized Device ....... 28

     B.  The Delay in Searching The Additional Devices was Reasonable ............................ 29

     C.  The Exclusionary Rule Does Not Require Suppression ............................................ 34

CONCLUSION ................................................................................................ 35

TABLE OF AUTHORITIES

Page(s)

FEDERAL CASES

Abidor v. Napolitano,
    990 F. Supp. 2d 260 (E.D.N.Y. 2013) ................................................................ 12, 15

Alasaad v. Mayorkas,
    988 F.3d 8, 17 (1st Cir. 2021) .......................................................................... 10, 12

Berkemer v. McCarty,
    468 U.S. 420 (1984) .............................................................................................. 21

California v. Beheler,
    463 U.S. 1121 (1983) ............................................................................................ 23

Davis v. United States,
    564 U.S. 229 (2011) .............................................................................................. 34

Dickerson v. United States,
    530 U.S. 428 (2000) .............................................................................................. 25

Haynes v. Washington,
    373 U.S. 503 (1963) .............................................................................................. 26

Herring v. United States,
    555 U.S. 135 (2009) .............................................................................................. 35

Howes v. Fields,
    565 U.S. 499 (2012) .............................................................................................. 21

Lo-Ji Sales, Inc. v. New York,
    442 U.S. 319 (1979) .............................................................................................. 19

Miranda v. Arizona,
    384 U.S. 436 (1966) .............................................................................................. 20

Oregon v. Elstad,
    470 U.S. 298 (1985) .............................................................................................. 26

Oregon v. Mathiason,
    429 U.S. 492 (1977) .............................................................................................. 23

Rhode Island v. Innis,
    446 U.S. 291 (1980)............................................................................. 21

Riley v. California,
    573 U.S. 373 (2014)......................................................................... 9, 11

Stansbury v. California,
    511 U.S. 318 (1994)) ........................................................................ 21

Stone v. Powell,
    428 U.S. 465 (1976)........................................................................... 18

Tabbaa v. Chertoff,
    509 F.3d 89 (2d Cir. 2007) ............................................................... 8, 9

Tankleff v. Senkowski,
    135 F.3d 235 (2d Cir. 1998) ............................................................. 22

United States v. Aigbekaen,
    943 F.3d 713 (4th Cir. 2019) ............................................................ 14

United States v. Anderson,
    929 F.2d 96 (2d Cir. 1991) ............................................................... 27

United States v. Asbury,
    586 F.2d 973 (2d Cir. 1978)) ............................................................ 15

United States v. Cano,
    934 F.3d 1002 (9th Cir. 2019) ........................................... 11, 12, 14, 16

United States v. Chang,
    No. 18-CR-681 (NGG), 2024 WL 1308775 (E.D.N.Y. Mar 27, 2024) ................ 30, 31, 33, 35

United States v. Clark,
    638 F.3d (2d Cir. 2011) ................................................................. 19, 20

United States v. Corbett,
    No. 20-CR-213 (KAM), 2021 WL 4480626 (E.D.N.Y. Sept. 30, 2021) .................... 31, 33, 35

United States v. Cotterman,
    709 F.3d 952 (9th Cir. 2013) ........................................... 13, 15, 16

United States v. Daskal,
    676 F. Supp. 2d 153 (E.D.N.Y. 2023) ............................................. 29

United States v. Falso,
    544 F.3d 110 (2d Cir. 2008) .................................................................. 19

United States v. Familetti,
    878 F.3d 53 (2017) ............................................................................... 21

United States v. Faux,
    828 F.3d 130 (2d Cir. 2016) ............................................................. 21, 22

United States v. Flores-Montano,
    541 U.S. 149 (2004) .......................................................................... 8, 12

United States v. FNU LNU,
    653 F.3d 144 (2d Cir. 2011) ......................................................... passim

United States v. Ganias,
    824 F.3d 199 (2d Cir. 2016) .................................................................. 18

United States v. Gavino,
    No. 22-CR-136 (RPK), 2024 WL 85072  (E.D.N.Y. Jan. 7, 2024) ............... 8, 13, 15

United States v. Green,
    No. 18-CR-121 (RJA)(MJR), 2021 WL 1877236 (W.D.N.Y. Feb. 3, 2021) .................... 30, 35

United States v. Haak,
884 F.3d 400 (2d Cir. 2018)................................................................... 26

United States v. Irving,
    452 F.3d 110 (2d Cir. 2006) ......................................................... passim

United States v. Kamaldoss,
    No. 19-CR-543 (ARR), 2022 WL 1200776 (E.D.N.Y. Apr. 22, 2022) .................................. 18

United States v. Kolsuz,
    890 F.3d 133 (4th Cir. 2018)) ............................................................... 14

United States v. Kourani,
    6 F.4th 345 (2d Cir. 2021) .................................................................... 26

United States v. Leon,
    468 U.S. 897 (1984).......................................................................... 18, 20

United States v. Levy,
    803 F.3d 120 (2d Cir. 2015) .................................................................... 8

United States v. Mendez,
103 F.4th 1303 (7th Cir. 2024) ............................................. 8, 10, 11, 12

United States v. Mendonca,
88 F.4th 144 (2d Cir. 2023) ........................................................ 25

United States v. Molina-Isidoro,
884 F.3d 287 (5th Cir. 2018) ...................................................... 11

United States v. Montoya de Hernandez,
473 U.S. 531 (1985)............................................................. 8, 15

United States v. Newton,
369 F.3d 659 (2d Cir. 2004) ............................................ 22, 23, 25

United States v. Plugh,
648 F.3d 118 (2d Cir. 2011) ...................................................... 25

United States v. Ramirez,
No. EP-18-CR-3530-PRM, 2019 WL 3502913 (W.D. Tex. Aug. 1, 2019) ........................... 15

United States v. Ramsey,
431 U.S. 606 (1977).................................................................. 7

United States v. Raymonda,
780 F.3d 105 (2d Cir. 2015 ........................................................ 18

United States v. Santillan,
902 F.3d 49 (2d Cir. 2018) ........................................................ 22

United States v. Shvartsman,
No. 23-cr-307 (LJL), 2024 WL 1193703 (S.D.N.Y. Mar. 20, 2024) ............................. 26, 27

United States v. Smith,
673 F. Supp. 3d 381 (S.D.N.Y. 2023) ...................................... passim

United States v. Smith,
967 F.3d 198 (2d Cir. 2020) ................................................. passim

United States v. Sultanov,
No. 22-CR-149 (NRM), 2024 WL 3520443 (E.D.N.Y. July 24, 2024) .......................... passim

United States v. Taylor,
745 F.3d 15 (2d Cir. 2014) ........................................................ 27

United States v. Tineo,
  No. 23-cr-223 (DLI), 2024 WL 2862289 (E.D.N.Y. June 6, 2024) ...................... 12, 13, 17, 19

United States v. Tisdol,
  544 F. Supp. 3d 219 (D. Conn. 2021)....................................................................... 30

United States v. Touset,
  890 F.3d 1227 (11th Cir. 2018) ........................................................... 10, 11, 12, 14

United States v. Wanjiku,
  919 F.3d 472 (7th Cir. 2019) ................................................................................. 11

United States v. Zodhiates,
  901 F.3d 137 (2d Cir. 2018) ................................................................................... 17

## FEDERAL STATUTES

18 U.S.C. § 2252(a)(1).................................................................................................. 5

18 U.S.C. § 2252(a)(4)(B) ........................................................................................... 5

PRELIMINARY STATEMENT

The defendant moves to suppress the following: (1) his iPhone and evidence obtained during searches of that device conducted during a border search and pursuant to a judicially authorized search warrant; (2) statements he made to a Special Agent with Homeland Security Investigations ("HSI") during an interview at John F. Kennedy International Airport ("JFK Airport"); and (3) evidence obtained during judicially authorized searches of additional electronic devices.  See ECF No 25 ("Def. Mot.").  The defendant argues that this evidence was obtained in violation of the Fourth and Fifth Amendments.  For the reasons set forth below, the government respectfully submits that the Court should deny the defendant's motion in its entirety.

STATEMENT OF FACTS[1]

On November 14, 2022, the defendant arrived at JFK Airport aboard a British Airways flight from London, United Kingdom which had originated in Cairo, Egypt.  After disembarking, the defendant made his way to passport control where he presented his passport to an officer with Customs and Border Protection ("CBP").  At that time, CBP was alerted to a lookout for the defendant because he was the subject of a TECS report.[2]  Specifically, the information available to the CBP officers that evening indicated that the defendant was believed to possibly be in possession of child sexual abuse material ("CSAM").  As a result, at

---

[1] The facts are drawn from documents produced to the defendant as discovery in this case, including affidavits in support of two search warrants, and information that the government proffers in connection with the instant motion and would establish at an evidentiary hearing.

[2] The government understands that "TECS" is not an acronym but is the name for a system formerly known as the Treasury Enforcement Communications System.

approximately 5:35 p.m., defendant was directed to another area of passport control for an additional—or secondary—inspection.

Once he arrived for a secondary inspection, the defendant interacted with additional CBP officers.  He stated to a CBP officer that he went to Egypt for vacation and did not visit other countries.  Based upon the information they had received regarding the defendant's believed possession of CSAM, CBP officers decided to conduct an electronic media examination.  A CBP officer asked the defendant for his electronic devices.  The defendant voluntarily provided the officer with his iPhone cell phone, a laptop, and a USB thumb drive.  When the devices were provided, they were powered on and unlocked.  Although no password was necessary to access the devices because they were unlocked, the defendant also provided the passwords for his iPhone and laptop.  Prior to any review of the devices, a CBP officer placed them in airplane mode to disable their cellular service and data connections.  At approximately 5:50 p.m., a CBP officer conducted a review of the defendant's laptop but did not find any CSAM.  Then, at approximately 6:20 p.m., a CBP officer conducted an examination of the defendant's iPhone and observed CSAM to be present on it.  Specially, the CBP officer observed that the device had a folder which contained videos of young boys engaged in sex acts.  An additional search of the defendant's baggage was conducted and CBP officers located a memory card.

After finding CSAM on the defendant's iPhone, CBP officers contacted HSI Special Agent Allen Anstee at approximately 6:45 p.m.  Agent Anstee arrived at approximately 7:57 p.m.  When Agent Anstee arrived, he conducted a brief, approximately three-minute, review of the contents of the defendant's iPhone.  During this review, Agent Anstee observed several images of a minor male, approximately 13 to 16 years of age, engaged in anal and oral sex with

an adult male.  The defendant's iPhone also included additional images of the minor male,

including close up pictures of the minor male's genitals.  After making these observations, Agent

Anstee detained the defendant's iPhone.

Agent Anstee also interviewed the defendant following Agent Anstee's review of

the defendant's iPhone.  The defendant acknowledged during the interview that he understood he

was not under arrest and that a border search was being conducted.  During the interview, Agent

Anstee observed the defendant to be nervous and fidgety.  Specifically, Agent Anstee observed

that the defendant did not make eye contact with Agent Anstee and appeared to be shaking.  The

defendant stated in substance to Agent Anstee that he knew what would be found on his devices.

The defendant also asked if he would be arrested and stated in substance that his husband (with

whom he had traveled to JFK Airport) did not know what was on his devices.  Agent Anstee

further observed that the defendant was extremely nervous and unable to even hold a glass of

water in his hand.

Following the interview, the defendant was not placed under arrest.  Rather, CBP

completed its border inspection procedures, and the defendant was permitted to proceed into the

United States.  The defendant was provided with a receipt for his electronic devices which were

detained by HSI pursuant to its border control authorities.  These included his iPhone, his laptop,

a thumb drive, and the memory card found in the defendant's luggage.  No forensic search of any

of these devices was performed.  Rather, the manual searches described above were the only

searches conducted of the defendant's devices.

On November 21, 2022, one week after the seizure of the devices, HSI Special

Agent Richard Stepien applied for a warrant (the "November 2022 Warrant") to conduct a

further search of the defendant's detained iPhone, an Apple iPhone XS.  In support of the

application, Special Agent Stepien stated that both CBP officers and an HSI Special Agent had

previously conducted a border search of the defendant's iPhone, during which law enforcement

had observed CSAM.  After reviewing the application, the Honorable James R. Cho, United

States Magistrate Judge for the Eastern District of New York, issued a warrant authorizing a

search of the defendant's iPhone.

After obtaining judicial authorization to search the defendant's iPhone, HSI,

including Agent Stepien, conducted a forensic examination of the device.  At least 241,872 files

were reviewed.  The iPhone was found to contain at least 235 images which were confirmed to

be CSAM; 2,363 images classified as being age difficult;[3] 280 images depicting bestiality; and

495 images containing computer generated images of child exploitation content.  The device also

contained at least 457 videos confirmed to be CSAM and 579 videos classified as either age

difficult or bestiality.  The review determined that the majority of the videos depicted

prepubescent and pubescent boys.  Several videos also depicted oral and anal sexual activity

involving male infants and toddlers.  After an initial forensic examination of the device pursuant

to the search warrant, investigators were unable to determine if certain images on the iPhone

depicted the defendant personally engaged in sexual acts with children.  Due to the large amount

of data contained on the device, review of its contents remained ongoing into January 2023.

Among other investigative steps, HSI continued to examine chats and other communications

present on the device between the defendant and other individuals as they related to child

exploitation.

---

[3] An image is considered to be "age difficult" when the age of individuals depicted in the
material cannot be easily determined.

On January 17, 2023, while the review of the contents of the defendant's iPhone was still ongoing, Agent Stepien applied for a warrant (the "January 2023 Warrant") to search the remaining electronic devices detained during the border search, specifically, a Microsoft Surface Pro laptop, a USB thumb drive, and a Sandisk Ultra Micro SD memory card.  In his application in support of the January 2023 Warrant, Agent Stepien stated that the defendant's iPhone had been searched pursuant to the November 2022 Warrant and that hundreds of images and videos depicting CSAM had been found.  See Def. Mot., Ex. D, ¶ 11.  Agent Stepien noted that the laptop was not found to contain CSAM during a basic inspection during the border search.  Id. ¶ 13.  Agent Stepien explained that, in his training and experience, given the volume of CSAM during the forensic search of the defendant's iPhone, he believed that CSAM would also be found on the other devices in the defendant's possession.  Id.  After reviewing Agent Stepien's application, Judge Cho issued the January 2023 Warrant authorizing a search of the defendant's laptop, USB thumb drive and memory card.

HSI subsequently executed the January 2023 Warrant and searched the laptop, USB thumb drive, and memory card.  During this search, investigators observed approximately 21 images containing CSAM and four videos containing CSAM.

On May 1, 2023, a Grand Jury returned an indictment charging the defendant with Transportation of Child Pornography, in violation of 18 U.S.C. § 2252(a)(1), and Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  An arrest warrant was issued in conjunction with the indictment.  On May 16, 2023, the defendant was arrested pursuant to the warrant.  That same day, HSI executed a judicially authorized search warrant at the defendant's residence in Pittsburgh, Pennsylvania.  At the time of his arrest, the defendant was advised of his rights in accordance with Miranda v. Arizona and subsequently agreed to speak with

investigators.  In substance, he recalled having been stopped at JFK Airport during the November 2022 border search and acknowledged that CSAM was present on his phone at that time.  Among other things, he stated that he had initially obtained CSAM in a chatroom after it was provided by another participant.

The investigation of the defendant's conduct remained ongoing following his arrest.  Additional warrants were obtained authorizing a search of the defendant's Dropbox, Snapchat, and Instagram accounts.  The defendant's Dropbox account was found to contain additional CSAM, including images and videos.  Several of the videos depict young males engaged in anal and oral sex.

<u>ARGUMENT</u>

The defendant's motion to suppress the CSAM seized from his iPhone, his statements to HSI Agent Anstee, and the CSAM seized from his additional electronic devices should be denied.  The defendant asserts that his iPhone, laptop, thumb drive, and memory card were searched and seized in violation of the Fourth Amendment and that his statements to Agent Anstee were obtained in violation of the Fifth Amendment.  Specially, he claims (i) the manual search of his iPhone required probable cause and a warrant or reasonable suspicion, and was conducted in violation of the Fourth Amendment; (ii) he made statements to Agent Anstee even though he was not first provided with <u>Miranda</u> warnings; and (iii) the warrant authorizing a search of his laptop, thumb drive, and memory card was issued after what he claims was an undue delay in violation of the Fourth Amendment.  As the government explains below, (i) the border search of the defendant's iPhone was lawful and in any event was conducted in good faith, (ii) the defendant was not in custody at the time of his statements to Agent Anstee and <u>Miranda</u> warnings were not required and (iii) the search of the defendant's additional devices

was not issued after an unreasonable delay and was conducted in good faith.  Accordingly, the

defendant's motion to suppress should be denied.

I.       THE BORDER SEARCH OF THE DEFENDANT'S PHONE CONDUCTED BY CBP
         DID NOT VIOLATE THE FOURTH AMENDMENT

         The defendant argues that CBP and HSI violated the Fourth Amendment by

searching his iPhone.  First, relying largely on the non-binding authority of United States v.

Smith, 673 F. Supp. 3d 381 (S.D.N.Y. 2023), he asks the Court to employ a restrictive approach

to the Fourth Amendment's border search exception by holding that probable cause and a

warrant are required for a cell phone border search.  Alternatively, he argues that border searches

of electronic devices must at least be supported by reasonable suspicion, which he claims the

government lacked.

         At the outset, the government is mindful of this Court's recent decision in United

States v. Sultanov, and its finding that a warrant, supported by probable cause, is required for the

search of a cell phone at the border.  No. 22-CR-149 (NRM), 2024 WL 3520443, at *20-23

(E.D.N.Y. July 24, 2024).  For the reasons set forth below, the government respectfully disagrees

and submits that cell phones are subject to search under CBP's traditionally broad authority to

conduct searches at the border.  In any event, for the reasons discussed by this Court in Sultanov,

the good faith exception applies to the forensic search of the defendant's cell phone in this case.

See id. at *26-28.

         A.       Searches of Electronic Devices During a Border Search

         "The border-search exception is grounded in the recognized right of the sovereign

to control, subject to substantive limitations imposed by the Constitution, who and what may

enter the country."  United States v. Ramsey, 431 U.S. 606, 620 (1977).  This is because, as the

Supreme Court instructs, "[t]he Government's interest in preventing the entry of unwanted

persons and effects is at its zenith at the internation border." See United States v. Flores-Montano, 541 U.S. 149, 152 (2004).  The border-search exception to the Fourth Amendment's warrant requirement broadly enables law enforcement agents to conduct routine, warrantless searches at points of entry, including airports, for, among other purposes, interdicting contraband.  See United States v. Montoya de Hernandez, 473 U.S. 531, 537-39 (1985); see also United States v. Irving, 452 F.3d 110, 123 (2d Cir. 2006) ("An airport is considered the functional equivalent of a border and thus a search there may fit within the border search exception.").  Meanwhile, nonroutine border searches, which are determined by weighing the degree of intrusion "against the level of warranted suspicion," require reasonable suspicion of criminal activity.  Irving, 452 F.3d at 123.  "Routine or otherwise, searches at the border 'never' require a warrant or probable cause."  United States v. Mendez, 103 F.4th 1303, 1308 (7th Cir. 2024) (citing Ramsey, 431 U.S. at 619)).

The Second Circuit has long favored an expansive view of border search authority that facilitates crucial governmental objectives like preventing dangerous individuals and contraband from entering the country. See United States v. Levy, 803 F.3d 120, 124 (2d Cir. 2015) ("CBP officers … [can search] items at the border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties."); see also United States v. Gavino, No. 22-CR-136 (RPK), 2024 WL 85072, at *5–6 (E.D.N.Y. Jan. 7, 2024) (finding that the Second Circuit construes border search authority more broadly than the Ninth and Fourth Circuits).  In other words, in this Circuit, it is "well established that the government has broad powers to conduct searches at the border even where … there is no reasonable suspicion that the prospective entrant has committed a crime."  Tabbaa v. Chertoff, 509 F.3d 89, 97 (2d Cir. 2007) (collecting cases).

This legal foundation affords substantial leeway to federal law enforcement officers in performing border searches even without reasonable suspicion or probable cause. For example, the Second Circuit has concluded that, at the border, conduct like "fingerprinting and photographing . . . does not take the searches out of the realm of what is considered routine." See id. at 99. Similarly, in Irving, the Second Circuit defined routine border searches as activities like inspecting an individual's "clothing, luggage, a purse, wallet, pockets, or shoes… [and other acts that] do not substantially infringe on a traveler's privacy rights." See 452 F.3d at 123. Using this broad definition, the court determined that customs agents merely conducted a routine airport search by looking through the luggage of a defendant they knew was a suspect in a nationwide child sex tourism investigation. Id. at 114–15, 123–24. Notably, the court averred that a routine inspection can stem from a criminal investigative motive because "it would make little sense to allow random searches of any incoming passenger, without reasonable suspicion, but require reasonable suspicion for searches of passengers that are suspected of criminal activity." Id. at 123 (internal citations omitted).

    B.    The Search of the Defendant's Cell Phone Was a Routine Border Search Which Did Not Require a Warrant

        Contrary to this Circuit's traditionally broad approach, the defendant urges the Court to curtail the border search exception's scope by subjecting it to the logic of Riley v. California, 573 U.S. 373, 401 (2014), which held that police generally need a warrant to search a defendant's cell phone seized incident to an arrest. Def. Mem. at 8–10.

        In support of his argument, the defendant points to Smith, in which a district court in the Southern District of New York applied "the logic and analysis of Riley to the border context" in ruling that "phone searches at the border generally require warrants outside exigent circumstances." See 673 F. Supp. 3d at 396, 398. There, upon the defendant's arrival at Newark

Airport, federal law enforcement agents forensically copied his cell phone's data to further an investigation into gang activity.  See id. at 387–89.  Over a month later, after having partially reviewed the extraction, the government obtained a warrant and completed searching the device.  See id. at 388–89.  In adjudicating the defendant's motion to suppress, the court concluded that the "warrantless search of [this] cell phone was unreasonable under the Fourth Amendment."  Id. at 398.  Specifically, the court stated, among other things, that applying Riley to the border search context revealed that the profound privacy interest associated with smartphones outweighed what it termed the government's comparably weak interest in interdicting contraband, especially because illicit content on cell phones can enter the country digitally.  See id. at 394–96.  Regardless, the court ultimately declined to suppress the evidence due to the good faith exception to the exclusionary rule.  See id. 401–05.  Following the defendant's submission of his motion to suppress, this court decided Sultanov, which similarly held that a warrant was required for the search of a cell phone at the border.  2024 WL 3520443, at *20-23.

There are multiple reasons why the government respectfully maintains that probable cause and a warrant are not required for a search of an electronic device at the border.  First, notwithstanding this court's ruling in Sultanov, numerous other courts, including every Circuit court to have considered the question, have rejected similar attempts to apply Riley in the border search exception context.  See, e.g., Mendez, 103 F.4th at 1308 (distinguishing the rationale for searches incident to arrest and those conducted at the border); United States v. Touset, 890 F.3d 1227, 1234 (11th Cir. 2018) ("Our [circuit's precedent makes] clear that Riley, which involved the search-incident-to-arrest exception, does not apply to searches at the border."); Alasaad v. Mayorkas, 988 F.3d 8, 17 (1st Cir. 2021) ("Riley does not command a warrant requirement for border searches of electronic devices nor does the logic behind Riley

compel us to impose one."); see also, e.g., United States v. Wanjiku, 919 F.3d 472, 485 (7th Cir.

2019) ("No circuit court, before or after Riley, has required more than reasonable suspicion for a

border search of cell phones or electronically-stored data."); United States v. Molina-Isidoro, 884

F.3d 287, 292 (5th Cir. 2018) ("Not a single court addressing border searches of computers since

Riley has read it to require a warrant.").  One common refrain in this chorus is that the

government's interests are more heavily weighted in a border search exception analysis than a

search-incident-to-arrest inquiry.  See United States v. Cano, 934 F.3d 1002, 1015-16 (9th Cir.

2019); see also Touset, 890 F.3d at 1234–36 (holding that Riley is limited to the search-incident-

to-arrest exception and does not undermine the government's interest in protecting the border,

particularly as it pertains CSAM interdiction efforts).  Further, the Riley Court's decision was

premised in part on its conclusion that the primary government interests to be weighed in

connection with an arrest – including officer safety and destruction of evidence – did not carry

the same weight when it came to searching the data on a cell phone seized incident to arrest.  See

Mendez, 103 F.4th at 1308 (citing Riley, 573 U.S. at 386)).  On the contrary, in the context of a

border search – a mechanism justified by the government's significant interest in protecting the

border – "warrantless electronic device searches are essential."  See id. (quoting Alasaad, 988

F.3d at 17).

       Second, carving out electronic devices from routine border search authority would

undermine the government's national security efforts.  The defendant asserts that, under Smith,

the government's interest in embargoing contraband is far weaker for digital than physical

material as the former can and does frequently enter the country via the internet, cloud, or other

digital means.  See Def. Mot. at 9-10.  However, the defendant's argument downplays the extent

to which the courts have long recognized routine border searches as a vital tool for achieving the

government's "paramount" goal of ensuring territorial integrity by preventing the introduction of myriad "unwanted persons and effects" into the country, which necessarily includes CSAM.  See e.g., Flores-Montano, 541 U.S. at 152–53 (collecting cases).  Indeed, at least one Circuit has explicitly rejected the argument the defendant rasies, explaining "[t]hat digital contraband like child pornography can pass into the country electronically or be accessed remotely does little to diminish the government's interest in preventing its physical entry into the country."  See Mendez, 103 F.4th at 1309 (citing Touset, 890 F.3d at 1235).  Most, fundamentally, though, the defendant's argument understates the fact that crimes—not to mention evidence related to such activity—are frequently conducted on or facilitated by cell phones.  See United States v. Tineo, No. 23-cr-223 (DLI), 2024 WL 2862289, at *6 (E.D.N.Y. June 6, 2024).  Whether contraband on a cell phone can also be accessed remotely does not acknowledge the significant government interest in ensuring that crimes and criminal activity conducted on or facilitated by cell phones are appropriately interdicted or disrupted by searches conducted at the border.  Accordingly, especially "[g]iven the volume of travelers passing through our nation's borders, warrantless electronic device searches are essential to the border search exception's purpose of ensuring that the executive branch can adequately protect the border."  See Alasaad, 988 F.3d at 17.

Third, it is crucial to note that, in the instant case, the defendant is charged with possessing and transporting child pornography, material that has been singled out as a form of digital contraband that the government has a "strong interest" in excluding from the country.  See Cano, 934 F.3d at 1014-15; see also, e.g., Abidor v. Napolitano, 990 F. Supp. 2d 260, 263-64 (E.D.N.Y. 2013) ("In the 21st century, the most dangerous contraband is often contained in laptop computers or other electronic devices… [this includes] despicable images of child pornography.") (quoting former Department of Homeland Security Secretary Michael Chertoff);

United States v. Cotterman, 709 F.3d 952, 960-61, 966-68 (9th Cir. 2013) (balancing privacy interests and the government's "legitimate" interest in interdicting CSAM by imposing a reasonable suspicion standard for forensic—but not manual—laptop border searches); Tineo, 2024 WL 2862289, at *5–6 (noting that CSAM is the only example of digital contraband of which the court is aware while refusing to limit border search authority to instances in which law enforcement is seeking digital contraband).  Indeed, whether the CSAM can also be accessed remotely does nothing to protect the government interest in preventing and disrupting the possession and transport of CSAM into the country across an international border.

In short, the government respectfully submits that the government's vital stake in keeping a uniquely harmful form of digital contraband out of the country should weigh more heavily in the Fourth Amendment analysis than the significant privacy interests associated with cell phones and the nonphysical nature of illicit material contained thereon.

Separately, the government also disagrees with the defendant's assertion that manual border searches of cell phones are nonroutine and therefore must be supported by reasonable suspicion.  See Def. Mot. at 11-12.  Specifically, the defendant cites a recent case in this District where a court refused to adopt Smith's warrant standard[4] while still finding that, under Riley, manual border searches of cell phones are nonroutine.  See Gavino, 2024 WL 85072, at *4-6. Since the defendant's motion was filed, this Court has also found "that a manual

---

[4] The court reasoned, that "the Smith court does not explain why a cell-phone search—while no doubt sensitive—should be treated as more intrusive than strip searches, alimentary canal searches, or the other intrusive searches for which reasonable suspicion has long been treated as striking the appropriate balance of interests." Gavino, 2024 WL 85072, at *6.  Thus, the Gavino court found that, contrary to Smith, "in the Second Circuit, reasonable suspicion of criminal activity suffices to justify a cell phone border search." Id.

search of a cell phone at the border is a nonroutine search to which a categorical border search exception does not apply." Sultanov, 2024 WL 3520443, at 20.

However, while "the level of intrusion into a person's privacy is what determines whether a border search is routine," Irving, 452 F.3d at 123, Circuit courts adjudicating this issue post-Riley have consistently found that manual border searches of electronic devices—though not always forensic ones—are routine. See, e.g., Touset, 890 F.3d at 1233 ("We see no reason why the Fourth Amendment would require suspicion for a forensic [border] search of an electronic device when it imposes no such requirement for a search of other personal property."); Cano, 934 F.3d at 1016 ("[W]e hold that manual searches of cell phones at the border are reasonable without individualized suspicion, whereas the forensic examination of a cell phone requires a showing of reasonable suspicion."); United States v. Aigbekaen, 943 F.3d 713, 728 (4th Cir. 2019) (citing United States v. Kolsuz, 890 F.3d 133, 137, 144 (4th Cir. 2018)) (holding that manual border searches of electronic devices are routine while forensic ones are nonroutine)). Thus, reasonable suspicion was not necessary to support the manual search of the defendant's phone that was conducted in this case.

    C.    <u>The Search of the Defendant's Cell Phone Was Supported by Reasonable Suspicion</u>

Even had reasonable suspicion been required to conduct a manual search of the defendant's cell phone, as described above, CBP and HSI possessed the requisite suspicion. Therefore, as explained below, the border search was justified.

When determining whether law enforcement agents' investigative activity crossed into nonroutine border search territory, courts consider factors "including unusual conduct of the defendant, discovery of incriminating matter during routine searches, computerized information showing propensity to commit relevant crimes, or a suspicious itinerary." See Irving, 452 F.3d

at 124 (citing United States v. Asbury, 586 F.2d 973, 975-76 (2d Cir. 1978)).  Based on this

framework, "reasonable suspicion is a relatively low standard and border officials are afforded

deference due to their training and experience."  Abidor, 990 F. Supp. 2d at 282 (citing Montoya

de Hernandez, 473 U.S. at 542).  In fact, satisfying this standard "requires only a particularized

and objective basis for suspecting the particular person stopped of criminal activity, based on the

totality of the circumstances."  Gavino, 2024 WL 85072, at *6 (internal quotation marks and

citations omitted).  Indeed, in Gavino, despite taking the position that reasonable suspicion is

required to manually conduct a cell phone border search, the court nevertheless upheld the

validity of the search in question as law enforcement agents reasonably suspected the defendant

of engaging in drug trafficking.  See id.  Thus, even if a search is intrusive to the point that it

may be nonroutine, it is justified so long as it is undergirded by reasonable suspicion.

Regarding border searches involving CSAM, courts have held that agents'

awareness of an individual's involvement in a criminal investigation or a TECS hit can

significantly factor into a reasonable suspicion finding.  See, e.g., Cotterman, 709 F.3d at 968-

69; United States v. Ramirez, No. EP-18-CR-3530-PRM, 2019 WL 3502913, at *15 (W.D. Tex.

Aug. 1, 2019) (holding that CBP had reasonable suspicion to inspect a defendant's cell phone

where his TECS record indicated that he "was linked to the purchase of child pornography" and

he consented to the search); Irving, 452 F.3d at 114–15, 124 (declining to decide if CSAM

uncovered from diskettes and undeveloped film found in the defendant's luggage was obtained

in a nonroutine search as law enforcement agents reasonably suspected criminal activity given

that, among other things, the defendant was named in an investigation into pedophiles traveling

to Mexico to abuse children).  For instance, in Cotterman, CBP initiated a border search of the

defendant's laptop after seeing a TECS entry indicating that he was a sex offender "who was

potentially involved in child sex tourism." 709 F.3d at 957. In finding that agents had

reasonable suspicion to forensically inspect the laptop after password-protected files were

manually found thereon, the court noted that "an alert regarding possession of this type of

criminal contraband justified obtaining additional resources ... to properly determine whether

illegal files were present." See id. at 970. Thus, the TECS hit was a core part of the court's

determination that agents "certainly had more than an inchoate and unparticularized suspicion or

hunch of criminal activity to support their decision to more carefully search for evidence of child

pornography." See id. (internal quotation marks and citation omitted).

      Here, contrary to the defendant's claim that CBP and HSI lacked "an articulable

basis to believe that evidence of any crime ... would be found on [the defendant's] phone," see

Def. Mot. at 12, the reasonable suspicion standard was readily satisfied. The TECS record

available to CBP stated that the defendant was suspected of possibly possessing CSAM, a form

of digital contraband that the government has a strong interest in interdicting at the border. See

Cano, 934 F.3d at 1014-15. Accordingly, based on their training and experience, CBP and HSI

reasonably suspected that this may well be the case. Therefore, akin to Irving, it was reasonable

that CBP and HSI initiated a routine border search of the defendant's iPhone. 452 F.3d at 123.

Indeed, a brief manual search conducted after obtaining the defendant's phone revealed that the

agents and TECS report were correct. Therefore, even under a more exacting standard, the

search in question was supported by reasonable suspicion and the contents of the defendant's

phone should not be suppressed.

    D.    <u>The Good Faith Exception Applies and the Contents of the Defendant's Phone
Should Not be Suppressed</u>

      Ultimately, should the Court, as it did in Sultanov, 2024 WL 352044, at *22, hold

that probable cause and a warrant are necessary to conduct a search of an electronic device at the

border, or find that reasonable suspicion was necessary to search the defendant's iPhone and that

law enforcement agents failed to satisfy that standard, the evidence obtained from his phone

should still not be suppressed.  This is because, as the Court recognized in Sultanov, 2024 WL

352044, at *27-28, the good faith exception to the exclusionary rule applies.  This exception

covers unlawfully obtained evidence "when the [g]overnment acts with an objectively reasonable

good-faith belief that their conduct is lawful."  United States v. Zodhiates, 901 F.3d 137, 143 (2d

Cir. 2018) (internal citation omitted).

        In this Circuit, multiple courts have applied the good faith exception to the

exclusionary rule in cases involving border searches of electronic devices.   For instance, the

Tineo court upheld the validity of a warrantless border search of a cell phone and noted that,

while no constitutional violations occurred in that case, even if such violations had taken place,

suppression would be inappropriate under the good faith exception because, among other things,

law enforcement agents acted pursuant to a warrant.  See 2024 WL 2862289, at *7.  Moreover,

even the Smith court declined to suppress evidence obtained from an extraction of the

defendant's cell phone because it found that the good faith exception to the exclusionary rule

applied.  See 673 F. Supp. 3d at 401-05.  Crucially, the Smith court reasoned that law

enforcement agents may have reasonably believed that existing precedent provided a legal basis

for searching the cell phone, the government had "an objectively reasonable suspicion of Smith's

involvement in criminal activity," and officers ultimately obtained a warrant before completing

their review of an extraction of the device.  See id.

        Here, as in Smith, law enforcement agents were fully justified in believing that

their actions fell within the purview of their border search authority.  As detailed above, a

reasonable officer or agent could believe that the search in question was routine or, even if it was

17

nonroutine, that there was sufficient reasonable suspicion to sustain their actions.  Either belief

would be eminently reasonable given that, at the time of the search in November 2022, Smith

and Sultanov had not yet been decided.  Indeed, even if the search here had post-dated those

cases "a prior holding by a district court cannot establish a binding principle of law sufficient to

undermine an agent's good faith…."  See United States v. Raymonda, 780 F.3d 105, 119 (2d Cir.

2015.  As such, CBP and HSI acted in reasonable reliance on Second Circuit and Supreme Court

precedent that "at most reasonable suspicion [is] required for some more intrusive searches."

See United States v. Kamaldoss, No. 19-CR-543 (ARR), 2022 WL 1200776, at *12 (E.D.N.Y.

Apr. 22, 2022).

Here, as in Smith, Tineo, and Sultanov, law enforcement agents completed their

investigation pursuant to a warrant.  In fact, just one week after the initial border search, Agent

Stepien obtained a warrant to search the defendant's iPhone.  Accordingly, the bulk of this

investigation's fruits were uncovered after a magistrate judge found that there was probable

cause to search the defendant's cell phone.  Thus, in this case, "suppression is inappropriate

[because the agent's] reliance on [the] warrant was objectively reasonable." See, e.g., Smith, 673

F. Supp. 3d at 402-04 (quoting United States v. Ganias, 824 F.3d 199, 223 (2d Cir. 2016) (en

banc)).

As the Supreme Court instructs in the context of the exclusionary rule, "when law

enforcement officers have acted in objective good faith or their transgressions have been minor,

the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the

criminal justice system." United States v. Leon, 468 U.S. 897, 908 (1984) (citing Stone v.

Powell, 428 U.S. 465, 490 (1976)).  Applying the exclusionary rule indiscriminately and

suppressing evidence even when such action is likely to have little deterrent effect on law

enforcement will "generate disrespect for the law and administration of justice." Id. (citing

Stone, 428 U.S. at 491). For this reason, typically, "searches conducted pursuant to a[n]

[objectively reasonable reliance on] a warrant are sufficient to establish that a law enforcement

officer has acted in good faith in conducting the search." Tineo, 2024 WL 2862289, at *7

(citing Leon, 468 U.S. at 922) (internal quotation marks omitted)). Ultimately, so long as law

enforcement officers acted in good faith, evidence obtained pursuant to an invalid warrant will

not be excluded except in the following situations:

> (1) where the issuing [judge] has been knowingly misled; (2) where the issuing
> [judge] wholly abandoned his or her judicial role; (3) where the application is so
> lacking in indicia of probable cause as to render reliance upon it unreasonable;
> and (4) where the warrant is so facially deficient … that reliance upon it is
> unreasonable.

United States v. Falso, 544 F.3d 110, 125 (2d Cir. 2008) (internal citations omitted).

In this case, none of the factors which may defeat the good faith exception to the

Fourth Amendment's warrant requirement are present. First, there is simply no evidence or even

a suggestion that the issuing magistrate judge was misled. A magistrate judge is misled when the

affidavit includes false or misleading statements. Id. at 126. Here, there is no allegation that the

affidavit in support of the search warrant was based on false or misleading information. Second,

there is no basis to conclude that the issuing judge abandoned his judicial role. Such

abandonment occurs when the issuing judge allows himself to become "an adjunct law

enforcement officer," and a member of a "police operation." See United States v. Clark, 638

F.3d 89, 100-01 (2d Cir. 2011) (quoting Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 327

(1979)). Third, the warrant affidavit included adequate probable cause and is not susceptible to

any allegation that a lack of probable cause rendered reliance on it unreasonable. Affidavits

which provide detailed factual allegations, as here, "almost invariably demonstrate reasonable

19

reliance." Id. at 103.  Indeed, the affidavit contains detailed factual allegations regarding the contents of defendant's phone, including citing observations by both a CBP officer and HSI agent about the presence of CSAM on the device.  Def. Mot., Ex. C, ¶¶ 7-8.  Finally, the warrant was not facially deficient because it "particularized the place to be searched and the things to be seized."  Clark, 638 F.3d at 101 (quoting Leon, 468 U.S. at 923).  Here, the place to be searched—the iPhone—was particularly described by both its make, model, serial number, and international mobile equipment identity number.  Def. Mot., Ex. C, ¶ 4.  Further, the warrant's attachment B specifically described the items to be seized during a search of the defendant's iPhone.  Id. at 19-20.

The defendant's motion to suppression his iPhone and its contents should be denied.

## II.   THE STATEMENT TO THE HSI SPECIAL AGENT DID NOT VIOLATE THE FIFTH AMENDMENT

The defendant next argues that his statements made to HSI Special Agent Allen Anstee should be suppressed because he was not provided with Miranda warnings prior to speaking with the agent.  Although the government agrees that the defendant was interrogated by the HSI agent, it respectfully submits that the defendant was not in custody and therefore Miranda warnings were not required.

### A.   Statements Made During a Border Search

A defendant subjected to custodial interrogation must be advised of his right to remain silent and to consult with an attorney.  Miranda v. Arizona, 384 U.S. 436, 471 (1966).  "Custodial interrogation" refers to "questioning initiated by law enforcement after a person has been taken into custody."  Id. at 444.  The provision of Miranda warnings is triggered not simply

by custody or interrogation but by both occurring together.  See Rhode Island v. Innis, 446 U.S. 291, 300 (1980) ("[T]he special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.").

Interrogation occurs when a person "is subjected to express questioning or its functional equivalent."  Id. at 300-01.  It involves "not only … express questioning, but also … any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response…."  Id.  at 301.  It follows then that not all questions or words used by law enforcement will be considered interrogation.  See United States v. Familetti, 878 F.3d 53, 57 (2017).

"'[C]ustody' for Miranda purposes is not coterminous with, though it is often informed by, the colloquial understanding of custody."  United States v. FNU LNU, 653 F.3d 144, 152-53 (2d Cir. 2011).  "Not all restraints on freedom of movement amount to custody for purposes of Miranda."  Howes v. Fields, 565 U.S. 499, 509 (2012).  The inquiry depends not on the subjective beliefs of a law enforcement official or a suspect, but rather on how a reasonable person under the circumstances would view the situation.  See FNU LNU, 653 F.3d at 151 (citing Stansbury v. California, 511 U.S. 318, 323 (1994)).  As part of its inquiry, a court considering whether a defendant was in custody at the time of an interrogation must look at "all the surrounding circumstances" and ask, "how a reasonable [person] in the suspect's position would have understood his situation."  United States v. Faux, 828 F.3d 130, 135 (2d Cir. 2016) (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).  This is an objective inquiry, requiring a determination about "(1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have

21

understood his freedom of action to have been curtailed to a degree associated with a formal arrest." Id. (quoting United States v. Newton, 369 F.3d 659, 672 (2d Cir. 2004)).

The context under which an interrogation occurs further informs a court's determination about whether a person was in custody at the time they made a statement to law enforcement. See FNU LNU, 653 F.3d at 154. For example, a reasonable person would assume a traffic stop to be relatively brief and to be focused on a driver's conduct on the road, making it uncoercive and mitigating the need for Miranda warnings. Id. at 153. Similarly, a traveler arriving at an international border, including an airport, can be expected to be faced with "compulsory questioning," to be deprived for a time of freedom of movement and to be required to submit to "some degree of confinement and restraint." Id. The traveler should expect to be asked questions about their "citizenship, authorization to enter the country, destination, baggage, and so on." Id. at 153-54.

Several additional factors inform the ultimate determination about whether a person may reasonably be considered to have been in custody. See Faux, 828 F.3d at 135 (citing FNU LNU, 653 F.3d at 153). As the Supreme Court has instructed, these include "(1) the location of questioning, (2) its duration, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, (5) and the release of the interviewee at the end of questioning." See Howes, 565 U.S. at 509 (collecting cases); see also, United States v. Santillan, 902 F.3d 49, 60-61 (2d Cir. 2018) (citing Tankleff v. Senkowski, 135 F.3d 235, 243-44 (2d Cir. 1998)) ("[R]elevant factors are whether the suspect is told that he or she is free to leave, the location and atmosphere of the interrogation, the language and tone used by the law enforcement officers, whether the subject is searched or frisked, and the length of the interrogation."). Whether a person is directly told that they are not under arrest is an important

factor to be considered.  See Newton, 369 F.3d 659, 676 (2d Cir. 2004).  An additional relevant factor is whether "weapons were present and especially whether they were drawn."  FNU LNU, 653 F.3d at 153.  While the nature of the questions asked by an interviewer is important, no one factor is dispositive, and a Court must consider the totality of the circumstances.  See id. at 154-55.  "[A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'"  California v. Beheler, 463 U.S. 1121, 1124 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  Further, Miranda warnings are not required simply because a law enforcement officer has probable cause to arrest the person they are interviewing.  FNU LNU, 653 F.3d at 150 .

    B.    <u>The Defendant Was Not In Custody at the Time of His Statements to HSI and Miranda Warnings Were Not Required</u>

        The defendant, an international traveler who was returning to the United States, was not in custody at the time he was interviewed by Agent Anstee and therefore Miranda warnings were not required.  Although the defendant was taken to a private room where Agent Anstee spoke to him regarding his secondary inspection and cell phone, the location and nature of the discussion are but two factors to consider in a wider analysis.  See id. at 154-55.  At the time of the interview, the defendant was not handcuffed and was informed that he was not under arrest.  Indeed, as recounted in Agent Anstee's report, the defendant acknowledged that he understood that he was not under arrest and that a border search was being conducted.  See Def. Mot., Ex. B.  Moreover, at the conclusion of the interview and after the defendant had completed all of his CBP border checks, he was permitted to enter the United States, thus corroborating that he was not under arrest.

The duration of Agent Anstee's interview with the defendant further demonstrates that the defendant was not in custody.  As the defendant admits, he was only interviewed by Agent Anstee for "approximately 10 or 15 minutes."  Def. Mot, Ex. A, ¶ 12.  Courts have found that defendants were not in custody in cases where interviews lasted for far longer periods of time.  For example, in <u>FNU LNU</u>, after reviewing the totality of the circumstances, the Second Circuit found that the defendant was not in custody even though she was interrogated by a CBP officer for 90 minutes.  653 F.3d at 154-55.

To be sure, the defendant's entire secondary inspection, during which he first interacted with CBP officers and was mostly in a sitting area, lasted approximately three hours and this is a factor to consider in the totality-of-circumstances analysis.  However, the defendant's motion papers incorrectly describe the chronology of events.  They also contain instances of internal inconsistency.  For example, the defendant's motion states that "the interview was conducted after nearly three hours' detention."  Def. Mot. 15.  In the defendant's affidavit, he states that the HSI agent arrived to meet with him "[a]t approximately 8 p.m."  This was approximately two and a half hours after the defendant was first directed to a secondary inspection and a full hour before the defendant was told he was free to go and left the secondary inspection area.  Indeed, approximately a third of the time the defendant spent in the secondary inspection area occurred <u>after</u> the interview with Agent Anstee concluded and is thus not relevant to the question of whether he was in "custody" at the time of the interview.

Further review of the totality of the circumstances demonstrates that the defendant was not in custody.  As stated previously, the defendant was informed that he was not under arrest and indicated that he understood.  This is an important factor to consider when making the objective determination regarding whether a defendant was in custody, especially in

24

circumstances where the defendant was unrestrained.  See Newton, 369 F.3d at 676.  The

defendant was not handcuffed and, other than being instructed that he could not leave the

secondary inspection area, was not restrained in any way.  In addition, none of the law

enforcement officers or agents involved in the defendant's secondary inspection displayed a

weapon and the defendant was not subjected to practices ordinarily associated with an arrest,

such as fingerprinting.  This is in contrast to FNU LNU, where the defendant was escorted

directly to a private room by armed guards, fingerprinted and told she could not leave. 653 F.3d

at 146-47.  Yet, even under those circumstances, which the government submits are more akin to

a formal arrest then those present in the instant case, the Court ultimately found under the

"totality of the circumstances" that the defendant was not in custody.  Id.  at 155.  This was

because officers did not draw their weapons, the defendant was not physically restrained, and –

in the Court's view – all of the questions asked appeared relevant to the defendant's admissibility

to the county.  Id.  Finally, in the present case, the defendant was not ultimately arrested and was

allowed to go on his way.  Under these circumstances, a reasonable person examining the

circumstances would conclude that the defendant was not in custody and therefore Miranda

warnings were not required.

     C.    The Defendant's Statements Were Voluntary

       The Fifth Amendment requires that a defendant's statements have been made

voluntarily before they may be admitted in evidence against him at trial.  Dickerson v. United

States, 530 U.S. 428, 433 (2000).  A statement is voluntary when it is "the product of a free and

deliberate choice rather than intimidation, coercion, or deception."  United States v. Mendonca,

88 F.4th 144, 163 (2d Cir. 2023) (quoting United States v. Plugh, 648 F.3d 118, 127 (2d Cir.

2011)).  The Fifth Amendment's protection against self-incrimination is violated when a

statement is obtained thorough methods which offend due process or when a "suspect clearly had

no opportunity to exercise 'a free and unconstrained will.'" See Oregon v. Elstad, 470 U.S. 298, 304 (1985) (quoting Haynes v. Washington, 373 U.S. 503, 514-15 (1963)).  Evaluating whether a defendant's statement was voluntarily made, generally requires an examination of "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials."  Mendonca, 88 F.4th at 164 (quoting United States v. Haak, 884 F.3d 400, 409 (2d Cir. 2018)).  The inquiry requires a determination of whether "the defendant's will was overborne."  United States v. Shvartsman, No. 23-cr-307 (LJL), 2024 WL 1193703, at *26 (S.D.N.Y. Mar. 20, 2024) (quoting United States v. Kourani, 6 F.4th 345, 351-52 (2d Cir. 2021)).

Here, the defendant's statements to Agent Anstee were voluntary.  The government is unaware of any characteristic of the defendant which would make him uniquely "prone to coercion."  Shvartsman, 2024 WL 1193703 at *27 (reviewing a defendant's characteristics and finding him to be intelligent and understanding of his situation).  Nor does the defendant identity any such characteristic in his motion to suppress.  Agent Anstee's notes of his encounter with the defendant reflect that the defendant appeared understanding of the circumstances.  Def. Mot., Ex. B ("The TARGET advised that he understood that he was not under arrest and that the Border Search was being conducted.").

There is also nothing about the conditions of the defendant's interview which indicate that it was conducted under coercive circumstances.  Other than his concern about the length of time he was kept in the secondary inspection area, the defendant's declaration appended to his motion papers, Def. Mot, Ex. A, does not identify any condition that would have contributed to a coercive atmosphere.  There is no indication that the defendant was denied

access to the restroom, food or water.  See Shvartsman, 2024 WL 1193703, at *27 (exploring factors which might render a statement involuntary).

Moreover, other factors demonstrate the voluntariness of the statements, including the length of the defendant's interview with Agent Anstee.  As described above, the entire interview was only approximately fifteen minutes long, far shorter than other interviews which have been found to be voluntary.  See id. (collecting cases).  Further, the conduct of the law enforcement official involved—in this case Agent Anstee—contributed to the voluntariness of the defendant's statements.  The defendant's declaration makes no reference to any threats or intimidation on the part of Agent Anstee or any of the CBP officers involved in his secondary inspection.  In fact, Agent Anstee specifically told the defendant that he was not under arrest, see Def. Mot., Ex. B, and the defendant was not physically restrained at any time during the secondary inspection.  Under the totality of the circumstances, the defendant's statements to Agent Anstee were voluntary and suppression is not warranted.  See United States v. Taylor, 745 F.3d 15, 23-24 (2d Cir. 2014) (quoting United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)) (explaining that a voluntariness inquiry must examine the "totality of the circumstances").

III.   THE SEARCH OF THE DEFENDANT'S LAPTOP, USB THUMB DRIVE, AND MEMORY CARD WAS REASONABLE AND DID NOT VIOLATE THE FOURTH AMENDMENT

Relying on United States v. Smith, 967 F.3d 198, 205 (2d Cir. 2020), the defendant argues that evidence obtained following the search of his laptop, a USB thumb drive, and a memory card should be suppressed because the delay in obtaining a warrant to search those devices was unreasonable.  Def. Mot. 18.  However, law enforcement was actively investigating the defendant's conduct, including reviewing the contents of his cell phone pursuant to a prior search warrant, before obtaining a warrant for his additional devices.  Therefore, any delay in obtaining the subsequent warrant was justified and defendant's motion should be denied.

A.     Law Enforcement Must Promptly Obtain a Warrant to Search a Seized Device

In United States v. Smith, the Second Circuit considered the Fourth Amendment

implications of law enforcement's delay in seeking a warrant to search an electronic device.  967

F.3d at 202.  There, a New York State Police trooper observed the defendant with a tablet

displaying an image of possible child pornography.  Id. at 202.  The trooper seized the tablet but

did not seek a search warrant for over one month.  Id. at 203.  The Second Circuit found this

delay to be unreasonable and a violation of the defendant's rights under the Fourth Amendment.

Id. at 202, 211.  In reaching this conclusion, the Court explained that four factors are pertinent

when considering whether a delayed search was unreasonable: "(1) the length of the delay; (2)

the importance of the seized property to the defendant; (3) whether the defendant had a reduced

property interest in the seized item, and (4) the strength of the state's justification for the delay."

Id. at 206 (citation omitted).  The Court found the month-long delay between the seizure of the

device and the warrant application to "well exceed[] what is ordinarily reasonable, that the

defendant had a strong property interest in his device, and that law enforcement did "very little

investigation" between the seizure of the device and the application for the warrant.  Id. at 207-

10.  In balancing the relevant factors, the Court found that they weighed in favor of finding

unreasonable delay and a Fourth Amendment violation.  Id. at 211.

Although it held that the delay was unreasonable, the Court found that law

enforcement had not "acted with deliberate intent to violate [the defendant's] rights or that it was

reckless or grossly negligent … to allow a month to slip by before applying for a search

warrant."  Id. at 212.  As a result, the Court explained that application of the exclusionary rule

was not warranted and suppression was inappropriate.  Id. at 212-13.

B.    The Delay in Searching The Additional Devices Was Reasonable

The present case is not Smith.  The government does not dispute that approximately two months passed between when the defendant's devices were detained by HSI under its border authority and when a warrant was obtained.  However, an examination of the relevant factors shows that, in totality, they weigh in the government's favor.

As the Smith Court instructed, "independent weight" must be given to the length of the delay and a "month-long delay well exceeds what is ordinarily reasonable." Id. at 207.  As explained above, there is no dispute that authorization to search the defendant's laptop, USB drive, and memory card was obtained two months after they were seized.  This factor weighs in favor of the defendant.

The Court must also consider the importance of the seized property to the defendant. Id. at 207.  Certainly, a person's electronic devices, which may store a wealth of personal and sensitive information, are presumptively important to them. Id.; see also United States v. Daskal, 676 F. Supp. 2d 153, 168 (E.D.N.Y. 2023) (discussing the importance of electronic devices).  However, the Court must also consider the "particular significance of "a device to the defendant, whether the defendant had alternate devices, and whether a request was made for a device's return." Smith, 967 F.3d at 208.

 The defendant's declaration submitted in support of his motion does not claim that these additional devices had any significance to him. See Def. Mot, Ex. A.  The government is unaware of any request by the defendant for the return of the devices, and the defendant's declaration does not claim that he sought their return.  Moreover, the defendant appears to have had alternate devices at his disposal.  Upon the execution of a warrant at his residence in May 2023, following his indictment, law enforcement recovered hard drives, an iPhone, USB drives, and a computer from the defendant's residence, showing that he had these other devices for his

29

use.  These circumstances show that this second factor—the importance of the property to the defendant—weighs in the government's favor.  See Smith, 967 F.3d at 208 (finding the spare detail about a device's importance, the fact that alternative devices were available, and the fact that the defendant did not request the device back to weigh in favor of the government); see also United States v. Green, No. 18-CR-121 (RJA)(MJR), 2021 WL 1877236, at *5-6 (W.D.N.Y. Feb. 3, 2021) (explaining that the lack of evidence that a device was important to a defendant or that it was needed working in conjunction with the defendant's incarceration weighed in favor of the government).

Next, the Court must examine "whether the defendant had a reduced property interest in the seized item."  Smith, 967 F.3d at 208.  The Smith Court instructed that, even in cases where probable cause to seize an electronic device exists and reduces a person's property interest in it, law enforcement's interest is "delimited by the obligation to seek a search warrant without unreasonable delay."  Id. at 209.  The analysis also requires an inquiry into whether a defendant did something "to reduce his property interest by means of consent or voluntarily relinquishing control" of a device.  Id. at 208.  The level of law enforcement suspicion regarding a device also affects the analysis.  See United States v. Chang, No. 18-CR-681 (NGG), 2024 WL 1308775, at *8 (E.D.N.Y. Mar 27, 2024) ("[T]here are several elements that encompass the strength of this property interest [including] … the police's level of suspicion, meaning probable cause or reasonable suspicion."  (quoting United States v. Tisdol, 544 F. Supp. 3d 219, 226-27 (D. Conn. 2021)).

Here, the defendant had a reduced property interest in his electronic devices and this factor weighs in the government's favor.  As discussed above, CBP and HSI had reasonable suspicion to detain and search the defendant's devices because he was identified in a TECS

record as potentially possessing child pornography.  In today's world, child pornography almost exclusively is found in digital format and so it was reasonable for CBP and HSI to be concerned with any electronic media storage devices in the defendant's possession.  Further, although an initial examination of the defendant's laptop did not result in the discovery of child pornography, CBP officers did observe child pornography on the defendant's phone.  This discovery only served to heighten law enforcement's suspicion that other electronic devices may have contained additional child pornography.  Therefore, the government submits that CBP and HSI were justified in safekeeping the defendant's other devices to allow for further investigation.  The items became part of a criminal investigation, and law enforcement was permitted to detain and safekeep them to develop probable cause to search them.  See Tisdol, 544 F. Supp. at 227 (explaining how confiscation as part of an ongoing investigation may further reduce a person's interest in an electronic device).

The final factor to consider is the government's justification for the delay in seeking a warrant to search a device.  Smith, 967 F.3d at 210.  In Smith, the Court noted that the New York State police did not appear to have "engaged in any investigation" for nearly the entirety of the delay between seizure and the seeking of a warrant.  Id.  However, when the government has a reasonable justification for the delay in seeking a warrant, including ongoing investigation, this serves to tip this factor in the government's favor.  See, e.g., United States v. Corbett, No. 20-CR-213 (KAM), 2021 WL 4480626, at *6 (E.D.N.Y. Sept. 30, 2021) (finding that the fourth Smith factor weighed in the government's favor, in part, because the government continued to investigate and the warrant affidavit cited new evidence obtained after a device's seizure); Chang, 2024 WL 1308775, at *9 (finding that the government's continued investigation

and the agent's needs to learn the facts of the case contributed to justifying the delay in seeking a warrant).

In this case, the delay in obtaining a warrant for the defendant's additional devices was justified.  This is not a case where law enforcement did not engage in any investigation between seizure of the devices and the obtaining of a search warrant.  On the contrary, the assigned HSI agent applied for a warrant for the defendant's cell phone only days after it was detained.  The warrant was then executed, data extracted from the phone, and an examination of that data began.  The examination required the review of at least 241,872 files.  In conducting that review, the assigned agent identified over 230 images containing CSAM and over 450 videos.  There were over 2,360 individual images which were age difficult and an additional over 570 videos which were age difficult or contained bestiality.  Simply put, this process took time.  Further still, the investigation continued and required an examination of chats and other communication files because the evidence viewed suggested the defendant was in direct communication with children to obtain pornographic images. That investigation of the defendant's phone was still ongoing in January 2023, when the agent applied for a search warrant for the remaining devices.

The agent relied on the probable cause obtained from the judicially authorized search of the defendant's phone to apply for the warrant to search the additional devices.  The affidavit in support of the second warrant contains details about the search of the defendant's phone, including the number of CSAM files found on the device, a description of them, and his assessment that more CSAM files would be found in other devices.  Def. Mot., Ex. D, ¶¶ 11-13.  The information from the first search directly supported the second warrant application.  This

was especially important under the circumstances because CSAM was not found during the border search of the defendant's laptop.

The government disagrees with defendant's claim that probable cause for the additional devices already existed at the time of their seizure and that this continuing investigation was "not essential." See Def. Mot. at 20. As stated, a review of the defendant's laptop by CBP and HSI during the border search found no CSAM on the laptop. The government does not believe that a magistrate judge in this Court would have approved a warrant to search the laptop, USB drive and memory card in those circumstances. It was only after the examination of the defendant's cell phone yielded such a large amount of CSAM that law enforcement could be confident that additional CSAM would be found after a more thorough search of the other devices and could state in the warrant affidavit that they believed the presence of such a significant amount of CSAM on the defendant's phone provided probable cause that CSAM would be located and found on the defendant's other devices.

The defendant's position is a variation on the "heads I win, tails you lose" conundrum. He essentially urges this Court to adopt a rule that the government must proceed to seek a warrant even when probable cause for a search is thin. In such a case, anything the government finds in such a search is potentially subject to later suppression on the ground that the affidavit did not contain sufficient probable cause. But if the government waits to further develop probable cause, any delay may also potentially lead to suppression of the warrant. But the defendant's position is not correct. The government need not face this dilemma because, consistent with the Fourth Amendment, it is permitted to continue its investigation and obtain robust probable cause before seeking a search warrant. See Chang, 2024 WL 1308775, at *9; Corbett, 2021 WL 4480626, at *6.

C.    The Exclusionary Rule Does Not Require Suppression

Even if the court were to find that delay in seeking a warrant was unreasonable, the court should not suppress the evidence found on the laptop, USB drive and memory card. Indeed, in the primary case on which the defendant relies, the Smith court—while finding that law enforcement's delay in seeking a search warrant was unreasonable—nevertheless declined to suppress the evidence. Rather, the Smith court held that the exclusionary rule did not require suppression. Smith, 967 F.3d at 212-13. As the Court explained, "the exclusionary rule applies only if the police have violated the Constitution deliberately, recklessly, or with gross negligence, or if a constitutional violation is the product of recurring or systemic negligence." Id. at 211 (quoting Davis v. United States, 564 U.S. 229, 236-40 (2011)). The rule does not apply to "isolated simple negligence, because the exclusion in such circumstances will not result in appreciable deterrence of police misconduct." Id. at 211-12 (quoting Davis, 564 U.S. at 237-38)). Given the record there, where there was no evidence of deliberate intent to violate the Fourth Amendment, suppression was not warranted. Id. at 212.

The same rationale applies here. Even if the Court were to find that Agent Stepien's delay in seeking the January 2023 Warrant was unreasonable, there is no evidence that he acted to intentionally violate the defendant's rights. On the contrary, the pertinent facts demonstrate that the opposite is true. Agent Stepien acted promptly in obtaining a warrant for the defendant's cell phone only a few days after its detention at the airport. This conduct evinces diligence, not negligence and an effort to preserve the defendant's rights, not violate them. Given the ongoing investigation, the fact that the border search did not detect CSAM on the defendant's laptop, and the fact that a second warrant was obtained based on information discovered as a result of the first warrant, it cannot be said that a reasonably well-trained agent would have known the later search was illegal. Id. (citing Herring v. United States, 555 U.S.

135, 145 (2009)).  Therefore, the exclusionary rule does not require suppression.  See Chang, 2024 WL 1308775, at *11 (declining to apply the exclusionary rule when no evidence that law enforcement deliberately violated the Fourth Amendment); Green, 2021 WL 1877236, at *8-9 (finding that the exclusionary rule should not apply where there was no evidence of "deliberate, reckless, or grossly negligent" conduct or "systematic or reoccurring negligence"); Corbett, 2021 WL 4480626, at *7 (same).

<u>CONCLUSION</u>

      For the reasons stated above, the defendant's motion should be denied in its entirety.

Dated:     Brooklyn, New York
           August 9, 2024

                     Respectfully submitted,

                     BREON PEACE
                     UNITED STATES ATTORNEY
                     Eastern District of New York
                     271 Cadman Plaza East
                     Brooklyn, New York 11201

               By:   /s/ Gilbert M. Rein        
                     Gilbert M. Rein
                     Assistant United States Attorney
                     (718) 254-6407

1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2    - - - - - - - - - - - - - X
      UNITED STATES OF AMERICA,    :   23-CR-00192 (NRM)
 3                                  :
                                    :
 4        -against-                 :
                                    :   United States Courthouse
                                    :   Brooklyn, New York
 5    JASON ROBINSON,               :
                                    :
 6         Defendant.               :   January 8, 2025
                                    :   11:00 a.m.
 7                                  :
      - - - - - - - - - - - - - X
 8  REDACTED TRANSCRIPT OF CRIMINAL CAUSE FOR SUPPRESSION HEARING
            BEFORE THE HONORABLE NINA R. MORRISON
 9              UNITED STATES DISTRICT JUDGE

10
                  A P P E A R A N C E S:
11
    For the Government:      BREON PEACE, ESQ.
12                           United States Attorney
                             Eastern District of New York
13                               271 Cadman Plaza East
                                 Brooklyn, New York 11201
14
                             BY:  GILBERT REIN, ESQ.
15                                NICHOLAS MOSCOW, ESQ.
                                  Assistant United States Attorneys
16
    For the Defendant:       FEDERAL DEFENDERS OF NEW YORK, INC.
17                               One Pierrepont Plaza
                                 Brooklyn, New York 11201
18
                             BY:  BENJAMIN YASTER, ESQ.
19

20

21  Court Reporter:          JAMIE ANN STANTON, RMR, CRR, RPR
                             225 Cadman Plaza East
22                           Brooklyn, New York 11201
                             Telephone: (718) 613-2274
23                           E-mail: JamieStanton.edny@gmail.com

24
    Proceedings recorded by computerized stenography.  Transcript produced by
25  Computer-aided Transcription.
```

*Proceedings*                                                        2

1          (In open court.)

2          THE COURTROOM DEPUTY:  Criminal cause for a

3   suppression hearing for case number 23-CR-192.  USA v. Jason

4   Robinson.

5          Counsel, please state your appearance for the

6   record, starting with the Government.

7          MR. REIN:  Good morning, Your Honor.

8          Gilbert Rein for the United States.  And I'm

9   joined by my colleagues, Nicholas Moscow, an AUSA in our

10  office; our paralegal, Emma Tavangari, and Special Agent

11  Richard Stepien from the Department of Homeland Security

12  Investigations.

13         THE COURT:  Good morning, everyone.

14         MR. YASTER:  Good afternoon, Your Honor.

15         Federal Defenders by Benjamin Yaster on behalf of

16  Jason Robinson who is seated to my right.  I'm also joined

17  at counsel's table by Jessica Hernandez.  She's an

18  investigator with our office.

19         THE COURT:  Good morning, everyone.

20         Mr. Robinson, I think this may be the first time

21  we met in person; is that right?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Good to see you, sir.

24         So we are here for a hearing on the defense's

25  Motion to Suppress.  I will just note for the record

*Proceedings* 3

1  pursuant to the parties' letters exchanged over the last

2  couple of weeks and filed on the docket, the parties are in

3  agreement that the Court should deny without prejudice as

4  moot those portions of the defendant's motion which relate

5  to suppression, the portions in which he sought suppression

6  of -- I don't know have the exact list in front of me -- but

7  essentially all of the items listed in the motion from which

8  physical evidence or digital evidence was obtained other

9  than Mr. Robinson's iPhone, as well as the defense's Motion

10 to Suppress the statements made to law enforcement at the

11 airport entering his interview as moot because the

12 Government does not intend to offer such evidence at trial.

13          Have I stated that correctly?

14          MR. REIN:  That's correct, Judge.

15          THE COURT:  Anything further from the defense on

16 that?

17          MR. YASTER:  No, Your Honor.

18          THE COURT:  That portion of the motion will be

19 denied as moot with prejudice to renew if the Government's

20 position happens to change.

21          So we are here today for an evidentiary hearing on

22 the circumstances surrounding the search both at the airport

23 and then the subsequent warrant regarding Mr. Robinson's

24 iPhone.  And the hearing is going to be limited to those

25 issues.

*Proceedings*                                                    4

1        Let me just take up a couple of housekeeping

2   matters.  First, I wanted to let you all know, I think I'm

3   probably not going to want to hear oral argument from you

4   today after the testimony.  I find it can be helpful for me

5   to have a little time to think about the facts that have

6   been put on the record so I can go back and look at the

7   relevant law and think about what questions I want to ask

8   each of you and potentially look at a rough transcript in

9   the intervening time.  So most likely I will want you to

10  come back in a week or two for that.

11       Mr. Robinson, you are welcome to appear by video

12  for that portion or you are welcome to be here, whatever you

13  prefer.

14       So we can talk about scheduling if we finish with

15  the testimony today, which I'm hopeful that we will.  And

16  just to let you all know that.

17       Okay.  A couple of other things.  I did get an

18  application from the Government under seal, filed on the

19  docket under seal regarding two potential *Giglio* issues that

20  I appreciate them disclosing out of an abundance of caution

21  in which the Government urged me not to permit the defense

22  to inquire about at this hearing, arguing -- and this is a

23  rough summary, but in essence -- that neither of these prior

24  instances of past conduct by the two law enforcement

25  witnesses bore on their credibility particularly given the

*Proceedings*                                                        5

1    subjects about which they were to testify or likely to

2    testify at this hearing.  This is the motion to limit

3    cross-examination filed on the docket at ECF 41.

4           So let me first ask -- I didn't direct the defense

5    to do a written response because I didn't think it was

6    necessary, but let me ask you, Mr. Yaster, do you intend to

7    inquire about either of these incidents?

8           MR. YASTER:  I don't.

9           THE COURT:  I will grant the application as

10   unopposed.

11          Next, with respect to the TECS hit and audit

12   report, the Government filed an ex parte at my request and a

13   fully un-redacted version, or I should say, rather than

14   filed, provided it to me through my court deputy of the TECS

15   hit and audit report of which I reviewed and indicated that

16   it was going to provide the defense with not a fully

17   redacted copy but a less redacted copy.

18          Have you done that, Mr. Rein?

19          MR. REIN:  We have done that.  And just to

20   clarify, Judge, the copy that was filed ex parte or under

21   seal was a fully redacted copy.  So we did provide it to

22   Your Honor's deputy, but it's also on the docket as

23   un-redacted.

24          THE COURT:  So there's a record of what I have

25   been provided?

Proceedings                                                    6

1          MR. REIN:  Yes.

2          THE COURT:  But the defense does not have access

3    to that.

4          MR. REIN:  They do not have that.  They have a

5    copy of the letter that was filed in connection with it and

6    a copy of a less redacted copy of a TECS report and the

7    audit history was provided to the defense.

8          THE COURT:  I did not think to ask you for the

9    less redacted copy myself before the hearing, but it does

10   occur to me that I should, you know, at least prior to the

11   time that we are going to hear from a witness who claims to

12   have relied on that information, that I should review it to

13   see if any additional information that's not in there that's

14   in the un-redacted copy should be disclosed.

15         MR. REIN:  We have a copy and we could provide it

16   to Your Honor now.

17         THE COURT:  Let's do that.  I don't mean to delay

18   things further, but I think it would be helpful for me to

19   take a look at it.

20         Do you happen to have two, by any chance?

21         MR. REIN:  Two copies of it?

22         THE COURT:  Yes.

23         MR. REIN:  We do.

24         THE COURT:  Okay, thank you.

25         MR. REIN:  And, Judge, we would just ask, after

*Proceedings*                                                              7

1   Your Honor reviews it, if we could just confer at sidebar if

2   there is information you would like to review?

3             THE COURT:  Yes, let's do that.

4             So this is the TECS report.  Is the audit record

5   separate?  Was there a separate less redacted version

6   provided as well?

7             MR. REIN:  There is, Judge.  I don't think I have

8   a hard copy of it.

9             THE COURT:  Okay.  Why don't you go ahead and if

10  you can e-mail that to Freddie and then --

11            MR. REIN:  I will do that now, Judge.

12            THE COURT:  I am going to just compare the TECS

13  report right now.

14            While you are pulling up the audit report, I am

15  going to briefly take the Government at sidebar just to ask

16  a couple of questions.  Before I do, I will just say for the

17  record that one of the redactions seems to me to be

18  appropriate and goes to investigative methods, so I will

19  just briefly at sidebar make a record as to why I believe

20  that's appropriate and then I have a couple of questions

21  about the others.

22            So I will move now just with the Government only

23  to sidebar for that portion of our colloquy.  Thanks.

24            (Continued on the following page.)

25



*Sealed by Order of the Court*

9





A083

*Proceedings*                                                                11



*Proceedings*                                                    12

1        (In open court.)

2        THE COURT:  We're back on the record.

3        Having now spoken with Counsel for the Government

4   at sidebar and that portion of the record will remain under

5   seal, I have reviewed with them each of the proposed

6   redactions.  I've also confirmed with them that I may say

7   the following regarding the bases for the redactions, each

8   of which I have approved.

9        First, on page 1, there are certain redactions at

10  the bottom that involves proprietary information retained

11  and maintained by the Transportation Security Administration

12  that is not related to the Government's proffered reasons

13  for the search of Mr. Robinson's devices or his interview

14  and I also am satisfied that it is not information that

15  would aid the defense in its cross-examination of any of the

16  individuals who did conduct the search or the interview.  So

17  I've accepted those redactions.

18       On page 2, the redactions relate to general

19  investigative methods and not the specifics of the basis for

20  the search of Mr. Robinson.  And so because it relates to

21  law enforcement methodology in other cases involving

22  potential child sexual abuse material, I've permitted those

23  redactions.

24       On page three, the name of an analyst employed by

25  CBP is redacted.  I confirmed with the Government that that

*Proceedings*                                                   13

1   individual had no involvement in this search or interview of

2   Mr. Robinson and did not communicate with the agents or

3   individuals who conducted the search prior to when it was

4   conducted and also had no involvement in the preparation of

5   the search warrant.  So therefore, I don't find it's

6   relevant to the hearing, there are compelling law

7   enforcement reasons to keep that individual's identity from

8   disclosure for purposes of this hearing.

9           And I think that is all regarding these.

10          So Government's GX 101 will be admitted into

11  evidence as provided to the defense with these redactions.

12  Thank you.

13          THE COURT:  All right.  Are you all ready to

14  proceed?

15          MR. REIN:  We are, Judge.

16          THE COURT:  I don't think I need opening

17  statements from you all, since I've read the motion papers,

18  so you can go ahead and proceed with your first witness.

19          MR. REIN:  Judge, I will give you a brief overview

20  of who we intend to call.

21          THE COURT:  Sure, that's fine.

22          MR. REIN:  We have three witnesses who we intend

23  to call today.  The first is Officer Nunes.  The second is

24  an investigator with our office, Egbert Simon who used to be

25  a CBT officer.  And then we're going to call Special Agent

*Proceedings* 14

1    Stepien.  So we'll begin by calling Officer Nunes.

2            THE COURT:  Okay, thank you.

3            And is it N-U-N-E-S?

4            MR. REIN:  N-U-N-E-S, but it's pronounced "Nunes."

5            THE COURT:  I'm so sorry, before we call him, I

6    forgot we were still going to look at the audit history

7    redactions, so let's go ahead and do that.  I apologize.

8            MR. REIN:  Yes.  I sent that to Freddie.

9            THE COURT:  It will just take a minute to get a

10   physical copy.

11           (Pause in proceedings.)

12           THE COURT:  Let me have the Government come

13   briefly to sidebar to discuss these redactions.  Thank you.

14           (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

*Sealed by Order of the Court* 15









*Sealed by Order of the Court*                18

Proceedings                                    19

1        (In open court.)

2        THE COURT:  We're back on the record with all

3   parties.  The transcript of the sidebar we just held will

4   remain sealed.

5        I reviewed the five-page audit report and compared

6   the redacted and un-redacted versions.  I did want to let

7   the defense know that at the very top of the audit report on

8   each page, there is a redacted name, presumably, after

9   "generated by."  It turns out the Government does not

10  actually know the name of the individual who is listed there

11  either because they received this document from another

12  agency.  On a break, they're going to make an inquiry to

13  find out whose name is there and then I will determine if

14  that individual's name should be disclosed, if the

15  Government has any objection to doing so.

16       The remaining redactions all relate to the same

17  individual or information in the audit report whose

18  redactions I previously allowed, so those will stand for the

19  same reasons listed on the record previously.  All right?

20       Okay.  Now I think we are ready to have you call

21  your first witness, Mr. Rein.

22       MR. REIN:  Thank you, Judge.

23       The Government calls Officer Shahamin Nunes.

24       (Witness takes the stand.)

25       THE COURTROOM DEPUTY:  Please raise your right

*Nunes - Direct - Mr. Rein* 20

1   hand.

2           (Witness sworn.)

3           THE WITNESS:  I do.

4           THE COURTROOM DEPUTY:  Please state and spell your

5   name for the record.

6           THE WITNESS:  Shahamin Nunes.  S-H-A-H-A-M-I-N,

7   last name is N-U-N-E-S.

8           THE COURT:  All right.  Ms. Nunes, have a seat.

9   Just pull the mic down and close to you so the court

10  reporter can get what you are saying.

11          THE WITNESS:  Sure.

12          MR. REIN:  May I inquire, Judge?

13          THE COURT:  Yes.

14  **SHAHAMIN NUNES,**

15          called a witness, having been first duly

16          sworn/affirmed was examined and testified

17          as follows:

18  DIRECT EXAMINATION BY

19  MR. REIN:

20  Q    Good morning, Officer Nunes.

21  A    Good morning.

22  Q    Are you currently employed?

23  A    Yes, I am.

24  Q    And where do you work?

25  A    I work with U.S. Customs and Border Protection.

*Nunes - Direct - Mr. Rein*                                    21

1   Q     How long have you been employed with U.S. Customs and

2   Border Protection?

3   A     Five years, going on six.

4   Q     And is U.S. Customs and Border Protection also known as

5   CBP?

6   A     It is.

7   Q     And what is your title with CBP?

8   A     I am a CBPO, Customs and Border Protection Officer.

9   Q     Can you briefly describe for us, what is CBP?

10  A     We're an agency, a U.S. federal agency that's tasked

11  with being in the front lines for the borders of the United

12  States.  We regulate trade and basically oversee

13  immigration.

14  Q     In furtherance of that mission, does CBP station its

15  officers at particular locations throughout the country?

16  A     Yes, we do.

17  Q     What are those locations include?

18  A     We're located at the airports, seaports and the

19  borders.

20  Q     And what type of work do those officers do at those

21  locations?

22  A     We process passengers at the airports and also at the

23  borders, anyone coming into or out of the United States, we

24  basically regulate travel.

25  Q     What type of training did you receive when you first

A094

*Nunes - Direct - Mr. Rein*                                    22

1   joined CBP?

2   A    So I went to an academy in Georgia for four months,

3   called FLETC, Federal Law Enforcement Training Center, where

4   they taught you to be an officer, all the tasks and duties.

5   Q    Do you continue to receive additional training on a

6   regular basis?

7   A    I do.  Mostly, computer-based training.

8   Q    Can you just describe for us what that consists of?

9   A    So courses, we have to complete courses basically every

10  quarter.  And on a computer that basically refreshes us on

11  policies and different things that the agents wants us to

12  know.  And we also do our tactics training and firearms

13  training every quarter.

14  Q    Do you have a specific assignment within CBP currently?

15  A    Yes.  Currently I'm a secondary officer.

16  Q    And what are your responsibilities as a secondary

17  officer?

18  A    I conduct secondary inspections in passport control

19  secondary area.

20  Q    And are you assigned to a particular location?

21  A    Yes.  I'm at JFK, John F. Kennedy International

22  Airport, and I'm at Terminal 7.

23  Q    What was your assignment in November of 2022?

24  A    I was assigned as a secondary officer.

25  Q    You mentioned that you conduct secondary inspections.

*Nunes - Direct - Mr. Rein*         23

1         Can you describe for the Court what a secondary

2 inspection is?

3 A     Sure. So basically, when a passenger comes in at the

4 airport at my terminal, they undergo primary inspection

5 first, which is basically when they present your passport,

6 you talk to the initial officer that you encounter and they

7 ask you questions about your travel. And at that time, they

8 decide whether or not you can proceed or, if you are

9 admitted, you proceed forward and if not, you can be

10 referred, which is when they bring you to a special room

11 where we conduct our inspection.

12 Q     When you mentioned primary inspection, are you

13 referring to the booth area --

14 A     Yes.

15 Q     -- that somebody would encounter when they get off of

16 an airplane?

17 A     Yes, I am.

18 Q     Have you ever performed the duties of a primary

19 inspection officer?

20 A     Yes.

21 Q     And approximately how many times have you done that?

22 A     Countless times. It's one of the first duties that you

23 do before you learn secondary training, so I would say more

24 than a hundred, way more than a hundred.

25 Q     In circumstances where a passenger goes to primary

1   inspection and they're admitted into the country, where do

2   they go after that?

3   A    The baggage area to collect their baggage.

4   Q    And from there, where would they go?

5   A    They would exit.

6   Q    Can you describe for us, as an officer that's assigned

7   to the secondary inspection area, what your responsibilities

8   are once somebody actually is referred to secondary for

9   further inspection?

10  A    Yes, sure.

11        So basically, when they are brought into the room,

12  the primary officer, the first officer that they

13  encountered, walks them into the inspection area and they

14  are basically told to have a seat anywhere that they want.

15  And then the officer puts their passport into a folder.  We

16  have a rack that's on our desk.  And the officer puts the

17  passport in the folder and then places the folder on the

18  rack.  So whoever's available at the time will grab the

19  folder.  And then we would basically look up the person in

20  our -- we have a queue on our screen that shows everyone

21  that's been referred into our room.  So we would find the

22  person and see what was the reason that they were referred

23  for.

24  Q    When you say a queue on a screen, are you talking about

25  a computer screen?

Nunes - Direct - Mr. Rein                                    25

1    A    I'm sorry, yes.

2    Q    I will note that as you gave that answer, you used your

3    hands to indicate like a screen right in front of you?

4    A    Yeah.

5    Q    Okay.

6         Have you received training in conducting secondary

7    inspections?

8    A    I did.

9    Q    What did that consist of?

10   A    I -- well, at the academy, we did training which

11   basically shows you how to conduct the inspections.  And

12   then we had post-academy training at the port where they

13   basically showed you how the port wants you to conduct their

14   inspections specifically.

15   Q    When you say "the port," in your case, you are

16   referring to the airport?

17   A    JFK.  Yeah, the airport.

18   Q    And that's JFK, you said?

19   A    Yes.

20   Q    If you can approximate, how many secondary inspections

21   have you done in your career?

22   A    Sure.  I would say roughly maybe 500.  I've been there

23   for six years, so maybe 500.

24   Q    Are there different types of secondary inspections?

25   A    Yeah, there are.  There are baggage inspections and we

1   have an agricultural -- agriculture inspections and then

2   immigration inspections.

3   Q   What's a baggage inspection?

4   A   That's when the officer -- I mean, an officer refers a

5   passenger to get their bags inspected and basically look

6   through their bags to make sure they're not bringing

7   anything that's not permitted.

8   Q   And how does that differ from an immigration

9   inspection?

10   A   Immigration's more we're looking at the admissibility

11   of the person, whether they're permitted to come into the

12   country themselves, if they have the right documents and so

13   forth, yeah.

14   Q   The area where a secondary inspection occurs, can you

15   describe it for us?

16   A   Well, it's a room. It's more like a huge waiting area.

17   It's roughly, I would say, about from here to maybe the

18   first pew -- line of pews, from where I'm sitting to the

19   first line of pews, like that. And as far as width, maybe

20   from I guess where the chairs start to the other table over

21   there.

22   Q   So just for point of reference, you are sitting at the

23   witness stand in the front of the courtroom. You said that

24   the room is as long as from the witness stand to the first

25   row of pews.

Nunes - Direct - Mr. Rein                    27

1    A    Mm-hm.

2    Q    So I would approximate that's about maybe 40 or

3    50 feet?

4    A    Correct.

5    Q    And then you mentioned that the room is maybe as wide

6    as from the wall of the jury box to the table where defense

7    counsel is sitting; is that right?

8    A    Yes, correct.

9    Q    And so I would estimate that's about maybe somewhere

10   between 30 and 40 feet?

11   A    Okay, yes, I agree.

12   Q    And how is the room laid out?

13   A    So it's -- we have a long bench in the front, roughly

14   about this height, like the Judge's table and it's maybe

15   about five chairs behind it.  So we're all seated at an

16   elevated height.  And then we have roughly around maybe 40

17   to 50 chairs that's facing us.  So it kind of looks like a

18   DMV, maybe.

19   Q    And the officers who are sitting in the chairs in the

20   row in front of the room, what type of work are they doing?

21   A    The officers that are -- I'm sorry, can you repeat?

22   Q    The officers that are sitting in the row in the front

23   of the room that you described where there's five chairs,

24   what type of work are they doing?

25   A    Well, they're doing secondary inspections, so whoever

1   comes in the room, they're working on whatever passenger's

2   inside at the time.

3   Q    And for what different reasons might somebody be

4   referred for a secondary inspection?

5   A    For immigration, it would be maybe -- it could be a

6   lookout.  The person may have a lookout on them for -- or it

7   may be officer's discretion, if the officer's not

8   understanding or either not believing the story that the

9   person is telling them, they might want us to look into it

10  further to verify certain things.  And, yeah, for baggage,

11  it would probably be something similar.

12  Q    When you say the officer may not be believing someone,

13  are you referring to the primary officer?

14  A    The primary officer, correct.

15  Q    And so who makes the ultimate decision as to whether

16  somebody, a passenger, should be referred to secondary

17  inspection once they're screened at primary inspection?

18  A    Well, the primary officer makes the decision whether

19  they -- they get admitted or not.

20  Q    What is the purpose of conducting these inspections at

21  secondary inspection?

22  A    They want to determine that the person that we're

23  admitting into the country is admittable and that they have

24  the right documents or the right to be there and they

25  haven't violated any of our laws or our rules in that sense.

A101

1    Q    In the context of a baggage inspection, what's the

2    purpose of conducting that type of inspection?

3    A    To make sure that they're not transporting or bringing

4    in anything that we would consider contraband or illegal.

5    Q    You mentioned the term "lookout" previously.

6         Can you just describe for us what that is?

7    A    So a lookout is similar to like -- I would say like a

8    BOLO, be on the lookout.  It's basically a flag.  When a

9    passenger comes in and the system runs their inspection, if

10   there's something that exists that's a match to that person

11   that we should be aware of, it would flag and say refer this

12   person to secondary.

13   Q    Are you familiar with something called the TECS system,

14   T-E-C-S?

15   A    Yes, I am.

16   Q    Can you describe for us what that is?

17   A    TECS is -- I can't really get into specifics because I

18   don't really know the inner workings.  I just know it's a

19   system that we use that has a lot -- all the lookouts -- so

20   it shows every passenger from the manifest coming in from

21   every flight and it has like, if that person does, some type

22   of derog information tied to them, it shows up under that

23   person's name.  So if someone comes in and there's derog on

24   that person, the TECS system automatically flag it.

25   Q    What do you mean by "derog"?

Nunes - Direct - Mr. Rein                    30

1    A    Derogatory, any type of derogatory information or -- or

2    it could be like, for an example, a warrant, if they have a

3    warrant or anything that we should be aware of with this

4    person.

5    Q    At the point of primary inspection, how would a CBP

6    officer become aware of whether or not a passenger is the

7    subject of a lookout?

8    A    Well, when they take -- so at primary, when the

9    passenger comes, they're required to take a picture.  The

10   picture runs biometrics and if they match to something

11   that's already in, I guess, the TECS system, then it would

12   show on the primary officer's screen that this person is a

13   match to this lookout.  So that's how they would be aware.

14   Q    And what does the primary officer do once they become

15   aware that somebody is the subject of a lookout?

16   A    Well, depending on what the lookout actually says would

17   determine what they do next.  If it's something that is

18   mandatory referral, then they would have no choice but to

19   refer the person to secondary inspection.

20   Q    In your experience, why might there be a lookout for

21   someone?

22   A    Lookouts are placed for a lot of different things.

23   Like I said previously, it could be for a warrant.  It could

24   be for a past encounter that CBP had with this person that

25   we need to be aware of.  It could be for someone bringing

Nunes - Direct - Mr. Rein                                    31

1  mangoes that mangoes aren't permitted and they found it

2  before.  It could be for immigration stuff, like visa, like

3  this person got denied a visa in the past and we should be

4  aware if they're coming in that they have the right document

5  to come in because they've been denied in the past.  Like it

6  could be a million different reasons.

7  Q    You mentioned earlier that one of the things CBP is

8  concerned with is preventing contraband from being brought

9  into the country; is that right?

10 A    Correct.

11 Q    Would that include child pornography?

12 A    Yes, it would.

13 Q    And based upon your training, why is CBP interested in

14 preventing the entry of child pornography into the country?

15 A    Because it's not permitted.  It's illegal for -- to be

16 transported or even possess.

17 Q    Are you familiar with the term, Child Sexual Abuse

18 Material?

19 A    Yes.

20 Q    And is that also known as CSAM, C-S-A-M?

21 A    Yes.

22 Q    Have you heard of the term, Child Sexual Exploitation

23 Material?

24 A    I have.

25 Q    And is that also known as CSEM, C-S-E-M?

Nunes - Direct - Mr. Rein                                    32

1   A    Correct.

2   Q    When you conduct your secondary inspections, the room

3   that it's being conducted in, is it a locked room or are the

4   doors open?

5   A    The doors are opened.

6   Q    And when people are referred to the room, are they

7   allowed to sit anywhere they want, or are they directed to a

8   particular place?

9   A    They can sit wherever they would like.

10  Q    When you focus on someone who's been referred to the

11  room, what steps do you take when you actually want to begin

12  your inspection of that person?

13  A    Well, after I pull the folder and I see -- I pull the

14  passport, I look for the match in our queue to see what it

15  is that they're referred for.  So basically the first thing

16  I do is I look to see if it's an immigrant -- someone that's

17  not a non-U.S.C.  I look at the travel history.  I look at

18  the reason they're referred.  I look to see if there are any

19  lookouts tied to the person.

20  Q    When you say "a non-U.S.C.," do you mean a non-U.S.

21  citizen?

22  A    That's what I mean, yes.

23  Q    Are you familiar with the term, electronic media

24  review?

25  A    I am.

Nunes - Direct - Mr. Rein                               33

1  Q    What's an electric media review?

2  A    It's a review of someone's electronic device by a CBP

3  officer, when we look through the phone to make sure that --

4  a phone or a laptop or whatever type of electronic device

5  they have, to make sure that they -- well, depends on the

6  reason why they were referred, but usually it's to make sure

7  that what they're either saying is the truth or -- we're

8  basically trying to verify a story or intent.

9  Q    And when you conduct an electronic media review, how do

10 you actually do it?

11 A    It's manually.  You scroll through.  If it's a phone, a

12 touchscreen phone, you scroll through the phone, look at

13 different apps and different things depending on what you're

14 looking for.

15 Q    And under what circumstances will a CBP officer

16 actually conduct this electronic media review of a

17 passenger's phone?

18 A    So mainly lookouts would be like number one in my book.

19 If there is an a lookout that explicitly says to conduct an

20 electronic media search, then sometimes with admissibility

21 stuff, you would look if -- if a passenger's, like, telling

22 us something that doesn't necessarily make sense or we want

23 to, like, confirm something, an officer might look through

24 the phone just to make sure that they're getting --

25 receiving the truth.

1  Q    When a lookout directs a CBP officer to refer a

2  passenger for an electronic media review, can that officer

3  not refer the passenger?

4  A    No.  No.  It would be a mandatory referral.

5  Q    Once the passenger is sent to secondary, does the

6  secondary officer have discretion about whether or not to

7  conduct a review?

8  A    If the lookout states to conduct the review?

9  Q    Yes.

10  A    I would say depending on who the record holder is, who

11  put the lookout in.

12  Q    Have you ever received any training in how to conduct

13  these type of reviews?

14  A    Training on how to look through the phones or devices?

15  No, I haven't.

16  Q    Training just with regard to the reviews in general?

17  A    Yeah, I know the policy of how to conduct it, yes.

18  Q    And can you just describe for us, what are you supposed

19  to do when you are conducting the review?

20  A    You're supposed to put the phone in the airplane mode

21  and you need to have a supervisor's approval prior to the

22  search.

23  Q    What's the purpose of putting the phone in airplane

24  mode?

25  A    So we don't accidentally get into the cloud or

Nunes - Direct - Mr. Rein                    35

1    anything that's not -- we're only supposed to look at what's
2    on the device itself.  So we don't want to accidentally
3    access anything that might be in the cloud or --
4    Q    When you say "the cloud," you mean just available from
5    the internet?
6    A    Internet, yes.
7    Q    I'm sorry, let me just repeat that.
8         When you say "the cloud," do you mean things that
9    might be on the internet, but are not actually on the
10   physical device itself?
11   A    Correct.
12   Q    And approximately how many times have you conducted an
13   electronic media review of an electronic device?
14   A    Throughout my career, I would say no more than, like,
15   50 times.
16   Q    Are there different types of electronic media reviews?
17   A    There are.  There are advanced media searches and
18   basic.
19   Q    What's a basic review?
20   A    It's just when you manually look through the phone.
21   You're not using any type of, like, system or machinery to
22   look -- to help assist you in looking through the phone.
23   It's whatever you see with your eyes.
24   Q    What's an advanced review?
25   A    An advanced review is, I believe, when you use the

Nunes - Direct - Mr. Rein                                    36

1  assistance of technology to help look through the phone, so

2  I think you can see, like, deleted stuff as well.

3  Q    Have you ever conducted an advanced review?

4  A    No.  I'm not trained on advanced.

5  Q    When you conduct a manual of a device, is the device

6  plugged into a computer or other electronic device?

7  A    No, it's not.

8  Q    Do you know if the device is plugged into anything at

9  all?

10 A    The only thing that it would be plugged into is if it's

11 dying or dead, you would probably use the charger and plug

12 it into the wall.  That's the only time it would be plugged

13 into like an outlet maybe.

14 Q    When you say "a wall," you mean --

15 A    An outlet.

16 Q    -- an outlet?

17 A    An electrical outlet, yes.

18 Q    Before a review is conducted, is a passenger given any

19 type of instruction about what's going to happen?

20 A    Yeah.  We -- we explain to them verbally.  And we also

21 provide a media tear sheet.

22 Q    Sorry, you said a tear sheet?

23 A    Yes, a media tear sheet.

24 Q    Is any information about the device requested from a

25 passenger before a review begins?

Nunes - Direct - Mr. Rein                          37

1   A    The password or the passcode prior, if there is one.

2   Q    And how do you go about ascertaining what the password

3   is?

4   A    We ask the passenger.

5   Q    Do you do that routinely?

6   A    Yeah.

7   Q    Why?

8   A    First, to get access into the phone.  And secondly, so

9   that in case when we are looking through the phone, it

10  locks -- accidentally locks, we can gain back access, so we

11  might ask for it directly.

12  Q    Prior to asking for the password, do you threaten the

13  passenger in any way?

14  A    No.

15  Q    Do you promise them anything?

16  A    No.

17  Q    Before you can conduct this type of review, an

18  electronic media review, are any authorizations needed?

19  A    Yeah.  You need the permission of your supervisor.

20  Q    And when you're conducting the electronic media review

21  manually, what types of things are you looking for in a

22  device?

23  A    So, again, it depends on the reason, why the person's

24  referred.  In admissibility issues, it would be looking for

25  any proof that they're working, maybe, here.  If they have

1  extensive travel history, where they have a lot of their

2  presence -- their presence in the United States.  Or in the

3  baggage sense, it might be if it's a person that's linked to

4  some type of criminal activity, it might be that, something

5  that ties them to it.  It all depends on why they're

6  actually in the room.

7  Q    When you conduct this type of review, how do you

8  constrain what you are doing while you are looking through a

9  device?

10 A    What do you mean by constrain?

11 Q    So when you conduct a review, given one of the reasons

12 that you have given for why it would be conducted, how do

13 you direct your search based upon the information that you

14 have previously?

15 A    Well, whatever's related.  So whatever apps or -- the

16 phone may have that's related to what I'm looking for.  So

17 if it's photos or videos, I'll be looking in photos that

18 have folders or any type of, like, video media.  And if it's

19 something that is written or is, like, or if I want to know

20 someone's in communication with someone, then I'll probably

21 be looking through maybe text messages and stuff like that,

22 yeah.

23 Q    While the review is being conducted, where is the

24 passenger located?

25 A    In the room with you.

Nunes - Direct - Mr. Rein                                    39

1    Q    When you are conducting the review, is it just you or

2    are there other CBP officers who are involved in conducting

3    the review at the same time?

4    A    Usually, it's one officer.  It's the officer that's

5    handling the referral.  But in certain instances, it can be

6    another officer helping out.  Especially if there's more

7    than one device, maybe to save time, another officer could

8    help out.

9    Q    What do you do when conducting a review and you come

10   across something that you deem to be contraband?

11   A    Notify the supervisor and he would basically give me

12   instruction on how to proceed.

13   Q    All right.  I would like to direct your attention now

14   to November 14th of 2022.

15              Were you working on that day?

16   A    I was.

17   Q    And approximately what hours did you work that day?

18   A    I believe I was 12:00 to 9:00 p.m.  12:00 p.m. to

19   9:00 p.m.

20   Q    What was your assignment during your shift that day?

21   A    Secondary inspections.

22   Q    And so where were you stationed?

23   A    In secondary, in the secondary inspection area.

24   Q    And is this at JFK Airport?

25   A    Correct.

Nunes - Direct - Mr. Rein                                    40

1    Q    And what terminal were you stationed at?

2    A    Terminal 7.

3    Q    What types of flights at that time departed and arrived

4    at Terminal 7?

5    A    At that time, I don't necessarily recall.

6    Q    Was it domestic or international?

7    A    International.

8    Q    And did British Airways service that terminal?

9    A    They did, yes.

10   Q    During your assignment, were you working alone or with

11   other CBP officers?

12   A    With other officers.

13   Q    And were you working in a uniform or plain clothes?

14   A    In uniform.

15   Q    And that uniform, did it identify you as being a member

16   of CBP?

17   A    It did.

18   Q    I want to direct your attention to approximately

19   5:30 p.m. on November 14, 2022.

20          Did you come to conduct a secondary inspection

21   related to someone named Jason Robinson around that time?

22   A    I did.

23   Q    As you sit here today, if you saw Jason Robinson, would

24   you recognize him?

25   A    No.

Nunes - Direct - Mr. Rein                    41

1   Q    How did you come to conduct an inspection of Jason
2   Robinson?
3   A    He was referred by a primary officer into secondary.
4   Q    And why was he referred?
5   A    There was a lookout on him, I believe, yes.
6   Q    And what was the basis of the lookout?
7   A    Basically stated that he was tied to either the
8   purchase or the possession of CSEM and it was requesting a
9   media -- electronic media search on his devices.
10  Q    And once he was referred to secondary, what was your
11  role as part of the investigation that began?
12  A    So I would be the officer tasked with actually
13  conducting the -- the media search on his devices.
14  Q    And was the secondary room that you described
15  previously laid out the same way then as the way you
16  described it to us?
17  A    Yes, it was.
18  Q    Approximately how many officers were located in the
19  room at that time?
20  A    Four, I would say.
21  Q    And once Mr. Robinson was referred to the room, was he
22  allowed to freely use the restroom?
23  A    Yes.
24  Q    Was he allowed access to water?
25  A    Yes.

Nunes - Direct - Mr. Rein                    42

1  Q    And were the doors to the room open or closed?

2  A    They were opened.

3  Q    When Mr. Robinson entered the secondary inspection

4  area, where were you located?

5  A    I was sitting at the first chair.  Yeah, the first

6  chair of that desk that I told you about.

7  Q    Is that closer to the door or is it farther away?

8  A    It's closer to the door.

9  Q    And who was with him when he entered the room?

10  A    He was by himself.

11  Q    And do you know which officer had referred him?

12  A    Yes.  Officer Johnson.

13  Q    Upon arriving at the secondary room, where did Jason

14  Robinson go?

15  A    He sat not too far from in front of where I was

16  sitting, so one of the chairs that were like -- it was

17  directly in my view from my station.

18  Q    Prior to beginning any type of inspection of him, did

19  you review any CBP records pertaining to him?

20  A    Prior to starting the inspection of the devices?  Or?

21  Q    Prior to speaking with Mr. Robinson.

22  A    Yes, I did.

23  Q    What record did you review?

24  A    I looked at his referral.  I looked at the lookout that

25  was tied to him.  And I looked at his travel history.

*Nunes - Direct - Mr. Rein*                                    43

1  Q    And how did you actually review those materials?

2  A    So I clicked on his name and picture on the queue.  And

3  I looked at his travel history which showed -- it basically

4  shows all of your prior travel into and out of the United

5  States.  Then I -- there's a tab that shows lookouts.  I

6  clicked on that tab.  And the lookout popped up.  And that's

7  how I -- that's basically, like, the initial stuff that I

8  looked at.

9  Q    So you did this on a computer in front of you?

10 A    On a computer in front of me, yes.

11 Q    I would like to show you now what's been premarked for

12 identification as Government Exhibit 101.

13          MR. REIN:  If we could show the witness on the

14 screen.

15 Q    While we're working on that, I can take a look here.

16          Are you familiar with the information contained in

17 Government Exhibit 101 for identification?

18 A    Yes, I am familiar.

19          MR. REIN:  And I note it's a multiple-page

20 document.  If we could flip through the pages.  And if we

21 could look at the second page of the document?

22 Q    And Officer, what is this information that we're

23 looking at on the second page of Government Exhibit 101 for

24 identification?

25 A    So this would be a printout of the lookout that we

*Nunes - Direct - Mr. Rein*            44

1   receive in our system.

2   Q    And does Government Exhibit 101 for identification

3   contain the information that you were able to see when you

4   reviewed the lookout for Jason Robinson --

5   A    Yes.

6   Q    -- on November 14, 2022?

7   A    Yes, it does.

8         MR. REIN: Your Honor, at this time the Government

9   would offer Government Exhibit 101.

10        MR. YASTER: No objection.

11        THE COURT: It's admitted.

12        (Government Exhibit 101 received in evidence.)

13        THE COURT: Let me just ask one clarifying

14   question even though it's already been admitted.

15        You indicated that you had a queue with a number

16   of individuals' names that you were looking at on

17   November 14, 2022?

18        THE WITNESS: Correct.

19        THE COURT: I know you just said that the

20   information here at page 2 appears to be the same

21   information you looked at, but this is not a visual image of

22   the queue because the queue had other people there --

23        THE WITNESS: So --

24        THE COURT: The court reporter can get it down,

25   you just have to wait until I finish the question, even if

Nunes - Direct - Mr. Rein                           45

1   you think you know.  And you've probably guessed what I'm

2   asking you, but let me get the question down.  So now you

3   can answer.

4             THE WITNESS:  So this is a printout of the actual

5   lookout.  So how I said that there was a tab that you click

6   on that brings you to the lookouts, this would be a printout

7   of that lookout.  But initially, yes, you are correct, there

8   is a queue and we have to click on the individual first

9   before we can get to their information.

10             THE COURT:  Thank you.

11  Q    Officer, just to be clear, when you look at the

12  inspection in the lookout, you're looking at it on a

13  computer screen?

14  A    Correct.

15  Q    And this is just, what we're looking at as Government

16  Exhibit 101, it's a printout of the information from the

17  TECS system that you described; is that correct?

18  A    Correct.

19  Q    If you could read for us what we see in that box at the

20  top of the screen that says number one.

21  A    Of the remarks?

22  Q    Yes.  Could you read for us what that says?

23  A    Subject linked to the purchase of Child Sexual

24  Exploitation Material via FinCEN.  Referred to secondary for

25  interview and media devices exam to include cellphones and

Nunes - Direct - Mr. Rein                                    46

1    laptops.

2    Q    And this information that you reviewed as part of the

3    lookout, would that also have been available to the primary

4    inspection officer?

5    A    Yes.

6    Q    And the primary inspection officer, I think you said

7    this before, but who was that?

8    A    Officer Johnson.

9    Q    After receiving this information, could Officer Johnson

10   have waived the defendant into the country without referring

11   him to secondary?

12   A    No.

13   Q    Why not?

14   A    It would be considered a mandatory referral.

15   Q    Is there any way to override that?

16   A    No.  Usually with mandatory referrals, they only give

17   you the option to refer the passenger.  They don't give you

18   the option to admit them on the system.

19   Q    So after you reviewed this information that we see in

20   this lookout, did there come a time when you spoke to Jason

21   Robinson?

22   A    Yes.

23   Q    And can you describe for us how you actually came to

24   speak with him?

25   A    So after I selected this folder with his passport and I

Nunes - Direct - Mr. Rein                    47

1    overlooked his inspection, I called him up to where I was

2    sitting.  And he -- we spoke a little bit about his travel.

3    I asked him, like, where he was coming from, where he'd go,

4    who was he traveling with, or what did he do.  I think I

5    even asked him, like, where he worked.  I think he may have

6    told me that he worked at a restaurant or was a restaurant

7    manager.  We spoke briefly.  And then I asked him about if

8    he had any devices, electronic devices.

9    Q    What did he say when you asked him where he was

10   traveling from?

11   A    He said he was coming from Egypt and it was his first

12   time traveling out of the country.

13   Q    And who was he traveling with?

14   A    With his partner.

15   Q    And when you asked him about electronic devices, can

16   you describe for us what happened?

17   A    Well, I asked him if he had any first.  And then he

18   said he did.  And then I think I requested -- I think he

19   said he had a laptop and a cellphone or maybe I asked do you

20   have a laptop or a cellphone.  I can't really recall.  But

21   then he said that he did.  And I asked him for the devices

22   and he brought them up to me.

23   Q    You mentioned that he said he was traveling with a

24   partner.

25        Was that person also present at secondary

Nunes - Direct - Mr. Rein                                    48

1    inspection?

2    A    No, they weren't.

3    Q    Why not?

4    A    Usually we only allow the person that's being referred

5    into the room.  Not usually -- unless they're traveling with

6    like a minor child or something.

7              MR. REIN:  If we could go back to Government

8    Exhibit 101 and look at the last page of it.  I'm sorry, the

9    second to last page.

10   Q    I want to direct your attention, Officer, to the top

11   portion, where it says National Targeting Center.

12             Do you see that?

13   A    Yes.

14   Q    Can you describe for us what that means?

15   A    It's a subsection.  National Targeting Center also

16   known as NTC.  It's a subsection of CBP.  I think they're

17   located in the DC area.  They basically do targeting and

18   they provide lookouts based on the intel that they find on

19   people or passengers.

20   Q    Can you describe for us, if you see that a lookout was

21   generated by the National Targeting Center, how does that

22   impact the review and inspection that you eventually will

23   do?

24   A    Well, in that sense, I guess, for CBP officers, when we

25   see that it comes from NTC, it holds a little more weight

Nunes - Direct - Mr. Rein                    49

1  than if it came from anybody else because that's literally

2  your job, is to give us information based on the stuff that

3  they find.

4  Q    When you are inspecting a passenger who has been

5  referred for an electronic media review, do you always

6  conduct an electronic media review of that person?

7  A    My personal experience?  I don't -- give me one moment.

8  I'm thinking.  I can't be a hundred percent sure that I

9  have, but I wouldn't say that it's -- that --

10 Q    Let me ask a question a different way.

11 A    Yeah, maybe.

12 Q    Do you have discretion as to whether or not to conduct

13 the electronic media review once the person actually arrives

14 at secondary from primary?

15 A    I think it depends on the record holder.  In this case,

16 how it's NTC, I wouldn't say there's much discretion here at

17 all.  But if it was, for example, maybe like an officer from

18 let's say a different port, Miami, who may have, like,

19 requested a media search, there's a bit of discretion there.

20 Q    And can you describe for us, if you can, why the fact

21 that a lookout was generated by someone at NTC affects the

22 analysis?

23 A    Well, NTC, it's based on intel.  It's based on what

24 they -- what -- like already established findings, usually

25 when they put a lookout on someone.  So it's more we're here

1    to confirm what more or less they already know or -- or what

2    they have information on or even to assist in that matter.

3    As opposed to sometimes with an officer, it might be, who

4    puts a lookout in, it could be based on maybe the first

5    encounter, they weren't able to find or hadn't had enough

6    time to find what they were looking for so they might

7    request another officer to do a secondary search.

8    Q    In exercising the discretion that you are talking

9    about, how might a person's travel history affect your

10   decision as to whether to go through with completing an

11   electronic media review?

12   A    We look at the countries that they've traveled to and

13   their connections to those countries.  And whether the

14   travel history is extensive or whether it's basically

15   virtually nonexistent, that affects it as well.

16        MR. REIN:  I want to look at the first page of

17   Government Exhibit 101, if we could.

18        And if we could look at that first row of text.

19   Q    Officer, could you tell us, in consulting the exhibit,

20   when was the lookout for Jason Robinson that you reviewed

21   initially entered?

22   A    November 11, 2019.

23   Q    And when you were conducting your examination in

24   November of 2022, were you able to determine if there had

25   been any refreshing of the lookout since it had first been

1  entered?

2  A    I don't necessarily recall if there was any refreshing.

3  I vaguely remember that I think there was an update, but I

4  can't a hundred percent sure tell you, like, when that was

5  or the date.

6  Q    Well, even just approximating, in connection with the

7  date of the actual referral to secondary, how far in advance

8  had there been an update?

9  A    I would say maybe a year prior to our encounter, but

10 I'm not a hundred percent sure.

11        THE COURT:  Can you establish or explain what a

12 refreshing or an update is because I'm not sure I understand

13 what the witness or you meant by that?

14 Q    Well, in your experience, are lookouts sometimes

15 updated after they are initially entered into the system?

16 A    They are, yes.

17 Q    And what does that consist of?

18 A    So the initial -- it would say entry date, which is the

19 initial date that the lookout was put in.  And then

20 sometimes the record holder can go back and update it by

21 adding either additional information to the lookout or

22 changing certain things about the lookout.  So we usually

23 get to see the entry date and the update, the latest update

24 dates.

25 Q    Would that also be considered like refreshing the

Nunes - Direct - Mr. Rein                    52

1    lookout?

2    A    Yes, so essentially refreshing it.

3    Q    But just to be clear, the information that we looked at

4    on page 2 of this -- of the lookout -- of this document in

5    evidence as Government Exhibit 101, is that the information

6    that you had when you conducted your examination?

7    A    It was.  It was.

8    Q    When you examined Jason Robinson's travel history, as

9    you said you did a moment ago, did that impact at all your

10   decision to proceed with further inspection?

11   A    It did, in the fact that this was his first and only

12   travel outside the United States.  So I knew for a fact that

13   I was the first officer that he would encounter, like,

14   coming back into the United States.  So this wasn't an issue

15   or a lookout that had been previously addressed by a

16   different officer.

17   Q    And did you ultimately conduct an electronic media

18   review of any devices that belonged to Jason Robinson?

19   A    I did.

20   Q    And which devices were those?

21   A    A laptop and a cellphone.

22   Q    Prior to beginning the review, was he provided with any

23   information about CBP's authority to conduct the exam?

24   A    Yeah.  I verbally told him and I also provided him with

25   a tear sheet.

1    Q    I would like to show you what's marked for

2    identification as Government Exhibit 102.

3            Can you see the exhibit?

4            THE COURT:  Do you have a hard copy for me?  I'm

5    not sure if you sent it to me electronically in advance.

6            MR. REIN:  Judge, we actually have a binder of

7    exhibits for Your Honor.

8            THE COURT:  Thank you.  That would be very

9    helpful.

10           All right, you may proceed.

11           MR. REIN:  I will note that it's a two-page

12   document, so we could scroll from page 1 to 2.

13   Q    And, Officer, what is Government Exhibit 102 marked for

14   identification?

15   A    It's a copy of the tear sheet, the electronic media

16   device tear sheet, search sheet.

17   Q    And is this a fair and accurate copy of the type of

18   tear sheet provided to Jason Robinson during the course of

19   his inspection?

20   A    Yes, it is.

21           MR. REIN:  Your Honor, at this time, the

22   Government offers Exhibit 102.

23           MR. YASTER:  No objection.

24           THE COURT:  All right.  It's admitted.

25           (Government's Exhibit 102 received in evidence.)

Nunes - Direct - Mr. Rein                              54

1  Q    And just looking very briefly at the exhibit, can you

2  tell us, in general, what kind of information this document

3  provides?

4  A    So it briefly tells, explains CBP's authority to search

5  electronic devices to passengers and, I guess, the legal

6  background surrounding it.

7  Q    And why is it given to passengers?

8  A    So that they're aware that they're not violating their

9  rights or doing it out of our own view, our own wants,

10 desires.

11 Q    During the course of your inspection of Jason

12 Robinson -- well, you mentioned that you inspected an iPhone

13 and a laptop.  How did you come to actually physically

14 possess those things?

15 A    He brought them over to me.

16 Q    And did you ask him for the passwords of the devices?

17 A    I did ask him for the password.

18 Q    Why did you do that?

19 A    So that I was able to access the devices.

20 Q    And what was his response when you asked him for the

21 passwords?

22        THE COURT:  Sorry, before you do that, when you

23 say you asked him for the passwords, can you remember what

24 words you used or what words you typically use when you ask

25 someone for the devices and then for the passwords?

Nunes - Direct - Mr. Rein                                      55

1          THE WITNESS:  Sure.  Usually, when they come,
2     they're in front of me and I have the devices, what I would
3     do is I have the phone.  I will just ask, what's the
4     password for the phone.
5          THE COURT:  Okay.
6          THE WITNESS:  And that's it.
7          THE COURT:  And do you remember doing anything
8     specific or different in this particular case?
9          THE WITNESS:  Different in this case?  No, I think
10    he was in front of me and I asked him.  The only thing I
11    did, I wrote it down.
12         THE COURT:  Okay.  Thanks.
13    Q    Okay, so what was his response when you asked him for
14    the passwords?
15    A    He gave it to me.  He just -- it wasn't really much of
16    a response.  He just gave it to me.
17    Q    And did he give them to you by speaking them out loud
18    or writing them down and handing them to you?
19    A    Oh, speaking out loud.
20    Q    Before he gave them to you, did you threaten him?
21    A    No.
22    Q    Did you promise him anything?
23    A    No.
24    Q    What happens if a passenger refuses to give their
25    password when asked for it?

1    A    Well, at that point, we would have to go to your

2    supervisor and they would determine what the next course of

3    action would be.

4    Q    You mentioned that you wrote the passwords down; is

5    that right?

6    A    Correct.

7    Q    I'd like to show you what's been marked for

8    identification as Government Exhibits 103 and 104.  Let's

9    start with 103 first.

10            Can you see the exhibit?

11   A    Yes, I can.

12   Q    What is Exhibit 103 for identification?

13   A    It's the Post-it where I wrote the password for his

14   phone on.

15   Q    Does the exhibit fairly and accurately depict the

16   sticky note that you wrote the password down on?

17   A    Yes, it does.

18            MR. REIN:  Your Honor, at this time the Government

19   offers Exhibit 103.

20            MR. YASTER:  No objection.

21            THE COURT:  It's admitted.

22            (Government's Exhibit 103 received in evidence.)

23   Q    And why did you write down this password, the password

24   on the sticky note we see in Exhibit 103?

25   A    So in the event that the phone accidentally locked

*Officer Nunes - Voir Dire - Mr. Yaster* 57

1  while I was searching, because he had two different devices,

2  I just wanted to write it down so I would have easy access

3  to get it again.

4       MR. REIN:  If we could look now at Exhibit 104.

5  Q    Can you see the exhibit, Officer?

6  A    I do.

7  Q    What are we looking at in this exhibit?

8  A    It's the password for the laptop on a sticky note.

9  Q    Is this a fair and accurate depiction of the way the

10 sticky note appeared after you wrote the password down on

11 it?

12 A    Yes.

13      MR. REIN:  Your Honor, at this time the Government

14 offers Exhibit 104.

15      MR. YASTER:  Brief voir dire?

16      THE COURT:  Yes.

17 VOIR DIRE BY

18 MR. YASTER:

19 Q    Officer Nunes, I have a question.  The way this picture

20 looks, it appears that there's like -- that there's print

21 over the sticky note.  Like there's like kind of like a blue

22 image and then an arrow?

23 A    Yes.

24 Q    What is that?

25 A    Well, this is an evidence bag.  The print on it is

*Officer Nunes - Voir Dire - Mr. Yaster*                    58

1   showing you how to seal the evidence bag.  So you see that

2   it has the arrow showing you to pull the tab that allows you

3   to get access to the sticky part to fold it and close the

4   bag.

5   Q    So this blue print is on the evidence bag that contains

6   the sticky note?

7   A    It is, yes.

8   Q    That's not your handwriting?

9   A    That's not the drawing of -- no, it's not mine.

10  Q    Your handwriting is what appears to be the writing on

11  the sticky note underneath --

12  A    Underneath the -- yes.

13            MR. YASTER:  No objection.

14            THE COURT:  It's admitted, thank you.

15            (Government's Exhibit 104 received in evidence.)

16  CONTINUED DIRECT EXAMINATION BY

17  MR. REIN:

18  Q    To be clear, Officer, the part where it says Surface

19  Pro, did you write that?

20  A    No, I didn't write that.

21  Q    But where it says Stargate1?

22  A    Yeah, that was me.

23  Q    Do you know who wrote Surface Pro?

24  A    I'm not sure who wrote that.

25  Q    But was that on the sticky note when you wrote

Nunes - Direct - Mr. Rein                                    59

1    Stargate1?

2    A    No, it wasn't.

3    Q    So is it fair to say it was added later?

4    A    Yes, it was.

5    Q    And, again, why did you write down stargate1?

6    A    So that I would remember the passport for the laptop.

7    Q    After you obtained the passwords for the devices, can

8    you describe for us how you actually proceeded with your

9    search?

10   A    Sure.  So the first device I think I looked at was the

11   laptop.  And I powered it on.  Placed it in -- well, tried

12   to figure out how to place it in the airplane mode which I

13   think someone assisted me with.  And then I started looking

14   through, like, files that he had on the laptop, looking for

15   any type of, like, photos or videos.

16   Q    At the time that you conducted that search of the

17   laptop, did you use any other electronic devices to aid your

18   search?

19   A    No.

20   Q    And what was you looking for when you did that search

21   of the laptop?

22   A    Any evidence of CSEM on the laptop.

23   Q    Approximately how long was your search of that device?

24   A    I can't recall.

25   Q    Is there anything that would refresh your recollection?

Nunes - Direct - Mr. Rein                    60

1  A    Sure.  The report that I wrote.

2          MR. REIN:  If we could show the witness what's

3  marked as Government Exhibit 3500 SN-1.

4          THE COURT:  I don't think I have a copy of that in

5  this binder.

6          MR. REIN:  I'm sorry.

7          THE COURT:  Is there a separate 3500 binder?

8          MR. REIN:  My apologies.

9          THE COURT:  That's okay.

10          MR. REIN:  I intended to provide this to you.  My

11  apologies.

12          If we could look at the second page of this

13  document.

14          THE COURT:  Sorry, which document is this again?

15          MR. REIN:  This is 3500 SN-1.

16          THE COURT:  Okay.

17  Q    And Officer, are you able to read it from where you

18  are?

19  A    Yes, I can read it.

20  Q    If you look at this document and look up at me if your

21  recollection is refreshed as to the timeframe -- or the time

22  it took to conduct the search of the laptop?

23  A    Okay.

24  Q    So approximately how long did your search take?

25  A    Roughly 30 minutes.

1    Q    And while you were conducting that search, where was

2    Mr. Robinson?

3    A    He was seated, back to -- in front of my desk.

4    Q    What were your results of the search of the laptop?

5    A    It was negative.

6    Q    What makes you say it was negative?

7    A    There was nothing that I clearly found that could --

8    that was -- I can clearly and confidently say that it was

9    CSEM.

10   Q    Was there anything on the device at all that caught

11   your attention?

12   A    Yeah.  There was a video of a person masturbating.  And

13   the person did look relatively young.  There was no way for

14   us to definitively determine whether or not it was a minor,

15   so...

16   Q    And so given your analysis of that video, what

17   conclusion did you reach overall about what was contained on

18   that device?

19   A    That it wasn't -- there was a negative result of CSEM.

20   Q    Did you then proceed to do a search of the iPhone?

21   A    I did.

22   Q    And can you just describe for us how that was done?

23   A    Sure.  So I unlocked it and then I started looking

24   through his -- the photos that were on the phone.  And I

25   can't remember the apps.  But then I went to, I remember,

1  the files folder on his iPhone.  And there was a folder in

2  his files named My Favorites.  And I clicked on that.  And

3  that's when I found it.

4  Q    When you say you found "it"?

5  A    Well, I found videos and photos of what appeared to be

6  CSEM.

7  Q    Can you describe for us, what makes you say that what

8  you saw was CSEM?

9  A    Well, in one video, it was a clear depiction of a

10  little -- a small boy that was giving oral sex to a -- an

11  adult, a grown man.  And there were other, like, videos,

12  too, but that was the one that I can clearly remember.

13  Q    And if you can, just very briefly, when you say that

14  you saw a little boy giving oral sex, can you describe for

15  us what you saw?

16  A    It was a little boy on his knees and there was a man

17  standing over him and the little boy had the man's penis in

18  his mouth and was performing oral sex.

19  Q    In addition to seeing that one piece of media, were

20  there other things that you saw as well on the phone that

21  fall within the category of --

22  A    Yeah, there were other videos of younger boys or

23  smaller boys engaging in different various sexual acts on

24  the phone, but I didn't look too extensively at the video,

25  so.

1 Q    After you saw these videos that you have been

2 describing, did you continue to search the phone?

3 A    No.

4 Q    Why did you not continue to search it?

5 A    At that point, we found -- well, I found basically the

6 whole purpose of the search was to find -- see whether or

7 not he had CSEM and we found it at that point.  So at that

8 point I just stopped and I notified my supervisor.

9 Q    Approximately how long, how much time passed between

10 when you began your search and when you finished your search

11 of the phone?

12 A    Do you mind if I?

13 Q    If it would refresh your recollection --

14 A    Yes.

15 Q    -- if we could look again at 3500 SN-1.  I think it's

16 still in front of you?

17 A    Yes, it is.

18 Q    If you could just look down and look up at us when your

19 recollection is refreshed.

20 A    Okay.  It's refreshed.

21        It was 15 minutes, roughly 15 minutes.

22 Q    After you found the media that you are describing on

23 the iPhone, did you tell Mr. Robinson what you had found?

24 A    No, I didn't.

25 Q    Why didn't you tell him?

A136

Nunes - Direct - Mr. Rein                                    64

1  A     At that point I was notified -- I was told directly to

2  contact his in regards and it was to be passed on to them.

3  So I felt like there was really no need for me to speak with

4  the passenger at that moment.  I was going to just wait

5  until his got there.

6  Q     When you say "HSI," is that Homeland Security

7  Investigations?

8  A     It is.

9  Q     Approximately how much time passed between when you

10  notified HSI and when they arrived at the secondary

11  inspection area?

12  A     I don't remember.

13  Q     I'm sorry?

14  A     I don't remember.

15  Q     Would it refresh your recollection to look at your

16  notes?

17  A     It would.

18            MR. REIN:  If we could show the witness again

19  SN-1.

20  A     So they arrived roughly, like, 20 minutes, I would say,

21  or approximately 20 minutes later, I notified them -- after

22  I notified them.

23  Q     After you notified them?

24  A     Yeah.  Wait.  I'm sorry, actually, I read that wrong, I

25  apologize.

Nunes - Direct - Mr. Rein                    65

1          Let's see.  I stand corrected.  An hour, like a

2    little bit more than an hour.

3    Q    Approximately what time was it?

4    A    So they arrived at 1957.  And I notified them at 1845.

5    Q    So 1957 is 7:57 p.m., and you had notified them at

6    6:45 p.m.?

7    A    Correct.

8    Q    And what time did you finish conducting the search of

9    the iPhone?

10   A    At 1835.

11   Q    So is that 6:35 p.m.?

12   A    Correct.

13   Q    And what time did you initially begin your search of

14   the electronic devices that Mr. Robinson had?

15   A    At 1820.

16   Q    Is that the time you conducted your search of the phone

17   or of the electronic devices?

18   A    The phone -- so you mean of all of the devices.  I

19   started at 1750.

20   Q    So that's 5:50 p.m.?

21   A    Yes.

22   Q    After you contacted HSI, what did you do with Jason

23   Robinson's iPhone and laptop?

24   A    Nothing.  I retained it.  They were on my desk.

25   Q    Did there come a time when an HSI agent named Allen

Nunes - Direct - Mr. Rein                                    66

1   Anstee actually arrived at secondary?

2   A    Yes.

3   Q    And what did you do with the phone and laptop after

4   that agent arrived?

5   A    I handed it over to him along with the -- the sticky

6   note that I had and I just gave it to him.

7   Q    And when the HSI agent arrived, what did he do?

8   A    He took the devices and then he went into -- we have

9   interview rooms, so I think he went into an interview room

10  and then he called the passenger in with him.

11  Q    Once the HSI agent was completely done with his portion

12  of the investigation that evening, what happened to the

13  iPhone and the laptop?

14  A    He retained it.  And I think he gave me a copy of the

15  receipt because we officially turned it over to him.  And,

16  yeah, that was it.

17  Q    After HSI took possession of those devices, did you

18  have any other role in the investigation of Jason Robinson's

19  conduct?

20  A    No.

21  Q    Was Jason Robinson arrested that night?

22  A    No, he wasn't.

23  Q    So what happened to him?

24  A    He was released.  After the agent spoke to him, he was

25  free to go.

1          MR. REIN:  Just one moment, Judge?

2          THE COURT:  Sure.

3          MR. REIN:  Nothing further, Judge.

4          THE COURT:  Let's take a five-minute break.

5          Officer Nunes, you are welcome to go stretch, use

6    the restroom if you would like you just can't, because you

7    are still on the stand, you just can't speak with anybody

8    about your testimony, including the Government.

9          THE WITNESS:  Sure.

10          THE COURT:  So we are adjourned.  I will see

11    everybody back at 12:45.  Thanks.

12          (Witness steps down.)

13          (Recess taken.)

14          (Witness resumes the stand.)

15          THE COURT:  Back on the record.

16          Mr. Yaster?

17          MR. YASTER:  Thank you, Your Honor.

18    CROSS-EXAMINATION BY

19    MR. YASTER:

20    Q    Good afternoon, Officer Nunes.

21    A    Good afternoon.

22    Q    My name is Ben Yaster.  I am a lawyer for Jason

23    Robinson.  I have a few questions for you.

24    A    Sure.

25    Q    Okay.  You told us that the reason that Mr. Robinson

*Nunes - Cross - Mr. Yaster* 68

1  was referred to secondary inspection was because of a

2  lookout, right?

3  A    Yes.

4  Q    And --

5          THE COURT:  Sorry, Mr. Yaster, can you lift the

6  mic just a couple of inches there?  Perfect.  Thanks.

7  Q    And a lookout, just so I make sure I understand the

8  terminology, that's the same thing as a TECS report; is that

9  correct?

10  A    That TECS report -- essentially, the TECS report is a

11  printout of the lookout.

12  Q    So Government Exhibit 101 that we've looked at, that

13  you described as the printout, that is the TECS report; is

14  that right?

15  A    Yes.

16  Q    And just to make sure I understand it, that is the

17  printout of the lookout you saw on your computer screen?

18  A    Correct.

19  Q    Are you familiar with a term, prime hit?

20  A    Correct, yes, I am.

21  Q    What is a prime hit?

22  A    Prime hit is a type of lookout.

23  Q    Was there a prime hit in this case?

24  A    I don't recall if it came up as a prime or what the

25  kind of wording was.

Nunes - Cross - Mr. Yaster                                    69

1   Q    Can you just tell us a little bit more about what kind

2   of a lookout a prime hit is?

3   A    Prime hits are usually lookouts that are 100 percent

4   matched to the person.  So sometimes there are some lookouts

5   that pop up that the system is unsure about, whether this

6   person is the person in question.  So that type of lookout

7   has a different name.  It's called, like, PSBP.  Prime

8   lookouts are 100 percent the person that's in front of you

9   and they are mandatory referrals to secondary.

10  Q    Thank you.

11        Now, in the TECS report or lookout that we saw in

12  Government Exhibit 101, am I right, the TECS report said

13  that the subject, meaning Mr. Robinson, was linked to the

14  purchase of Child Sexual Exploitation Material?

15  A    I believe that's what it says.

16  Q    And on the basis of Mr. Robinson being linked to the

17  purchase of sexual exploitation material, am I correct that

18  you believe that he may be in possession of child

19  pornography on his electronic devices?

20  A    That I personal believe?  Well, the lookout is stating

21  that he was linked to the purchase of it.  So it's not

22  necessarily my belief.  It's what, I guess, whoever put that

23  lookout found.

24  Q    So whoever made the lookout --

25  A    Yes.

*Nunes - Cross - Mr. Yaster*                                    70

1  Q    -- believed that he was linked to the purchase of

2  sexual exploitation material, right?

3  A    Correct, correct.

4  Q    And then, whoever wrote the lookout, also wrote that he

5  should be referred to secondary inspection?

6  A    Correct.

7  Q    And that an electronic exam should be performed?

8  A    Correct.

9  Q    I believe you told us that the primary inspector was

10 Officer Johnson in this case --

11 A    Correct.

12 Q    -- right?

13         And do you know, when he did his primary

14 inspection, did he see the lookout, the same lookout that

15 you saw at secondary?

16 A    I can't a hundred percent say for sure how it appeared

17 on his screen.  But I would say that there's a very good

18 chance -- like more positive than not that he saw it the way

19 that we saw it on the screen.

20 Q    And it was his decision to refer Mr. Robinson to

21 secondary inspection; is that right?

22 A    You would have to -- I wouldn't say it was his

23 decision, because if it did present itself, like you said,

24 as a prime hit, it would be a mandatory referral.  It

25 wouldn't necessarily be a decision.

*Nunes - Cross - Mr. Yaster* 71

1  Q    I see, however, he was the person who brought

2  Mr. Robinson to secondary inspection?

3  A    Correct.

4  Q    And based on the lookout that you reviewed, Officer

5  Johnson had no discretion not to bring him to secondary

6  inspection?

7  A    Correct.

8  Q    It was, as you said, mandatory?

9  A    It was mandatory.

10  Q    Put differently, Mr. Robinson could not enter the

11  United States without going through secondary inspection

12  first, right?

13  A    No.  He wouldn't be able to enter if -- no, he wouldn't

14  be able to.  If the lookout was presented and Officer

15  Johnson saw what we saw today and he got that information,

16  which I'm pretty positive that's what he saw, he couldn't

17  just admit that -- Mr. Robinson in.  He would have to refer.

18  Q    He would have to refer?

19  A    He would have to refer.

20  Q    And Mr. Robinson could then only enter or be admitted

21  into the United States once he had passed through secondary

22  inspection?

23  A    Correct.

24  Q    I want to talk about the tear sheet that you provided

25  to Mr. Robinson.

*Nunes - Cross - Mr. Yaster*          72

1        MR. YASTER:  May I use the ELMO?

2        I'm showing what's been previously admitted as

3 Government Exhibit 102.  And I'm showing the second page.

4 Q    Officer Nunes, can you see this on your screen?

5 A    I can.  I can.

6 Q    Before I ask about what the tear sheet says, as a part

7 of your secondary inspection, you conducted an electronic

8 exam, right?

9 A    Correct.

10 Q    And to do the electronic exam, obviously, you had to

11 obtain the electronic devices from Mr. Robinson?

12 A    Correct.

13 Q    You couldn't do a manual review of them if you didn't

14 have them from Mr. Robinson?

15 A    Correct.

16 Q    Is it fair to say that when you took the electronic

17 devices from Mr. Robinson, that you had seized or detained

18 them for purposes of the exam?

19 A    I would say not seized.  Detained for purpose of the

20 exam -- exam, yes.

21 Q    I want to draw your attention to the tear sheet.  Do

22 you see the section that begins:  What happens now?

23 A    Me?  Yes, I do.

24 Q    Thank you.

25        THE COURT:  Just pull the mic over while you are

*Nunes - Cross - Mr. Yaster*                                    73

1  doing that.

2  Q    I am going to read the first sentence out loud.  It

3  says:  You are receiving this sheet because your electronic

4  devices have been detained for further examination, possibly

5  including copying data contained in the device.

6           That's what that says, right?

7  A    Yes.

8  Q    And that's consistent with what you just told us, which

9  is his devices were being detained for purposes of the

10 examination?

11 A    Correct.

12 Q    Now I'm going to slide the document to the next

13 section, which reads:  Return or seizure of detained

14 electronic devices.

15          Do you see that?

16 A    Yes, I do.

17 Q    I am going to read the first sentence.  It says:  CBP

18 will contact you by telephone when the examination of your

19 electronic devices is complete and to notify you that you

20 may pick up the items during regular business hours from the

21 location where the items were detained.

22          That's what that says?

23 A    Mm-hm, I see.

24 Q    Your authority to detain an electronic device allows

25 you to keep a device for as long as the examination takes,

Nunes - Cross - Mr. Yaster                                74

1   right?

2   A    Correct.

3   Q    That could be a very short examination, but it could

4   also be a lengthy examination, potentially?

5   A    Correct.

6   Q    An examination that could take potentially days or

7   weeks?

8   A    As a secondary officer, I wouldn't say days or weeks,

9   but you are right, it can be lengthy and maybe it can take

10  an hour.

11  Q    As a basic exam, you mean?

12  A    I'm talking about basic exams.

13  Q    Right.

14  A    I wouldn't, in any situation, see a secondary officer

15  detaining anyone's phone for more than the time that they're

16  actually there.  And if it gets to that threshold, then

17  that's beyond, I guess, a regular secondary officer.

18  Q    Now, you mentioned that there were two kinds of

19  electronic exams?

20  A    Correct.

21  Q    There is basic exam, right?

22  A    And advanced.

23  Q    And what they call an advanced exam?

24  A    Yes.

25  Q    Now, am I right that you have the authority to detain a

Nunes - Cross - Mr. Yaster                           75

1  device for purposes of keeping it for an advanced exam?

2  A    Me, personally?

3  Q    At secondary inspection?

4  A    Me, personally, as a secondary officer, no.  My

5  supervisor, if he makes that call, then we do have special

6  teams that would handle that.

7  Q    I see.  So at secondary inspection, the secondary

8  officer, like you, can do a manual exam, right?

9  A    Yes, yes.

10 Q    And you can then speak with your supervisor about the

11 need, potentially, to do an advanced exam, correct?

12 A    Correct.

13 Q    And if your supervisor makes the call --

14 A    Yes.

15 Q    -- that an advanced exam should be performed, the

16 electronic device can be kept or detained, continue to be

17 detained for purposes of conducting that advanced exam --

18 A    Yes.

19 Q    -- is that right?

20 A    Yes, yes.

21 Q    And, if you know, an advanced exam can take days or

22 weeks to perform; is that right?

23        MR. REIN:  Objection, Judge.  This is outside the

24 scope of -- the testimony is that there was not an advanced

25 exam done.

1          THE COURT:  Right, but you elicited testimony

2     about general policies and what constitutes an advanced exam

3     so I think he's allowed to inquire.  So that's overruled.

4     A    Can you repeat the question?

5     Q    Sure.  If you know, an advanced exam of an electronic

6     device, like an iPhone, can take days or weeks?

7     A    I can assume.  I have no knowledge of any device,

8     particularly.

9     Q    You had never done an advanced?

10    A    I have never done an advance, yeah, I can assume.

11    Q    Understood.  But would you agree that the tear sheet,

12    specifically, the sentence that I read out loud to you,

13    contemplates that a phone can be detained for a period of

14    time, long enough that CBP would have to return it --

15          MR. YASTER:  Objection, Judge.

16    Q    -- to the traveler?

17          THE COURT:  Just let him finish the question.

18          MR. REIN:  Oh, sorry.

19    A    One more time, I'm sorry.

20    Q    Sure.

21          Would you agree that your authority to detain an

22    electronic device for purposes of an advanced exam would

23    allow you to keep the device for a period of days or weeks

24    until it is completed and then would have to be returned to

25    the traveler?

1  A    I honestly don't know the timeframe.  I don't even know

2  if there's a policy on the timeframe of how long CBP -- I

3  mean, I get an idea from the tear sheet that this is like

4  general information.  I don't know if they're going to

5  specify, like, how long they can hold the phone.  So I

6  really don't know, like, how that works.  I apologize.

7  Q    Thank you.

8         Now, when you were testifying on direct

9  examination, you indicated that there could be some

10 discretion as to whether an electronic exam should be

11 performed when it's requested in a lookout, right?

12 A    Correct.

13 Q    And am I right that --

14        MR. YASTER:  Well, withdrawn.

15 Q    Who exercises the discretion whether to conduct the

16 electronic exam when a request is made in a lookout?  Is it

17 you, the secondary officer, or is it a supervisor?

18 A    I would say ultimately, it's the secondary -- the

19 secondary officer that exercises the discretion.  But there

20 are some instances where you can't make that call on your

21 own.  Like I said, it all depends on the -- the record

22 holder, the person who inputted the record.  And also how,

23 like, old the record might be, where you can be, like, for

24 an example, I can give you, if it was a record that was put

25 in ten-plus years ago, there's a good chance that that

Nunes - Cross - Mr. Yaster                          78

1    record has already been addressed by a previous CBP officer,

2    so there would be no need for me to search the phone, so I

3    could use discretion in that matter, where I could think,

4    okay, this person has been fully addressed, there's no need

5    for me to do this.

6    Q    So in this case, right --

7    A    Yeah.

8    Q    -- the lookout was entered by NTC, right?

9    A    Correct.

10   Q    And that's the National Targeting Center?

11   A    Yes.

12   Q    And did you have any discretion not to conduct the

13   electronic exam for this lookout?

14   A    I wouldn't say so.

15   Q    So you did not have discretion, that was your

16   understanding; is that correct?

17   A    That's my understanding, that I did not have a choice

18   in this matter, if that's what you are asking.

19   Q    Just so I'm clear, there would be some other lookouts,

20   such as lookouts entered by a random officer, and I think

21   you said, in Miami, that maybe you could have discretion not

22   to follow the request for an electronic exam; is that right?

23   A    Yes.

24   Q    That wasn't this case, though, right?

25   A    That wasn't this case, no.

*Nunes - Cross - Mr. Yaster*                                          79

1    Q    Now, when you asked for Mr. Robinson's devices, he gave

2    them to you, right?

3    A    Correct.

4    Q    What if he had refused to give you the devices?  What

5    would have happened?

6    A    At that point, if he didn't want to give it to me, I

7    would just have to contact my supervisor and see how they

8    would want to proceed.  And however they chose to go about

9    it would be -- I would have to follow.

10   Q    I think on direct, you said that you have conducted

11   about 50, like five-zero --

12   A    I would say five-zero, yes.

13   Q    -- electronic exams?

14   A    Yeah.

15   Q    Have you ever had a situation where the traveler did

16   not give you their electronic devices?

17   A    Honestly, no, never.

18   Q    So you have never seen, in your personal experience as

19   a CBP officer, what happens if an electronic exam is

20   requested and if the traveler refuses to give their devices?

21   A    Personally seen, no.

22   Q    In all, roughly, 50 cases, they've just given the

23   devices, right?

24   A    Yes.

25   Q    I want to ask a few questions about your interactions

*Nunes - Cross - Mr. Yaster*                              80

1    with Mr. Robinson's secondary inspection, but before I do, I

2    just want to clarify.  When you walked into the courtroom

3    today, you didn't recognize Jason Robinson; is that right?

4    A    No, I don't, no.

5    Q    However, you do remember details about your

6    interactions with him on November 14, 2022?

7    A    Yes.

8    Q    Is that at least, in part, because you reviewed your

9    report before testifying today?

10   A    You can say partly.  I've seen the report prior to

11   testifying.  And also, it was the fact that it was the

12   first -- that was my first encounter finding CSEM, so there

13   are things that I remember.

14   Q    Understood.

15            Now, you told us that as part of your secondary

16   inspection, you asked Mr. Robinson questions --

17   A    Yeah.

18   Q    -- right?

19            Those questions were about his travel?

20   A    Yeah.

21   Q    Such as where he was coming from, how long he stayed

22   there, and maybe -- was that one of the questions, how long

23   he stayed there?

24   A    I don't remember if I asked him how long he was there

25   for.  I think I was able to see that on my system.  But I

*Nunes - Cross - Mr. Yaster*                                    81

1    did ask him where he was coming from.  I asked him if he had

2    any friends or family.  I think he said he was coming from

3    Egypt.

4    Q    When you said you asked him if he had any friends or

5    family, do you mean if he had any friends or family in the

6    place where he had visited?

7    A    Yeah.

8    Q    Okay.

9    A    So any friend or family that was there.  The purpose of

10   the travel.  I don't if I necessarily asked how long he was

11   there.

12   Q    And you also --

13            MR. YASTER:  Withdrawn.

14   Q    During your questioning of him, he also disclosed the

15   fact that he's employed, right?

16   A    Yes.

17   Q    And I think he told you what kind of work he does?

18   A    Yes.

19   Q    Did Mr. Robinson's answers match the inspection that

20   you had in your -- that you had about him as a traveler,

21   such as the country that he had come from and how many times

22   he had traveled abroad?

23   A    Yes, that matched.

24   Q    As far as you could tell, were the answers to these

25   questions, did they appear to be truthful?

Nunes - Cross - Mr. Yaster                                          82

1   A    Yes, they did.

2   Q    Now, while you were speaking to Mr. Robinson, you also

3   asked him whether he had any electronic devices?

4   A    Correct.

5   Q    And he told you that he had two, right?

6   A    Mm-hm, yes.

7   Q    And he identified it as a laptop and an iPhone?

8   A    Yes.

9   Q    Did he give that information to you freely?

10  A    I would say so.

11  Q    I asked him to give you the laptop and iPhone, right?

12  A    Yes.

13  Q    And you also asked him to turn them on?

14  A    I don't recall if I asked him to turn it on or if I did

15  it, I can't tell you.

16  Q    When Mr. Robinson gave you his devices, he gave them to

17  you with the power on; is that correct?

18  A    I don't recall.

19  Q    If I were to show you your report, would that help

20  refresh your recollection?

21  A    Sure.

22        MR. YASTER:  I am going to use the ELMO for this.

23  Q    I am going to just direct you to this paragraph with my

24  pen.  Once you have had an opportunity to read it, if you

25  can look up.

1  A    Okay, yes.

2  Q    Does this refresh your recollection as to whether

3  Mr. Robinson's devices were on when he presented them to

4  you?

5  A    Yes.  So I see that it says that it was on an unlocked

6  and on position, but I don't necessarily think or -- I don't

7  believe, from my recollection, that it was unlocked already.

8  I believe I asked -- I unlocked it.  That may have been an

9  oversight on my part in making the report.  I believe what

10 truly happened was that he presented the cellphone to me and

11 I unlocked it.

12 Q    Do you remember the date that you wrote this report?

13 A    It's probably 2019.  I don't remember.  2019 sometime.

14 The day of -- the day of.

15 Q    Your recollection is you wrote it the day of?

16 A    The day of, yes.

17 Q    When the events were fresher in your mind than they are

18 today?

19 A    Yes.

20 Q    And when you wrote this report, you wrote it to be

21 truthful and accurate, correct?

22 A    Correct.

23 Q    Because you wanted to correctly capture what your

24 interaction was like with Mr. Robinson?

25 A    Yes.

*Nunes - Cross - Mr. Yaster*                                    84

1   Q    Right?  And am I correct that in this report what you

2   wrote was that the subject voluntarily presented his

3   cellphone and his laptop in the powered on and unlocked

4   position?

5   A    I did write that, yes.

6   Q    Thank you.

7           He also presented you with his passcodes, correct?

8   A    He did.

9   Q    And I believe he gave them to you in response to your

10  question, what are the passcodes to the phone and laptop,

11  right?

12  A    Yes.

13  Q    And you wrote down the passcodes as he gave them to

14  you?

15  A    Correct.

16  Q    Is it fair to say that when Mr. Robinson --

17          MR. YASTER:  Withdrawn.

18  Q    Is it fair to say that when you asked for

19  Mr. Robinson's devices and the passcodes, that he complied?

20  A    Yes.

21  Q    And when you asked for his devices and the passcodes,

22  am I right that this was after you had verbally explained

23  the process of the electronics examination to him?

24  A    I don't -- I don't believe so.  I think I asked for the

25  passwords first, if I'm recalling correctly, I think I asked

*Nunes - Cross - Mr. Yaster*                                    85

1    for the passwords first.  I think I asked for the devices

2    and then I asked for the passwords and I wrote them down.  I

3    think I then explained to him what I was going to do, but it

4    was prior to the search.

5    Q    And you gave him the tear sheet in the course of all of

6    this, right?

7    A    Yes.

8    Q    You gave him the tear sheet at the time that you gave

9    him the verbal --

10   A    Yes.

11   Q    -- explanation --

12   A    Yes.

13   Q    -- of the process?

14   A    Yes.

15   Q    I want to ask a couple of questions about the secondary

16   inspection room.

17   A    Sure.

18   Q    So when you were describing the secondary inspection

19   room to us, you told us that the doors were open?

20   A    They are.

21   Q    Right?  But I believe you also said that Mr. Robinson

22   was released from secondary inspection only after Agent

23   Anstee had come, interviewed him, and picked up the devices?

24   A    Correct.

25   Q    So I just want to be clear.  Could Mr. Robinson, during

1    the secondary inspection, have walked through those doors

2    and left Customs?

3    A    No, because, in fact, when you are undergoing

4    inspection, you can't leave until your inspection's over.

5    Q    So even though those doors were open, Mr. Robinson

6    could not just get up and go during the secondary

7    inspection --

8    A    Not until his inspection was over.

9    Q    Thank you.

10         I want to show you Government Exhibit 101, which

11   is the TECS report.

12         Officer Nunes, can you see the first page of the

13   TECS report on your screen?

14   A    Yes, I can.

15   Q    You told us on direct examination that the entry date,

16   which here says November 11, 2019, was the date that the

17   lookout was created; is that right?

18   A    Yes, correct.

19   Q    You also told us that you had a recollection that you

20   saw that the lookout had been updated or refreshed, I think

21   was the word --

22   A    Correct.

23   Q    -- at some point after this date?

24   A    Yes.

25   Q    Looking at page 1 here of the TECS report, do you see

1  where there's anything about this report having been updated

2  or refreshed?

3  A    Yes.  There is an update date here for November 15,

4  2022.

5  Q    Okay.  November 15, 2022 is the day after Mr. Robinson

6  was put in secondary inspection, right?

7  A    Yes.

8  Q    But is it fair to say that there's nothing on this

9  first page of the TECS report that shows that the record had

10  been refreshed approximately one year after it was entered?

11  A    Well, it wouldn't, because it only shows the last

12  update date.

13  Q    Understood, but my question --

14  A    Yes, yes.  For your question, it wouldn't show on this

15  page, no.

16  Q    I am going to show you page 2 of the TECS report.

17  A    Sure.

18  Q    Are you able to see that on your screen?

19  A    Yes, I can.

20  Q    Is there anything on this page that shows that the

21  lookout had been refreshed approximately one year after it

22  was entered?

23  A    No.

24  Q    I am showing you the third page of the TECS report.

25        Same question:  Is there anything on this page

*Nunes - Cross - Mr. Yaster*                                   88

1   that shows that the TECS report had been updated

2   approximately one year after it had been created?

3   A    No.

4   Q    And now I am going to show you the fourth and final

5   page.

6          Anything on this page that shows that this record

7   had been updated approximately one year after it had been

8   entered?

9   A    No.

10  Q    Thank you.

11         Can I ask, do you know why the lookout was updated

12  on November 15, 2022?

13  A    No, I don't know.

14  Q    I am going to show you page 2 of the TECS report again,

15  just for reference.

16         Officer Nunes, do you see the top of the second

17  page of Government Exhibit 101, which includes the remarks

18  information?

19  A    Yes, I do.

20  Q    Do you know what investigation led to these remarks

21  being put in the lookout?

22  A    I'm not aware of the investigation.

23  Q    Do you know the specifics as to why this --

24         MR. YASTER:  Sorry, withdrawn.

25  Q    Do you know specific information as to why Mr. Robinson

Nunes - Cross - Mr. Yaster                                          89

1    was believed to be linked to the purchase of sexual

2    exploitation material?

3    A    No, I don't know specific information.

4    Q    Do you see on the first line of the remarks, it says:

5    Purchase of Child Sexual Exploitation Material via FinCEN?

6    A    Yes, I do.

7    Q    Do you know what FinCEN is?

8    A    Vaguely, yes.  It's an agency that I think they oversee

9    kind of how the purchases or maybe the movement of money

10   within the United States -- I know when we deal with them,

11   when passengers are bringing in certain large amounts of

12   money, there's like a form that they have to fill out called

13   FinCEN to declare that money, so I know that they overlook

14   how the money is being moved in and out of the country and

15   stuff like that.

16   Q    So in the course of your job at CBP --

17   A    Yeah.

18   Q    -- you've come to learn a little bit about what FinCEN

19   is?

20   A    Yes.

21   Q    And am I right that what you know about FinCEN relates

22   to certain documents that have to be filled out --

23   A    Yes.

24   Q    -- when large amounts of money are brought into the

25   country?

1   A    Correct, yes.

2   Q    Let me ask, at the time that you did your secondary

3   inspection, did you know anything about Mr. Robinson's

4   criminal history or lack thereof?

5   A    I don't believe he had a criminal record.  It didn't

6   show in the systems checks.

7   Q    Well, if he had a criminal record --

8   A    It would show.

9   Q    -- that would show?

10  A    Yes.

11  Q    Where would it have shown in your records?

12  A    In the screen.  So we would have a tab that

13  basically -- so looking at -- once I clicked into his

14  profile or off my queue, we have a tab that's basically

15  called triple I that shows everyone's criminal history,

16  their rap sheet.

17  Q    Just so I understand --

18  A    Yeah.

19  Q    -- when a passenger or traveler comes to secondary

20  inspection --

21  A    Mm-hm.

22  Q    -- and you bring up their records --

23  A    Yes.

24  Q    -- one of the tabs that is available to you is their

25  criminal history --

*Nunes - Cross - Mr. Yaster* 91

1   A   Correct.

2   Q   -- is that right?

3   A   Yes.

4   Q   And to your recollection, Mr. Robinson did not have any

5   criminal history in his tab; is that right?

6   A   Yes.

7         MR. YASTER:  I am going to take down Government

8   Exhibit 101.

9   Q   I want to ask a few questions about your basic

10  examination of the iPhone.

11  A   Sure.

12  Q   So you had told us that when you searched

13  Mr. Robinson's phone, you did it by scrolling through the

14  phone, right?

15  A   Correct, yes.

16  Q   You did not copy the contents of the device to like

17  another program and then look at it --

18  A   No.

19  Q   -- on a separate screen?

20  A   No.

21  Q   It was just on the device itself?

22  A   On the actual device.

23  Q   All right.  And I believe you told us that the items

24  that you identified as Child Sexual Exploitation Material

25  were in a folder --

A164

Nunes - Cross - Mr. Yaster                                    92

1   A    Yes.

2   Q    -- right?

3        And I believe your recollection is it was called

4   My Favorites or Favorites?

5   A    Yes.

6   Q    Is that right?

7   A    Correct.

8   Q    Now, do you recall what app you found this folder in?

9   A    Yes.

10  Q    What app was it?

11  A    It was just a regular iPhone files.  So it's not an

12  app.  The iPhone, it has -- it allows you to store files.

13  And it has its own, like, it's already programmed into the

14  phone.  It's not something that you download.  It's its own

15  folder for like whatever you want to download or save to

16  your phone.

17  Q    Do you recall how you got -- how you found the

18  folder --

19        MR. YASTER:  Sorry, withdrawn.

20  Q    The main folder which I think you would call favorites?

21  A    Yes.

22  Q    Do you recall how you found that main folder on

23  Mr. Robinson's phone?

24  A    So I went into his files folder.

25  Q    Okay.

Nunes - Cross - Mr. Yaster                           93

1    A    And then within the files folder, there are a lot of

2    other folders.  So I scrolled and I found one that was named

3    My Favorites and I clicked into that one.

4    Q    Let me take a step back.

5    A    Yes.

6    Q    The files application or folder --

7    A    Yes.

8    Q    -- do you remember how you found that?

9    A    It's general knowledge.  I have an iPhone.  Everyone

10   has a files folder.

11   Q    So as an iPhone user, did you find it by using the

12   search command on the iPhone --

13   A    No.

14   Q    -- or did you just find the icon?

15   A    I just swiped and found the icon.

16   Q    You found the icon for files, you opened it up?

17   A    Yes.

18   Q    And then you saw the sub-folders; am I right?

19   A    Yes.

20   Q    And one of the sub-folders was called My Favorites?

21   A    Correct.

22   Q    And then you opened that up and that is where you

23   found --

24   A    Correct.

25   Q    Other than this sub-folder within the files on

Nunes - Cross - Mr. Yaster                                    94

1    Mr. Robinson's iPhone, do you recall searching any other

2    apps on his device?

3    A    His photos, the regular photo album, I looked through

4    there.  And --

5    Q    Before you go on.

6    A    Yes?

7    Q    In the regular photo album, did you find any child

8    sexual exploitation --

9    A    No.

10   Q    -- material?

11   A    No, no.

12   Q    All right.  Other than the photos, what else did you

13   search?

14   A    So there's this app, it's a calculator app.  So the

15   iPhone has a built-in calculator that comes with everyone's

16   iPhone.  He had another calculator app in there.  And --

17   Q    So just so I understand --

18   A    Yes.

19   Q    -- he had a second calculator?

20   A    Second calculator.

21   Q    Not the native calculator?

22   A    Not the native.

23   Q    A calculator app he had to download presumably from the

24   App Store?

25   A    Correct.

Nunes - Cross - Mr. Yaster                              95

1    Q    So you looked in the second calculator app, right?

2    A    Yes.

3    Q    Okay.

4    A    The second calculator app was known to be one of those

5    applications where it looks like and it functions as a

6    calculator, but when you type in a certain number sequence,

7    it opens into like a hidden folder.

8    Q    So just so to make sure I understand.

9    A    Yes.

10   Q    You knew that this second calculator app could be used

11   to basically disguise things on the phone; is that right?

12   A    Correct.

13   Q    So you looked in it, right?

14   A    I looked into it, but I didn't know the -- whatever the

15   combination was, so there wasn't anything I did with it.

16   Q    Okay.

17   A    I just --

18   Q    So as I understand it, you opened up the second

19   calculator app, but didn't know whatever the code was to, I

20   guess, get into any potential disguised content; is that

21   right?

22   A    Correct.

23   Q    So other than the My Favorites sub-folder and the

24   files, his photo roll and the second calculator app, did you

25   search any other apps on his phone?

*Nunes - Cross - Mr. Yaster*                                        96

1  A    I'm thinking.  Not that I could recall.  Those are the

2  three that I remember.  I could have.  I may have.  But I

3  don't remember them.

4  Q    Now, you told us on direct examination that after you

5  found the Child Sexual Exploitation Material in the My

6  Favorites folder, you stopped your search --

7  A    Yes.

8  Q    -- right?

9  A    I did.

10  Q    If you had not found any Child Sexual Exploitation

11  Material in the My Favorites folder, would you have

12  continued searching the phone?

13  A    No.  I would have -- after I did everything that I

14  could, no, I would have just marked it negative like I did

15  with the laptop.

16  Q    So you wouldn't have searched Mr. Robinson's social

17  media applications?

18  A    No.  I don't go into social media.

19  Q    Would you have searched his video library?

20  A    Well, that would be in the photos.

21  Q    Oh, let me just clarify.  The photos that you examined

22  were the photos and videos, right?

23  A    Correct.

24  Q    Would you have searched his messaging apps, like a text

25  message or Signal or WhatsApp?

*Officer Nunes - Redirect - Mr. Rein*                    97

1   A    I wouldn't have.  The only thing that I may possibly

2   search -- and I don't remember if I did in his case -- would

3   be the browsing history.

4   Q    On the web browser on his phone?

5   A    On the web browser.  I don't think -- I wouldn't look

6   through the text messages.  It wouldn't be relevant.

7   Q    If he had any file sharing applications like Dropbox,

8   would you have searched that?

9   A    Possibly, yes.

10          MR. YASTER:  May I have one moment?

11          THE COURT:  Yes.

12          (Pause in proceedings.)

13          MR. YASTER:  Officer Nunes, I have no further

14  questions.  Thank you.

15          THE COURT:  Any redirect?

16          MR. REIN:  Yes.

17  REDIRECT EXAMINATION BY

18  MR. REIN:

19  Q    Officer, you were asked some questions on

20  cross-examination about prime hits.

21          Do you remember being asked about that?

22  A    Yes, I do.

23  Q    As you sit here today, I believe you said you weren't

24  sure if this was a prime hit or not?

25  A    Yes.

Officer Nunes - Redirect - Mr. Rein                    98

1    Q    Is there anything that would refresh your recollection
2    as to whether it was?
3    A    The TECS record should say what it was, perhaps.
4    Q    Would you have recorded that in your notes in any way?
5    A    No, I wouldn't.
6    Q    When you receive a referral from primary, does that
7    include the reasons for referral?
8    A    Yes, it does.
9    Q    And does that get incorporated into what's called a
10   secondary inspection report?
11   A    Yes, it is.
12   Q    If you were to view a secondary inspection report,
13   might that refresh your recollection?
14   A    It would.  It would.
15   Q    I want to ask you to take a look at 3500 SN-1.  I just
16   direct your attention to the first page of the report.
17   A    Yes, I see.
18   Q    Having looked at this record, is your recollection
19   refreshed as to whether this was a prime hit?
20   A    It has been.
21   Q    And what was it?
22   A    It is a prime hit.
23   Q    Can you just explain for us what that means?
24   A    A prime hit is when the system has determined that the
25   person that's in front of the officer is 100 percent the

1    person in the record and it requires a mandatory referral to

2    secondary for an inspection.

3    Q    And just to confirm, I think on cross-examination you

4    were asked some questions about when the actual inspection

5    occurred in relation to the initial entry of the lookout.

6            Do you remember being asked about that?

7    A    Yes.

8    Q    What year did the inspection occur?

9    A    2022 -- I'm sorry, yes, 2022.

10   Q    And in your experience, might the timeframe between

11   when a lookout is first placed and when an encounter occurs

12   affect whether a secondary inspection might take place?

13   A    For a prime hit, they're referred mandatory -- it's

14   mandatory, so it won't matter the length of time that it

15   was input into the system, it wouldn't matter.

16   Q    In cases where it's not a prime hit --

17   A    Yes.

18   Q    -- does the length of time between when a lookout is

19   first entered into the system and when someone's encountered

20   matter at all in your analysis?

21   A    That's a determination that's made in secondary, not

22   primary, so, again, it wouldn't matter.

23   Q    I am talking about in secondary.

24   A    In secondary?

25   Q    Yes.

Officer Nunes - Redirect - Mr. Rein                    100

1   A    It wouldn't matter.  The length of how old a lookout is

2   wouldn't matter in how we conduct --

3   Q    Could you describe how so?

4   A    If a lookout is extremely old --

5        THE COURT:  This is for nonprime hits, correct?

6        THE WITNESS:  Yes.

7   A    If a lookout is extremely old, there is a chance that

8   it has been addressed maybe even multiple times by prior

9   officers or different encounters, so we wouldn't necessarily

10  give it much attention and might just admit the passenger

11  and release them because it's already been fully addressed.

12  Q    What does "extremely old" mean?

13  A    Extremely old, for me, personally, means ten-plus

14  years, ten years -- more than ten years.

15  Q    You were also asked some questions about detaining a

16  device for the purposes of an advanced search.

17       Do you remember being asked about that?

18  A    Yes.

19  Q    In this case, did you make a decision to detain any

20  devices for an advanced search?

21  A    No.

22  Q    You were also asked a question about the date that the

23  lookout was updated --

24  A    Yes.

25  Q    -- do you remember that?

*Officer Nunes - Redirect - Mr. Rein*                                101

1    A    Yes.

2          MR. REIN:  If we could look at Government

3    Exhibit 101.

4    Q    At the time that you were conducting your inspection,

5    did the most recent update date for that lookout appear in

6    the lookout?

7    A    Yes.

8    Q    And so on this record, where would that have appeared?

9    A    Right where it says update date.

10   Q    At the time that you conducted your inspection, what

11   reason, if any, did you have to question the information

12   that was contained in the lookout?

13   A    I didn't have much reason to question it.  It came from

14   a credible source.  It was an NTC lookout.  And it was

15   recent, in my view, so there was nothing really for me to

16   question.

17          MR. REIN:  Nothing further, Judge.

18          THE COURT:  Any re-cross?

19          MR. YASTER:  Just very brief.

20          THE COURT:  Sure.

21   RECROSS-EXAMINATION BY

22   MR. YASTER:

23   Q    Officer Nunes, I just want to ask a few questions about

24   the length of time after a lookout is entered and when you

25   have discretion to follow it or not.

*Officer Nunes - Recross - Mr. Yaster*                                    102

1   A    Sure.

2   Q    Am I right that if the lookout is a prime hit --

3   A    Yes.

4   Q    -- referral to secondary is mandatory?

5   A    Correct.

6   Q    And it's mandatory regardless of how old that prime hit

7   is?

8   A    Correct.

9   Q    So it could be more than ten years old.  If it's a

10  prime hit, that traveler is going to secondary inspection?

11  A    Correct.

12  Q    But if it's a nonprime hit, right, in that case, you

13  have discretion not to refer to secondary if the lookout is

14  old; is that right?

15  A    Not necessarily.  So, again, when it comes to the

16  length of the lookout, that is a discretion that's reserved

17  for secondary officers.  Primary just basically has to

18  follow whether it's a mandatory or not.

19  Q    Let me rephrase.

20         As a secondary officer, if you are presented with

21  a nonprime lookout --

22  A    Correct.

23  Q    -- you have the discretion not to perform the secondary

24  inspection if the lookout is old; is that right?

25  A    Not necessarily.  So if it's a nonprime -- either way,

*Officer Nunes - Recross - Mr. Yaster*                          103

1  the inspection's going to happen in the sense that I have to

2  do a closing -- a closing report for whatever the issue is.

3  So I guess it just influences how we conduct the inspection.

4  Q    I understand.

5  A    Yeah.

6  Q    So let's imagine you have a nonprime hit lookout --

7  A    Yeah.

8  Q    -- that's 15 years old --

9  A    Yes.

10 Q    -- and it asks for an electronics examination, right?

11 A    Okay.

12 Q    Just assume.

13 A    Yes.

14 Q    In that situation, at secondary, the secondary officer

15 would have discretion not to do the electronic examination?

16 A    Yes, you are correct.

17 Q    But if it was a prime hit that was 15 years old that

18 requested an electronics exam and secondary, it would be

19 mandatory to do the electronics exam; am I right?

20 A    No.  There is still a chance that it wouldn't be

21 discretion.  It would more be like you would have to inquire

22 or see if this hit has been resolved.  So in that situation,

23 if it's a prime hit, and it has been addressed fully

24 already, then you wouldn't have to do it again.  It's not

25 necessarily discretion.  It's just the fact that you are not

1   going to do the work twice if it's already been done.

2   Q    I see.  So let me ask a point of clarification.

3   A    Sure.

4   Q    You can have a prime hit lookout for someone who's

5   already been encountered on that lookout?

6   A    Yeah.  The lookouts don't expire.  They don't expire.

7   So for example, if there's a prime hit, like you said, on

8   someone, and they came in and they encountered me today and

9   I did the inspection and I closed them out and I released

10  them and they, say, travel a month from now and that prime

11  is still going to flag.

12          So the difference with the second encounter would

13  be that they will still get mandatory referred to secondary.

14  However, the secondary officer will see that the first

15  officer a month ago fully addressed whatever the lookout

16  was.  And then in their closing remarks would say, this

17  lookout has been fully addressed, and then would leave the

18  encounter ID number and then release the passenger.

19  Q    So what I think I need help with --

20  A    Yes.

21  Q    -- is in that scenario --

22  A    Yes.

23  Q    -- where you have a prime hit and they've gone through

24  secondary inspection and the lookout has been closed out --

25  A    Yes.

1    Q    -- as you said, why would there still be a lookout for

2    that person if it's been closed out?

3    A    Well, I honestly couldn't answer that.  I don't know,

4    I'm not really familiar with how they retract lookouts.  I

5    don't have the ability to do that.  That's a different

6    division.

7    Q    Maybe this is the part I'm missing.

8    A    Yeah.

9    Q    When you, as a secondary inspection officer, close out

10   a lookout, that doesn't necessarily mean the lookout has

11   been retracted?

12   A    Exactly.

13   Q    Understood.

14        This, what we've been talking about in terms of

15   the discretion about -- or lack thereof, following a

16   lookout, these are things that you are trained on at CBP.

17   A    Secondary training.

18   Q    During secondary training?

19   A    Yeah.

20   Q    And that was training that you had at the academy?

21   A    And also at the port.  So we had our training at the

22   academy and then we have our port-specific training.

23             MR. YASTER:  No further questions.  Thank you.

24             THE COURT:  All right.  Thank you, all.

25             So it is 1:40.

*Proceedings*                                                    106

1         You are excused, Officer Nunes.  Thank you very

2   much for being here today.

3              (Witness excused.)

4         Let's take a short lunch break since it's after

5   1:30.  Why don't we come back in 20 minutes.  So let's come

6   back at ten minutes to 2:00, and then we'll proceed from

7   there.  Thank you all.

8              (Luncheon recess taken.)

9         THE COURT:  Let's proceed.

10        Mr. Rein, you can call your next witness, please.

11        MR. REIN:  Judge, just briefly, I did want to

12   update the Court because I did speak with CBP counsel on the

13   question that Your Honor asked about.

14        THE COURT:  Yes.

15        MR. REIN:  First, what I was told was that the

16   record was transmitted to them, meaning CBP counsel, with

17   that redaction already in place.

18        THE COURT:  Okay.

19        MR. REIN:  However, they did inquire further and

20   they learned that what is under that redaction is the name

21   of the IT specialist in the passenger systems program

22   directorate at CBP that actually generated the record.  And

23   I can confirm to the Court that none of the witnesses who we

24   anticipate calling today ever spoke with that person, never

25   had any contact with them.

*Simon - Direct - Mr. Rein*                                        107

1        THE COURT:  Any concern on the defense's part if I

2   allow that redaction to stand as it is?

3        MR. YASTER:  No objection, Judge.

4        THE COURT:  Thank you.

5        Thank you for taking care of that so quickly.

6        MR. REIN:  The Government calls Egbert Simon.

7        (Witness takes the stand.)

8        THE COURTROOM DEPUTY:  Please raise your right

9   hand.

10       (Witness sworn.)

11       THE WITNESS:  Yes.

12       THE COURTROOM DEPUTY:  Please state and spell your

13  name for the record.

14       THE WITNESS:  My name is Egbert, E-G-B-E-R-T.

15  Last name is Simon, S-I-M-O-N.

16       THE COURT:  Good afternoon.

17       You may proceed.

18  **EGBERT SIMON**,

19            called as a witness, having been first duly

20            sworn/affirmed, was examined and testified

21            as follows:

22  DIRECT EXAMINATION BY

23  MR. REIN:

24  Q    Good afternoon.  Mr. Simon, are you currently employed?

25  A    Yes.

Simon - Direct - Mr. Rein                              108

1   Q    Where do you work currently?

2   A    I work for the U.S. Attorney's Office for the Eastern

3   District of New York.

4   Q    Approximately how long have you worked with the U.S.

5   Attorney's Office?

6   A    Two weeks.

7   Q    What is your current title with the U.S. Attorney's

8   Office?

9   A    Special Agent.

10  Q    Where did you work before working with the U.S.

11  Attorney's Office?

12  A    I worked for U.S. Customs and Border Protection.

13  Q    How long were you employed by Customs and Border

14  Protection?

15  A    Sixteen years.

16  Q    I am going to refer to that as CBP, okay?

17  A    Yes.

18  Q    During your 16 years with CBP, what positions did you

19  hold?

20  A    I was an agricultural specialist.  Then I became a

21  Customs and Border Protection officer.  Then I was a Customs

22  and Border Protection Intel officer.  Then I became a

23  Supervisory Customs and Border Protection officer.

24  Q    What were your responsibilities as a CBP officer?

25  A    As a CBP officer, I was predominantly assigned to the

A181

1  admissibility review office, where I would process incoming

2  passengers for possible immigration violations, conduct

3  notices to appear, and process them for refusals.

4  Q    And when you became a Supervisory Customs and Border

5  Protection officer, what were your responsibilities?

6  A    I was tasked with managing the daily operations of my

7  direct reports.  Making sure if they need any help with any

8  CBP policy or coordination with their host agency that they

9  were detailed with, I would help them with that.  I would

10  also help them with coordination with the port of entries

11  for any law enforcement actions that their host agents might

12  have to take.

13  Q    What type of training did you receive when you first

14  joined CBP?

15  A    When I first started as an agricultural specialist, I

16  was sent down to the USDA training facility to learn about

17  the different laws that the USDA administered and enforced

18  at a port entry.

19  Q    Did you receive additional training periodically during

20  your time as a CBP officer?

21  A    Yes.

22  Q    And what did that consist of?

23  A    So when I first started as a CBP officer, I went to the

24  Federal Law Enforcement Training Center, where I went

25  through the CBP officer basic training program that taught

1   us Immigration, Customs, and use of our systems.  Then upon

2   my return, I had other training, technical training,

3   enforcement training, and some additional immigration and

4   trade training.

5   Q    And during your time at CBP, what geographic area were

6   you assigned to?

7   A    I was assigned to the New York AOR.  So I was working

8   New York City.

9   Q    Did you have the occasion to become involved in

10  different investigations that CBP was conducting during your

11  time at CBP?

12  A    Yes.

13  Q    And what type did those consist of?

14  A    A lot of those were immigration-related cases.  We had

15  some Customs-related.  And cargo.

16  Q    And what was your role in those investigations?

17  A    For a lot of those, I would do more of like an

18  investigative -- well, researching the information that we

19  had collected, performing analysis, identifying different

20  patterns, linking other individuals to certain inspections

21  or incidents that might have arrived at the port of entry.

22  Q    Did you play any role in the investigation of Jason

23  Robinson in November of 2022 or afterward?

24  A    No.

25  Q    During your time at CBP, did you become familiar with

Simon - Direct - Mr. Rein                              111

1    what are called lookouts?

2    A    Yes.

3    Q    And how would you describe what a lookout is?

4    A    A lookout is -- it's an alert that is within the TECS

5    system and it basically provides the CBP officer, border

6    patrol agent, who is using TECS, information on the

7    individual that they currently have in front of them or that

8    they're researching.

9    Q    How are those lookouts generated?

10   A    So for CBP, the alerts are generated when you have, for

11   example, an immigration refusal, a seizure, that's -- that's

12   when we create an alert.  Or when you have a situation where

13   you develop information from research or from an incident

14   that already occurred, you would create an alert on that.

15   Q    And then how were they subsequently used by CBP

16   officers?

17   A    So on the primary inspection area, when the officer is

18   processing the traveler, the alert would come up in primary.

19   The officer would then refer that individual to the

20   secondary area that the alert is directing them to send them

21   to.

22   Q    And what's the process that CBP personnel go through

23   when they are actually generating the lookout that is later

24   viewable by other officers?

25   A    So in order -- you have to basically enter all the

1   identifiers that you have for the individual that you are

2   creating the TECS record for.  You are going to create a

3   remarks area.  You are going to fill that out with as much

4   information as you can.  Your -- your name, your phone

5   number will come up in the -- the alert.  And once you

6   submit that, it will notify your supervisor and then your

7   supervisor will have to go into the system to review it and

8   either approve it or disapprove it.

9   Q    And what are the steps that are taken to verify

10  information which forms the basis of a lookout?

11  A    So the officer creating the lookout will do some type

12  of research on the individual and the information that

13  they're creating the lookout for.

14  Q    Does there always have to be a reason behind why a

15  lookout is placed?

16  A    Yes.

17  Q    And what is the purpose of wanting to inform a primary

18  inspection officer about the information that might be in

19  the lookout?

20  A    So you're going to want to alert the primary officer to

21  a situation that, based on the research and analysis, the

22  person that created it feels that -- or knows that the

23  individual falls within CBP's enforcement and the laws that

24  CBP enforces and administers at the border.

25  Q    Are there different categories that lookouts can relate

Simon - Direct - Mr. Rein                                      113

1    to?

2    A     Yes.

3    Q     And what are those categories?

4    A     It's either for Immigration, Customs, or Agriculture.

5    Q     Are you familiar with something called the National

6    Targeting Center?

7    A     Yes.

8    Q     What is that?

9    A     The National Targeting Center is like an intelligence

10   hub for frontline personnel.

11   Q     And so who works there?

12   A     We have -- CBP has Customs and Border Protection

13   officers, border patrol agents, intel analysts, and HSI also

14   sits there and they have liaisons from other agencies.

15   Q     Can you describe for us, when a lookout is generated by

16   the National Targeting Center -- well, first, does the

17   National Targeting Center generate lookouts?

18   A     Yes.

19   Q     When a lookout is generated by the National Targeting

20   Center, how would that impact the assessment of the lookout

21   by CBP officers on the ground at a port?

22   A     So when you see a lookout from the NTC -- the National

23   Targeting Center, you're going to -- you're going to feel

24   that they have already done their -- their research and

25   their analysis for creating that record.

Simon - Direct - Mr. Rein                                   114

1  Q    What distinguishes the impact of a lookout from NTC

2  from a lookout generated by another source?

3  A    So if it's from NTC, we're going off the basis that

4  there's some type of research or intel behind it.  If it's

5  an officer at a port of entry, you're not going to -- it's

6  not going to have the same thought that -- unless that

7  person's from a specialized unit.

8  Q    If a CBP officer or other employee places a lookout for

9  a person, can you just describe for us how other officers

10 actually become aware of the lookout?

11 A    So other officers will become aware of the lookout

12 either on primary, when they process the passenger, or in

13 secondary, when the passenger has been referred and is being

14 processed by the secondary officer.  The secondary officer

15 will query that person in the system.

16 Q    If a United States citizen is the subject of a lookout,

17 can that person be denied entry into the United States

18 because of a lookout?

19 A    No.

20 Q    Could the U.S. citizen have property detained on the

21 basis of a lookout?

22 A    Yes.

23 Q    Can you describe how?

24 A    So based on -- going from the lookout and based on the

25 inspection and what is determined there or found during the

Simon - Direct - Mr. Rein                                      115

1   course of the inspection, the CBP officer can make

2   determination to detain whatever good, merchandise, or

3   substance is being brought to the United States.

4   Q    But if the subject of the lookout is a United States

5   citizen, would that person still be allowed to enter the

6   United States?

7   A    Yes.

8   Q    Once a CBP officer learns of a lookout, do they have

9   the discretion to disregard it?

10  A    On primary, it's a mandatory referral.

11       THE COURT:  Sorry, let me ask one clarifying

12  question.

13       When you said that if there's a lookout, the

14  citizen could have property detained because of a referral,

15  is there any limitation on which property can be retained or

16  once there's a lookout, any property that they're bringing

17  with them into that port of entry could be detained based on

18  the lookout?

19       THE WITNESS:  Just to clarify, the property is not

20  detained specifically because of the lookout.  It's based on

21  the inspection and what the officer finds during the course

22  of the inspection.

23       THE COURT:  Okay.  Understood.

24  Q    So just to clarify, if a United States citizen is found

25  in possession of contraband, what might happen in that

*Simon - Direct - Mr. Rein*          116

1   situation with regard to contraband?

2   A   Depending on the type of contraband that it is, it can

3   either be detained for further review or analysis or, like I

4   said, depending what it is, it can be seized.

5   Q   And in those situations what happens to the actual U.S.

6   citizen if they are not otherwise arrested?

7   A   They are given a receipt for the detention and they're

8   allowed to leave.

9   Q   And once a CBP officer learns of a lookout, do they

10   have the discretion to disregard it?

11   A   The CBP officer in the primary area does not have the

12   ability to disregard, no, the alert.

13   Q   In what types of circumstances might a lookout be

14   placed on a particular person?

15   A   You -- so if, for example, if you have an individual

16   that's refused entry, an alert will be created. An

17   individual that is served with a notice to appear before an

18   immigration judge will have one created. A traveler who,

19   for example, has narcotics seized will have an alert

20   created.

21        During the course of an inspection, if you develop

22   information possibly connecting another individual to some

23   type of activity that conflicts with the laws that CBP

24   administers or enforces at the border, you can create an

25   alert based off that as well.

Simon - Direct - Mr. Rein                                        117

1    Q     Is the information upon which a lookout is based

2    refreshed periodically or updated?

3    A     Yes.

4    Q     And how so?

5    A     So you have situations where you can be conducting

6    further research and develop other information.  So you

7    would want to update your alert to reflect that.  Or you may

8    have situations where the individual is inspected based on

9    your alert and then information is developed from that

10   inspection.

11   Q     Is there a CBP guidance about how long a lookout should

12   remain active?

13   A     Yes.

14   Q     And what is that?

15   A     Guidance was issued that for CBP officers in the field,

16   the TECS record would only be valid for one year.

17   Q     How is that guidance affected by whether or not a

18   lookout was generated by the NTC?

19   A     So because the -- the officers who are working out of

20   the NTC have a different, I want to say, mission, mission

21   set, with what they do that doesn't affect them,

22   specifically.

23   Q     What types of actions might a lookout direct a CBP

24   officer who encounters a subject of a lookout to take?

25   A     So if it's on primary, they would refer the individual

1   to secondary.  In secondary, the officer who is processing

2   that person will look at their lookout and use it as a guide

3   to direct their inspection.  They might call the record

4   owner to see if they can get more information.  But they

5   will conduct their inspection based off of that.

6   Q    After a CBP officer encounters someone who is the

7   subject of a lookout, might they further update the lookout

8   in the TECS system?

9   A    Yes.

10  Q    And for what purpose would they update it?

11  A    If new information is discovered during the inspection,

12  they might want to update the record.  If the inspection is

13  negative, they might want to update that record to reflect

14  that.  If there's a -- like a -- it's like a seizure, based

15  off of that inspection, they might want to record that in

16  that alert.

17  Q    What steps, if any, might a CBP officer take to update

18  a record so that a person isn't continuously stopped if

19  they've already been the subject a secondary inspection?

20  A    So when you have the alert, the officer who conducts

21  the secondary, when they do their inspection and close it

22  out in the system, that generates a notification to the

23  record owner.  It will either say positive or negative.  And

24  then based off of that, the record owner can look at that

25  and make a determination whether or not further inspections

Simon - Cross - Mr. Yaster                                    119

1    are necessary.

2    Q    As part of the CBP's mission, is it concerned with

3    preventing the flow of contraband into the country?

4    A    Yes.

5    Q    Does that include child sexual abuse material?

6    A    Yes.

7            MR. REIN:  One moment, Judge.

8            Nothing further, Judge.

9            THE COURT:  Let me ask one question before you sit

10   down.  I may have missed this in your credentials, but were

11   you ever detailed at NTC?

12           THE WITNESS:  I was not detailed to NTC, but I've

13   been to NTC, you know, a number of times.

14           THE COURT:  Understood.

15           And is NTC part of CBP?  Is it a division of CBP?

16   What's the institutional relationship between the two?

17           THE WITNESS:  So NTC is part of CBP.  Like I said,

18   it is like our intelligence hub for field personnel, so it's

19   kind of like a standalone, but it is part of CBP.

20           THE COURT:  Okay, thank you.

21           MR. YASTER:  May I inquire?

22           THE COURT:  Yes.

23   CROSS-EXAMINATION BY

24   MR. YASTER:

25   Q    Good afternoon, Agent Simon.

Simon - Cross - Mr. Yaster                                    120

1   A      Good afternoon.

2   Q      My name is is Ben Yaster.  I am a lawyer for Jason

3   Robinson.  Welcome to the district.  I have just a few

4   questions.

5          I just want to walk through again the process for

6   creating or entering a lookout.  I believe you said on

7   direct examination that one of the first things you would do

8   in creating a lookout is you would enter the identifying

9   information for the person who is the subject of the

10  lookout; is that right?

11  A      That's correct.

12  Q      I believe that you then said that you would fill out

13  the remarks section with as much information as you can; is

14  that right?

15  A      That's correct.

16  Q      Did you receive training about how to fill out the

17  remarks section in a lookout?

18  A      So the Federal Law Enforcement Training Center, they do

19  teach you how to use TECS.  And they do teach you how to

20  create that, the records.

21  Q      In the remarks section, is there a character or a word

22  maximum for how much information can be provided?

23  A      Yes.  It won't let you go over after a certain amount.

24  Q      Do you remember what that amount was?

25  A      I do not.

*Simon - Cross - Mr. Yaster*                                      121

1    Q    The person who is creating the lookout, they can add as

2    much information as they think is appropriate up to whatever

3    that limit is, right?

4    A    That's correct.

5    Q    And then after the lookout remarks section is

6    completed, am I right that the lookout is then taken to a

7    supervisor who signs off on it?

8    A    So after you fill out all the -- whatever you can fill

9    out in there, it will be -- and you -- you complete it, the

10   supervisor gets a notification in the system.

11   Q    Okay.  And in your experience, does the supervisor do

12   much editing of a lookout before they sign off on it?

13   A    I don't believe you can edit it.  It's either approved

14   or disapproved.  You would have to -- if you had an issue --

15   in my experience, if I had -- whenever I had issues with

16   TECS records created by my direct reports, I've called them

17   up and said, I need you to edit this because I don't

18   understand this, you need to explain it to me.

19   Q    Have you ever, in your experience as a supervisor,

20   rejected a lookout for having too much information in the

21   remarks section?

22   A    No.

23   Q    I am going to move on.

24        You said on direct examination that a U.S. citizen

25   who has a lookout cannot be denied entry into the United

Simon - Cross - Mr. Yaster                                        122

1    States on the basis of a lookout, right?

2            I can rephrase if that was unclear.

3    A    Yeah, can you?

4    Q    Let me say it again.

5            So if a U.S. citizen has a lookout and they come

6    to Customs at an airport, they cannot be denied entry into

7    the United States because of the lookout; am I right?

8    A    A bona fide U.S. citizen cannot be denied entry into

9    the United States.

10   Q    Right.  However, am I right that if there is a lookout,

11   at primary inspection, they may be referred to secondary

12   inspection before they are ultimately admitted?

13   A    That's correct.

14   Q    I want to ask about the difference between detaining

15   property and seizing property.

16           Am I right that at CBP there is a distinction

17   between the two, that detention of property and seizure of

18   property mean different things?

19   A    Yes.

20   Q    What's the difference?

21   A    So for a detention, CBP would, for example, if you're

22   bringing in jewelry and you claim the jewelry would be $60.

23   For example, we have people coming from Europe who bring

24   these high-value purses.  They buy it over in Europe because

25   they don't have to pay the taxes.  They bring it to the

Simon - Cross - Mr. Yaster                    123

1   United States and not declare it.  When they get stopped and

2   inspected, they'll say the purse is worth $50, but it's a

3   Louis Vuitton bag that we see online, it's worth $2,000.  So

4   we'll detain the bag and send it for appraisal.  The

5   specialist who does the appraisal will do what they do and

6   they'll give us the appraisal value of that item.  And then

7   we will contact the owner of the item, notify them, hey,

8   listen, the CBP appraisal said that this bag is worth

9   such-and-such value, you under-declared, there is a duty on

10  this.  Would you like to come in to pay the duty?  And if

11  they pay, when they pay it, they get their property back.

12  Q    What happens if they don't pay it, in that example?

13  A    Then they -- that goes through, I believe, our Fines

14  Forfeitures and Penalties division.

15  Q    Let me try to specify.  In that example, if the duty is

16  not paid, does the property move from being detained to

17  being seized?

18            MR. REIN:  Objection, Judge.  This is outside the

19  scope of his testimony on direct.  And it's also just

20  outside the scope of the hearing.  It's not based upon his

21  personal knowledge.

22            THE COURT:  So let me ask Mr. Yaster to clarify.

23            Which portion of the direct do you think this

24  relates to?

25            MR. YASTER:  So I believe it refers to the direct

Simon - Cross - Mr. Yaster                    124

1    where, on direct, Agent Simon said that after a property is

2    detained, it can be seized.  I am trying to tease out what

3    the distinction is between the detention and the seizure.

4    I'm trying to do it through this example, but I can try to

5    ask --

6              THE COURT:  I think it is an example the witness

7    offered, so I think we are getting outside the scope because

8    the witness offered it.  Why don't you inquire about this

9    difference and then we'll move on.

10             MR. YASTER:  Thank you.

11   Q    Am I right that the difference between a detention and

12   a seizure is this:  That a detention is a temporary taking

13   of the property for purposes of inspection or examination,

14   but then a seizure would be a permanent or longer term

15   taking?

16   A    Yes.

17   Q    Okay, thank you.

18             THE COURT:  And in the example that you just gave

19   regarding the handbag, which I know is not this case, but

20   where it's sent for an appraisal, CBP would hold on to that

21   bag even while the traveler leaves the airport for as long

22   as it takes to do the appraisal and notify the traveler

23   whether they need to pay a duty or not; is that right?

24             THE WITNESS:  Yes.

25             THE COURT:  Okay, thank you.

Simon - Cross - Mr. Yaster                                    125

1    Q    I want to ask a couple of questions about updating TECS

2    records or updating lookouts.

3            Am I correct that there is CBP guidance that a

4    lookout should last for one year?

5    A    Yes.

6    Q    And that after that year, for the lookout to still be

7    active, it has to be renewed or updated; is that correct?

8    A    Yes.

9    Q    So let's say a lookout was entered in November of 2019,

10   right?  Under the guidance, it would expect to be expired in

11   November of 2020, right?

12   A    As I explained, when the guidance came out, it informed

13   frontline officers that the TECS record, the alerts, would

14   only be for a year.  So in the system, CBP took steps where

15   officers could only create the TECS record for a year.  But

16   if you're in specific -- if you're in specific groups or --

17   or offices, for example, the NTC, they have a different

18   directive.  So when they create TECS records, the same

19   restrictions that, for example, I would have for when I

20   create a TECS record for only a year, would not apply to

21   them.

22   Q    So am I correct, then, that the guidance, this one-year

23   guidance for a lookout alert, are you saying it doesn't

24   apply to NTC lookouts?

25   A    The NTC lookouts, because of what they do in their

Simon - Cross - Mr. Yaster                                        126

1   mission, their specific mission tasking, it was not applied

2   to them within that guidance.

3   Q    So just to make sure I understand.  If a lookout is

4   created by a CBP officer not associated with NTC, that alert

5   would, under the guidance, last for one year, right?

6   A    Yes.  It would be automatically created for one year.

7   Q    One year.  And then that alert would only continue

8   after that one year if the lookout is updated; is that

9   right?

10  A    Yes.

11  Q    However, if a lookout is created by NTC -- sorry, let

12  me finish my question.  If a lookout is created by NTC, that

13  one-year restriction on the alert doesn't apply; is that

14  right?

15  A    Yes.

16  Q    And this is something that you learned in the course of

17  your training while you were at CBP; is that right?

18  A    Training and experience.

19  Q    Training and experience.  Thank you.

20           And then last question.  During your direct, you

21  talked about a lookout record owner.  And I believe what you

22  said was that after the subject of a lookout has been

23  encountered, the record owner is notified; is that right?

24  A    Yes.

25  Q    Just so I'm clear, the record owner is the person who

Stepien - Direct - Mr. Rein                    127

1  entered or created the lookout; is that right?

2  A    Yes.

3          MR. YASTER:  No further questions.

4          THE COURT:  Any redirect?

5          MR. REIN:  No, Judge.  Thank you.

6          THE COURT:  Okay, thank you.

7          Thank you.  You are excused.  And let me also

8  welcome you to the district.  I should have done that

9  initially.  Good to see you here.

10          THE WITNESS:  Thank you.

11          (Witness excused.)

12          MR. REIN:  Your Honor, we call our final witness,

13  that's Special Agent Stepien.

14          (Witness takes the stand.)

15          THE COURTROOM DEPUTY:  Please raise your right

16  hand.

17          (Witness sworn.)

18          THE WITNESS:  I do.

19          THE COURTROOM DEPUTY:  Please state and spell your

20  name for the record.

21          THE WITNESS:  My first name is Richard,

22  R-I-C-H-A-R-D.  Last name, Stepien, S-T-E-P-I-E-N.

23          THE COURT:  Good afternoon.

24          THE WITNESS:  Good afternoon.

25  **RICHARD STEPIEN,**

1                called as a witness, having been first duly

2                sworn/affirmed, was examined and testified

3                as follows:

4    DIRECT EXAMINATION BY

5    MR. REIN:

6    Q    Good afternoon, Agent Stepien.  Are you currently

7    employed?

8    A    Yes.

9    Q    Where are you employed?

10   A    I work for Homeland Security Investigations.

11   Q    Is that also known as HSI?

12   A    Correct.

13   Q    What is your title there?

14   A    I am currently the acting group supervisor over the

15   Child Exploitation Team.

16   Q    How long have you worked with HSI?

17   A    I was hired in May of 2019 and graduated December '19.

18   Q    How long have you been the acting group supervisor of

19   your unit?

20   A    Since August of this year -- last year, 2024.

21   Q    So prior to joining HSI, were you previously employed?

22   A    Yes.

23   Q    How so?

24   A    I was hired by Vermont State Police.  I did five years

25   as a Vermont trooper and around four-and-a-half as a

Stepien - Direct - Mr. Rein                              129

1  detective trooper.

2  Q    What type of training did you receive when you joined

3  the state police?

4  A    For state police, I had a basic academy as well as the

5  Vermont State Police specific add-on on both ends of the

6  academy which taught me criminal law and procedures of state

7  police.

8  Q    And what were your duties as a member of the Vermont

9  state police?

10 A    Well, working the road, I was a first responder to

11 burglaries, robberies, traffic enforcement, crashes, things

12 like that.  And then when I was promoted to detective

13 trooper, I was assigned to the northwest unit for special

14 investigations, so like a special victim unit.  And there, I

15 was a forensic interviewer and a detective that investigated

16 crimes with children and vulnerable adults.

17 Q    What type of training did you receive when you joined

18 HSI?

19 A    When I joined HSI, I went down for the -- I went down

20 to FLETC, the Federal Law Enforcement Training Center, where

21 I spent six months roughly.  The first three were for the

22 criminal investigator course which is the basic course that

23 all 1811 series criminal investigators have and then I had

24 an add-on for HSI-specific training, which is an additional

25 three months.  It was around -- between six and seven months

Stepien - Direct - Mr. Rein                    130

1  total, given the holidays and stuff.

2  Q    You said 1811 training.  What's that?

3  A    That's just the series, the job series, but it's

4  criminal investigator.

5  Q    Can you describe for us, what are the responsibilities

6  of the units which you are currently the acting group

7  supervisor?

8  A    So the Child Exploitation Team, we investigate crimes

9  involving children as the victims where it can be domestic

10 or international.  Cyber crimes, sex tourism, possession,

11 distribution, and production of child pornography.

12 Q    And prior to being the acting group supervisor, were

13 you just a member of that unit?

14 A    Yeah.  I did a short stint about one year as an acting

15 program manager on the front office which is basically just

16 a liaison between headquarters and our office.  And then

17 prior to that, right out of the academy, I was a Special

18 Agent investigator with this Child Exploitation Team.

19 Q    Are you familiar with the term, Child Sexual Abuse

20 Material or CSAM?

21 A    Yes.

22 Q    Is it also known as CSEM, C-S-E-M?

23 A    Yes.  They are one in the same, interchangeable.

24 Q    Just generally, what's that?

25 A    That's content involving minors which is anyone under

1  the age of 18, boys or girls involved in sex acts or photos

2  of genitalia.

3  Q    Can you describe for us what type of training and

4  experience you have in identifying that type of content?

5  A    So there was a brief class that all criminal

6  investigators get at FLETC, but then over training and

7  experience over the years, I have continued to build on

8  that.

9  Q    And what is your -- well, how would you describe how

10  many cases you've -- or investigations you have been

11  involved with that involve that type of material?

12  A    Including Vermont, I mean, hundreds.  But HSI, just

13  three-and-a-half years, probably -- probably close to

14  hundred with just HSI alone.

15  Q    What has your experience shown you about people who

16  possess CSAM on one device if they have?

17  A    Typically, through my training and experience and from

18  what we've seen is if they have it on one device, it usually

19  carries over on to multiple devices, whether it be storage

20  media or other electronics like phones, laptops, things that

21  share.

22  Q    And based upon your experience, what can you tell us

23  about the length of time over which people accumulate CSAM?

24  A    It can -- usually it doesn't just stop with one

25  download.  It's usually over years of collection until

Stepien - Direct - Mr. Rein                                       132

1   either they get caught or, you know, something else happens.

2   Q    In cases where you've examined devices -- well, have

3   you examined people's devices that contain CSAM?

4   A    I have.

5   Q    And in cases where you have done that, what was the

6   length of time over which the CSAM had been collected on the

7   device?

8   A    It varies, but sometimes it's decades, you know, years,

9   that we've identified victims.  What happens is collections

10  go around kind of like trading cards so, you know, there may

11  be images that are still being shared, but the victims --

12  you know, it happened 20 years ago or something, but it

13  still occurred during that time when they were a child.

14  Q    I want to direct your attention to --

15            THE COURT:  Sorry, were you talking about the time

16  between creation and when it's on a device?  I was a little

17  unclear which timeframe you were asking about.

18            MR. REIN:  I am asking about that timeframe

19  between when the actual media itself was created.

20  Q    But also, the timeframe that passes between when a

21  piece of media is first -- when the first piece of media

22  that's present on a device was collected and when the last

23  piece of media was collected.

24  A    I don't know if I understand what you are saying.

25  Q    So what has your experience shown you about the time

1   span between when someone first acquires their first piece

2   of CSAM and when they acquired the last piece of CSAM before

3   a device is seized?

4   A    It could be years depending on how long they have been

5   going at it.  Like I said, usually until they get caught or

6   something happens, intervention, it could be years.

7   Q    I want to direct your attention to approximately

8   November 14, 2022.

9          Did you have the occasion to become involved in an

10  investigation around then involving someone named Jason

11  Robinson?

12  A    I did.

13  Q    How did you become involved in that investigation?

14  A    So I received a call from the responding duty agent for

15  HSI, Special Agent Anstee.  He advised me via phone that he

16  was responding to JFK International Airport.  He had just

17  received a call from U.S. Customs and Border Protection.

18  They had screened an incoming passenger who was in

19  possession of child pornography, so he was looking for

20  guidance on how he should respond.

21  Q    And you said that Agent Anstee was the duty agent?

22  A    Correct.

23  Q    What does that mean to be the duty agent?

24  A    So all our offices have assigned duty.  So that's

25  basically like for that one day of -- like JFK might do a

Stepien - Direct - Mr. Rein                                134

1   week-long duty.  For that duty desk, they do a day and they

2   interchange, so different agents take turns being the duty

3   agent and they are responsible for all like the incoming

4   calls or complaints that come in and they help redirect or

5   respond to whatever is happening.

6   Q    In connection with that investigation, did you

7   eventually come an arrest Jason Robinson in May of 2023?

8   A    I did.

9   Q    If you saw Jason Robinson again, would you recognize

10  him?

11  A    I would.

12  Q    I ask you to look around the courtroom.  Do you see him

13  here today?

14  A    I do.

15  Q    Could you point at him and identify him with an article

16  of clothing he is wearing?

17  A    Mr. Robertson is sitting over at the desk with the

18  defense in the grey suit with the black turtleneck.

19         MR. REIN:  Your Honor, I would just ask that the

20  record reflect that the witness has identified the

21  defendant.

22         THE COURT:  It will so reflect.

23  Q    Agent, when you became involved, what was your

24  understanding of why the defendant had been stopped by CBP

25  on November 14th?

Stepien - Direct - Mr. Rein                                    135

1    A    I was told that he had come in and they had done a

2    secondary inspection and they located child pornography on

3    his device.

4    Q    And at the time that you learned that, did you know if

5    it was one device or multiple devices?

6    A    My understanding was it was one device, but he was in

7    possession of multiple devices.

8    Q    And what was your understanding about how the CBP

9    officers had actually learned about the material possessed

10   in that one device?

11   A    They had done a border search and they did a manual

12   review of the devices and they witnessed what they believed

13   to be child exploit -- or CSEM and that's when they called

14   HSI to confirm.

15   Q    And what type of device was it that the CSEM had been

16   on?

17   A    It was a cellphone, an iPhone.

18   Q    To be clear, were you present at the time that CBP did

19   the search of that phone?

20   A    I was not.

21   Q    And to your knowledge, was anyone from HSI present at

22   the time of that initial search?

23   A    No.

24   Q    For what purpose was HSI contacted by CBP?

25   A    So typical protocol or guidance, once CBP finds child

Stepien - Direct - Mr. Rein                                136

1   exploitive material, they refer the case to HSI to do the

2   investigation since we have the authority and jurisdiction

3   to investigate those cases.

4   Q     And the agent that responded from HSI, you said before,

5   was Agent Anstee?

6   A     Correct, Allen Anstee.

7   Q     Why didn't you respond?

8   A     The current policy of how we had it was since it

9   happened at JFK, the duty agent would respond to that and

10  then later turn the case over to the -- our specialized

11  team.

12  Q     And so even though you didn't respond, did you confer

13  with Agent Anstee and review his reports?

14  A     I did.

15  Q     And why did you ultimately become involved, even if you

16  weren't the one to respond?

17  A     Because I was part of the team at that time, so the

18  case was assigned to me.

19  Q     In speaking with Agent Anstee, what did you learn that

20  he did when he responded?

21  A     So when he responded to the airport, he met with the

22  secondary CBP officer coming with a summary or review of

23  what they had found.  He then reviewed the material via

24  border search to confirm it was child pornography.  And then

25  he interviewed Mr. Robinson and then detained the devices

Stepien - Direct - Mr. Rein                                    137

1  for further investigation.

2  Q    And based upon your discussions with Agent Anstee and

3  your review of his reports, what did he observe when he also

4  reviewed the phone?

5  A    He also identified child pornography.

6  Q    And if you could tell us a bit more specifically what

7  it was that he actually saw on the device.

8  A    So he witnessed adult males engaged in sexual activity

9  with young minor males, engaged in oral and anal sex, which

10 was basically the males erect penis in a child's mouth.

11 Q    Did Agent Anstee arrest the defendant on November 14th?

12 A    He did not.

13 Q    Why not?

14 A    Our current protocol is, for these kind of cases,

15 usually it takes a little extra time to get a full picture

16 of what's on the device because they are so compact and have

17 so many -- updated technology now.  And given the fact that

18 he did not have children or have access, direct access to

19 children, we allowed him to be released.

20 Q    Did you also, in addition to speaking with Agent

21 Anstee, review reports that had been created by CBP officers

22 involved in the border search?

23 A    I did.

24 Q    And what did you learn about what they had observed

25 when you reviewed those reports?

Stepien - Direct - Mr. Rein                                    138

1   A     Much of the same stuff.  So they had witnessed what

2   they believed to be child pornography or CSEM material

3   involving the minors with the oral sex.

4   Q     After becoming involved in the investigation and

5   learning about what had happened during the border search,

6   did you take any additional steps with regard to the iPhone

7   that you testified Agent Anstee had reviewed?

8   A     Sorry, what about the phone?

9   Q     Did you take any additional investigative steps with

10  regard to it?

11  A     We detained that phone for further examination and

12  applied for a warrant.

13  Q     Did you actually ever receive physical custody of the

14  phone?

15  A     I did.

16  Q     And who did you get that from?

17  A     Agent Anstee brought it to me the following day.

18  Q     You said you attained a warrant.  Why did you apply for

19  a warrant?

20  A     We applied for a warrant out of an abundance of caution

21  because we were hoping to do a more thorough examination of

22  the phone that is not as easily done manually because like I

23  said there are certain programs that you can delete files

24  and it's more complicated.  So we have certain technology

25  that will help with the review of that.

1   Q    Directing your attention to approximately November 21st

2   of 2022, were you actually acting on a search warrant

3   seeking judicial authorization to conduct a forensic search

4   of the iPhone that was seized from the Defendant on

5   November 14th?

6   A    Yes.

7   Q    And what was the result of your application to the

8   Court for a search warrant?

9   A    It was granted.

10  Q    After receiving that authorization, did you then

11  conduct a search of the phone?

12  A    Yes.  So once we got the warrant, we had computer

13  forensic analysts.  The phone was then given to them so they

14  could run their tests and the forensic examination and then

15  they produced it on a -- a readable program that I could

16  better review the device on.

17  Q    And the review that you did, how does that differ from

18  the review that was done by CBP on November 14th?

19  A    So their protocol is basically just to confirm that

20  there is child pornography on the device or CSEM material.

21  My review, then, did the complete examination.  So for my

22  review, there's a lot -- a lot more content.  So, you know,

23  they just described that they saw whatever the number was,

24  three to five images or files.  I went through the entire

25  phone to have a rough estimate of the total amount.

Stepien - Direct - Mr. Rein                                        140

1   Q    And when you conducted your examination pursuant to the

2   search warrant, did you observe any contraband on the

3   device?

4   A    Yes.

5   Q    And can you tell us what you saw?

6   A    There were videos, a large number of videos, as well as

7   photos of child pornography, mostly ranging with younger

8   males and adult males engaged in sex acts including anal

9   sex, oral sex.  There was also files with bestiality where

10  that may be an adult or a child engaged in sex acts with an

11  animal.  And then a lot of, like, cartoon porn that isn't

12  illegal to possess, but just as a factor.  And age difficult

13  material as well.  There was quite a bit of that.

14  Q    When you say "age difficult material," what does that

15  mean?

16  A    Well, age difficult material is how we classify images

17  or files that we err on the side of caution and say the

18  victim that we're looking at could be an adult or could be a

19  child, they're somewhere in between.  So we are not

20  confident enough to say without further examination to say

21  it's a child, so we err on the side of caution and we say

22  it's age difficult.

23  Q    And approximately how many -- when you reviewed the

24  device, how many files did you conclude contained CSAM?

25  A    I don't remember the exact number.

Stepien - Direct - Mr. Rein                                        141

1    Q    Is there anything that would refresh your recollection?

2    A    Yeah.  My report of investigation would have that for

3    the device review.

4          MR. REIN:  If we could show the witness what's

5    marked as Government Exhibit 3500 RS-21.  If we could look

6    at page 2.

7    Q    Agent, if you could look at this page and just look up

8    at us when your recollection's refreshed or if your

9    recollection's refreshed.

10   A    You want total number, total files examined?

11   Q    Well, if you could tell us how many files -- first, how

12   many photographs did you determine contained CSAM material?

13   A    Okay.  So out of -- the total number of files that were

14   on the phone were 241,872 files.  Of those, 180,227 images.

15   And of those, 235 were classified as Child Sex Abuse

16   Material.  2,363 were age difficult.

17   Q    Did you also classify videos as containing CSAM?

18   A    I did.

19   Q    And approximately how many videos did you determine

20   contained CSAM?

21   A    Out of 4,288 videos, 457 were classified as Child Sex

22   Abuse Material.

23         MR. REIN:  Nothing further, Judge.

24         THE COURT:  Mr. Yaster?

25         MR. YASTER:  Thank you.

A214

*Stepien - Cross - Mr. Yaster* 142

1  CROSS-EXAMINATION BY

2  MR. YASTER:

3  Q    Good afternoon, Agent Stepien.

4  A    Good afternoon.

5  Q    I want to start with the search warrant that you

6  applied for on November 21, 2022.

7  A    Okay.

8  Q    This search warrant, this was a search warrant

9  affidavit that you signed personally, right?

10  A    Yes.  Digitally, but, yes.

11  Q    And you signed it under penalty of perjury?

12  A    Yes, yes, sir.

13  Q    And as you indicated, the search warrant was granted?

14  A    Yes.

15  Q    In the search warrant application, you provided a

16  narrative about how child pornography or child exploitation

17  material was found on Mr. Robinson's phone on November 14,

18  2022, right?

19  A    Correct.

20  Q    And in that narrative, you said that a border search

21  was conducted?

22  A    Correct.

23  Q    And it was during that border search that child

24  pornography or Child Sexual Exploitation Material was found,

25  right?

*Stepien - Cross - Mr. Yaster*                    143

1   A    Yes.

2   Q    Your search warrant affidavit did not mention the

3   existence of a TECS report or a lookout, correct?

4   A    I don't recall, but do you have it, just to check it?

5   Q    Yes.

6        MR. YASTER:  Using the ELMO, I am going to show

7   Agent Stepien what has been previously marked as 3500 RS-10.

8   Q    Agent Stepien, I am going to show you what's page 3.

9   You let me know if that refreshes your recollection.

10       THE COURT:  It might be a good idea to give him a

11  full copy of the affidavit since you are asking general

12  questions about what was or wasn't included.  I just want

13  him to have a chance to look at the whole thing.

14       MR. REIN:  We are happy to stipulate to the fact

15  that --

16       THE COURT:  He's entitled to inquire, so we'll

17  give him the affidavit and we'll see what happens.

18  Q    Agent Stepien, I will direct you to page 3, paragraph

19  seven.  Once you have had a chance to read that, you can

20  look up.

21  A    Okay.

22  Q    Does that refresh your recollection as to whether your

23  search warrant application included a mention of a TECS

24  report or a lookout?

25  A    Correct.  There was no mention.

*Stepien - Cross - Mr. Yaster*                                    144

1    Q     Thank you.

2          In your search warrant application, you also said

3    that Mr. Robinson voluntarily provided the passcodes to his

4    electronic devices while at JFK Airport; is that right?

5    A     Correct.

6    Q     But the search warrant application does not mention him

7    being provided a tear sheet, informing him that his

8    electronic devices were being detained; is that right?

9    A     Correct.  I did not mention that there.

10         MR. YASTER:  I can retrieve the exhibit.  Thank

11   you.

12   Q     Agent Stepien, have you signed search warrant

13   affidavits in other cases where a border search revealed

14   Child Sexual Exploitation Material?

15   A     Yes, I have.

16   Q     And to the best of your recollection, in those search

17   warrant applications, did you describe the search as you did

18   here, that is as a border search?

19   A     Correct.

20   Q     And in those applications, did you also report that the

21   defendant voluntarily supplied his passcodes to his

22   electronic devices?

23         MR. REIN:  Objection, Judge.  This is not relevant

24   to what happened here.

25         THE COURT:  I think it goes to the good faith

Stepien - Cross - Mr. Yaster                                    145

1    exception; is that?

2            MR. YASTER:  That's correct.

3            THE COURT:  That seems to be where this is going,

4    so overruled.

5    A    I mean, it's case-dependent, so I don't want to say a

6    hundred percent, but in my history, my experience, mostly

7    they just voluntarily present their electronics when CBP

8    asks for it.

9    Q    In your best estimate, how many search warrant

10   applications have you signed that involved a border search?

11   A    Only maybe 15 to 20.

12   Q    And of those 15 to 20, how many involved a border

13   search of a cellphone or laptop like we have here?

14   A    I would say almost all of them, at least a cellphone.

15   Q    Is it fair to say that in those approximately 15 to 20

16   search warrant applications, you described the search as a

17   border search as you did here?

18   A    I would imagine, yes, but as I said, given it may be

19   different, if I had responded, it may have been something

20   else, because sometimes other things happen at the border

21   with another case and they find child porn for like a

22   terrorism case.  You know what I mean?  So -- but I don't

23   want to say I always say border search.

24   Q    Let me try to rephrase.

25            As a general matter --

Stepien - Cross - Mr. Yaster                                146

1   A      Generally.

2   Q      -- is this how your search warrant affidavits are

3   written?

4   A      Pretty much.

5   Q      Now, I believe you testified on direct that before you

6   applied for the search warrant, you had received your

7   information from CBP officers about the primary and

8   secondary inspection of Mr. Robinson; is that right?

9   A      I heard it through Anstee, who called me.  I never

10  spoke with CBP direct that night.

11  Q      So Agent Anstee relayed what he learned from CBP to

12  you; is that right?

13  A      Correct.  And then I reviewed CBP reports.  This is on

14  a later time, not that evening of the detainment.

15  Q      Do you recall, did you review those CBP reports before

16  you applied for the search warrant?

17  A      Yes.

18  Q      And had you learned, by the time you applied for the

19  search warrant, that Mr. Robinson had been referred to

20  secondary inspection because of a lookout or a TECS report?

21  A      I believe so.

22  Q      By the time you wrote your search warrant application,

23  had you seen the lookout or TECS report?

24  A      No.

25  Q      So what you knew about it came from either Agent Anstee

Stepien - Cross - Mr. Yaster                    147

1    or the CBP officer's report; is that right?

2    A    Correct.

3    Q    Now, you arrested Mr. Robinson on May 16, 2023,

4    correct?

5    A    Correct.

6    Q    And on the day you arrested him, you interviewed him;

7    is that right?

8    A    I did.

9    Q    And you gave him his Miranda warnings as a part of that

10   interview, correct?

11          MR. REIN:  Objection.

12   A    I did.

13          THE COURT:  What's the relevance given the issues?

14          MR. YASTER:  I will withdraw that question.

15          THE COURT:  Okay.

16   Q    During your interview of Mr. Robinson, Mr. Robinson

17   asked you why he was stopped by CBP and referred to

18   secondary inspection, right?

19          MR. REIN:  Objection.

20   A    I don't remember offhand because I --

21          THE COURT:  Hold on one second.  Sorry, when there

22   is an objection, don't answer until I consider it.

23          Can you read the question back for me, please?

24          (Record read.)

25          THE COURT:  Overruled.  I think this goes to the

Stepien - Cross - Mr. Yaster                           148

1   issues about the warrant affidavit that are the subject of

2   the hearing.

3           MR. YASTER:  Thank you.

4           THE COURT:  You can answer.

5   A    So I don't remember.  I didn't have time to review that

6   interview.  I don't know exactly what was said.  If you have

7   like a reference or something.  Because you have the

8   transcript probably or something, right?

9   Q    What I am going to do is I am going to show you what's

10  been previously marked as 3500 RS-42.  And I will ask if

11  that refreshes your recollection.

12  A    Okay.

13          MR. YASTER:  For the record, this is page 4, 3500

14  RS-42.

15  Q    And for purposes of refreshing your recollection, Agent

16  Stepien, I will refer you to the penultimate paragraph.

17          THE COURT:  Sorry, we are on which page?

18          MR. YASTER:  Page 4.

19          THE COURT:  Okay, thank you.

20  A    Okay.

21  Q    Does that refresh your recollection about whether

22  Mr. Robinson asked you why he was stopped and referred to

23  secondary?

24  A    Right.

25  Q    And you told him that he was stopped because he was

*Stepien - Cross - Mr. Yaster*                                      149

1   unlucky; is that correct?

2   A    Correct.

3   Q    And you told him that he was stopped randomly; is that

4   correct?

5   A    Correct.

6   Q    You did not tell him that he was stopped because he had

7   a TECS report; did you?

8   A    I did not.

9   Q    You didn't mention a lookout, right?

10  A    No.

11          MR. YASTER:  Your Honor, one moment.

12          Agent Stepien, thank you.  I have no further

13  questions.

14          THE COURT:  Any redirect?

15  REDIRECT EXAMINATION

16  BY MR. REIN:

17  Q    Agent Stepien, you were asked to take a look at your

18  search warrant affidavit just now during your

19  cross-examination.  Do you remember being asked about that?

20  A    Yes.

21  Q    Why did you refer to what the CBP officers had done as

22  a border search?

23  A    Because they were the first ones that viewed it.  They

24  did the actual border search.  So, you know, being law

25  enforcement, their statement's credible.

*Stepien - Redirect - Mr. Rein*                                    150

1    Q    And did you, when you wrote this search warrant,

2    believe that the observations that they made of what was in

3    the phone were lawfully obtained?

4    A    Yes.

5    Q    And was that on the basis of the fact that they had

6    conducted a border search?

7    A    Correct.

8    Q    You were also asked some questions about your

9    conversation with the defendant when you arrested him in May

10   of 2023.

11        Do you remember those?

12   A    Correct.

13   Q    And you were asked about what you had told him about

14   why he had been referred to secondary.

15        Do you remember that?

16   A    Yes.  What I just reviewed, yes, and refreshed my

17   memory.

18   Q    Why did you tell him that those were the reasons that

19   he had been stopped?

20   A    Like some interview techniques, you know, to build

21   rapport and sometimes, generally, kind of slide into it.  We

22   don't want to just show our cards right away and say, hey,

23   we are here for a child -- you know, he kind of figured why

24   we were there, but also to kind of -- in the interview, to

25   try to get some more information.

Stepien - Redirect - Mr. Rein                          151

1   Q    Why didn't you tell him that he was the subject of a

2   lookout generated by CBP?

3   A    I didn't think it was as relevant for that time to need

4   to disclose that to him.

5   Q    Is it your practice to direct the targets of your

6   investigation to the methods that law enforcement used to

7   identify them?

8   A    Yeah, no, we don't -- we don't typically, you know,

9   show all our cards like that.

10  Q    Why don't you do that?

11  A    Oh, it's just, you know, sometimes in the interviewing

12  process, you know, it's closed-end questions, yes, no.  We

13  want open narratives, so we want to kind of generate them to

14  tell us why we're there versus me just telling you why we've

15  come to your house or whatever.  So maybe we will learn new

16  information, new things will be disclosed.  But, you know,

17  in my training and experience, I find if you just go down,

18  you sit down with the subject and you tell them why you're

19  there, they will just say, well, I don't want to say

20  anything anymore.

21          So ask those open-ended questions, maybe kind of

22  lower the threat of why we're there, you get more out of the

23  interview.

24  Q    After you were the affiant on the search warrant for

25  the phone, did there come a time when you did speak with

Stepien - Redirect - Mr. Rein                    152

1    people at the National Targeting Center about the basis for

2    the lookout that they had placed?

3    A    I did.

4    Q    And so as you sit here today, do you know why it was

5    placed?

6    A    I do.

7         THE COURT:  Sorry, can you affix when that

8    conversation occurred, the National Targeting Center?

9    Q    And when did you speak with people at the National

10   Targeting Center?

11   A    Last -- a little bit last week and then Monday, I

12   believe.

13        MR. YASTER:  Objection.  I think this is outside

14   of the scope of my cross.

15        THE COURT:  I will allow it, given you asked him

16   about his knowledge of the TECS hit at the time he filled

17   out the affidavit.

18        Had you spoken with the National Targeting Center

19   people about the basis of the TECS hit at the time that you

20   prepared your application for the search warrant?

21        THE WITNESS:  I did not.

22        THE COURT:  Okay.

23        MR. REIN:  Nothing further, Judge.

24        MR. YASTER:  Very brief.

25        THE COURT:  Sure.

*Stepien - Recross - Mr. Yaster*                                     153

1   RECROSS-EXAMINATION BY

2   MR. YASTER:

3   Q    Agent Stepien, when Mr. Robinson asked you during the

4   May 16, 2023 interview why he had been stopped, you didn't

5   tell him about the lookout because you didn't want to show

6   your cards, right?

7   A    Correct.

8   Q    You could have said, I don't want to -- or I'm not

9   giving you the answer to that, right?

10  A    I mean, there's many different ways you could put it

11  out.  Could I have said that, yeah.

12  Q    But instead, you told him something that was false,

13  right?

14  A    Right.

15          MR. YASTER:  Thank you.

16          No further questions.

17          MR. REIN:  One moment, Judge.

18          Your Honor, we have no further questions for this

19  witness.  I will just say that although the witness does

20  possess information about the basis for the TECS report, we

21  understand that to be beyond the scope of the hearing and so

22  we haven't elicited that.

23          THE COURT:  Right.  It wasn't any information that

24  was known to this witness or any of the individuals who did

25  the manual search of the phone at the airport, correct?

*Proceedings*                                                        154

1           MR. REIN:  That's correct.

2           THE COURT:  Okay.  Then I agree with you.  It's

3  beyond the scope of the hearing.  Thank you.

4           So nothing further for this witness?

5           MR. REIN:  Nothing further, Judge.  Thank you.

6           THE COURT:  Agent Stepien, thank you.  You can

7  resume your seat at counsel table.

8           THE WITNESS:  Thank you, Your Honor.

9           (Witness excused.)

10          THE COURT:  I think that includes the three

11  witnesses the Government sought to present; is that correct?

12          MR. REIN:  Yes, Judge.

13          THE COURT:  Does the defense want to present any

14  witnesses?

15          MR. YASTER:  No, Your Honor.  We rest.

16          THE COURT:  It is now 3:15.  Let me ask you this

17  about scheduling oral argument.  Would either party or both

18  parties like to order the transcript and have a chance to

19  review it before we hold argument or would you like to

20  proceed based on your recollection and your notes on what

21  took place today?

22          MR. YASTER:  If the Court is going to order a

23  transcript, I think the parties would benefit from seeing it

24  too, so I am willing to defer to the Court's judgment on

25  this.

*Proceedings* 155

1    THE COURT:  You all tell me.  I am going to order

2  it certainly before I rule, or someone needs to order it.  I

3  think I can't simply order it without having the parties

4  share the cost or directing one party or the other to pay

5  the cost is the issue.

6        So the question is, do you want to go ahead and

7  have argument sooner, possibly without benefit of the

8  transcript, or since I am almost certain I will order it

9  before I issue a ruling in whatever form that ruling takes,

10 do you want to go ahead and order it now and we can resume

11 some reasonably short period of time after we get it?

12       MR. REIN:  Your Honor, the Government's prepared

13 to proceed without it.  Obviously, I would want a timeframe

14 as to when Your Honor wants to have argument, that might

15 affect when we want to order it.  But we are prepared to

16 proceed now or as soon as possible.  We are not going to let

17 the lack of transcript prohibit us from proceeding.

18       MR. YASTER:  We are fine with that.  Perhaps I am

19 just being conservative.  I usually like to have a

20 transcript just to make sure that my notes are accurate, but

21 no, we are prepared to argue whenever the Court wants.

22       THE COURT:  Let's pause for a minute while I speak

23 off the record with the reporter about timing and then we

24 can decide how we are going to proceed.

25       MR. REIN:  Before we do that, Judge, I am

*Proceedings* 156

1 scheduled to start a trial on January 27th.

2       THE COURT:  I think we will do it before then, but

3 thank you.

4       (Off the record.)

5       THE COURT:  Let me just check my calendar.  So

6 Jamie informed me that she can have the rough transcript by

7 Friday or the final by Friday evening or on Monday, which is

8 wonderful.  So I could hear argument next week.

9       How is next Friday, the 17th for everyone?  I

10 could also do Wednesday, the 15th, but that's not as much

11 time.

12       MR. REIN:  Either --

13       THE COURT:  We could also do after the Martin

14 Luther King Day weekend on the 21st or 22nd.

15       MR. REIN:  Obviously I will leave it to defense

16 counsel, but I prefer doing it next week, if possible.

17       THE COURT:  That's fine by me.  I know you've got

18 a trial coming up and it's helpful to do it while it's fresh

19 in everyone's mind.

20       Mr. Yaster, how is next week for you?

21       MR. YASTER:  Next week is fine.  Wednesday

22 afternoon is wide open.  And then on Friday, if we could do

23 it in the morning?

24       MR. REIN:  I just have what should be a brief

25 status conference before Judge Komitee at 9:45 on Friday, so

Proceedings                                                157

1   if we could do it?

2          THE COURT:  I have a video conference at 10:00, so

3   why don't we plan on doing it --

4          MR. YASTER:  Sorry, before we commit, I need to

5   check my personal calendar.  I'm afraid that my daughter has

6   a half day.

7          THE COURT:  That's okay.  We are all slaves to the

8   school calendar in that regard, those of us who are parents.

9          You said Wednesday afternoon was okay?

10          MR. REIN:  Wednesday afternoon would work.

11          THE COURT:  That's also fine by me.

12          MR. YASTER:  What I feared is correct.  Friday

13   morning is not available.  Wednesday afternoon is fine.

14          THE COURT:  Let's do Wednesday afternoon at, why

15   don't we say, 2:30 p.m. on the 15th.

16          MR. REIN:  Judge?

17          THE COURT:  Yes.

18          MR. REIN:  That's fine.  If we went past

19   4 o'clock, that could pose some difficulties.

20          THE COURT:  I don't think I am going to need an

21   hour and a half.  Why don't we say two to be safe.

22          MR. YASTER:  That's fine.

23          THE COURT:  2:00 p.m. on Wednesday, the 15th.

24          And I am going to ask the parties to share the

25   cost of the transcript and then I will see if Jamie can get

A230

*Proceedings* 158

1   us the rough by Friday, just in case you all want to start

2   looking at it over the weekend and we will get the final by

3   Monday so you can check it over again.

4          Mr. Robinson, I will leave it to you if you want

5   to be here in person for argument.  Otherwise we will

6   arrange for a video feed or a phone link so you can listen

7   in.

8          Thank you all.  Take care.

9          (Matter concluded.)

10

11                  *     *     *     *     *

12

13  I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

14

15     /s/ Jamie Ann Stanton              January, 8, 2025

16     _____        _____
       JAMIE ANN STANTON                         DATE

17

18

19

20

21

22

23

24

25

1                          <u>I N D E X</u>

2    <u>WITNESS</u>                                    <u>PAGE</u>

3    SHAHAMIN NUNES
         DIRECT EXAMINATION BY MR. REIN            20
4        VOIR DIRE BY MR. YASTER                    57
         CROSS-EXAMINATION BY MR. YASTER            67
5        REDIRECT EXAMINATION BY MR. REIN           97
         RECROSS-EXAMINATION BY MR. YASTER         101

6

7    EGBERT SIMON
         DIRECT EXAMINATION BY MR. REIN            107
8        CROSS-EXAMINATION BY MR. YASTER:          119

9

     RICHARD STEPIEN
10       DIRECT EXAMINATION BY MR. REIN            128
         CROSS-EXAMINATION BY MR. YASTER           142
11       REDIRECT EXAMINATION BY MR. REIN          149
         RECROSS-EXAMINATION BY MR. YASTER         153

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **E X H I B I T S**

2

3   Government Exhibit 101                    44

4   Government's Exhibit 102                  53

5   Government's Exhibit 103                  56

6   Government's Exhibit 104                  58

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A233



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
**TECS - Person Query**

GOVERNMENT
EXHIBIT
**GX 101**
22-CR-192 (NRM)

11/06/2024 10:38 AM EST        Generated By: EGBERT SIMON        Page 1 of 4

TECS RECORD ID: P3Q01963400CTG

**IMAGE INFORMATION - PART I (1)**

| No | Image Content | Image Description | Image Type | Entered Date |
|---|---|---|---|---|
| 1 | | | 01 - PHOTO - FRONT VIEW | 11/15/2022 |

**PERSON SUBJECT QUERY DETAILS INFORMATION**

| Tecs Record ID | Entry Date | Update Date |
|---|---|---|
| P3Q01963400CTG | 11/11/2019 | 11/15/2022 |

| Record Status | Category |
|---|---|
| AQ - ARCHIVED RECORD | |

**Query Notification**
1 - Notification to record owner

| Primary Action | Start Date | Stop Date |
|---|---|---|
| 0 - NOT ON PRIMARY | | |

| Last Name | First Name | Middle Name |
|---|---|---|
| ROBINSON | JASON | |

**Alias (0)**

| Approval Status | Hispanic Indicator |
|---|---|
| | U - UNKNOWN |

| Date of Birth (1) | Race (1) | Gender (1) |
|---|---|---|
| 1) ▇▇/1992(32 years old) | 1) U - UNKNOWN | 1) M - Male |

**For Official Use Only / Law Enforcement Sensitive**



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
**TECS - Person Query**

| 11/06/2024 10:38 AM EST | Generated By: EGBERT SIMON | Page 2 of 4 |
|---|---|---|

### REMARKS INFORMATION (3)

| No | Date | Remarks |
|---|---|---|
| 1 | 11/15/2022 | SUBJ LINKED TO THE PURCHASE OF CHILD SEXUAL EXPLOITATION MATERIAL VIA FinCEN. REFER TO SECONDARY FOR INTERVIEW & MEDIA DEVICE EXAM TO INCLUDE CELL PHONES AND LAPTOPS. |
| 2 | 11/15/2022 | ███████████████████████████████████████ NOTIFY LOCAL HSI/ |
| 3 | 11/15/2022 | LOCAL POLICE IF EVIDENCE OF CSEM IS DISCOVERED OR SUSPECTED  TF Event: 30877892. |

### PERSONAL DATA INFORMATION

| Nickname (0) | | Hair (0) | | Eyes (0) | |
|---|---|---|---|---|---|
| | | | | | |

| Height | | Weight | | Units | | Scars/Marks/Tattoos | |
|---|---|---|---|---|---|---|---|
| | | | | ENGLISH | | | |

### PERSONAL IDENTIFICATION INFORMATION

| Citizenship (1) | | SSN (0) | | Residency Status | |
|---|---|---|---|---|---|
| 1) USA - UNITED STATES | | | | | |

### BIRTH PLACE INFORMATION (2)

| No | Country | State | City |
|---|---|---|---|
| 1 | USA - UNITED STATES | OH - OHIO | |
| 2 | USA - UNITED STATES | OH - OHIO | LIMA |

### ALIEN INFORMATION (0)

### EXCLUSION INFORMATION (0)

### PASSPORT INFORMATION (1)

| No | Passport Number | Passport Type | Country of Issue | Issue Date | Expiration Date |
|---|---|---|---|---|---|
| 1 | ███4871 | | USA - UNITED STATES | 09/18/2017 | 09/17/2027 |

### ADDRESS INFORMATION (0)

### DRIVERS' LICENSE INFORMATION (0)

### PHONE INFORMATION (0)

### ALTERNATE COMMUNICATION INFORMATION (0)

### MISCELLANEOUS INFORMATION (1)

| No | Misc Number | Type |
|---|---|---|
| 1 | IOPS15763164 | IG - IADEG NUMBER |

### CRIMINAL AFFILIATION INFORMATION (0)

**For Official Use Only / Law Enforcement Sensitive**



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
**TECS - Person Query**

11/06/2024 10:38 AM EST    Generated By: EGBERT SIMON    Page 3 of 4

| CONTACT INFORMATION | | |
|---|---|---|
| Organization | Full Name | Telephone |
| HQ - NATL TARGETING CNTR, OFF OF BORDER SECURITY | ███████ | |

**CASE NUMBER INFORMATION (0)**

**FINGER PRINT INFORMATION**

| No | Left | | Right | |
|---|---|---|---|---|
| | Code | Description | Code | Description |
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |

**SPOUSE INFORMATION (0)**

**WARRANT INFORMATION (0)**

**ATF PROFILE INFORMATION (0)**

**BAGGAGE DECLARATION (CF6059) INFORMATION (0)**

**FINANCIAL INFORMATION (0)**

**EMPLOYMENT INFORMATION (0)**

**PILOT LICENSE INFORMATION (0)**

**For Official Use Only / Law Enforcement Sensitive**



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
**TECS - Person Query**

11/06/2024 10:38 AM EST

Generated By: EGBERT SIMON

Page 4 of 4

| IMAGE INFORMATION - PART II (1) | |
|---|---|
| **No** | **Image Details** |
| 1 | **Image Description:** Entered Date: 11/15/2022 |



**For Official Use Only / Law Enforcement Sensitive**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X
 UNITED STATES OF AMERICA,    : 23-CR-192(NRM)
                              :
                              :
                              :
                              :
                              : United States Courthouse
     -against-                : Brooklyn, New York
                              :
                              :
                              :
                              : Wednesday, January 15, 2025
 JASON ROBINSON,              : 2:00 p.m.
                              :
        Defendant.            :
- - - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE NINA R. MORRISON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:    UNITED STATES ATTORNEY'S OFFICE
                       Eastern District of New York
                          271 Cadman Plaza East
                          Brooklyn, New York 11201
                       BY: GILBERT REIN, ESQ.
                          NICHOLAS MOSCOW, ESQ.
                          SEAN FERN, ESQ.
                          Assistant United States Attorneys


 For the Defendant:    FEDERAL DEFENDERS OF NEW YORK
                       For the Defendant -
                       Jason Robinson
                          One Pierrepont Plaza
                          16th Floor
                          Brooklyn, New York  11201
                       BY: BENJAMIN ZEV YASTER, ESQ.

Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail: Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

*Oral Argument*                                                  2

1           (In open court.)

2           COURTROOM DEPUTY:  Criminal cause for oral

3    argument, Docket No. 23-CR-192.  United States v. Jason

4    Robinson.

5           Counsel state your appearances for the record

6    starting with the Government.

7           MR. REIN:  Good afternoon, your Honor.

8           Gilbert Rein for the United States.  And I'm

9    joined by my colleagues Nicholas Moscow, Sean Fern, and

10   parallel Emma Tavangari.

11          THE COURT:  Good afternoon, everyone.

12          MR. YASTER:  Good afternoon, your Honor.

13          Federal Defenders by Benjamin Yaster on behalf of

14   Jason Robinson who is present by video.  I'm joined at

15   counsel table by Chase Leto, a paralegal with your office;

16   and Jessica Hernandez, an investigator with our office.

17          THE COURT:  Good afternoon, every.  Mr. Robinson,

18   can you hear us okay.

19          THE DEFENDANT:  I can.  Good morning.

20          THE COURT:  Good afternoon, good morning, whatever

21   it is.  I'm losing track myself.

22          We're here for oral argument on defendant's motion

23   to suppress.  I would appreciate hearing argument from each

24   of you briefly on the points that you would like me to focus

25   on and then I will likely have some questions for both

*Oral Argument*                                                3

1    sides, so why don't we you begin with you Mr. Rein.

2              MR. REIN:  Yes, Judge.  Judge, is it okay if he

3    stay at the table?

4              THE COURT:  Absolutely, stay at the stable.  I

5    think that's fine.  And you're welcome to stay seated if

6    it's easier.  If you like to stand, that's fine, too.

7              MR. REIN:  I'll stay seated so the microphone can

8    capture what I'm saying --

9              THE COURT:  That's usually the calculus.

10             MR. REIN:  -- for benefit of the defendant who is

11   remote.

12             Judge, the first point I would like to make, and

13   let me first start off by saying I recognize your Honor's

14   decision in <u>Sultanov</u> and what the Court said there.  The

15   point I will make, though, just so the record is clear is

16   that it is the Government's position that border searches

17   are an exception to the warrant requirement if they're

18   grounded in the right of the sovereign to control who can

19   enter the country.  And the border search exception, as the

20   Supreme Court said in United States against

21   <u>Montoya de Hernandez</u> allows for conducting of routine

22   searches for the purpose, among other things, interdicting

23   contraband.  And, obviously, in this case, we've discussed

24   the fact that contraband was the subject of the search, that

25   being child sexual exploitation material.  And nonroutine

*Oral Argument* 4

1 searches and whether a search is nonroutine is determined by

2 whether the argument of intrusion against the level of

3 warranted suspicion and whether or not a search is routine

4 or not routine at the border, there's never been a

5 requirement from any controlling court, whether that's the

6 Circuit or the Supreme Court that a warrant was required.

7 So, respectfully, the Government believes that the

8 search here was a border search and there is no level of

9 suspicion that was required.

10 THE COURT: So let me just break this down to make

11 sure I understand your position.

12 II understand you're preserving the argument you

13 made in your original response to the motion which came in

14 right before I decided Sultanov that no warrant was required

15 nor probable cause so that's it's certainly noted and

16 preserved for record and I trust sooner rather than later

17 the Second Circuit may provide us all with some additional

18 guidance on that point.

19 But as I noted in Sultanov, given the fact that

20 there was no precedent at that time holding that a warrant

21 was required, I certainly recognize that the Government

22 could seek to avoid suppression through the good faith

23 exception to the warrant requirement. But let me just ask

24 you, is it your position that there was precedent

25 establishing that a search of an electronic device,

*Oral Argument*                                          5

1   specifically, a cell phone at the border was a routine

2   search or a nonroutine search.

3          MR. REIN:  It is our position that there is no

4   precedent which distinguishes that a search was a routine

5   search or a nonroutine search.  Certainly, the applicable

6   law does not further distinguish whether a manual search

7   versus a more in-depth forensic or advanced search would be

8   routine or nonroutine in the event that --

9          THE COURT:  Let's just assume for purposes of this

10  point that I agree with you that the search was so-called

11  "manual," meaning, exactly the scope that Agent Nunes

12  testified to in terms of what she believed she had the

13  authority to look at and what she did actually look at:

14  Photos, videos, messages, texts, e-mails, files, and the

15  like.

16         MR. REIN:  In the event of a non -- I'm sorry, in

17  the event of a manual search, it's the Government's position

18  that is a routine search that does not require any level of

19  suspicion.

20         THE COURT:  Okay.

21         MR. REIN:  And certainly, there has been no

22  decision from either the Second Circuit or the Supreme Court

23  which has said otherwise.

24         In the event that the Court were to disagree and

25  believe that the search that occurred here was a nonroutine

A242

*Oral Argument*                                    6

1   search requiring at least reasonable suspicion, under

2   circuit precedent, it's the Government's position that

3   reasonable suspicion was actually present in this case.

4         First, again, as the Supreme Court said in

5   Montoya de Hernandez, reasonable suspicion is a relatively

6   low bar especially in the context of border searches.  In

7   that case, the Court said that border searches are afforded

8   deference due to the training and experience of officers who

9   are at the border.

10         And in United States v. Levy, which is a case that

11  dealt with the distinction between nonroutine and routine

12  searches, Second Circuit says that reasonable suspicion

13  requires only a particularized and objective basis for

14  suspecting the particular person stopped of criminal

15  activity.

16         And so, in this case, the testimony that we heard

17  from Officer Nunes certainly was enough to meet that low

18  bar.  She testified that she was relying on a report

19  contained in an internal database which said that the

20  defendant was linked to the purchase of CSAM and that he

21  should be sent to secondary for a further inspection.  We

22  didn't just hear from her testimony we actually saw the

23  Lookout itself, a printed-out version from the

24  T.E.C.S. System, T-E-C-S, which says, and it was Government

25  Exhibit 101 that the subject was linked to the purchase of

*Oral Argument* 7

1   child sexual exploitation material via FinCen, referred to

2   secondary for interview and immediate device exam to include

3   cell phones and laptop.

4           And the officer testified to that and she also

5   testified that this Lookout was particularly significant

6   because it came from the National Targeting Center.  And she

7   testified, and just for the record it's clear, this is on

8   Page 48 of her testimony lines 24 and then going on to

9   Page 49, Line 3.  She said, that:  When we see it comes from

10  NTC, it holds a little more weight than if it came from

11  anybody else because that's literally your job -- to give us

12  information based on the stuff they find.

13          And she further went on to say, NTC is

14  Intel-based, it's based on what they -- already-established

15  findings.  Usually, when they put a Lookout on someone.  So

16  we're more here to confirm what more or less they already

17  know, or what they have information on to assist in that

18  matter.

19          In addition to that, we heard testimony from

20  Officer Simon who talked about how Lookouts are placed, the

21  process of it, the fact that before one can actually be

22  placed, it has to be reviewed by a supervisor.  And only

23  after that review, will the Lookout actually be placed.  He,

24  too, said that when you see a Lookout from the NTC, the

25  National Targeting Center, you're going to feel they've

*Oral Argument*                                              8

1  already done their research and their analysis for creating

2  that record.  If it's from NTC, we're going off of the basis

3  that there is some type of research or Intel behind it.

4           And so, this wasn't a case where the officers in

5  the moment weren't trying to piece together facts and had to

6  do any type of other intensive fact analysis because they

7  were relying on information that other law enforcement

8  officials from CBP had already investigated and put into

9  their computer system.

10          I want to direct the Court to a case, it's from

11 the Third Circuit, actually, it's called United States v.

12 Whitted, W-h-i-t-t-e-d.  And it's at 541 F.3d 480 and a Pen

13 Cite of 490 from 2008.

14          And that case, the Court actually provides some

15 helpful language about how T.E.C.S. records can support

16 reasonable suspicion.  And the Court said, As a general

17 matter, customs officers should be able to rely on data

18 provided by computer reports to create reasonable suspicion

19 for a search.  If they cannot, their hands would be tied

20 until they either independently investigated the individual

21 or contacted each source for the report to confirm its

22 validity.  Just as a customs officer is entitled to rely on

23 unconfirmed information relayed to him by his supervisor in

24 order to look out for, and search, an individual at the

25 border, so, too, is a customs official permitted to rely on

A245

*Oral Argument*           9

 1  T.E.C.S. information entered by other customs officials to

 2  create reasonable suspicion for a search.

 3         And that's exactly what happened here.  The

 4  officer was relying on information that had been generated

 5  within her own agency about the defendant.  She testified

 6  that it was, in her words, "a prime hit" which we heard

 7  means that they had identified the defendant as being the

 8  subject of the inquiry with one hundred percent certainty.

 9  And so, on that basis, she conducted the search as

10  instructed by the Lookout.

11         And the record was not ambiguous.  I think when we

12  parse through the language of what was actually in the

13  Lookout, there is lots of different data points to look at.

14  It said that he was linked to the purchase of CSAM through

15  FinCen which she said was another independent agency which

16  dealt about financial transactions and that he should be

17  referred to secondary for immediate exam to include cell

18  phones and a laptop.  And when she conducted her

19  investigation, he actually had a cell phone and a laptop.

20         And so, the information that she was presented

21  with actually comported very well with what was in the

22  Lookout.

23         And so --

24         THE COURT:  Are you saying that the Lookout from

25  2019 predicted that he would be carrying a cell phone and a

*Oral Argument* 10

1   laptop.  That the fact of carrying a cell phone and a

2   laptop, which I would wager a very substantial number of

3   travelers coming through JFK are carrying, as part of the

4   reasonable suspicion requirement or corroborated the

5   information about purchasing child pornography in 2019?

6           I'm just not sure I understand that part of the

7   your argument.

8           MR. REIN:  I'm not saying that it necessarily is a

9   required part of the reasonable suspicion analysis.  What

10  I'm saying is in the circumstances, she's getting a report

11  which says to conduct a search of a cell phone and laptop

12  and he actually had multiple electronic devices.  That's the

13  point I'm trying to make.

14          THE COURT:  Yes.

15          MR. REIN:  So given the directive that she got,

16  and the information in the Lookout, she was entitled to rely

17  on that information and form the basis for reasonable

18  suspicion to conduct the search.

19          THE COURT:  Let me ask you briefly, I don't want

20  to interrupt your flow too much.  But let me ask you briefly

21  about the testimony you just recited about the two CBP

22  officers' assessments of the evidence or the hit that comes

23  from the National Targeting Center.

24          I mean, the standard for reasonable suspicion as

25  you know is an objective one.  There's no doubt that

*Oral Argument*                                          11

1   subjectively, and it was very clear from their testimony,

2   both Agent Nunes and Officer Simon, or officer Nunes and

3   Officer Simon clearly believed that NTC does a good job in

4   assessing the hits.  Considers that office to be a reliable

5   source.

6          I think the concern I have is there was no

7   testimony or evidence presented as to why that's the case.

8   Meaning, it could be that when they got there, the first

9   person they meet in the locker room on their first day on

10  the job there, those guys at NTC are great, they're always

11  right; they're never wrong.  We just don't know other than

12  this kind of general, oh, they always do their job well.

13         So can you address how I am to weigh that

14  testimony in light of the fact they gave very general

15  assessments of their subjective belief in NTC's reliability.

16         MR. REIN:  Well, Officer Simon testified that he'd

17  been with Customs and Border Protection, I think, for

18  16 years at least and that he was a supervisor.  And so, I

19  think that the officer's -- the way I would respond to that

20  is by saying the officers are allowed to rely on their

21  experience as Customs and Border Protection officers and

22  their own knowledge of the way that their agency works.

23  This is obviously a suppression hearing, hearsay is

24  admissible.  And what the -- what Officer Nunes said as I

25  reencountered was that -- and what Officer Simon said as

*Oral Argument*                                    12

1   well -- that they know that the people employed by NTC are

2   analysts and they actually conduct independent

3   investigations.  They're not just, I think the comparison

4   that Officer Nunes gave was that it's not like just it's

5   some customs officer at a port in another part of the

6   country.  These are people whose job it is to actually

7   conduct investigations and make the type of determinations

8   that appeared in the Lookout here.  So that's what I think

9   the distinction is.

10              THE COURT:  Okay.

11              MR. REIN:  We had actually -- I think we had

12  raised at the end of the hearing the fact that the agent who

13  testified, Agent Stepian, did actually know some of the

14  basis for what the Lookout was and we offered, if necessary,

15  to --

16              THE COURT:  I thought it was very clear that

17  Stepian made a phone call a week before the hearing to find

18  out the basis for the Lookout and you agreed that it was not

19  relevant to my consideration of what the agents knew at the

20  time that they actually were assessing whether they had

21  reasonable suspicion or even, at the time that they applied

22  for the warrant because Agent Stepian hadn't gathered that

23  information before he applied for the warrant either.

24              MR. REIN:  That is true.

25              THE COURT:  You offered to present testimony that

*Oral Argument*                                                    13

1   you agreed it wasn't relevant to the legal issues I have to

2   consider so I don't -- I'll take that for what it's worth.

3          MR. REIN:  What we would say to that, Judge, is

4   that it is relevant as to whether there was reasonable

5   suspicion for the actual stop itself; however, it, in terms

6   of what the officers knew at the time, the officers did not

7   have that information.  There is a doctrine of law, it's

8   called the Collective Knowledge Doctrine and the

9   Second Circuit talks about this in <u>United States v.</u>

10  <u>Babilonia</u>, which is B-a-b-i-l-o-n-i-a, which says that

11  officers do not have to actually research the basis for

12  information that is providing the rationale for their

13  search.  They're allowed to rely on information that is

14  conveyed to them by other officers and that's what is done

15  here through the Lookout System.

16         And so, if there was a question as to whether or

17  not the basis for the Lookout was proper, then, that I think

18  will be a different issue which is not necessarily one that

19  we're addressing here.  The issue, I think, is reasonable

20  suspicion and through some of what I said already, the

21  officers were allowed to rely on the T.E.C.S. report.  Even

22  in the rationale of the Third Circuit case I recited over a

23  moment ago, <u>Witted</u>, they need to be able to unless they

24  would not be able to do their job.

25         THE COURT:  I don't think there is any question

*Oral Argument*                                          14

1  that they're certainly allowed to rely on the T.E.C.S.

2  report.  I think the question is whether the -- just like an

3  officer who gets a 911 call isn't allowed to presume that

4  the information given in that call is accurate.  But the

5  question for courts to consider always in that context is,

6  is what's described in the call both about the source and

7  the specific information given enough for an officer

8  objectively to conclude that there's reasonable suspicion.

9  So I'm certainly not disagreeing with you that they were

10 entitled to presume that the information listed in that

11 T.E.C.S. report was accurate.

12        But I think since they weren't given anything

13 about the basis for the report, I thought we had agreed at

14 the end of the hearing last week that since there was no

15 information known to any of them about the basis offering

16 testimony of what they could have learned if they had picked

17 up phone and called someone or had done further research

18 would be error for me to consider.

19        MR. REIN:  One moment, Judge.

20        THE COURT:  Sure.

21        (A brief pause in the proceedings was held.)

22        THE COURT:  In other words I think Collective

23 Knowledge Doctrine, which I'm familiar, of course, applies

24 to information that is knowledge that is actually conveyed,

25 not knowledge that is not possessed by the person who is

*Oral Argument*                                        15

1  then doing the action that is subject to Fourth Amendment

2  scrutiny.

3       MR. REIN:  And I think what I'd add to that is

4  that this is analogous to a situation where somebody's name

5  is run into computer database and they're found to have an

6  open warrant.  You do have to -- the officer is not

7  necessarily required at that very moment to determine what

8  the basis was for the warrant, what investigation might have

9  led --

10      THE COURT:  When there's a warrant, there's also a

11 judicial determination of probable cause and a right to stop

12 that person.  For example there's a number of case, and I

13 won't recite them now, where a 911 operator conveys certain

14 information to a officer in the field.  Whatever is

15 conveyed, the officer in the field is entitled to presume,

16 particularly, if it's a uniformed 911 officer, not a

17 civilian, that it's reliable.

18      But the fact that someone else involved in the

19 investigation who had spoken with a 911 officer had a whole

20 bunch of other information, my understanding is that it's

21 that's not proper for the reviewing court to consider.  It's

22 only what was known to the officers in the field.

23      I certainly understand your argument that, given

24 the testimony I heard, I should consider and must consider

25 everything that the individuals who testified here knew

*Oral Argument* 16

1  about the reliability of NTC, the exact wording of the

2  T.E.C.S. hit, their experience, whatever they knew and

3  testified to about FinCen and the like.

4         I just want to be clear that I don't think, and

5  please correct me if I'm wrong, that it would be appropriate

6  for me to hear testimony about information that

7  Agent Stepian learned a week before the hearing or that

8  officer, the other officer who was the supervisor, who now

9  works for your office.

10        MR. REIN:  Officer Simon.

11        THE COURT:  Simon.  Thank you.  Before the hearing

12  and that wasn't information either known personally or even

13  conveyed to them secondhand.

14        MR. REIN:  What I'll add, Judge, is that the

15  reason why we think it's relevant.

16        (A brief pause in the proceedings was held.)

17        MR. REIN:  I'm sorry, Judge.

18        THE COURT:  That's okay.

19        MR. REIN:  What I would say is that we think that

20  the information that might have formed the basis of the

21  Lookout does not go to the question of whether the officers

22  ultimately acted in good faith in this case.  However, it

23  does go to the question of whether the defendant even had a

24  reasonable expectation of privacy at the border in these

25  devices.  And because this information was possessed by the

*Oral Argument*                                        17

1  agency, he did not because it gave them reasonable suspicion

2  to search.  They were allowed to rely on information that

3  the agency held to justify their search of his devices at

4  the border.

5            THE COURT:  Because of the Collective Knowledge

6  Doctrine or because of something else?

7            MR. REIN:  Because they -- well, based upon the

8  fact, yes, based upon the fact the agency possessed this

9  information and it served to overcome any reasonable

10  expectation of privacy that he had in his devices so that

11  they could be searched at the border.

12            THE COURT:  So not just the wording of the

13  T.E.C.S. hit which was subject linked to the purchase of

14  child sexual exploitation material via FinCen and the rest

15  of the language that you read; that is, not just that they

16  were entitled to rely not on information but that they would

17  be allowed to rely on this all other information that you

18  didn't offer yet about what went into the original T.E.C.S.

19  hit.

20            MR. REIN:  Because it would serve to -- meaning,

21  that there would be no Fourth Amendment violation.  We

22  reached the good-faith exception were the Court to find that

23  there was a Fourth Amendment violation.  But the evidence

24  should not be suppressed because of the good-faith

25  exception.

*Oral Argument*                                    18

1    The argument that we're making is that there is no

2    Fourth Amendment violation because CBP, acting in its

3    position, where it has the authority to conduct border

4    searches is allowed to rely on the information that it has

5    gathered and that information serves to counteract any

6    reasonable expectation of privacy that the defendant would

7    have at the border because CBP --

8        THE COURT:  Correct me if I'm wrong, tell me where

9    this comes into my analysis given two things.  One, that

10   your position is that no suspicion is necessary for any

11   traveler at the border, period.  So, in some ways, in your

12   view it's irrelevant.  Second, since you know my view of

13   what's required at the border from <u>Sultanov</u>, I'm not sure

14   even though I certainly have to consider the good-faith

15   exceptions here.  I think it's probably not a surprise to

16   anyone to say it's unlikely I would go that route in

17   assessing the absence of direction from the Second Circuit

18   otherwise in assessing it.

19       Tell me how -- so if you don't think -- that you

20   agree that that information is not relevant to either of the

21   routes that the defendant here is arguing that the

22   good-faith exception should be overcome.  But if I were to

23   reconsider my earlier views in <u>Sultanov</u> or have some other

24   direction from the Court, in theory, we could reopen the

25   hearing to take that testimony to consider what they had.

*Oral Argument*                                           19

1   I'm still struggling to figure where that fits in.

2           MR. REIN:  What I'm saying is we don't have to

3   reopen the hearing.  It factors into the part of the

4   analysis where we determine -- if there were a determination

5   that this was not nonroutine search, which we don't agree

6   with, this would factor into the reasonable suspicion

7   analysis because under circuit precedent, nonroutine

8   searches do require reasonable suspicion.  So this would be

9   a factor in this prong where the Court could find that there

10  was reasonable suspicion and therefore the search was legal,

11  there was no Fourth Amendment violation.

12          THE COURT:  Okay.  And do you agree with the

13  general proposition of law in the defendant's letter that

14  was filed this morning that it is the Government's burden to

15  show, or the agent's burden to show, that there was some

16  established precedent from an appellate court either from

17  the Circuit or from the U.S. Supreme Court establishing that

18  this was a nonroutine search.  But your position is, yes,

19  that's correct, that <u>Levy</u> and some of the other cases you've

20  cited including <u>Montoya de Hernandez</u> constitute that

21  precedent which makes clear to a reasonable officer that a

22  search of a cell phone at the border is nonroutine.

23          MR. REIN:  We disagree with the premise in the

24  letter because the way the letter was drafted, and the way I

25  understand counsel's argument, is that the Government's

*Oral Argument*                                       20

1  required to point to a particular case and say this is

2  similarly situated.  And so, the officers can look at that

3  case and say, well, this seems analogous to what happened in

4  there, and so, that's precedent we're going to rely on.

5  That's actually not the way that I think the courts have

6  actually analyzed whether or not an officer can rely in good

7  faith on applicable precedent.

8         In fact, in <u>United States v. Smith</u>, the case that

9  counsel actually cites in his initial opening brief.

10        THE COURT:  Yes, Judge Rakoff's decision.

11        MR. REIN:  Judge Rakoff's decision.  The Court

12  actually addresses this head-on and.  The Court said, That

13  given the historic breadth of the border search exception, a

14  reasonable government agent could have a good-faith belief

15  that such a search was, as conducted here, permissible,

16  absent Supreme Court or Circuit precedent to the contrary.

17        So that's quite different.  It's not saying the

18  Government needs to point to a case where similar things

19  happened, and so, we assume that this would be okay because

20  it's similarly analogous.

21        What Judge Rakoff was saying in <u>Smith</u>, is that in

22  the absence of any case to the contrary, the Government

23  agent can rely on good faith especially in the context of

24  what is a very broad power of the border search authority to

25  believe that their conduct was legal.

*Oral Argument*                                                      21

1      THE COURT:  Okay.  Hypothetically, if I were to

2   take a different view than Judge Rakoff had and add a

3   sufficient level of generality, conclude that since it was a

4   warrantless search, the agents needed to be aware of some

5   authority at least strongly indicating to them that the

6   search was routine and did not require any level of

7   suspicion in order to conduct it or at least require

8   reasonable suspicion.

9           What authority that was in effect, particularly

10   after Reilly in November 2022, do you think for from either

11   the Second Circuit or U.S. Supreme Court would be the most

12   analogous upon which they should rely?

13      MR. REIN:  The issue is that there really isn't

14   any in the Circuit.  There is no case where the Circuit has

15   considered whether a manual search is routine or nonroutine.

16   There is Levy, obviously, which dealt with, in that case,

17   the copying of a notebook page.  However, here there was no

18   copying of anything.  There was just a manual review of a

19   cell phone.  And in terms of other available authorities,

20   whether they're from the Second Circuit or the Supreme Court

21   or other courts, at the time of the search, there was a

22   split in authority among all the circuits with some circuits

23   saying that a manual search required no reasonable suspicion

24   at all; other circuits saying that there needed to be some

25   suspicion.

*Oral Argument* 22

1    There is an 11th Circuit case, <u>United States v.</u>
2  <u>Touset</u>, T-o-u-s-e-t, where the Court of Appeals there said
3  that there was no level of suspicion needed especially when
4  the evidence sought was contraband in the form of child
5  pornography.
6    And so, given what can be described as a mix of
7  legal authority to rely on, certainly, we cannot expect a
8  reasonable officer under the circumstances to have to have
9  made their own legal determination when they -- about
10 whether or not their conduct would be proper.
11   And, you know, we've entered the discussion here
12 about the good-faith exception.  Here the agents did
13 promptly get a warrant and they are entitled to rely on the
14 determinations made by the magistrate judge, they cannot be
15 expected to, after having obtained a warrant from a judge,
16 to second guess that judge's legal determination that there
17 was, in fact, probable cause for the warrant to be issued
18 and that the search would then be proper.
19   THE COURT:  So let me have you address the two
20 routes through which the defendant, as I understand it,
21 seeks to attack the warrant or argue at least that the good
22 faith exception shouldn't apply here.
23   The first being whether that the reliance on the
24 warrant isn't proper because the issuing magistrate judge
25 has been knowingly misled or where the search itself, the

*Oral Argument*                                    23

1   original search was conducted, in objectively reasonable

2   reliance on binding precedent.  I think you've covered the

3   second one unless there is something else you want to add

4   about the precedent at that point.

5           MR. REIN:  I think, as of a moment ago I addressed

6   that, there was no precedent to the contrary in the

7   Second Circuit.

8           THE COURT:  Okay.

9           MR. REIN:  To address the first point about the

10  magistrate judge being misled.

11          THE COURT:  And do you have any thoughts about the

12  Reilly issue, meaning, that the Supreme Court made clear

13  that there is a very heightened privacy interest in a

14  person's cell phone.  As you know, in Reilly even found that

15  a search incident to arrest where there was probable cause

16  which is traditionally an exception to the warrant

17  requirement is not sufficient.  How could a reasonable

18  officer rely, absent some authority from a circuit court in

19  her own jurisdiction, post-Reilly presume that a cell phone

20  was just as routine of a search as a piece of luggage or a

21  pocket?

22          MR. REIN:  I think as your Honor said, Reilly is

23  confined to a search incident to an arrest.  And that's

24  different from the border search exception.  Closed

25  containers on somebody who is arrested can be searched.  In

*Oral Argument*                                   24

1   <u>Reilly</u>, the Court was very specific about it being incident

2   to arrest.

3          In the context of a border search where CBP is

4   acting under its broad power to interdict and prevent the

5   flow of contraband into the country is very different.  It

6   certainly, and there's no precedent to the contrary, would

7   be reasonable for a officer to believe that they'd be able

8   to conduct at least a manual search of someone's device.

9   Obviously, there is a level of intrusion but that level of

10  intrusion has to be balanced against the reasons for the

11  border search and the reason why it is an exception to the

12  general requirement under the Fourth Amendment that there be

13  a warrant.

14         THE COURT:  And, in your view, that applies to all

15  travellers, T.E.C.S. hit or no T.E.C.S. hit.  A U.S. citizen

16  goes abroad for a for a few days, a CBP officer can look at

17  their text messages, they're personal photographs, their

18  videos, their e-mails, any of the apps on their phone as

19  long as they're not backing it up or downloading it in the

20  way you would with a forensic search.

21         MR. REIN:  Yes, that is our view.  And in terms of

22  there being a forensic search, I don't think there is any,

23  at least I'm unaware of any precedent on point that a

24  forensic search of a cell phone would be considered a

25  nonroutine search.  I do recognize there are different court

*Oral Argument*                                        25

1   opinions.

2        THE COURT:  Let's just assume for the sake of the

3   hypothetical especially that this was the not a forensic

4   search of the phone.  Even the search, the scope of the

5   search, that your witnesses described conducted on

6   Mr. Robinson's phone any person in this courtroom could go

7   abroad for a few days, come back, and simply by virtue of

8   reentering the country without any individualized suspicion,

9   all of our text messages, e-mails, photos, videos could be

10  searched at the border in the interest of preventing

11  contraband from coming into the country.

12        MR. REIN:  Yes, that is our position.  I will say,

13  obviously, this case is different because there was

14  particular evidence that the officer was looking for and she

15  testified that she made sure to look in places where that

16  evidence might be.  And then once she found the evidence,

17  she stopped.  And I think she was questioned about this,

18  too.  She had found what she was looking for and that was

19  the end of the search.

20        THE COURT:  Okay.

21        MR. REIN:  To address your Honor's question about

22  the magistrate being knowingly misled.  I don't think there

23  is any testimony that really supported that contention.

24  There is no requirement that a search warrant states every

25  fact that might be known to an affiant on a search warrant

*Oral Argument*                                    26

1    in the affidavit for the search warrant.  In fact, here, the

2    affiant actually cited to a Second Circuit case.

3           THE COURT:  <u>Levy</u>, I think.

4           MR. REIN:  <u>Levy</u>.  And it was almost an invitation

5    to the judge, I think, to maybe inquire further or to do the

6    judge's own research.  Clearly, if anything, it shows that

7    the agents were operating under the view that this was a

8    routine search that it happened, and so, there would be no

9    level of suspicion that was needed.  So the argument that,

10   at least on that basis, that the magistrate judge was misled

11   I don't think is supported at all by any of the evidence

12   that we've seen.

13          THE COURT:  So let me ask you this then.

14          What explains the fact that, by your view, there

15   was this highly damning T.E.C.S. hit that the agent had at

16   the time the search was conducted from the National

17   Targeting Center via FinCen specifically targeting him for a

18   very important objective of law enforcement which is

19   stopping the contraband from coming into the country,

20   particularly, child sexual abuse material.  And they left it

21   out of the search warrant?  The officer's testimony was a

22   search was conducted, it wasn't a random search.  It wasn't

23   the fifth and tenth person who come off the plane, it was

24   for a specific reason.  What possible reason would your

25   agent have to leave that out of the warrant application if

*Oral Argument*                                        27

1   he wasn't trying to hide something from the magistrate?

2           MR. REIN:  Well, as I said, I don't think that

3   one -- I don't think that the fact that that doesn't appear

4   on the face of the warrant necessarily implies that it's

5   trying to be hidden from the magistrate.

6           THE COURT:  I'm not saying it necessarily implies

7   that.  I just want to know if you can explain it because he

8   didn't explain it.  Like, I didn't think it was my place to

9   ask him why this huge disconnect between what you knew and

10  what you put in the application, it's your burden.  But I

11  want to know based on the evidence presented what I should

12  draw from the fact that, in this particular case, they had

13  individualized suspicion, in your view, that was quite

14  persuasive and he just left it out of the application.  And

15  that same boilerplate language he could have put in a

16  warrant application for any citizen coming into the border

17  in the country who had given up his passcodes.

18          MR. REIN:  Well, as I said before, there is no

19  requirement that every fact that's known to an agent or an

20  affiant on a search warrant be included in a search, be

21  included in the face of the warrant.  The agent believed,

22  and for the reasons that I've expounded throughout our

23  discussion this afternoon, that CBP's border search

24  authority is broad.  And that even though -- and what I

25  would say is that even though there was individualized

*Oral Argument*                                            28

1   suspicion that he would possession the CSAM he was not

2   required that it be included in the warrant.  There was no

3   reason for it.  It didn't add or enhance the probable -- it

4   didn't necessarily -- wasn't needed for a probable cause

5   determination.

6            THE COURT:  You sort of hesitated there.  Do you

7   think it enhanced the showing of probable cause?  I mean,

8   struggling with what feels like an intentional omission

9   here, I want to be candid with you.  Let me just be candid

10  with you about my concern and something that I'm still

11  considering.

12           I'd like you to address whether it's reasonable to

13  infer that Agent Stepian put this boilerplate language about

14  a routine search in the affidavit despite the fact that he

15  had, by your view, specific information purportedly linking

16  Mr. Robinson to the purchase of child pornography because he

17  didn't want the magistrate judge asking questions about it.

18  Questions like, how old is the T.E.C.S. hit?  What's it

19  based on?  What did the border agent know at the time?  Why

20  was it three years ago and they're only searching him now?

21  Did they do anything to investigate in the intervening three

22  years?  All these things that a magistrate judge might have

23  asked if he had been told there was a T.E.C.S. hit linked to

24  him in 2019 and when he crossed the border in 2022, we did a

25  search.

*Oral Argument*                                    29

1    Why is that not a reasonable inference that

2  someone could draw from the gap between what he knew and

3  what he told Judge Cho.

4    MR. REIN:  Well, first, Judge, I don't think that

5  that necessarily -- the fact that the T.E.C.S. hit enhances

6  the probable cause because the probable cause is based upon

7  the fact that the CBP officers searched the phone and

8  actually saw the CSAM images.  And so, the fact that he was

9  suspected of it previously doesn't necessarily add to the

10  probable cause determination because they had actual direct

11  evidence that he now -- that he now possessed the CSAM

12  material the contraband.

13    And to address your --

14    THE COURT:  So why give any information at all

15  about like he consented to the search and voluntarily agreed

16  to the search, why is that necessary?  Because all he has to

17  do is say a border search was conducted and he didn't even

18  need his consent by you view, so why did he put that in?

19    MR. REIN:  I don't think he said he consented to

20  the search.

21    THE COURT:  Doesn't he say it's a voluntary -- he

22  voluntarily searched?  I don't have the affidavit in front

23  of me.

24    MR. REIN:  I have the warrant in front of me.

25  It's Page 3 of the affidavit.  It says:  During the search,

*Oral Argument*                                                    30

1   Robinson gave the officers the passwords for device.

2           THE COURT:  Right.

3           MR. REIN:  That's not same as agreeing to a

4   consent of the search.  I think that if the officer was --

5   and not just thinking this, logic infers this, that if the

6   officer was trying to mislead the magistrate, he would have

7   said that the defendant consented to the search and that is

8   just not what we have here.

9           THE COURT:  So what was the -- explain what the

10  magistrate was supposed to take away from the passage you

11  just read, He voluntarily gave up his passcodes?  Why put in

12  it was voluntary.  It seems pretty straightforward that it's

13  about consent to do the search.  You voluntarily give your

14  passcodes because they asked you for them and you either

15  refuse or you agree.

16          MR. REIN:  I think that there's a leap there that

17  that is not evident from either the testimony or what's in

18  the affidavit.  The testimony from Officer Nunes was that

19  she asked him for his passwords and he gave them to her.

20  And there was some back-and-forth and some questioning about

21  whether -- what would you do in a situation where somebody

22  doesn't give you the passcodes.  Here, they asked for them

23  and he gave them.  That in their view was voluntary.  There

24  was nothing needed to be done.  If anything, using the word

25  "voluntarily" implies that he wasn't threatened or coerced

*Oral Argument*                                        31

1  in some way into giving the passcodes.  And this first

2  paragraph, it's Paragraph 7 of the warrant that we're

3  looking at, is providing some context as to how this came to

4  be a search at all.  They need to provide -- the affiant

5  needed to provide some type of explanation to the Court as

6  to how they even came to encounter this person and possessed

7  their phone and that's what's really being here.

8          In terms of talking about why not say anything

9  about the T.E.C.S. record being in place or the Lookout or

10 the kind of Lookout.  Warrants usually don't include the

11 validity of every prior investigative step that had been

12 taken in order to obtain a device or in order to develop the

13 probable cause.  Sometimes warrant applications, not

14 sometimes, frequently they're based upon grand jury

15 investigations, with subpoenas, and not.

16         THE COURT:  My question to you, you might have

17 misunderstood.  I wasn't saying why didn't he include all

18 the information in the warrant?  The question is, is there

19 an inference, and you can tell me if it's not reasonable, I

20 suspect your answer will be it's not.  But to draw that he

21 left even the most basic information about the T.E.C.S. hit

22 that was the actual reason why Mr. Robinson was singled out

23 for this search, routine or nonroutine.  That's why they

24 targeted him and sent him to secondary inspection, we know

25 that.  They left that out because they didn't want

*Oral Argument*                                             32

1  magistrate judge asking questions about what was behind the

2  individualized suspicion.

3          MR. REIN:  I'm failing to see what is a -- what

4  ends up being a rather nefarious intent on the part of the

5  agent coming through, through the fact that the affidavit

6  didn't say that there was a T.E.C.S. hit or a Lookout and

7  that's why he was even stopped.

8          The idea -- you left out a fact, and so, prevented

9  that magistrate judge from asking questions.  I just frankly

10 don't think it's a fair inference that can be attributed to

11 the conduct of the agent under the circumstances, especially

12 when what was included in the warrant was sufficient to

13 establish probable cause.  It's reasonable that the agent

14 wouldn't think it necessary to include the prior

15 investigative step that actually doesn't -- wasn't necessary

16 to tell the magistrate for the magistrate to be able to make

17 the probable cause determination.  And as is standard in at

18 least in my experience, every warrant that is submitted for

19 consideration in this district, the warrants say that they

20 don't include all the information that the affiant may have

21 had in connection with the investigation.  They include the

22 bare bones information necessary or at least a sufficient

23 substance to justify the issuance of a warrant.

24         THE COURT:  Okay.  Let me just ask you about this

25 issue of the passcode being given voluntarily and consent

*Oral Argument*                                          33

1  given or not given, I'm not sure it will necessary factor

2  into the issues raised by the defendant.

3          My recollection, although I haven't looked at the

4  portion of the transcript, I have a recollection that

5  Officer Nunes when I asked her as best as she could recall

6  what word she used in order to request the defendant's

7  passcodes that she said, What's the passcode to your iPhone?

8  Which seems to me to be different from the types of

9  questions typically asked in the consent to search context

10  which are some version, usually a variation of would you

11  mind if I searched your pockets or your glove compartment,

12  or do I have your permission, right?  Something that makes

13  clear to the person that you're asking for their permission

14  and they can give it to you or not give it to you.  The law

15  is clear the officers don't need to advise the person.  They

16  have a right to refuse but they do need to ask.

17          Why isn't this the digital equivalent saying "open

18  your glove compartment" as opposed to "do I have your

19  permission to look in your glove compartment."

20          MR. REIN:  It's because in the context of a border

21  search, the permission is not necessary.  The officer did

22  not need his permission to do the border search for the

23  reasons we talked about already.  The border agents are

24  empowered to do these types of searches and these searches

25  are carved out in the Fourth Amendment as reasonable.  And

*Oral Argument*                                             34

1   so, she didn't have to ask any type of consent question at

2   all.

3           And I think I'll add to just further the argument

4   is that it's a like a situation where the agents have a

5   search warrant to search someone's home or their car and

6   they ask the person for the keys.  They don't have to advise

7   them of anything else because they're already empowered to

8   do the search.

9           THE COURT:  Right.

10          If they have the warrant, they can use whatever

11  reasonable means are necessary to effectuate the search

12  whether the person consents or not including force in some

13  circumstances depending.

14          MR. REIN:  Right.

15          And obviously, this is a different case.  But, at

16  the same time, the border search authority here is a

17  substitute for the need for warrant.

18          THE COURT:  Right.

19          So your position, I think I understand it now, she

20  wasn't asking she was directing him put she had the legal

21  authority to direct him to give up the passcode.

22          MR. REIN:  Right.

23          THE COURT:  Anything else you wanted to address?

24          MR. REIN:  One moment, Judge.

25          Judge, just to kind of bring everything together

*Oral Argument*                                            35

1  for a little bit.

2          In order to actually suppress the evidence in this

3  case, your Honor would have to find that, one, this was a

4  nonroutine search.  If it was a nonroutine search and

5  required reasonable suspicion, your Honor would have to find

6  that there was no there was no reasonable suspicion.  And if

7  your Honor found there was no reasonable suspicion, you

8  would have to find that the good-faith exception didn't

9  apply because one of the three different rationales for not

10  applying was evident here.  Either that the magistrate was

11  knowingly misled which for the reasons I said before.  I

12  vehemently disagree with.  I do not think that is supported

13  bit evidence in this case, or that the warrant as totally

14  lack income probable cause.  And there just is not any

15  evidence here to support any type of finding of that nature.

16          And so, for those reasons, Judge, your Honor would

17  also have to find, too, the CBP officers were acting in bad

18  fifth in the belief that they did not need reasonable

19  suspicion to do this search.

20          And for the reasons I stated, and because of the

21  case I cited and the law being so different in many

22  different circuits, that would not a reasonable finding it

23  make.

24          The testimony that your Honor heard establishes

25  that the customs officers believed that they had reasonable

*Oral Argument*                                          36

1   suspicion.  And you'd have to find that that was an

2   objectively unreasonable position for them to have based

3   upon all the information that was in front of them.

4           So, for those reasons, Judge, the Government

5   submits that the defense motion should be denied.

6           THE COURT:  I just remembered one other thing I

7   wanted to ask you about.

8           MR. REIN:  Sure.

9           THE COURT:  Can you address the time lag between

10  the November 2019 T.E.C.S. hit that was entered and the fact

11  that this search was not conducted until 2022.  I'm thinking

12  about the parallels or potential parallels between the facts

13  presented here and those presented before Judge Garaufis in

14  the Fox case.  In that case Judge Garaufis was quite

15  troubled by the fact that there had been what he

16  characterized as an early-stage investigation of a domestic

17  crime, in that case, fraud that had been done about a month

18  before the traveler left the country.  And rather than go

19  get a warrant or conduct additional measures to search her

20  digital devices while she was in the country, they

21  essentially laid in wait until she left the country and then

22  directed CBP to seize the phone at the border.

23          Given that, by your account, they had some

24  reliable information that Mr. Robinson may have been a

25  possible purchased of child pornography three years earlier,

*Oral Argument*                                    37

1    are there concerns about interpreting the case law in the

2    way that you asked me to do that law enforcement will simply

3    use the border authority as an end run around the

4    traditional Fourth Amendment requirements that apply to

5    domestic criminal law investigations even in situations like

6    this which Judge Garaufis noted in Fox that involve

7    particularly heightened public interests in terms of

8    prosecution of crime but that the border search really isn't

9    supposed to be a search for domestic criminal investigations

10   so let me have you address that concern.

11            MR. REIN:  So, first, I would say there was

12   testimony that even though the Lookout was initially placed

13   in 2019, it had been updated later on in time.  But I think

14   that this case is very different than Fox.  If I remember

15   Fox correctly, I think that the search actually there didn't

16   even happen at the border.

17            THE COURT:  Yes, that's not the part I'm asking

18   about.  I'm thinking about the fact that both cases involve

19   evidence of a domestic crime known to law enforcement that

20   was, by both accounts, in its relatively early stages.  And

21   Judge Garaufis found that not -- no precedent of the

22   Second Circuit or U.S. Supreme Court in his view gave what

23   he referred to, I'm quoting from the decision at 11,

24   "blanket permission for law enforcement to direct CBP to

25   seize smartphones pursuant to an early-stage investigation

*Oral Argument*                                      38

1   of a domestic crime."

2            How would you address that concern in this case

3   given that in Fox, it was an even a shorter timeframe than

4   the one at issue here.

5            MR. REIN:  So I think there's two points to make.

6            One is that there is no evidence that there was

7   actually a law enforcement investigation occurring.  What

8   the testimony was that CBP had conducted an investigation

9   and analysis and determined that the defendant was linked to

10  the purchase of CSAM.  There is no evidence that -- CBP is a

11  border authority, they aren't a domestic law enforcement

12  agency in the sense that the FBI or HSI --

13           THE COURT:  In <u>Fox</u>, CBP was the ones that

14  conducted the search of the phone in the same way pursuant a

15  directive from another agency.  But you're saying because

16  NTC is part of CBP.

17           MR. REIN:  We don't have that here.  And also, the

18  evidence at issue here is itself contraband.  It is CSAM

19  material which is illegal to possess, it's not financial

20  records or anything like that.  And the precedent is very

21  clear that child pornography is contraband and cannot be

22  possessed in and of itself.

23           In terms of the lag of time, I think it's

24  important to address that.  And in cases involving child

25  pornography, the courts have been very clear that that type

*Oral Argument*                                          39

1   of evidence is much different than any other types of

2   digital evidence that might be found.

3         In terms of just a lag in time in general, in a

4   case called <u>Diamondstone v. Macaluso</u> which is at 148 F.3d

5   113.  The Second Circuit instructs that the age of facts but

6   also the nature of the facts and the conduct involved have

7   to be considered when a court is addressing any argument

8   that there's been a lag in time.

9         Here, Agent Stepian testified that people who

10  possess and collect child exploitation material do so over

11  the course of many years and that he's examined devices

12  where CSAM was collected over the course of years and that

13  collections go around like trading cards.

14        And so, because we're talking about digital

15  contraband and digital evidence, it's just a different type

16  of analysis because it's likely that the material would

17  remain on someone's device for years maybe even decades.

18        And what the agent testified to is actually spot

19  on with what the Second Circuit has said about any type of

20  delay in the search of a digital device where the evidence

21  being sought is child pornography.  In <u>United States v.</u>

22  <u>Irving</u> the Court said, That when a defendant is suspected of

23  possessing child pornography, the determination is unique

24  because it's well known that images of child pornography are

25  likely to be hoarded by a person interested in those

*Oral Argument*                                        40

1   materials.

2           And then other courts in the circuit have said

3   that numerous courts have recognized that digital files

4   remain on computers for extensive periods of time.  Even if

5   they've about this deleted, many courts have suggested that

6   in the context of digital evidence, it's a unique situation

7   and the passage of time does not necessarily render the

8   evidence stale or that the passage of time isn't necessarily

9   as big a factor as it might be in another case.  And so, I

10  think that further distinguishes this case from <u>Fox</u> where

11  the evidence is much different than what was being sought

12  there.

13          And there's a number of other cases which kind of

14  state the same thing.

15          There is, I think, an instructive case from the

16  First Circuit.  It's <u>United States v. Riccardelli</u>,

17  R-i-c-c-a-r-d-e-l-l-i, where the Court said, "History

18  teaches that collectors of child pornography prefer not to

19  dispose of their dross, particularly retaining obscene

20  materials for years."

21          And so, here, even if there had not been an update

22  to the Lookout, the passage of less than three years is not

23  all that significant in the context of child pornography

24  because of its unique nature.  And so, that's how I

25  distinguish this case from <u>Fox</u> and any other case where the

*Oral Argument*                                           41

1    passage of time might have otherwise been an issue.

2              THE COURT:  Thank you.

3              Mr. Yaster.

4              MR. YASTER:  Thank you, your Honor.

5              The way that I would propose the Court go through

6    the issues is as follows.

7              The first question is, was there, when CBP

8    conducted its search, the manual search, that is, of

9    Mr. Robinson's phone, was there a Fourth Amendment

10   violation.  Under this Court's decision in <u>Sultanov</u> the

11   answer is yes.  <u>Sultanov</u> requires probable cause in a

12   warrant.  It's undisputed there was no probable cause and no

13   warrant to support Officer Nunes' search.

14             The second question then becomes, What's the

15   appropriate remedy, if any, for this Fourth Amendment

16   violation?

17             Our contention is that it's suppression.  The

18   Government's view is that suppression should not be granted

19   as a remedy because of the good-faith exception.  And the

20   Government makes three good-faith arguments.

21             The first argument is that at the time that the

22   search was conducted, even if this was a nonroutine search

23   only reasonable suspicion was required and they believed

24   they proved at the hearing that Officer Nunes did have

25   reasonable suspicion.

*Oral Argument*         42

1       THE COURT:  I think they're arguing not -- a

2 little bit intentioned with what you just said -- I think

3 their argument, if I understand it, is not only reasonable

4 suspicion was required but that the officer, an officer,

5 someone in Officer Nunes' position could have reasonably

6 believed that only reasonable suspicion was required based

7 on case law as it existed at that point.

8       MR. YASTER:  That's the second argument.

9       The second argument is that if the second

10 argument, actually, that's phrased a little bit differently.

11 What I understood the Government to be saying was that even

12 if reasonable suspicion was not proved, an officer in

13 Officer Nunes' position at the time of the search could have

14 reasonably believed reasonable suspicion wasn't required

15 under binding appellate precedent.

16       And then, third, what the Government argues is

17 that even if there's no reasonable suspicion, a warrant was

18 obtained and the warrant effectively cures whatever

19 constitutional violation occurred at the airport.

20       All three of those good-faith arguments are wrong.

21 There was no reasonable suspicion established at the

22 hearing.  The binding appellate precedent, that is, the

23 precedent of the Supreme Court and the Second Circuit at the

24 time of this search did not authorize a suspicionless search

25 of a cell phone.  In fact, it pretty strongly indicated that

*Oral Argument*                                        43

1   reasonable suspicion would be required at least.

2              And then, third, although it's true that the

3   Government obtained a warrant, they knowingly misled the

4   magistrate judge about what occurred during Officer Nunes'

5   search.  That knowing or at least grossly negligent

6   misleading of the magistrate judge is basis for not applying

7   the good-faith exception.  And additionally, and this didn't

8   come up in the Court's colloquy with the Government, there

9   are strong indicators that what occurred here in the

10  Government's warrant application represents systemic

11  negligence by Homeland Security and by the Eastern District

12  United States Attorney's Office.

13             So I can take each of those issues, that is,

14  reasonable suspicion, binding appellate precedent, and then

15  the warrant one at a time.

16             THE COURT:  Sure.

17             MR. YASTER:  The reasonable suspicion requires

18  specific and articulable facts showing that criminality or,

19  in this case, possession of contraband is occurring or

20  likely occurring.  At the hearing, Officer Nunes testified

21  that the reason she conducted the search of Mr. Robinson's

22  devices was solely because of a T.E.C.S. report, that's it.

23             Before I get into the T.E.C.S. report, I want to

24  just take a moment to say that there were no other facts

25  introduced at this hearing that would otherwise support a

*Oral Argument*                                    44

1    manual search or, excuse me, that would otherwise support a

2    finding of reasonable suspicion.  For example, Officer Nunes

3    testified that she interviewed Mr. Robinson about his travel

4    and whereabouts.  She testified that Mr. Robinson answered

5    those questions freely and appeared to give truthful

6    answers.  Her testimony did not indicate that his answers

7    were suspicious in any way.

8            Second, Officer Nunes testified that she asked

9    Mr. Robinson for his electronic devices and for the

10   passcodes.  And the testimony that she gave was that

11   Mr. Robinson gave the devices and the passcodes.  He didn't

12   try to evade, he followed her instructions, there was

13   nothing about his conduct with respect to the electronic

14   devices that was suspicious.

15           Third, the number of electronic devices that

16   Mr. Robinson had was not inherently suspicious.  As your

17   Honor noted, having a laptop and a cell phone is not

18   inherently suspicious, that most travelers probably have two

19   devices like that, particularly, when they're traveling from

20   abroad.

21           Fourth, Officer Nunes testified that she knew that

22   Mr. Robinson had no criminal history.  Unlike other cases

23   where a T.E.C.S. report has been the basis for reasonable

24   suspicion.  Here, there was no prior convictions and,

25   particularly, no prior convictions on any kind of sex

*Oral Argument* 45

1  offenses.  So I believe that distinguishes this case from

2  <u>Kotterman</u>, the Ninth Circuit case that the Government cites.

3        And then, finally, there was no testimony that

4  Mr. Robinson's travel itinerary was suspicious.  The

5  testimony was that Mr. Robinson was arriving from Egypt.

6  There was no testimony that Egypt is a notorious spot for,

7  or notorious country, for sex offenders to visit.  There was

8  no testimony that the duration of his travel was at all

9  suspicious.  To the contrary, the hearing record shows that

10  there was nothing about Mr. Robinson's answers or conduct

11  before or during the secondary inspection to arouse

12  suspicion.  This all comes down to the T.E.C.S. report.

13        Now, the T.E.C.S. report is pretty limited.  The

14  T.E.C.S. report says that Mr. Robinson is linked to the

15  purchase of child sexual exploitation material via FinCen.

16  And then the T.E.C.S. report says, Refer to secondary and

17  perform an electronics exam.

18        Officer Simon testified that when people create

19  Lookouts, they're supposed to provide as much information as

20  they can about the reason for the Lookout.  And while he

21  testified that there might be a -- that there is a word

22  limit, that he couldn't remember how long it was, in his

23  experience, he had never, as a supervisor, told a

24  subordinate that he had to cut down on the amount of

25  information that the officer was providing.  CBP could have

*Oral Argument* 46

1  provided more information in the T.E.C.S. report about why

2  Mr. Robinson was being referred for a stop, it didn't.  And,

3  as a result, Officer Nunes testified that she actually

4  didn't know the specifics about why Mr. Robinson was the

5  subject of this Lookout.  When I asked her did you know what

6  investigation led to this Lookout, she said no.  In fact,

7  when I asked her, On the basis of this Lookout, did you

8  believe that Mr. Robinson might be in possession of child

9  pornography she said, and this is on Transcript Page 69

10  that, I personally believe, well, the Lookout is saying that

11  he was linked to the purchase of it.  So it's not

12  necessarily my belief, it's what, I guess, whoever put that

13  Lookout found.  But she doesn't know that reason.  That

14  reason was not provided to her.

15         And what's also important is that Officer Nunes

16  testified, both on direct and cross, that the reason she

17  performed the electronics exam was not because she had

18  formed a belief that Mr. Robinson was suspicious, she did it

19  because she had to.  She said that she had no discretion not

20  to perform this exam because of the Lookout.  And what she

21  said is, I had to perform the exam because, one, it was a

22  prime hit.  So Mr. Robinson was the person that the Lookout

23  was intended for.  And then, second, because it was from the

24  National Targeting Center.  That was it.  She never

25  testified that she personally thought Mr. Robinson was

*Oral Argument*                                                47

1  suspicious and the T.E.C.S. report did not give her any

2  specific and articulable facts to support a view that he was

3  suspicious.

4          Now, as far as the National Targeting Center goes.

5  It's true, Officer Nunes and Officer Simon testified

6  generally what the NTC is.  What they said is that it's a

7  part of CBP and it collects intelligence.  And that, as a

8  part of their training and experience, when an NTC Lookout

9  is recorded, they follow it.  But there is no specific

10  information provided about how NTC performs its

11  investigations.  About why NTC's intelligence is deemed

12  reliable.  Or why in their training and experience, they

13  have been told and learned to follow NTC instructions.

14          As Officer Simon said there's just a, quote,

15  "feeling" that these are reliable.  A feeling, I submit,

16  your Honor, is not specific and articulable.  It doesn't

17  satisfy the Government's burden to establish reasonable

18  suspicion.

19          THE COURT:  So let me ask you about the specific

20  fact that was in the T.E.C.S. hit which is an allegation or

21  a fact that your client was linked to the purchase of child

22  pornography or CSAM and an additional fact that it was via

23  FinCen.  So there was at least some information on the route

24  through which, if not the specific methodology through which

25  they've done it.  Why doesn't the Collective Knowledge

A284

*Oral Argument*                                                    48

1   Doctrine answer your concern?  I mean, why is this any

2   different than a BOLO that goes out on a radio run with an

3   officer or a 911 call, particularly, where they have -- it

4   maybe inaccurate just like certain allegations made to a

5   officer on the street may prove to be inaccurate or based on

6   unreliable information but it is a specific allegation about

7   the purchase so why is that not enough?

8            MR. YASTER:  So in the BOLO context, which I think

9   is true here for a remember Lookout as well.  A BOLO is not

10  sufficient to establish reasonable suspicion by itself.

11  There has to be specific and articulable facts that support

12  the underlying BOLO itself.  Those are never communicated to

13  Officer Nunes.  There was no testimony from Officer Nunes

14  that she knew that.  In fact, she said that she did not.

15           And just to go back to FinCen for a minute.

16  Officer Nunes' testimony about FinCen was not clear either.

17  When I asked her, Do you know what FinCen is and she says --

18  her answer was "vaguely."  And what she said was, I am aware

19  that they have something to do with travelers who are

20  bringing in large amounts of cash.  And the reason I know

21  that is there are FinCen forms that have be filled out.  But

22  that was the entirety of her knowledge.  She did not offer

23  any testimony that when she saw the FinCen designation, that

24  that meant that the investigation was more reliable, or that

25  she understood what kind of investigation that might

*Oral Argument* 49

1  represent.  The most she could offer was, as she said, a

2  vague familiarity with what FinCen is.

3        So what the hearing testimony establishes is that

4  there was a T.E.C.S. report from the NTC, that is all

5  officer Nunes knew.  We submit that is insufficient to

6  establish specific and articulable facts that would have

7  supported the reasonable suspicion necessary for this

8  nonroutine search.

9        I want to turn next to the second argument that

10  the Government makes about binding appellate precedent.

11        In it, in the Government's argument just now, it

12  conceded there was no appellate precedent, binding appellate

13  precedent, at the time of the search authorizing a

14  suspicionless examination of a cell phone at the border.  I

15  believe that ends the analysis.

16        The leading case here is <u>Aguiar</u>.  That's

17  A-g-u-i-a-r, which we presented to the Court's as supplement

18  authority.  <u>Aguiar</u> is the Second Circuit's best case

19  interpreting <u>Davis v. United States</u> which is where the

20  binding appellate precedent good-faith doctrine emerges

21  from.

22        And what <u>Aguiar</u> holds is that if the Government is

23  going to claim good-faith reliance on appellate precedent,

24  they have to come forward with precedent that is at least

25  sufficiently similar to the search or stop that occurred.

*Oral Argument*                                            50

1      The Government has conceded they do not have

2  sufficiently similar precedent from within the

3  Second Circuit and the Supreme Court.  The Government's

4  noted that this has arisen in other circuits and there might

5  be some, at the time of the search, there may have been some

6  agreements among circuit courts.  Respectfully, that is

7  irrelevant.  The Second Circuit couldn't have been clear in

8  Aguiar.  What matters is Supreme Court precedent and

9  Second Circuit precedent.

10      THE COURT:  So how do you get around the fact that

11  Judge Rakoff was well familiar the decision of the Circuit?

12  Was that issue not briefed before him?

13      MR. YASTER:  My best answer far that, your Honor,

14  is Smith presents a different issue than this.  Smith

15  presents an issue where Judge Rakoff found that there was

16  reasonable suspicion.  And my recollection of the good-faith

17  discussion was that given that there was reasonable

18  suspicion, that was enough for the officers to have

19  reasonably believed that the search was lawful.

20      In Smith Judge Rakoff took the extra step of

21  saying probable cause on a warrant was required.  But like

22  this court in Sultanov, found the good-faith exception

23  applied because reasonable suspicion had been demonstrated.

24      THE COURT:  All right.  Okay.

25      MR. YASTER:  So then the third argument is about

*Oral Argument*                                              51

1    the warrant.

2              The Court touched on the misrepresentations or

3    omissions that we allege Agent Stepian made in the warrant

4    application.  Just so we're on the same page, there's three.

5              The first is the omission of the T.E.C.S. hit and

6    claimed reasonable suspicion for the secondary inspection;

7              The second is the incomplete description of the

8    Government's border search authority, and;

9              Then, the third is the inclusion of a sentence

10   about Mr. Robinson's voluntarily providing the passcodes

11   which we maintain is misleading at best.

12             Agent Stepian testified at the hearing that, in

13   his experience, he's written about 15 to 20 search warrant

14   applications involving searches of cell phones.  And what he

15   told the Court was that this is generally how he writes

16   them.  He says that a border search was conducted and that

17   that the traveler or defendant voluntarily provided the

18   passcodes to the phones.

19             I think it's also notable, and I believe the Court

20   can take judicial notice of the fact that that seems to be

21   the exact way that the search warrant application was

22   written in <u>Sultanov</u>.  I haven't seen that application, so

23   the Court will know better than me.  But this appears to be

24   a recurring and systemic way that the Government,

25   specifically, Homeland Security Investigations and the U.S.

*Oral Argument*                                                52

1  Attorney's Office, is preparing warrant applications for

2  border searches of cell phones.

3              Now, the misstatements I have identified are

4  material.  I'm going to start with the incomplete

5  description of the Government's border search authority.

6              The Government suggested that by including a

7  footnote which says that the Government has broad plenary

8  powers to perform routine searches at the border, that it

9  was inviting the magistrate judge to do its own research.

10             Respectfully, I don't believe that's what this

11 footnote is doing.  This footnote is providing case law to a

12 magistrate judge in an ex parte proceeding and representing

13 to the judge what the Government's view of the law is.  And

14 magistrate judges, I believe, when they see this, take the

15 Government at its word that it is presenting the law

16 accurately.  I don't believe this was an invitation for

17 research.  I believe this was written exactly so the

18 magistrate judge would not do his or her own research.

19 Because a complete description of the Government's border

20 search authority would have been different than this.

21             What a complete statement of the Government's

22 border search authority would have said is that the

23 Government for so-called nonroutine searches must have at

24 least reasonable suspicion before it can conduct them.  And

25 it would say that whether a search is routine or nonroutine

*Oral Argument* 53

1  depends on the invasion of privacy.  Had that language been

2  included, I think that the magistrate judge actually might

3  have done some research to determine whether this was

4  routine or nonroutine and I think, pretty quickly, a

5  magistrate judge would have found their way to <u>Reilly v.</u>

6  <u>California</u> and the Supreme Court's decade-old discussion

7  about the massive invasion of privacy that occurs when law

8  enforcement searches, and particularly, performs a manual

9  search of a cell phone.

10  THE COURT:  I don't have it in front of me but

11  didn't the footnote in the affidavit that addressed <u>Levy</u>

12  essentially indicate, and even explicitly say, that there

13  are these two categories of searches, routine and

14  nonroutine.

15  MR. YASTER:  No, it did not.  I'll read the

16  sentence.  The sentence is:  The federal government has,

17  quote, "broad plenary powers to conduct so-called routine

18  searches at the border even without reasonable suspicion

19  that the prospective entrant has committed a crime," close

20  quote, they cite to <u>Levy</u>.  That is the entirety of the

21  Government's description of the law.

22  THE COURT:  And is it your position that by

23  saying, even without reasonable suspicion, they were

24  essentially telling the magistrate judge this is not a case

25  where we are claiming we have reasonable suspicion.  This

*Oral Argument*                                          54

1  was, essentially, a routine search.

2          MR. YASTER:  That is right.

3          What I understand this footnote, and I think a

4  reasonable magistrate judge would have understood this

5  footnote to mean, is the Government is representing this was

6  a routine search.  We didn't need reasonable suspicion,

7  that's why in this affidavit you're not going to see any

8  description of suspicion leading up to the search.  Instead,

9  the affidavit is written in the passive voice that a border

10 search was conducted without more.

11         THE COURT:  How do you reconcile your claim that

12 the agent did it in 15 to 20 cases with, I guess, a

13 countervailing argument that, well, if he's doing it in all

14 of these cases maybe he's poorly trained and told this is

15 the kind of standard boilerplate language we use because we

16 believe we have this authority.  If any judges have

17 questions about the individual circumstances in this

18 ex parte proceeding about the individual, they can ask us

19 about the individual but this is kind of all we need.

20 Doesn't this cut against your argument that they were

21 knowingly misleading the magistrate judge about this

22 particular individual because the T.E.C.S. hit was old,

23 because it was nonspecific, because it may not have been

24 particular facts.

25         MR. YASTER:  My response is, to prevail on my

*Oral Argument* 55

1   argument, I don't necessarily have to show that the omission

2   or the statement was made knowingly.  Gross negligence is

3   sufficient, particularly, systemic negligence is sufficient.

4   And what your Honor's just described about poor training,

5   that is systemic negligence.  That I believe is exactly what

6   Herring v. United States contemplated as a basis for the

7   good-faith exception not to apply.

8        Now, I want to move on to the inclusion of the

9   voluntary consent.  But before I do, I want to just respond

10  to something that the Government said in talking about the

11  warrant.  The Government said that it is not required to

12  provide every fact that is known to it in a warrant

13  application.  That's true, but the Government does have an

14  obligation, "to provide all potentially adverse information

15  to the reviewing judge."  That's from United States v.

16  Ganis, G-a-n-i-s, 824 F.3d at 221.

17       And furthermore, the Government has an obligation

18  to include information about whether evidence was obtained

19  illegally and in bad faith.  That's from Reilly,

20  R-e-i-l-l-y, 76 F.3d at 1281.  We cite both of those cases

21  in our reply brief.

22       So there are some rules that the Government had to

23  follow in drafting and submitting its application for this

24  search warrant.  And our submission is that by not

25  completely describing the law and not completely

*Oral Argument*                                              56

1   describing -- and, in fact, misdescribing what occurred in

2   this border search, failed its obligations under <u>Ganis</u> and

3   <u>Reilly</u>.

4           So turning to the voluntary consent.

5           The Government, in its argument, conceded that

6   consent for a border search is not necessary.  I think the

7   exact words are that permission is not necessary.  So the

8   question is:  If Mr. Robinson's supposed consensual

9   providing of his passcode is unnecessary, why is it in the

10  warrant?  What purpose is it serving?  The Government did

11  not give you a compelling answer.  And I think they couldn't

12  give a compelling answer because the reason it's there is

13  obvious.

14          The Government's Paragraph 7 of its affidavit says

15  a border search was conducted.  And then the next sentence

16  says:  During the search, Robinson veil voluntarily gave CBP

17  officers the password for the subject device.  The reason

18  that sentence is there is to suggest to the magistrate judge

19  that this search is defensible as a consent search.

20          So in the event that the magistrate were to accept

21  the Government's supposed invitation to do its own research

22  and find that actually this was a nonroutine search that

23  required reasonable suspicion, this sentence provides a

24  backstop for the magistrate judge to say, It's okay anyway

25  because he agreed to it.

*Oral Argument*                                    57

1        It's clear this statement about Mr. Robinson's

2   consent is misleading at best.  As the Government just

3   noted, his consent wasn't necessary because the Government

4   already had authority like in a search warrant to conduct

5   the search.  And it is well established that where

6   Mr. Robinson's consent is acquiescence to that authority, it

7   is not valid consent.  It's not treated as --

8        THE COURT:  They've agreed that they're not

9   arguing that he was either asked for or gave his consent.

10  They're just saying it was, you know, a search that they had

11  the authority to conduct.

12        So what's your answer to Mr. Rein's point that the

13  word "voluntary" is a word that is different than the word

14  "consent"?  And here, it might have been offered merely to

15  show that there was no overcoming of his will as, you know,

16  might be the case in a Miranda context or where we're

17  looking truly at voluntariness.

18        MR. YASTER:  His will and his consent is

19  irrelevant to understanding why the Government conducted

20  this search.  It serves no purpose other than to suggest to

21  the magistrate judge that there was an independent and

22  adequate basis for the search which was his consent.  I

23  understand the Government is not here taking the position

24  that this was a consent search, but the way this was written

25  suggested to the magistrate judge that it could have been.

*Oral Argument*                                    58

1        And this paragraph as written misrepresents why

2   Mr. Robinson gave his passcode.  It wasn't necessary and he

3   gave it in the course of a secondary inspection where he was

4   not free to leave, and where he was told his electronic

5   devices were being detained for examination; and he was

6   given the tear sheet, which was submitted into evidence as

7   Government Exhibit 102, stating that the federal government

8   had the authority to detain and to examine the device for as

9   long as it took.

10        If the Government wanted to include for whatever

11  reason that Robinson gave his password to the subject

12  device, I think a complete recitation of the facts was

13  required so that the magistrate judge was not misled into

14  believing that this was a potentially consensual search.

15  And had the Government represented what actually occurred

16  here, that is, a detention and examination of electronic

17  devices at a secondary inspection to which Mr. Robinson

18  could not refuse, the magistrate judge -- there would be no

19  chance that the magistrate judge would have been misled.

20        So then to the third point about the omission

21  about -- of the T.E.C.S. record and the reasons why

22  Mr. Robinson was stopped.  The inference that the Court

23  proposed in its colloquy with Mr. Rein, I think that's

24  right.  The Government has a strategic advantage by saying

25  we have the authority to conduct a suspicionless search and

*Oral Argument*                                                     59

1   a suspicionless search was therefore conducted.

2          The strategic advantage is a magistrate judge, if

3   they accept the premise that a suspicionless search can be

4   conducted, won't ask any follow-up questions.  But if the

5   Government does what it should have done and notified the

6   judge that nonroutine searches require reasonable suspicion

7   and say why Mr. Robinson was stopped, there is a real risk,

8   I think, that a magistrate judge might have demanded more

9   information about what this T.E.C.S. report is, what the

10  basis for it was, why Officer Nunes followed it.  Why the

11  Government didn't want to include that information, I'm not

12  sure other than they were less likely to get pushback or to

13  have to answer questions from a magistrate judge if they

14  said, We could do this without suspicion and that's how it

15  was done.

16         So those misstatements were material.  At a

17  minimum, they were made with gross negligence and I believe

18  it's a product of systemic negligence.  I would go so far as

19  to say that some of these omissions like this last omission

20  about the T.E.C.S. report actually rises to the level of

21  recklessness or knowledge.  Agent Stepian testified that he

22  knew by the time he wrote this warrant affidavit that

23  Mr. Robinson had been stopped because of the T.E.C.S.

24  report, and so, he knew that he was not including that

25  information when he signed off on this warrant application.

*Oral Argument*                                              60

1   If it's knowing, reckless, or grossly negligent, the

2   misstatements that we've identified defeat the Government's

3   attempt to save this from suppression on good-faith grounds.

4          Unless the Court has any other questions, I think

5   I'm prepared to rest on our papers and the Court should

6   grant the motion.

7          THE COURT:  So let me ask you about the kind of

8   ultimate balance in suppression here given the material that

9   was on his phone and given the contrast between what

10  Judge Garaufis and a number of other courts have talked

11  about with other kinds of contraband or other kinds of

12  evidence of a crime.

13         As Mr. Rein pointed to in <u>Fox</u> there is potentially

14  a world i which what the individual or individuals in that

15  case were bringing into the country was illegal, but it

16  seemed pretty clear from Judge Garaufis' opinion that it was

17  a search done with the purpose of investigating a domestic

18  crime.  Here, it seems as though both things are true.

19  These were not -- these were actual videos that had been

20  downloaded on to your client's phone, meaning, he actually

21  possessed them and he was physically bringing, even though

22  there are thousands of copies in the world, those videos, he

23  was bringing a copy in the country, possibly the same one he

24  took out with him.  And the material itself is quite

25  harmful.  It's illegal to possess, it's a serious crime, and

*Oral Argument* 61

1　there is a very heightened interest on the part of the

2　Government in identifying the persons who are bringing that

3　material in for any number of reasons.  To remove at least

4　one copy from one person's possession and potentially to use

5　that information to stop the flow in other ways.

6　　　　　So how do you address that given that ultimately

7　each court considering legal grounds to suppress needs to

8　address those facts?

9　　　　　MR. YASTER:  So I have two responses.

10　　　　　The first is that there is not a sliding scale for

11　the Fourth Amendment depending on the seriousness of the

12　crime.  The fact that Mr. Robinson may have been in

13　possession of contraband does not change whether a

14　constitutional violation occurred.  And, frankly, I don't

15　think it really weighs into the good-faith analysis either.

16　　　　　The second point I would make is, we acknowledge,

17　as courts have held, that suppression is strong medicine but

18　it's necessary medicine to deter law enforcement misconduct.

19　And here, notwithstanding the seriousness of the allegations

20　against Mr. Robinson, that strong medicine is appropriate.

21　　　　　As Agent Stepian testified, and as I believe this

22　court knows from <u>Sultanov</u>, what's happening at JFK Airport

23　with border cell phone searches is a recurring and systemic

24　problem.  Travelers 'constitutional rights are being

25　violated and in case after case, those constitutional

*Oral Argument*                                      62

1   violations are being washed through search warrant

2   applications that are misleading and recklessly or grossly

3   negligently incomplete.

4          The only way that in the Fourth Amendment context

5   this court can address that misconduct is to suppress and we

6   think the record here makes a strong enough demonstration of

7   the kind of systemic and recurring problem that that remedy

8   is warranted.

9          THE COURT:  Thank you.

10          Mr. Rein, let me give you a chance to respond.

11   Given that it's the defendant's motion, it's ultimately your

12   burden.  I would like to hear anything else you would like

13   to say in response.

14          MR. REIN:  Thank you, Judge.  Just briefly.

15          I think there's some confusion here.  There's been

16   a suggestion that the affidavit is misleading the Court,

17   magistrate judge, but, if anything, I think what I hear

18   defense counsel saying is that there is an effort to mislead

19   the magistrate judge about what the law was.  And I just

20   don't -- it cannot be right that a special agent with

21   Homeland Security is going to be importing his own knowledge

22   of the law in a warrant to a magistrate judge, and that a

23   magistrate judge -- the agent is expected to think that he's

24   supposed to place his own knowledge of the law over that of

25   a magistrate judge.

*Oral Argument* 63

1    THE COURT:  So why include any law like -- what

2  was the point of the <u>Levy</u> footnote if not to say, Judge,

3  this is state of the law.  I would be maybe more -- I would

4  understand your argument a little better if there was no law

5  in there at all and he literally recited just the facts.

6  But he dropped a footnote in which he purported to recite

7  what is required for a border search of a device.

8    MR. REIN:  I think that just because the agent was

9  thorough and explained what a border search was in a

10  footnote does not imply that he is somehow putting that in

11  with some nefarious reason with some attempt to try to trick

12  a magistrate judge.  There is nothing wrong about what that

13  footnote says, it states the law accurately.  And, if

14  anything, it shows that what we've been saying throughout

15  this hearing is that the agents had a good-faith belief that

16  what happened here was a routine search to provide context

17  for why the agents even had the defendant's phone in the

18  first place, how they came to possess it.  Which actually

19  leads me to another point I wanted to make.

20    Clearly, the judge who is reviewing this warrant

21  knows that a -- knows about <u>Reilly</u> and knows about that line

22  of cases because he's been asked to consider a warrant for a

23  phone in the first place.  And so, it's well known at this

24  point in 2022 even that phones are the subject of search

25  warrants.  And it's not -- there's no effort by the agent to

*Oral Argument* 64

1    mislead the Court about that.

2           To address the point about why not include

3    information about the T.E.C.S. report and counsel said that

4    it should have been included because it was adverse to the

5    Government's position.  I think the exact opposite is true.

6    If that had been included in the warrant, it might have just

7    supported even further the probable cause potentially for

8    the warrant.  The reason why it was not included is because

9    it's not necessary to include all the background about

10   investigation when making a warrant application.  And, as I

11   said before, the probable cause was evident from the face of

12   the warrant because CBP had searched the device and found

13   the images of child pornography.

14          In any event, what counsel said was that the

15   Government's supposed to include in warrant applications any

16   indication that there's been bad faith in the investigation

17   of the warrant.  But here, the argument we're making is the

18   exact opposite.  There was no bad faith, and so, there would

19   be no obligation to include any argument or include any

20   information about there being possibly bad faith.

21          THE COURT:  What would be the type of information

22   the Government would include in a different kind of case

23   that would -- whether you call it bad faith or something

24   else go under this affirmative obligation.

25          MR. REIN:  Certainly.

*Oral Argument*                                              65

1      There are situations where information is obtained

2  from either a confidential source or from a victim in a

3  crime and the agent knows that that person has a criminal

4  record or something like that.  And so, they inform the

5  judge that the judge knows the source of information could

6  be potentially compromised, obviously, I'm giving you a

7  hypothetical situation.  But that is a situation where the

8  Government has an affirmative obligation to inform the Court

9  of potential facts that are necessary to an ultimate

10  credibility determination.

11      Here, there is nothing to disclose.  There was no

12  bad faith.  The agents, for the reasons we've been talking

13  about this entire hearing, thought that what they were doing

14  was lawful, and so, there would be no reason for them to

15  include any information to the contrary that didn't exist.

16      THE COURT:  By them, you mean the person who

17  filled out warrant application.

18      MR. REIN:  Yes.

19      THE COURT:  That is, he believed that what the CBP

20  officers had done was lawful.

21      MR. REIN:  Exactly.  I think he actually testified

22  to that.  He was asked on, I think, either on direct or

23  redirect, Did you have any reason to think that the search

24  was unlawful?  He said, no, that he thought it was a lawful

25  search; and so, there would be nothing to disclose.

*Oral Argument*                                                  66

1    We talked about this issue, I know your Honor

2   asked me about this, the voluntary providing of a password.

3   Again, it just provides context.  The agent had said it was

4   a border search and it helps just to provide context as to

5   how the password came to be obtained.

6          THE COURT:  But what context for what?  Like, if a

7   border search was conducted and their position is, as you

8   said, that they didn't need it, why does it matter whether

9   he gave up the passcode voluntarily or he just broke into

10  the phone?  What's the context.  That's what -- I'm

11  having -- I'm not necessarily saying I don't credit your

12  contention that some facts are important for context and

13  others aren't necessary but what context was it providing

14  here?

15         MR. REIN:  I think it explains the story about how

16  the incident unfolded.  In the context of a search warrant,

17  it's impossible to include every single fact.  Obviously,

18  the agent also said that the defendant was coming from

19  Cairo, Egypt.  He obviously didn't say other things that the

20  defendant had said during the course of his discussions with

21  CBP.  It's impossible to include every single thing that

22  happens in an interaction with somebody when you're writing

23  a search warrant affidavit.  I don't think there is anything

24  in particular to be garnered from the fact that that fact is

25  included to the exclusion of others.  It's really impossible

*Oral Argument*                                    67

1  to include everything and I think that if you --

2        THE COURT:  Your argument isn't that it was not

3  possible to include the T.E.C.S. hit, just that it wasn't

4  necessary.

5        MR. REIN:  That's correct.  However, what I am

6  saying is that it's impossible.

7        THE COURT:  It wouldn't take much ink to say we

8  had a T.E.C.S. hit and here's what it says.

9        MR. REIN:  Obviously, it would be one sentence.

10 The argument I'm making is that it's not necessary and, in

11 fact, it is outside the practice of search warrant drafting

12 to include every single fact that might have led to the

13 recovery of an electronic device that is now the subject of

14 a search warrant.  It's just not part of the analysis that

15 is being conducted.  The analysis is, is there probable

16 cause now to issue the warrant?

17        And so, I have to push back strongly on the idea

18 that the of agent was somehow misleading in his affidavit

19 simply because he said that the password was given

20 voluntarily.  There also was some comments about the fact

21 that the defendant had been given the tear sheet and that

22 that somehow changed the dynamic of the interaction.

23        I think the fact that the agent gave -- the fact

24 that the officer gave the defendant truthful information

25 about what was happening and what the authority was and was

A304

*Oral Argument*                                           68

1   informative about it, it's difficult to understand how that

2   could that then be construed as meaning that they were

3   actually trying to mislead the defendant about whether or

4   not he had to give them his password whether or not they had

5   to do other things that they were asking of him.

6           I think that the overall point here is that what

7   we essentially heard is that the agent is supposed to be

8   somehow anticipating suppression arguments that could be

9   made well down the line and trying to counter all of those

10  in a search warrant affidavit.  That's kind of what I was

11  taking away from some of the points that were just made.

12  But that is not the -- that is not the point of a search

13  warrant affidavit.  The point is to establish probable

14  cause.  It's not to point out every single possible argument

15  that might be raised in suppression.  The agent does not

16  have to address every single issue.  In fact, in the search

17  warrant, the agent doesn't have to say that, you know, oh,

18  and to be clear, the person did not consent to do this

19  search.  I think it's obvious by the fact that they're

20  seeking a warrant in the first place, that there was consent

21  for the search.

22          And so --

23          THE COURT:  Don't they seek warrants often in

24  consent cases just to cover their bases and to ensure good

25  faith?  Applies to challenge a hearing about whether or not

*Oral Argument*                                                69

1    consent was valid.  I mean, think it's fairly common to go

2    seek a warrant after a consent search.

3            MR. REIN:  It's done out of an abundance of

4    caution.  I know the phrase is used a lot.  If the search is

5    consensual, consent in and of itself is an exception to the

6    Fourth Amendment's general crime of a warrant.  So there

7    would be no -- really there is no requirement that a warrant

8    be sought even if it is done as a prophylactic.

9            And then I think that actually goes to the point

10   I'm trying to make.  In the many cases there obviously was

11   no consent and the officer doesn't affirmatively say to the

12   magistrate, just so you know there was consent for this

13   search.  I think it's assumed, in fact, in cases where there

14   is consent and to the point I made to the Court, it is

15   affirmatively said that there was consent and we're seeking

16   this warrant out of an abundance of caution and that's not

17   what happened here.

18           THE COURT:  Before I let you go, I think one more

19   thing I wanted to ask of you.

20           What, if anything, am I to make of the testimony,

21   and unlike both of you, I haven't gone back and reread the

22   transcript so this is operating off my admittedly imperfect

23   memory that I think Officer Nunes testified to various

24   issues about whether a T.E.C.S. hit ever expires in her

25   system or doesn't expire, meaning, I think there were two

*Oral Argument*                                                    70

1   issues that the parties raised in your various examinations

2   of this witness.  One, and this goes to the general kind of

3   what is the scope of this authority and some of the larger

4   issues that come into play, as well as, I think, to the

5   reliability of the information that the Government's relying

6   on to lead to reasonable suspicion.

7          My recollection is that she testified, and the

8   transcript will speak for itself, of course, that when a

9   T.E.C.S. hit comes from the NTC, it never expires unless,

10  and the only way it comes out of the system, meaning, she'd

11  be relieved of her obligation to conduct an ESM search for

12  someone against whom there is a T.E.C.S. hit once she

13  confirms with a prime hit is if the hit has been quote,

14  unquote, "resolved" and I was a little unclear as to what

15  that meant.

16         So, again, the transcript will speak for itself.

17  But the point here each of you address how, if at all, and

18  it may not relevant to your arguments, the fact that this

19  could, for example, there could be, and let me know,

20  Mr. Rein, if you disagree.  I know you're not saying that

21  happened here, but in circumstances where the hit was

22  erroneous, it was the wrong person, or it was based on

23  information not proved reliable; or even a case where the

24  original hit was reliable, but the person's digital devices

25  were searched at the border, there was no contraband found.

*Oral Argument*                                         71

1  Would that hit get cleared and, in that case, would the

2  Government still have permission base on the original hit to

3  search their devices every single time, assuming reasonable

4  suspicion is required, every single time they passed over

5  the border.

6         So let me hear from both of you on those issues

7  and that very bungled question.  And by your faces, I trust

8  you get my gist.

9         MR. REIN:  I think I understand, Judge, and I know

10 you'll correct me if I'm wrong.

11        Obviously here, I think the officer testified that

12 she could tell that it had never been addressed before this

13 one, this T.E.C.S. hit.  In your hypothetical, you're asking

14 whether or not somebody could keep being searched?

15        THE COURT:  Yes.

16        I think she said that unless it's cleared somehow,

17 meaning, another agent might have done a search but she's

18 not sure unless they mark it as resolved, she could continue

19 to do the search.  Meaning, the hit stays in the system and

20 her understanding, I think, is that she would, whatever it

21 is, as long as it comes from the NTC not limited to CSAM,

22 she would be required to do an electronic media search each

23 time that traveler comes across the border.

24        MR. REIN:  I don't think that that necessarily

25 impacts the question here.  What I would say is that if the

*Oral Argument*                                    72

1    question is, would they still have reasonable suspicion to

2    do the search?  I think the answer is yes because even if

3    the facts supporting the suspicion are ultimately wrong the

4    question is, would an officer be able to objectively rely on

5    it and was it sufficiently particularized.

6           And, you know, in the context that your Honor gave

7    earlier which would be a radio call, gives a description of

8    somebody, and an officer stops somebody based upon that, if

9    the person really did meet the description, there was

10   reasonable suspicion to stop that person.  And if the result

11   of that stop ends up being some evidence of criminality, it

12   is not -- it's not suppressible simply because that person

13   wasn't the actual person who may have committed the crime as

14   long as there were objective and particularized reasons to

15   actually stop them.  So I don't think it impacts the

16   analysis here.

17          THE COURT:  Okay.  Mr. Yaster.

18          MR. YASTER:  The first thing I'll say is I believe

19   the Court's description is correct.  When a Prime Hit

20   Lookout is an entered, it is on the T.E.C.S. System until,

21   one, the person is encountered and then the, I think, the

22   secondary officer notes that the Lookout has been addressed.

23   And then, two, the record holder or record owner retracts

24   it.

25          In this case, it would have required -- this

*Oral Argument*                                    73

1  Lookout would have required, one, Officer Nunes who closed

2  it out and then NTC to have retracted it.  The importance of

3  the permanence of Prime Hit Lookouts, I think, goes to what

4  degree, if any, of reasonable suspicion they provide to a

5  secondary officer.

6         The testimony is, as I understand it, that a Prime

7  Hit Lookout can be 15 years old and when a secondary, I'm

8  sorry, when a primary and then a secondary inspection

9  officer sees it for a traveler, they have to act on it.  At

10 that point, in most cases, whatever information prompted,

11 and probably, that information isn't provided in the

12 T.E.C.S. report.  What information prompted it is probably

13 stale.  But based on the CBP training, the primary and

14 secondary inspection officers have essentially no discretion

15 to ignore it.  They have to follow it.  And what that speaks

16 to is that when secondary officers are following Lookouts,

17 it's not because they have personal, reasonable suspicion

18 about the traveler.  They're following their training which

19 is when you get a Lookout, particularly a Prime Hit Lookout

20 and really particularly a Prime Hit Lookout from NTC you

21 have to follow it.

22         THE COURT:  So the testimony in your view about

23 what they personally believed or their feelings about NTC

24 are relevant because the policy says they have to do the

25 search anyway.

*Oral Argument*                                     74

1        MR. YASTER:  That was my understanding of

2   Officer Nunes' testimony.

3        THE COURT:  I'll go back and take a look.

4        One last quick thing.

5        There was some testimony at the end of

6   Officer Stepian's, I think it was cross or re-cross, about

7   his interview of Mr. Robinson at Mr. Robinson's home in

8   which there is -- and I always appreciate it when this is

9   available because it saves a lot of speculation and

10  guesswork about what happened -- a transcript that he made

11  or the Government made of a recording of the interview in

12  which Mr. Robinson asked, you know, essentially, in sum and

13  substance, why was I singled out for the search, I've always

14  been wondering why that happened.  And the agent told him it

15  was routine luck of the draw.  And then in response to

16  questions from Mr. Yaster, acknowledge that that was not

17  true.  He knew it was not true, it was not a routine or

18  random search.  It was, in fact, targeted to the him because

19  of the T.E.C.S. hit.

20       And he explained that the reason he said that it

21  Mr. Robinson was he, as a law enforcement matter, did not

22  want to disclose the routes through which a person suspected

23  of purchasing or possessing CSAM were discovered.  I didn't

24  understand the defense's position to be that that would be

25  in any way inappropriate.

Oral Argument                                        75

1          But I would like both parties to address how his

2     admission that it was not true when he said to Mr. Robinson

3     that it was a routine search or a random search makes the

4     affidavit any more or less suspect in light of the fact that

5     he told the magistrate judge that it was a routine border

6     search in sum and substance.

7          MR. REIN:  Judge, to address that, I think that

8     we're talk talking about two different things here.  A

9     routine border search has been given a legal definition.

10         THE COURT:  Not a routine search but a search that

11    not based on an individualized suspicion.  He told

12    Mr. Robinson you were selected randomly, that this was not

13    -- you were not targeted for any particular reason and he

14    didn't affirmatively state that to the magistrate judge but

15    he did write an affidavit in which he omitted any

16    information about the individualized suspicion.

17    Essentially, giving the impression that it was based simply

18    on the plenary powers and random.

19         So tell me if you think I'm overreading that in

20    the affidavit or there's some other reason why, I mean,

21    essentially, the argument I understand the defense to be

22    making is if it was a lie to Mr. Robinson, it's a lie to the

23    magistrate judge.  Whether it's a lie by omission or a lie

24    by comission, the facts are the same.

25         MR. REIN:  That argument is without basis because

*Oral Argument*                                        76

1   there's a big difference between lying to a federal judge in

2   a sworn document and lying to a suspect when you are trying

3   to debrief them as part --

4           THE COURT:  You are permitted to do one and not

5   the other.  So I think the question is, why is the substance

6   of the statement any more true when it's made to the

7   magistrate judge than when it's made to Mr. Robinson?

8           Whether he's permitted to do it in one context or

9   another is a different question.  Why is what he said to

10  Mr. Robinson not true and what he said to Judge Cho true?

11          MR. REIN:  So, yes, the agent never said in the

12  affidavit to Judge Cho affirmatively that this was a random

13  search.  Those words never appear in the affidavit.

14          And, again, I think that when you look at what

15  your Honor just said about the fact that you can mislead,

16  you can play on the ignorances of a defendant when you're

17  talking to them of in the context of a custodial interview,

18  that just has no impact on information that is provided in a

19  formalized setting before a federal court in a legal

20  application.

21          THE COURT:  Right.

22          You maybe misunderstanding my question.  So I

23  think that the question that I have is not:  Did he do

24  anything wrong by telling Mr. Robinson something that wasn't

25  true?  He didn't -- he just -- the legal authority to tell a

*Oral Argument*                                                77

1  suspect whatever he would like in the context of that

2  interview within reasonable, but certainly, in this context.

3        My question is if he's acknowledged as a factual

4  matter that what he told Mr. Robinson was not true, given

5  that he has a different obligation of candor towards

6  Judge Cho, why are the facts any less true or any more

7  interest true when he sent them to Judge Cho, that's my

8  question.

9        MR. REIN:  Again, for the reasons we said before,

10  it is not required that every single bit of context be

11  included in an affidavit.  And also, here, the defendant

12  specifically asked him why was he searched and the agent

13  gave a response to that.  That just wasn't the -- it's a

14  different posture when you're applying far a search warrant.

15  It's not necessary to explain why the defendant might have

16  been searched or why he might have been stopped and

17  subjected to a border search.

18        THE COURT:  Thank you.  Anything further from the

19  defense?

20        MR. YASTER:  No.  Except what I will say is in the

21  Court's questioning, that's exactly the point we were making

22  in our cross so I think the Court understands.

23        THE COURT:  Okay.  All right.  Thank you.  I will

24  take the motion under advisement and let you know if I need

25  anything further from you.  But, at this point, I believe I

*Oral Argument*                                    78

1   have thorough briefing and argument and a factual record

2   from both sides.

3           Thank you all very much.  We're adjourned.

4           Should we exclude time?  I think we need to take

5   care of that for now.  Given my trial schedule, let me

6   exclude time for 90 days and I may be able to get a decision

7   before then.  But given some of the legal issues raised and

8   the factual record, I may need that much.  So I will have

9   the minute entry reflect the date that comes to.  But I will

10  exclude time in light of the pending motion in the interest

11  of justice for the next the 90 days.

12          All right.  Thank you all.

13          MR. REIN:  Thank you.

14          MR. YASTER:  Thank you.

15          (WHEREUPON, this matter was concluded.)

16                      *   *   *

17          CERTIFICATE OF REPORTER

18

I certify that the foregoing is a correct transcript of the
19  record of proceedings in the above-entitled matter.

20

21  *Anthony D. Frisolone*

22  _____
    Anthony D. Frisolone, FAPR, RDR, CRR, CRI
23  Official Court Reporter

24

25

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NJM:GMR
F. #2023R00004

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 19, 2025

By ECF

The Honorable Nina R. Morrison
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:     United States v. Jason Robinson
>         Criminal Docket No. 23-192 (NRM)

Dear Judge Morrison:

The government respectfully submits this letter to direct the Court to relevant authority related to the issues raised during the suppression hearing in this matter and to further respond to arguments advanced during the hearing. As the Court is aware, among other issues raised, the defendant challenges the application of the good faith exception to the Fourth Amendment's warrant requirement on the grounds that the magistrate judge who authorized the search challenged in this case was knowingly or recklessly misled. There is no credible evidence to support these allegations.

Here, in pertinent part, the defendant alleges that the warrant application intentionally or recklessly misled the magistrate judge by omitting the reason the defendant was selected for a border search in November 2022. He suggests that if this information—his link to the purchase of child sexual exploitation material ("CSAM")—was included in the application, it may have caused the magistrate judge to question the affiant about the validity of the underlying border search. The argument suggests that omission of this (inculpatory) background was designed to prevent the magistrate judge from "asking questions" about the basis for the border search. This line of inquiry assumes that the magistrate judge—who was tasked with determining whether there was probable cause to issue the requested warrant—would have also engaged in the in-depth suppression analysis now before this Court.

At the outset, the government vehemently rejects the defendant's implication that Homeland Security Investigations ("HSI") and the United States Attorney's Office have engaged in a systematic practice of knowingly or recklessly misleading magistrate judges in the context of border searches and warrant applications. This is a serious allegation to be raised only based on sound evidence. However, the defendant comes forward with no evidence and relies on the fact

that the government espoused in search warrant applications an interpretation of the law governing its border search authority that differs from what this Court subsequently (and non-precedentially) articulated. The defendant's accusation that the government is acting in bad faith should be rejected out of hand.

The good faith exception to the Fourth Amendment's warrant requirement serves to prevent the exclusion of illegally obtained evidence when law enforcement relied in good faith on a search warrant issued by a neutral magistrate. *See United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015). However, the exception does not apply when the magistrate has been "knowingly misled" or where a law enforcement officer was "reckless or grossly negligent in seeking . . . a warrant." *Id.* (internal quotation marks and citations omitted).

The good faith exception does not apply "where the affiant knew certain facts that would *undermine* probable cause yet failed to provide these facts to the magistrate judge." *United States v. Falso*, 544 F.3d 110, 128 (2d Cir. 2008) (quoting *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996)) (emphasis added). Similarly, the exception "does not protect searches by officers who fail to provide all potentially adverse information to the issuing judge," including information relevant to the legality of a prior search. *Reilly*, 76 F.3d at 1280. However, such a finding must be based on evidence—not "conjecture—that the government failed to disclose additional information in its possession that might tend to exculpate [the defendant] or otherwise negate the existence of probable cause." *Id.* "[W]here an affiant's misstatements are attributable to mere 'negligence or innocent mistake,' suppression is not required." *See United States v. Lauria*, 70 F.4th 106, 121 (2d Cir. 2023) (quoting *United States v. Lambus*, 897 F.3d 368, 399 (2d Cir. 2018)).

In *Raymonda*, also a case involving the possession of child pornography, the Second Circuit reversed the district court's order suppressing physical evidence obtained through a search warrant. 780 F.3d at 109. There, the district court found that the warrant application was "grossly negligent," preventing the application of the good faith exception. *Id.* at 118. This finding was based in part on the district court's determination that the warrant affiant "significantly exaggerated the credible import" of certain evidence and "baselessly claimed that the suspect was involved in the 'distribution' of child pornography." *Id.* The court also noted that the application "omitted the critical fact" that images of child pornography were all accessed over the span of only seventeen seconds which may have undermined probable cause for the warrant. *Id.* In reversing the district court, the Second Circuit explained that it was improper to find the affiant "grossly negligent" for failing to anticipate later work done by the defendant's expert which uncovered information not included in the warrant affidavit which may have undermined the probable cause determination. *Id.* at 120.

Here, as the hearing testimony demonstrated, the defendant was selected for a secondary inspection because Customs and Border Protection previously linked him to the purchase of CSAM and sought to examine his electronic devices. Although not included in the warrant application, this information was unnecessary to support a finding of probable cause for the warrant's issuance. Therefore, it cannot be said that failing to include it in the warrant affidavit served to undermine the magistrate judge's probable cause determination. *See Falso*, 544 F.3d at 128 (explaining that a material omission, if disclosed, would be one which would

2

tend to undermine the probable cause analysis). If anything, had the reason for the border search been included, it would have bolstered that determination.

Although in certain instances failing to inform a magistrate judge about the reason for an underlying search may constitute a material omission, invaliding the good faith exception, *see Reilly*, 76 F.3d at 1280, that is not true in the instant case. Here, the parameters of the border search doctrine, a historically broad exception to the Fourth Amendment's warrant requirement are at issue. As made plain during briefing and oral argument in this case, and as this Court recognized in *United States v. Sultanov*, 742 F. Supp. 3d 258, 290 (E.D.N.Y. 2024), there continues to be genuine disagreement about whether a manual search of a cell phone at the border is a "routine" search requiring no suspicion at all or a "non-routine" search requiring at least reasonable suspicion. The law was objectively unsettled in this area at the time of the search of the defendant's phone in 2022 and remains unsettled today. Many of the district court cases relied on by both parties which touch upon this issue and the distinction between routine and non-routine searches in the context of cell phones at the border were not yet decided in November 2022.[1]

In light of the reality that many of the relevant judicial opinions in this area came after the search in question, defendant's argument fails for two reasons. *First*, it is unreasonable to suggest that the warrant affiant—a special agent with HSI—would have had a firm enough grasp of the nuances of the applicable law that he purposefully and nefariously omitted facts to mislead the magistrate judge. As the government stated at oral argument, it is of the position that a manual search of a cell phone is a routine search and can be conducted without suspicion. The statements in the warrant application are in line with that position and the magistrate judge could hardly have been misled by them.[2] Moreover, the argument assumes a level of sophisticated analysis in assessing the alleged import of the *inculpatory* background material which is incongruent with the affiant's background.[3] Put differently—like most people, the HSI agent

_____

[1]    These cases include, among others, *United States v. Smith*, 673 F.Supp.3d 381 (S.D.N.Y. 2023), *United States v. Alisigwe*, No. 22-CR-425 (VEC), 2023 WL 8275923 (S.D.N.Y. Nov. 30, 2023), and United *States v. Gavino*, No. 22-CR-136 (RPK), 2024 WL 85072 (E.D.N.Y. Jan. 7, 2024).

[2]    The warrant affidavit notes that under *United States v. Levy*, a routine search can be conducted at the border without any level of suspicion. Including this truthful statement of the law in the affidavit could hardly have misled the magistrate judge who knew the application sought permission to search a cell phone previously searched at the border. If the magistrate judge believed that all searches of cell phones were "non-routine," the judge would have seen that this language did not apply on its face. If the magistrate judge agreed with defendant's argument that a manual scrolling of a cell phone at the border required reasonable suspicion—an issue about which there is disagreement and which has yet to be decided by either the Second Circuit or the Supreme Court—nothing prevented him from inquiring as to whether such suspicion existed or from denying the application if he believed the applicable standard was not met.

[3]    To believe that the application would somehow benefit from the omission of the basis for the search, rather than simply believing that he was streamlining the affidavit, the

who swore out the search warrant would likely have believed (as does the government today) that including the fact that the defendant had previously been linked to the purchase of CSAM would have made a magistrate judge more likely, not less likely, to sign the search warrant. Its omission can be explained because probable cause was firmly established when the affidavit described the CSAM that was in fact viewed on the cell phone.[4]

      *Second*, the defendant's argument implies that the magistrate judge—a judicial officer tasked with interpreting the law—substituted the agent's legal determinations for his own. This position unjustifiably places too little faith in the magistrate judge to make the legal determinations required by his position. Further, he was being asked to consider the search of a cell phone at the border. Neither statements in the application nor alleged omissions prevented him from inquiring further regarding the reason for the search if he deemed it necessary to do so.

      As described above, in *Raymonda*, the Second Circuit held that a warrant affiant could not fairly be said to have been "grossly negligent" when later work done by a defense expert undermined the probable cause for a search warrant. 780 F.3d at 120. The Court remarked that "[w]hile a conscientious investigator might have taken the initiative to" conduct a more precise analysis of data before applying for a warrant, it could not find the warrant affiant to be "'grossly negligent' for failing to anticipate the work of . . . [the defendant's] expert witness." *Id.* In the instant matter, the defendant suggests that the warrant affiant, Agent Richard Stepien, was either intentionally misleading or grossly negligent in failing to inform the magistrate judge that the defendant was stopped because he was suspected of possessing CSAM. However, the same rationale regarding the anticipation of later developments employed by the *Raymonda* Court applies. Agent Stepien cannot be said to be intentionally misleading or grossly negligent for relying on a good faith belief about what the law permitted or for failing to

---

affiant would have to (1) assess that the standard CBP procedure of conducting manual warrantless review of cell phones at secondary was unconstitutional (which the government does not concede today—much less in 2022—in light of substantial authority that searches at the border that would otherwise require a warrant do not require one because the government needs to be able to regulate import into (and export from) the nation), and also (2) believe that a random manual search was somehow preferable to a targeted manual search for constitutional purposes, although the defendant has pointed to no basis to conclude that the affiant had that eccentric and perhaps erroneous legal belief.

[4]    The defendant does not explain why, in a contrafactual world in which the affiant harbored genuine concern about the validity of the border search he described and sought to mislead the magistrate judge, he rested probable cause entirely upon the search the validity of which he doubted, rather than including the earlier material to better position the affidavit to weather a challenge to the material obtained through the border search.

anticipate developments in the law occurring after his warrant application. There is no basis in the record to find otherwise.

Respectfully submitted,

JOHN J. DURHAM
United States Attorney

By:    /s/Gilbert M. Rein
Gilbert M. Rein
Assistant U.S. Attorney
(718) 254-6407

cc:    Clerk of the Court (NRM) (by Email and ECF)
Benjamin Yaster, Esq., Defense Counsel (by Email and ECF)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA

                                               MEMORANDUM AND ORDER
                                               23-CR-192 (NRM)

                    -against-

JASON ROBINSON,

                Defendant.

----------------------------------------------------------------x

NINA R. MORRISON, United States District Judge:

      Pending before the Court is Defendant Jason Robinson's motion to suppress

evidence obtained by the government (1) during Robinson's detention and manual

search of his iPhone at JFK Airport (2) thereafter through a warrant issued for a

forensic search of the same cell phone.  The Court has considered the parties' written

briefs, the testimony given and exhibits entered at the suppression hearing held on

January 8, 2025, the parties' statements from oral argument held on January 15,

2025, and all other letters and briefs submitted to the Court.  For the reasons outlined

below, Robinson's motion is GRANTED.

## <u>OVERVIEW</u>

      On November 14, 2022, Jason Robinson, a resident of Pennsylvania and a

United States citizen, returned from a vacation in Egypt with his spouse.  At customs,

he was detained at secondary inspection at John F. Kennedy International Airport

("JFK"), and directed to hand over and provide the passwords to his electronic devices.

A Customs and Border Patrol ("CBP") agent manually searched his cell phone and

found evidence of child pornography. Relying on that information, a Special Agent from Homeland Security Investigations ("HSI") seized all of Robinson's devices and thereafter applied for a warrant to conduct a forensic search of Robinson's phone. After additional pictures and videos depicting child pornography were found as a result of the forensic search, Robinson was indicted on one count of Transportation of Child Pornography, in violation of 18 U.S.C. § 2252(a)(1), and one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).

Robinson now seeks to suppress the contents of his cell phone. In support of his motion to suppress the physical evidence, Robinson argues that the Fourth Amendment requires the search of a cellular device at the border to be supported by a warrant and probable cause — neither of which was present here. This Court agrees. Although the Second Circuit has yet to address this issue, the Court has previously considered it in *United States v. Sultanov*, 742 F. Supp. 3d 258 (E.D.N.Y. 2024), where it determined that the search of a cellular device at the border must indeed be supported by a warrant and probable cause.

Additionally, the Court does not find that the search of Robinson's phone at JFK, or the subsequent forensic search pursuant to a warrant, are covered by the good faith exception to the exclusionary rule. As detailed below, this is chiefly because (1) the limited information that led CBP to search Robinson's cell phone at JFK airport did not provide reasonable suspicion that he possessed contraband on his device at the time of the search, and (2) the Special Agent who prepared the subsequent warrant application misled the magistrate judge about the actual

circumstances that led to the airport search, intentionally omitting the one and only item of specific information known to CPB that led Robinson to be targeted for secondary screening and a device search in the first place. Thus, because the warrantless searches of Robinson's phone violated the Fourth Amendment and are not covered by any exceptions to the warrant requirement or the exclusionary rule, Robinson's motion to suppress the contents of his cell phone is GRANTED.

## FACTS AND PROCEDURAL HISTORY

The Court makes the following findings of fact based on the testimony and evidence presented at a suppression hearing held in this case and in exhibits offered by both parties.

### I.  Background Facts

#### A.  Initial Search of Robinson's Phone

On November 14, 2022, Jason Robinson arrived at JFK Airport aboard a British Airways flight from London, United Kingdom, which originated in Cairo, Egypt. *See* Warrant Aff., Def. Mot. to Suppress Ex. C, ECF 25-5 ¶ 7. Robinson was traveling with his spouse, and returning from his first trip ever outside of the country. *See* Transcript of January 8, 2025 Suppression Hearing ("Hr'g Tr.") at 52. As Robinson went through customs, he was asked routine questions about his identity and travel itinerary by an officer. *See* Robinson Decl., Def. Mot. to Suppress Ex. A, ECF 25-3 at 1. The officer then brought Robinson, without his spouse, to a separate room where he was called to a counter and asked questions by a different, female officer. *Id.* at 1–3. He was asked by that officer what electronic devices he was

carrying, and he produced his iPhone, a laptop, and a Nintendo Switch gaming device. *Id.* at 2.

That second officer was Customs and Border Patrol ("CBP") Officer Shahamin Nunes. *See* Hr'g Tr. at 20–21, 41. On November 14, 2022, Officer Nunes was assigned as a secondary officer at JFK Terminal 7. *See id.* at 22. A secondary officer conducts a "secondary inspection," which occurs after the initial officer, to whom an individual presents their passport, refers a passenger to "a special room" where the secondary inspection is conducted. *Id.* at 23. Officer Nunes confirmed that Robinson's spouse was not allowed in the room for the secondary inspection. *Id.* at 47–48.

The secondary room to which Robinson was directed consists of around 40 to 50 chairs which all face a long bench where the secondary officers sit. *Id.* at 27. The room is approximately 50 or 40 feet by 40 or 30 feet. *Id.* Although the doors to the room remain open, Officer Nunes confirmed that Robinson was not free to "leave until [his] inspection[] [was] over." *Id.* at 86.

The primary officer referred Robinson to secondary inspection because the information presented was considered a "mandatory referral." *Id.* at 46. This information was in the form of a "TECS lookout."[1] *See* TECS Report, Gov't Hr'g Ex. 101. The TECS report, which Officer Nunes reviewed before speaking to Robinson, read: "Subj linked to the purchase of child sexual exploitation material via FinCen. Refer to secondary for interview & media device exam to include cell phones and

---

[1] The government indicates that TECS is not an acronym but rather is the "name for a system formerly known as the Treasury Enforcement Communications System." Gov't Opp., ECF 27 at 8 n.2.

laptops." *Id.* at 2; Hr'g Tr. at 45–47. This TECS lookout for Robinson was entered on November 11, 2019 — three years before Robinson's arrival at JFK. *Id.* at 1; Hr'g Tr. at 50.

Officer Nunes then called Robinson up and asked him a few preliminary questions. He answered her questions fully and told her that he was traveling from Egypt with his spouse. Hr'g Tr. at 47. All of Robinson's answers to these preliminary questions, such as whether he had any friends or family in Egypt, the purpose of the travel, and what he did for work, "matched" what Officer Nunes had in her system and, insofar as she was aware, appeared to be truthful. *Id.* at 80–82.

Officer Nunes then gave Robinson a "tear sheet" which "explain[ed] CBP's authority to search electronic devices." *Id.* at 53–54; *see also* Tear Sheet, Gov't Hr'g Ex. 102. She told him that CBP had the authority to conduct an exam. Hr'g Tr. at 52. She then directed him to provide her with the passwords to his phone and other electronic devices. *Id.* at 54. He provided them, and she wrote them down on a sticky note. *See id.* at 56.

Officer Nunes testified that if Robinson had refused to give her the devices or the passwords to them, she would have had "to contact [her] supervisor and see how they would want to proceed." *Id.* at 55–56, 79. However, in the approximately 50 electronic device searches that she has conducted, she has never once had a passenger refuse to hand over their devices. *Id.*

Officer Nunes then put Robinson's laptop in airplane mode, so it would not connect to the internet, and searched it for evidence of child sexual exploitation/abuse

material ("CSEM" or "CSAM").  *Id.* at 59.  Robinson stayed seated in front of her at her desk as she performed a roughly thirty-minute search of his laptop, but found no evidence of CSAM.  *See id.* at 60–61.

After that, she proceeded to search Robinson's iPhone.  *Id.* at 61.  After roughly 15 minutes of searching applications on Robinson's phone, Officer Nunes viewed videos and photographs that appeared to be depictions of CSAM in a folder called "My Favorites."  *Id.* at 62–63.  At that point, Officer Nunes alerted Homeland Security Investigations ("HSI").  *Id.* at 64.

About an hour later, HSI agent Allen Anstee arrived, and he took the devices into a separate room.  *Id.* at 65–66.  Agent Anstee conducted a brief review of Robinson's iPhone, and also observed CSAM.  Gov't Opp. at 9–10.  Agent Anstee then called Robinson into the interview room, where Anstee interviewed Robinson.  *Id.* at 10.  Robinson was not arrested that night and was allowed to leave the airport.  Hr'g Tr. at 66.  However, HSI retained possession of his electronic devices.  *Id.*

### B.    Search Warrant

That same day, Agent Anstee called HSI Agent Richard Stepien.  *Id.* at 136–37.  Agent Anstee relayed to Agent Stepien that he had identified CSAM on Robinson's phone after a manual search of the phone at JFK airport.  *Id.* at 137.  Agent Stepien also reviewed the reports from the CBP Officers involved in the initial search.  *Id.*  Agent Stepien knew, from those reports, that Robinson had specifically been referred to secondary inspection because of a TECS report.  *Id.* at 146.

One week later, on November 21, 2022, Agent Stepien applied for a warrant to search Robinson's seized phone. *Id.* at 138–39; Warrant Aff. at 12. Although HSI had already identified CSAM on the phone, Agent Stepien testified that he applied for a warrant to search that same device "out of an abundance of caution because we were hoping to do a more thorough examination of the phone that is not as easily done manually." *Id.* at 138.

In the warrant application, Stepien described the circumstances that led to the seizure of Robinson's phone as follows:

> [] On November 14, 2022, ROBINSON landed at John F. Kennedy International Airport ("JFK Airport"), traveling from Cairo, Egypt, via British Airways flight BA 115 arriving from London, United Kingdom. He was stopped by United States Customs and Border Protection ("CBP") at JFK Airport for secondary inspection. A border search was conducted. During the search, ROBINSON voluntarily gave CBP officers the password for the Subject Device. Upon manually reviewing the Subject Device, CBP officers identified that there was child sexual abuse material on the subject device.
>
> [] At the border, a law enforcement agent with HSI conducted a preliminary review of the Subject Device and confirmed that it contained at least five photos containing child sex abuse material.

Warrant Aff. ¶¶ 7–8.

After the sentence "[a] border search was conducted," Agent Stepien added a footnote that read: "The federal government has 'broad plenary powers to conduct so-called "routine" searches at the border even without "reasonable suspicion that the prospective entrant has committed a crime."'" *Id.* at 3 n.1 (quoting *United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015)). Agent Stepien also indicated that following the initial search by CBP, an HSI agent reviewed the phone and confirmed that it

contained "at least five photos containing child sex abuse material." *Id.* ¶ 8.
Magistrate Judge Cho granted the application and signed the warrant that same day.
*Id.* at 12.

### C.    The Subsequent Searches and Interview

Following the issuance of the warrant, Agent Stepien conducted a forensic
examination of the phone, revealing 235 images that were classified as CSAM.  Hr'g
Tr. at 141.  The examination also revealed 457 videos classified as CSAM.  *Id.*

On January 17, 2023, Agent Stepien applied for a warrant to search the
remaining devices they had seized from Robinson, including a laptop, a USB thumb
drive, and a memory card.  Gov't Opp. at 12.  Agent Stepien based the probable cause
determination in that warrant application on the photos and videos that had been
recovered from Robinson's phone.  *Id.*  That warrant was also authorized, and the
search of Robinson's remaining devices revealed 21 images and four videos containing
CSAM.  *Id.*

On May 1, 2023, a Grand Jury returned an indictment charging Robinson with
the Transportation of Child Pornography, in violation of 18 U.S.C. § 2252(a)(1), and
Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  *See*
Indictment, ECF No. 1.  On May 16, 2023, Agent Stepien arrested Robinson.  *See* Hr'g
Tr. at 147.  Robinson agreed to speak with investigators after being advised of his
*Miranda* rights, acknowledging that CSAM was present on his phone.  Gov't Opp. at
12–13.

## II.    Procedural History

On July 10, 2024, Robinson filed the instant motion to suppress.  *See* Robinson Br., ECF No. 25 at 1.  Specifically, he asserted that the initial search and seizure of his phone at JFK airport by CBP and subsequently by HSI violated his Fourth Amendment rights, as the border-search exception to the warrant requirement does not permit the warrantless search of a traveler's cell phone; that the officers lacked not only probable cause, but even reasonable suspicion to believe that he was traveling in possession of contraband.  *Id.* at 9–17.  He also argued that any statements made to Agent Anstee on the day of the search should be suppressed under the Fifth Amendment, arguing that he was in custody by the time the interview was conducted and that he was not advised of his *Miranda* rights.  *Id.* at 17–21. Lastly, he claimed that the government had unreasonably delayed its application for a warrant to search the laptop, SD card, and thumb drive despite seizing those devices nine weeks earlier, was unreasonable, and that the evidence obtained from those searches should therefore be suppressed as well.  *Id.* at 22–24.

Regarding the search of Robinson's iPhone, the government argued that the warrantless search at JFK Airport was covered by the border search exception, permitting CBP to conduct a device search without any individualized suspicion at all.  Gov't Opp. at 14–21.  It then contended, alternatively, that even if a border search of a traveler's cell phone requires reasonable suspicion, the November 2019 TECS report in this case provided the requisite reasonable suspicion.  *Id.* at 21–23.  Last, the government argued that even if probable cause and a warrant are required, the

fruits of the search should not be suppressed because the officers conducting it were covered by the good faith exception to the exclusionary rule. In the government's view, the good faith exception applies because (1) the initial search was done in reliance on Second Circuit and Supreme Court precedent that authorizes a search of traveler's phone as "routine"; (2) alternatively, even a "nonroutine" search need only be supported by reasonable suspicion, which the CBP officer had in this case; and (3) because the subsequent forensic search was done in reasonable reliance on Judge Cho's warrant. *Id.* at 23–27.

The Court scheduled an evidentiary hearing to take place on January 8, 2025. *See* Order dated on Nov. 12, 2024. On December 27, 2024, the government filed a letter with the Court, narrowing the claims at issue and arguing that a hearing was unnecessary. *See* Gov't Letter Dated Dec. 27, 2024, ECF No. 38 (Gov't 12/27/2024 Ltr.). First, the government proffered that it will not seek to admit at trial any of the evidence recovered from any of Robinson's devices besides his iPhone. *Id.* at 1. The government also stated that it did not intend to offer any of Robinson's statements made to Agent Anstee on November 14, 2022. *Id.* at 2 n.1. The government then argued that all of the remaining issues were legal, not factual, and therefore an evidentiary hearing was unnecessary. *Id.* at 2–3.

The Court denied the government's request to cancel the evidentiary hearing. *See* Docket Order on 1/2/2025. However, based on the government's representations that certain aspects of the motion were now moot, the Court denied without prejudice the aspects of Robinson's motion that related to his statements to Agent Anstee and

the evidence recovered from any device other than his iPhone.  *See* Minute Entry on 1/8/2025.

At the evidentiary hearing, the government put on three witnesses: CBP Officer Shahamin Nunes, Special Agent Egbert Simon of the United States Attorney's Office (formerly of CBP), and Special Agent Richard Stepien.  *See id.*  The Court then held oral argument one week later, on January 15, 2025.  *See* Minute Entry on 1/15/2025.

<u>**DISCUSSION**</u>

On a motion to suppress in a criminal case, the defendant bears the burden of demonstrating the basis for the motion.  *See United States v. Masterson*, 383 F.2d 610, 614 (2d Cir. 1967).  Once the defendant meets his burden, the burden shifts to the government.  *See United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980). Where the defendant's motion is premised on a Fourth Amendment violation, "the Government bears the burden of justifying an exception to the warrant requirement by a preponderance of the evidence."  *United States v. Alisigwe*, No. 22-cr-425 (VEC), 2023 WL 8275923, at *4 (S.D.N.Y. Nov. 30, 2023) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)).

**I.    Fourth Amendment**

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures."  U.S. Const. amend. IV. The Fourth Amendment "expressly imposes two requirements.  First, all searches and seizures must be reasonable.  Second, a warrant may not be issued unless

probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011).

Before law enforcement officers conduct a search for evidence of a crime, "reasonableness generally requires the obtaining of a judicial warrant," subject to several narrowly delineated exceptions. *Riley v. California*, 573 U.S. 373, 382 (2014) (internal quotation marks omitted). This case implicates the so-called "border exception" to the warrant requirement, which has historically been applied to exempt government officials from the warrant requirement and allow them to conduct brief searches of travelers' persons and effects to prevent contraband from entering the country. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). The issue here is whether, in light of that exception, a compelled search of the contents of a traveler's cell phone or other handheld electronic device conducted without a warrant and without probable cause is reasonable under the Fourth Amendment if that search takes place at an international border.[2] If the Court answers that question in the negative, then the warrantless search of Robinson's cell phone violated the Fourth Amendment, and the fruits of that search could be subject to suppression.

### A.  The Warrant Exception for Routine Border Searches

When assessing the reasonableness of a search, courts are guided by "balancing its intrusion on the individual's Fourth Amendment interests against its

---

[2] An international airport, like JFK, "is considered the functional equivalent of a border for Fourth Amendment purposes." *Alisigwe*, 2023 WL 8275923, at *3 n.5 (internal quotation marks omitted).

promotion of legitimate governmental interests." *Montoya de Hernandez*, 473 U.S. at 537 (internal quotation marks omitted).  At the border, searches that would violate the Fourth Amendment if they were conducted within the country may be reasonable because the balance between the government's interests and the individual's privacy interests tips decidedly in the government's favor. *See id.* at 539–40.  That is because the government's "interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).  And a traveler in an international airport seeking entry into the United States has a diminished expectation of privacy due in part to the surveillance and security measures that are endemic in air travel. *See Montoya de Hernandez*, 473 U.S. at 539–40.

The border search exception is based not only on the "balance between the interest of the Government and the privacy right of the individual," which is "struck much more favorably to the Government at the border," but also on the history and tradition of the government's customs enforcement power. *Id.* at 537–40.  The same Congress that proposed the Bill of Rights enacted the first customs statute that empowered customs officials to search incoming "ship[s] [and] vessel[s]" suspected of transporting "any goods, wares or merchandise subject to duty." *United States v. Ramsey*, 431 U.S. 606, 616 (1977) (internal quotation marks omitted).

Although such searches, if conducted domestically, would have required a warrant and probable cause to be reasonable under the Fourth Amendment, those warrantless searches by customs officials were reasonable "simply by virtue of the

fact that they occur[red] at the border." *Id.*; *see also United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971) ("Customs officers characteristically inspect luggage and their power to do so is not questioned in this case; it is an old practice and is intimately associated with excluding illegal articles from the country."). The historic power of customs officials to conduct "routine inspections and searches" of goods at the border and "its functional equivalents" also extends to searches of people at the border based on the government's power "to exclude aliens from the country." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973). Thus, for at least two centuries, the government's "inherent authority to protect" and "paramount interest in protecting[] its territorial integrity," *Flores-Montano*, 541 U.S. at 153, has led courts to uphold searches of people and property at the border that would under ordinary circumstances violate the Fourth Amendment. *See Montoya de Hernandez*, 472 U.S. at 554 (Brennan, J., dissenting) (distinguishing between searches at the border "*for purposes of immigration and customs control*" and searches "carried out *for purposes of investigating suspected criminal activity*").

## B.    Nonroutine Searches at the Border

"Nonetheless, the touchstone of the Fourth Amendment analysis remains reasonableness," and the border search exception "does not mean . . . that at the border anything goes." *United States v. Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013) (internal quotation marks omitted). The Supreme Court has differentiated between routine border searches, like the search of a traveler's luggage, *see Thirty-Seven Photographs*, 402 U.S. at 376, and searches conducted at the border "for purposes

other than a routine border search" that exceed the "scope of a routine customs search and inspection," *see Montoya de Hernandez*, 473 U.S. at 540–41. "[T]he level of intrusion into a person's privacy is what determines whether a border search is routine" and thus whether the border search exception applies or not. *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006).

To determine whether a warrantless, nonroutine search is permissible under the Fourth Amendment, courts conduct the customary reasonableness balancing test, in which "the offensiveness of the intrusion must be weighed against the level of warranted suspicion." *Id.* For example, in *Montoya de Hernandez*, the Supreme Court held that a noncitizen traveler who presented herself for admission at the border and was suspected of "smuggling contraband in her alimentary canal" was lawfully detained by CBP for sixteen hours because CBP had reasonable suspicion that the traveler was attempting to smuggle drugs into the country, and because they detained her only "for the period of time necessary to either verify or dispel" the suspicion. 473 U.S. at 541–44. The Court considered the totality of the circumstances surrounding the traveler's detention and weighed the intrusiveness of the detention at issue against the government's "longstanding concern for the protection of the integrity of the border." *Id.* at 538. And the government's interest in taking reasonable measures to interdict the flow of illegal narcotics was, in the Court's view, entitled to great weight given what was, at that time, a "veritable national crisis in law enforcement caused by smuggling of illicit narcotics." *Id.*

Similarly, in *United States v. Asbury*, 586 F.2d 973 (2d Cir. 1978), the Second Circuit assessed the Fourth Amendment reasonableness of a strip search at the border of a traveler suspected of carrying contraband. The court characterized the challenged strip search as a nonroutine search not governed by the border search exception, reasoning that while "anyone entering or leaving the country may expect to have his luggage and personal effects examined, he does not expect that his entry or departure, standing alone, will cause him to be subjected to a strip search." *Id.* at 975. The court then conducted the traditional Fourth Amendment reasonableness analysis in the specific (border-security) context presented. *Id.* at 976–77. It weighed the traveler's expectation of privacy against the government's heightened interest in preventing illegal narcotics from being smuggled across the border and ultimately upheld the search as supported by individualized suspicion and within the Fourth Amendment's bounds of reasonableness. *Id.*; *see also Irving*, 452 F.3d at 123 (citing *Asbury*, 586 F.2d at 975–76, for the proposition that while "routine border searches of a person's belongings," including searches of "outer clothing, luggage, a purse, wallet, pockets, or shoes," "are made reasonable by that person's decision to enter this country, more invasive searches, like strip searches" that "substantially infringe on a traveler's privacy rights," "require reasonable suspicion").

### C.    A Warrant is Required for the Search of a Cell Phone at the Border

To date, neither the Supreme Court nor the Second Circuit has decided (1) whether a search of a traveler's cell phone or other handheld electronic device at the border is a routine search covered by the border search exception, or (2) if it is a

nonroutine search, the level of suspicion required for the search to be reasonable under the Fourth Amendment (*i.e.,* whether it may be conducted at the point of entry by border officials based on a mere showing of reasonable suspicion or whether it requires a warrant and probable cause).

However, a number of district courts in this Circuit have had the issue squarely presented to them in border-search challenges in recent years. In one such case, this Court reviewed the Supreme Court's and Second Circuit's related jurisprudence and concluded that the search of a cell phone at the border, whether a so-called "manual" or "forensic" search, is a nonroutine search. *See United States v. Sultanov*, 742 F. Supp. 3d 258, 288 (E.D.N.Y. 2024). In that same case, this Court further held that applying that existing caselaw, including but not limited to the Supreme Court's decision in *Riley,* to the cell phone context compels the conclusion that the Fourth Amendment requires probable cause and a warrant for the government to search a traveler's cell phone. *See id.* at 296 ("Where the government seeks access to private devices that hold such a vast array of expressive content [such as cell phones], only the standard conceived by the Founders and codified in the Fourth Amendment — probable cause and the approval of a neutral magistrate — can bear the weight of that obligation.").

The Court's reasoning is more fully detailed in *Sultanov* itself, *see id.* at 280–96, but given that both parties have raised the issue anew in this motion, it is summarized below.

The Court begins its analysis with the Supreme Court's 2014 decision in *Riley v. California*, where the Court addressed how the search incident to arrest exception to the warrant requirement applies to modern cell phones. 573 U.S. at 385. In *Riley*, the Court concluded that "[c]ell phones differ in both a quantitative and qualitative sense from other objects" an arrestee might have on their person because they are "in fact minicomputers" with "immense storage capacity" that allowed an individual to carry "every piece of mail they have received in the past several months, every picture taken, [and] every book or article that they have read." *Id.* at 393–94. The Court explained that "a cell phone search would typically expose to the government far *more* [information] than the most exhaustive search of a house." *Id.* at 396–97. The Court concluded that because modern cell phones "hold for many Americans the privacies of life," the "answer to the question of what police must do before searching a cell phone seized incident to arrest is accordingly simple — get a warrant." *Id.* at 403 (internal quotation marks omitted).

Following *Riley*, the Second Circuit has recognized the immense privacy concerns implicated by the search of electronic devices. *See United States v. Smith*, 967 F.3d 198, 208 (2d Cir. 2020) ("[T]he search and seizure of personal electronic devices like a modern cell phone or tablet computer implicates different privacy and possessory concerns than the search and seizure of a person's ordinary personal effects."). The Circuit has noted that it is not just the *quantity* of the data contained on an electronic device which triggers heightened privacy concerns, but also the nature of that material, explaining that in *one* place the government can find "[t]ax

records, diaries, personal photographs, electronic books, electronic media, medical data, records of internet searches, [and] banking and shopping information." *United States v. Ganias*, 824 F.3d 199, 218 (2d Cir. 2016) (en banc).

While it is true that *Riley* concerned the search incident to arrest exception to the warrant requirement, the Supreme Court's clear holding regarding the extent of privacy interests implicated in a cell phone search is necessary for this Court to consider when "balancing [a search's] intrusion on the individual's Fourth Amendment interests against [the search's] promotion of legitimate governmental interests" in the border search context. *Montoya de Hernandez*, 473 U.S. at 537 (internal quotation marks omitted). As explained in *Sultanov*, Supreme Court and Second Circuit precedent make it clear that a traveler's Fourth Amendment interest in a personal cell phone is extremely high. *See Sultanov*, 742 F. Supp. 3d at 279–88.

To properly consider the "governmental interest" side of the equation in this context, the Court looks to the history behind the border search exception. The border search exception is primarily derived from "the government's legitimate interest in protecting the integrity of the border by preventing 'illegal articles' (including goods subject to duty) and inadmissible foreign citizens from entering the country." *Id.* at 285 (collecting cases) (finding that "[s]earching and seizing the data on a person's phone does not prevent that data . . . from entering and circulating within the country"). While there is of course always a general governmental interest in detecting and seizing contraband, especially CSAM, the extent to which that interest aligns with the justification for the border search exception is far from clear "when

the government searches data stored on a person's cell phone." *Id.* Thus, "[g]iven the extraordinary intrusion into a person's privacy posed by a cell phone search, this Court has no difficulty concluding that a manual search of a cell phone at the border is a nonroutine search to which a categorical border search exception does not apply." *Id.* at 288.[3]

After finding that the search of a cell phone is "nonroutine," a Court must then decide the requisite degree of suspicion required for the search to be reasonable under the Fourth Amendment. In *Sultanov*, this Court noted that the other circuit courts, and most district courts within the Second Circuit, which have recognized that law enforcement must have some degree of individualized suspicion to search a cell phone at the border, have not gone so far as to require a warrant. *See id.* at 290 (collecting cases). However, taking into consideration the various factors that bear on the Fourth Amendment's touchstone of "reasonableness" — including a person's heightened privacy interest in the vast contents of her cell phone, the remarkable speed at which a warrant can be obtained in modern times, the interest in preventing the flow of contraband that grounds the border-search exception, and the profound First Amendment concerns implicated by border agents conducting warrantless searches of travelers' cell phones and gaining "intimate window[s]" into virtually every aspect of their personal and professional lives — this Court concludes that the

---

[3] This Court in *Sultanov* also found that because both manual and forensic searches of cell phones "involve[d] . . . a vast intrusion on a traveler's privacy," "the privacy intrusion of a manual search is substantially the same, for Fourth Amendment purposes, as the privacy invasion of a forensic search." *Id.*

government must have a warrant and probable cause to search a cell phone at the border. *See id.* at 296 (quoting *Carpenter v. United States*, 585 U.S. 296, 311 (2018)).

Although this Court recognizes that the Second Circuit may well resolve this issue in the near future, at this writing, the government has presented no intervening case law or novel arguments that lead the Court to revisit its holding in *Sultanov*. Therefore, this Court concludes that the warrantless search of Robinson's iPhone on November 14, 2022, was conducted in violation of his Fourth Amendment rights. Accordingly, the contents revealed in that search, as well as all "evidence obtained from or as a consequence" of the search, is subject to exclusion. *Costello v. United States*, 365 U.S. 265, 280 (1961) (internal quotation marks omitted).

Accordingly, the evidence obtained "as a direct result of [the] illegal search or seizure" as well as evidence that is "derivative of [the] illegality" is subject to suppression. *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). As the warrantless search by Officer Nunes at JFK was a "[b]ut-for" cause of the subsequent search by HSI agent Anstee, and unquestionably provided the probable cause for a forensic search of Robinson's phone cited in the search warrant affidavit by Agent Stepien, all the fruits of the initial search of Robinson's iPhone are subject to suppression as well. *See Hudson v. Michigan*, 547 U.S. 586, 592 (2006).

## II.    The Good Faith Exception

The Court next turns to the government's claim that, even if probable cause and a warrant were necessary to search Robinson's phone at the border, evidence

from his phone should not be suppressed as it was obtained in good faith by law enforcement. *See* Gov't Opp. 23–27 (citing *United States v. Leon*, 468 U.S. 897, 908 (1984) ("[W]hen law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system.").

## A. Legal Standards and Summary of Findings

The government makes two core arguments as to why the good faith exception to the exclusionary rule should apply here. The first involves the initial search at JFK Airport. The government argues that Officer Nunes had a reasonable belief that the manual search of the cell phone at JFK airport was "routine" and thus required no individualized suspicion; alternatively, if it was "nonroutine," she had "reasonable suspicion" to search the phone, and therefore had a good faith basis to believe that her actions did not violate Robinson's Fourth Amendment rights. *Id.* at 24–25. The government's second argument is that the issuance of the warrant itself provides the requisite good faith: that is, that the subsequent forensic search was authorized by a judicial warrant, and HSI reasonably relied on that warrant when the agency conducted its forensic search of the iPhone. *See id.* at 25–27.

The Supreme Court has recognized two applications of the good faith exception to the exclusionary rule that may apply here. The first is when a search is conducted in "objectively reasonable reliance on binding appellate precedent," *Davis v. United States*, 564 U.S. 229, 249–50 (2011). The second is when a search is conducted in "objectively reasonable reliance on a subsequently invalidated search warrant."

*Leon*, 468 U.S. at 922; *but see id.* at 923 (suppression "remains an appropriate remedy" where, *inter alia*, a court finds that the magistrate judge who issued the warrant "was misled by information in an affidavit that the affiant knew was false" or where the affiant exhibited a "reckless disregard of the truth").

If neither of those two circumstances apply, that does not end the inquiry. For even if officers in the field who conduct a warrantless search or seizure lacked a good faith basis to believe their actions were constitutional, evidence will still only be excluded when the "corrective value [of exclusion] justifies its cost." *United States v. Raymonda*, 780 F.3d 105, 117–18 (2d Cir. 2015). This cost is justified when "the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Id.* at 118 (internal quotation marks omitted). On the other hand, "when police act with an *objectively* reasonable good faith belief that their conduct is lawful, or when their conduct involves only simple, isolated [instances of] negligence," exclusion is inappropriate. *Id.* (internal quotation marks omitted) (emphasis supplied). This is because the remedy of suppression is not borne out of any explicit text from the Fourth Amendment. Rather, the "Supreme Court has established an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *United States v. Lauria*, 70 F.4th 106, 121 (2d Cir. 2023) (alterations adopted and internal quotation marks omitted). The rule was created not as a "means to 'redress the injury' of an unconstitutional search" but rather was "designed to deter future Fourth Amendment violations." *Raymonda*, 780 F.3d at 117 (quoting *Davis*, 564 U.S. at 236); *see also Herring v. United States*, 555 U.S. 135,

141 (2009) ("[T]he exclusionary rule is not an individual right and applies only where it results in appreciable deterrence." (alterations adopted and internal quotation marks omitted)).  Because deterrence is the goal of the exclusionary rule, for it to apply, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it." *Herring*, 555 U.S. at 144.

For the reasons that follow, the Court finds that the government cannot rely upon either of its proposed good faith exceptions to the exclusionary rule.  First, with regard to the manual search by border agents, there was no binding precedent that authorized a so-called "routine" search of Robinson's iPhone on which a reasonable officer could have relied.  And even if the agents had a good faith basis to believe that no judicial warrant was required and they needed only reasonable suspicion, the staleness and limited information in the TECS Report that provided the sole ground for the search did not permit them to conduct the search under then-existing appellate caselaw that governs certain "nonroutine" searches at the border.  And after weighing the societal cost of exclusion against its "corrective value," *Raymonda*, 780 F.3d at 117–18, the Court finds that suppression is warranted.

Second, the government has not shown that the subsequent forensic search of Robinson's phone was conducted in a good faith reliance on the warrant.  This is because, as explained below, the magistrate judge was not provided with critical facts surrounding the government's earlier seizure of the evidence that supported the probable cause determination.  Instead, the record demonstrates that Agent Stepien (1) presented the magistrate judge with an incomplete and misleading affidavit in

support of the warrant, which falsely implied that the search of Robinson's phone at JFK was a routine, suspicionless "border search," and deliberately omitted the fact that it was actually conducted pursuant to a three-year-old TECS report; and (2) falsely suggested that the search was performed after Robinson gave his "voluntar[y]" consent, when that was not the case; for even the government does not contend that this case falls within the Fourth Amendment's consent exception, since Robinson was directed, not asked, to surrender his phone and provide his passcode at the time he was individually targeted for an electronic media search.

### B.  The Manual Search of Robinson's iPhone on November 14, 2022

The government first argues that even if the Court were to conclude that the manual search conducted on Robinson's cell phone on November 14, 2022, was unconstitutional, CBP Officer Nunes searched the iPhone "with an objectively reasonable good-faith belief that [her] conduct [was] lawful."  Gov't Opp. at 24 (quoting *United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018) (quoting *Davis*, 564 U.S. at 238).  The Court disagrees. After hearing her in-court testimony, the Court has no doubt that Officer Nunes *subjectively* believed that her actions were in accordance with (indeed, required by) CBP policy and the directives of her supervisors as she understood them.  But that is not the issue here.  Ultimately, the good faith exception does not apply because the government has not shown that there was an *objective* basis — supported by binding appellate caselaw — upon which Officer Nunes could have reasonably relied to believe that this particular search was constitutional.

It is well settled that searches "conducted in objectively reasonable reliance on binding precedent are not subject to the exclusionary rule." *Davis*, 564 U.S. at 232. The Second Circuit has held that "binding precedent refers to the precedent of this Circuit and the Supreme Court." *United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013) (internal quotation marks omitted). Therefore, if Officer Nunes reasonably believed that "binding precedent" of this Circuit or the Supreme Court authorized the search, the fruits of the search would not be subject to suppression. The government has failed to make that showing here.

> i. *Binding Appellate Precedent Would Not Lead a Reasonable Officer to Believe that the Search of an iPhone Was "Routine"*

The government first argues that Officer Nunes reasonably relied on binding appellate precedent in believing that the search was "routine," and therefore did not require any modicum of suspicion. *See* Gov't Opp. at 24 ("[A] reasonable officer or agent could believe that the search in question was routine . . . ."). The government contends that because there was no binding precedent *precluding* suspicionless searches of cell phones at the border, Officer Nunes "rel[ied] in good faith on the existing state of the law" in searching Robinson's iPhone. Gov't 12/27/2024 Ltr. at 3.

The first flaw in this argument is its initial premise: it reverses the burden the good faith exception places on law enforcement. The good faith exception does not permit the law enforcement to engage in any and all warrantless searches until an appeals court forbids it. Rather, there must be actual "binding precedent" on which a reasonable officer could rely in believing that the search was lawful — *i.e.,* that it fell within an established exception to the Fourth Amendment's warrant

requirement. *Davis*, 564 U.S. at 241; *see also United States v. Fox*, No. 23-cr-225 (NGG), 2024 WL 3520767, at *18 n.34 (E.D.N.Y. July 24, 2024) (noting that, unlike qualified immunity, "exclusion does not require a violation of 'clearly established law'" (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

At the time of the search of Robinson's iPhone, "neither the Supreme Court nor the Second Circuit ha[d] addressed the lawfulness of warrantless searches of cell phones at the border." *Alisigwe*, 2023 WL 8275923, at *7. However, the Second Circuit had long recognized that not all searches at the border were alike. Specifically, the Circuit had long held that border searches considered to be "non-routine" required at least reasonable suspicion to be constitutional. *See Irving*, 452 F.3d at 124.

The first question, then, is whether a reasonable officer could have objectively believed, in November 2022, that there was "binding appellate precedent" within this Circuit holding that a search of an international traveler's iPhone was a "routine" search requiring no individualized suspicion. On this issue, *Irving* provides a useful anchor point. *Irving* involved the warrantless border search of computer diskettes in a passenger's luggage — a rudimentary form of electronic media storage that is vastly different in kind than what is contained on modern smart phones.[4] The *Irving* court

---

[4] The search in *Irving* concerned a "disposable camera and two 3.5 inch computer diskettes," commonly known as floppy disks. *Irving*, 452 F.3d at 115. Floppy disks "featured 1.44 megabytes of storage space." *Floppy Disk Storage*, IBM, https://www.ibm.com/history/floppy-disk (last visited May 4, 2025). For comparison, Robinson's iPhone that was searched was an "Apple iPhone XS," Warrant Aff. ¶ 4, of which the base model has a storage capacity of 64 gigabytes, *iPhone XS – Technical Specifications*, Apple, https://support.apple.com/en-us/111881 (last visited May 4,

analyzed the search under the higher standard of a "nonroutine" border search, asking whether the agents had reasonable suspicion. Because the court was satisfied that reasonable suspicion justified the search in Irving's case, it did not reach the issue of whether this kind of search should, in general, be considered "routine" or "non-routine." *Id.* Thus, in 2006 — more than a decade before the Supreme Court provided the guidance in *Riley* that the search of a cell phone "differ[ed] in both a quantitative and qualitative sense" from the search of other objects, *Riley*, 573 U.S. at 393 — the Second Circuit acknowledged that the search of a far less substantial cache of electronic data at the border may not be a "routine" search.

More fundamentally, the government has pointed this Court to *no* Second Circuit or Supreme Court precedent holding — or even suggesting — that law enforcement's search of a modern cell phone and the breathtaking amount of personal information it holds could ever be considered a "routine" border search. Nor has it cited any case in which the Second Circuit or the Supreme Court found "routine" a search in which the level of intrusion was in any way analogous to the search of a traveler's iPhone.

It is true that in *United States v. Levy*, the Second Circuit, in a footnote that might reasonably be construed as dicta, noted that "we have suggested that the label 'non-routine' should *generally* be reserved for intrusive border searches of the person (such as body-cavity searches or strip searches), not belongings." 803 F.3d 120, 123

---

2025). As there are 1,000 megabytes in a gigabyte, Robinson's iPhone had at least approximately 44,444 times more storage than one of Irving's floppy disks.

n.3 (2d Cir. 2015) (emphasis supplied). *Levy* did not involve any sort of electronic evidence; the Court was asked to decide only whether border officials had lawfully searched and copied a traveler's notebook. *See id.* at 123. Notably, however, when addressing whether the search of a simple notebook was "routine" or "non-routine," the *Levy* Court "avoid[ed] resolving that question" and simply held that suppression was unwarranted because law enforcement had reasonable suspicion to conduct the search in Levy's case. *Id.*

Thus, even construing the caselaw in the light most favorable to the government, Second Circuit precedent as to whether the search of a cell phone at the border was routine or nonroutine in November of 2022 was, at the very most, unsettled. And unsettled law is not "binding appellate precedent" upon which law enforcement can reasonably rely to justify a suspicionless search. *Davis*, 564 U.S. at 241.

Indeed, all binding appellate precedent in 2022 strongly supported the opposite conclusion: that the search of an electronic device is nonroutine because it is clearly of a difference in kind than the search of a person's other belongings (like, for example, a notebook). In 2016, for example, the Second Circuit, sitting *en banc*, held that the level of intrusion caused by the search of a computer hard drive is not analogous to that caused by the search of an entire file cabinet, as "no file cabinet has the capacity to contain as much information as the typical computer hard drive." *Ganias*, 824 F.3d at 217; *see also Riley*, 573 U.S. at 393–94 (finding that the search of a cell phone was unusually invasive because it could permit the government to

reconstruct "[t]he sum of an individual's private life . . . through a thousand photographs labeled with dates, locations, and description").

It is important to note that all an officer may rely on in good faith is binding appellate precedent. The government presented evidence that it was CBP policy that the phone of any passenger may be subject to search upon entry into the country. *See* Hr'g Tr. at 54 (Officer Nunes explaining that a "tear sheet" is given to a passenger whose phone is searched that "explains CBP's authority to search electronic devices"); Tear Sheet at 3 (informing passengers that "[a]ll persons, baggage, and merchandise arriving in, or departing from, the United States are subject to inspection, search and detention" and that the passenger is "receiving this sheet because [their] electronic device(s) have been detained for further examination"). Officer Nunes also confirmed that in this case she had no "discretion not to conduct the electronic exam" of Robinson's iPhone. Hr'g Tr. at 78. But CBP policy and practice does not determine whether an officer relied on binding appellate caselaw. The line between a routine and nonroutine search is not determined by "how ordinary or commonplace [the] search is, but rather the level of intrusion into a person's privacy." *Tabaa v. Chertoff*, 509 F.3d 89, 98 (2d Cir. 2017) (internal quotation marks omitted). CBP's apparently widespread policy of performing manual searches of cell phones at the border and informing travelers that it had the broad authority to do so simply does not bear on whether the agents' actions in Robinson's case were authorized by binding appellate precedent.

Not only was there was no binding appellate precedent in November 2022

holding that border searches of cell phones are "routine" searches that may be conducted in the absence of reasonable suspicion, but also, relevant precedent strongly indicated that the search of a cell phone was a significant "level of intrusion into a person's privacy," *id.* (quoting *Irving*, 452 F.3d at 123)*,* and therefore nonroutine. Thus, no reasonable officer could have relied on binding precedent to believe that the search of Robinson's iPhone at the border was routine and could be conducted "even without reasonable suspicion." *Levy*, 803 F.3d at 122 (internal quotation marks omitted).

#### ii. *The Search of Robinson's Cell Phone was Not Supported by Reasonable Suspicion*

Given that the Officer Nunes could not have reasonably relied on the "routine" border search exception to conduct a suspicionless search of Robinson's iPhone, the Court next considers if the facts known to her at the time provided a good faith basis to conclude that a "nonroutine" border search was justified. While this Court, as explained *supra*, concludes that the Fourth Amendment requires probable cause and a warrant to conduct a manual search of a cell phone at the border, it recognizes that neither the Supreme Court nor the Second Circuit had yet decided this issue at the time Robinson's phone was searched in November 2022. (Nor has either court done so as of the date of this opinion.) Additionally, the highest degree of suspicion that the Second Circuit has found necessary in a nonroutine search is "reasonable suspicion." *See, e.g., Levy*, 803 F.3d at 124; *Irving*, 452 F.3d at 124; *United States v. Ogberaha*, 771 F.2d 655, 657 (2d Cir. 1985). Thus, if the objective facts available to Officer Nunes created a reasonable suspicion that there was contraband on

Robinson's iPhone at the time he presented himself at CBP, the government would have a stronger argument that the initial manual search was "conducted in objectively reasonable reliance on binding appellate precedent." *Davis*, 564 U.S. at 231. On this record, however, the government fails to make even that showing.

An officer's reasonable suspicion must be supported by "specific and articulable facts" that, "taken together with rational inferences," provide that officer with an objective basis for a search. *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (internal quotation marks omitted). In the context of a border search, "reasonableness is defined by weighing the warranted suspicion of the border official against the offensiveness of the intrusion." *Asbury*, 586 F.2d at 976. The Second Circuit has "pointed to a number of factors that courts may consider in making the reasonable suspicion determination, including unusual conduct of the defendant, discovery of incriminating matter during routine searches, computerized information showing propensity to commit relevant crimes, or a suspicious itinerary." *Irving*, 452 F.3d at 124. Because this Court has already held that the "offensiveness of the intrusion" of a cell phone search is high, it must measure the "warranted suspicion of the border official." *Asbury*, 586 F.2d at 976.

The government argues that the TECS report regarding Robinson, standing alone, provided Agent Nunes with reasonable suspicion that he possessed CSAM on his phone. *See* Gov't Opp. at 23. The TECS report was generated three years before Robinson's phone was searched, on November 11, 2019. TECS Report at 1; *see* Hr'g Tr. at 50. The full contents of the alert, as presented to Officer Nunes, read: "Subj

linked to the purchase of child sexual exploitation material via FinCen.  Refer to Secondary for interview & media device exam to include cell phones and laptops."[5] TECS Report at 2.

Nunes confirmed that the entry on Robinson was a "prime hit" — meaning that the "system ha[d] determined that the person that's in front of the officer is 100 percent the person in the record."  Hr'g Tr. at 98–99.  However, a "prime hit" does not indicate anything about the reasons why the TECS Report was created; it merely confirms that the traveler is the person whom the alert was intended to flag for inspection.

Once a CBP officer at JFK Airport is alerted to a prime hit, it "requires a mandatory referral to secondary for inspection."  *Id.*  Officer Nunes also testified that the TECS hit was generated by a division of CBP called the National Targeting Center ("NTC").  *See id.* at 101.   In the case of a prime hit lookout generated by the NTC, there is typically no discretion as to whether or not the officer conducts an electronic media exam.  Hr'g Tr. at 103–04.  Nunes indicated that she may have discretion only when it is clear that the "hit ha[d] been resolved," such as when the

_____

[5] Officer Nunes testified that she "vaguely remember[ed] that [she] [thought] there was an update" to the TECS lookout, which was "maybe a year prior" to the encounter but she was "not a hundred percent sure."  Hr'g Tr. at 51.  At the hearing, she also reviewed each page of the lookout and confirmed that there was nothing on those pages indicating that the report had been "refreshed" or "updated" approximately one year after it was entered.  *Id.* at 87–88.  Based on the Court's assessment of Officer Nunes' in-court testimony, and the fact that she was candid about the fact that this was a "vague[]" recollection, the Court finds, for purposes of this motion, that the TECS lookout was entered in November 2019, and that there is no evidence that it was updated at any time before Robinson landed at JFK in November 2022.

system indicates that another officer already "fully addressed whatever the lookout was." *Id.* Nunes also testified, however, that prime-hit lookouts "don't expire." *Id.* at 104. And even if Nunes interviews a traveler who is subject to a TECS lookout, and releases the traveler after she has determined that the reason for the detention has been "fully addressed," an NTC-generated lookout will remain in the system until someone at "a different division" of CBP removes it. *Id.* at 104–05. Nunes herself has no ability to remove an NTC lookout from TECS, even when it has been "closed out" by her. *Id.*

The government also called Agent Egbert Simon, formerly a Supervisory Customs and Border Protection Officer and now a Special Agent with the United States Attorney's Office. *Id.* at 107–08. Agent Simon played no role in the investigation of Robinson, *id.* at 110, and had never been detailed at NTC, *id.* at 119, but testified to his understanding of how TECS reports are generated by the National Targeting Center and how they are viewed by officers at the border. He described the NTC as "like an intelligence hub for frontline personnel." *Id.* at 113. In his view, when a lookout is generated by the NTC, "you're going to feel that they have already done their . . . research and their analysis for creating that record." *Id.*; *see also id.* at 114 ("[I]f it's from NTC, we're going off the basis that there's some type of research or intel behind it."). Agent Simon also confirmed that while lookouts issued by CBP officers in the field only remain valid for one year, that expiration date does *not* apply to lookouts generated by anyone at NTC. *Id.* at 117, 126. Thus, a single lookout generated by an agent at the National Targeting Center could remain in TECS

indefinitely. *Id.*

It is true, as the government argues, that "a TECS hit can significantly factor into a reasonable suspicion finding." Gov't Opp. at 22. But here, the TECS hit did not just "factor significantly" into CBP's decision to search Robinson's cell phone. It is the *only* evidence the government cites in support of its claim that Officer Nunes had a reasonable suspicion that Robinson was in possession of CSAM on his iPhone on November 14, 2022. *See id.* at 21–23. Yet the government has cited no case, from any jurisdiction, in which any court has held that a TECS hit with this paucity of information, standing alone, established the requisite reasonable suspicion to conduct a nonroutine border search. And it certainly has not pointed this Court to any case in which a three-year-old TECS hit provided the requisite reasonable suspicion.

Instead, every case the government relies upon in which reasonable suspicion existed involves a TECS hit combined with other factors. In the Ninth Circuit case of *United States v. Cotterman*, for example, a TECS hit indicated not only that the defendant was a registered sex offender whose prior convictions involved multiple acts of sexual abuse against children, but also that he was "potentially involved in child sex tourism." 709 F.3d at 957, 969. As the court noted, CBP was alerted to the fact that Cotterman frequently traveled outside the United States and was returning from a "country associated with sex tourism," and the agent was specifically informed by Immigration and Customs Enforcement that the TECS alert had been generated by Operation Angel Watch, a specialized law enforcement unit that "targeted

individuals potentially involved in sex tourism." *Id.* at 968–69. The Court concluded that "[defendant's] TECS alert, prior child-related conviction, frequent travels, crossing from a country known for sex tourism, and collection of electronic equipment, plus the parameters of Operation Angel Watch program, taken collectively, gave rise to reasonable suspicion." *Id.* at 969.

Similarly, in *United States v. Whitted*, while the government did rely on a TECS hit which indicated a "one-day lookout" for the defendant in establishing reasonable suspicion, the law enforcement officer "conducted further inquiries in the TECS and discovered that [defendant's] ticket has been purchased at the last minute," that he "traveled to other drug source countries" and that he had a "criminal record." 541 F.3d 480, 483 (3d Cir. 2008). The Third Circuit found that these were "numerous facts" which "raised the suspicion that that Whitted was involved in drug smuggling." *Id.* at 490. Nor is this case analogous to *Irving*, in which the Second Circuit found that there was reasonable suspicion to search the defendant's computer diskettes. Gov't Opp. at 23. In *Irving*, the Second Circuit based its reasonable suspicion determination not only on the fact that the defendant "was the subject of a criminal investigation," but also that he "was a convicted pedophile," that he "had been to Mexico," that "he claimed that he visited an orphanage while in Mexico," and that "his luggage contained children's books and drawing that appeared to be drawn by children." 452 F.3d at 124.[6]

---

[6] In addition to the Circuit Court decisions cited above, the government also cites *United States v. Ramirez*, in which a district court in the Western District of Texas found that border agents had reasonable suspicion to search the phone of a

Here, by contrast, the only information provided to Officer Nunes was a three-year old electronic notification that the person in front of her was "linked to the purchase" of CSAM. TECS Report at 2. It is undisputed that "customs officers should be able to rely on data provided by computer reports to create reasonable suspicion for a search." *Whitted*, 541 F.3d at 490. However, the information relied upon must itself create the requisite suspicion. Even taking into account the facts that this was a "prime hit" (which confirmed that Robinson was the person to whom the November 2019 entry referred) and generated by the National Targeting Center, all that demonstrates is that a unit of CBP — which acts as its "intelligence hub for field personnel," Hr'g Tr. at 119 — possessed information about a possible "link[]" to a CSAM purchase by Robinson from three years earlier, TECS Report at 2. And for several reasons, that alone was insufficient to provide a reasonable suspicion that Robinson possessed CSAM on his phone on November 14, 2022.

First, Officer Nunes did not know if the TECS hit from November 11, 2019, was in reference to a single isolated purchase, or multiple purchases over a longer

_____

defendant who was diverted to secondary inspection based on a TECS hit that (as here) linked him to the possible purchase of child pornography. No. EP-18-cr-3530 (PRM), 2019 WL 3502913, at *1 (W.D. Tex. Aug. 1, 2019). But that case is inapposite, since in *Ramirez,* the court made a factual finding (after an evidentiary hearing) that the defendant immediately gave his knowing and voluntary consent to search his device, and *during that consent search*, child pornography was lawfully discovered and seized. *Id.* at *6–12. Here, by contrast, the government is not contending that Robinson consented to the search of his phone, but rather that CBP had the legal authority to compel him to submit to a device search because the TECS hit alone provided the requisite reasonable suspicion. *See* Oral Arg. Tr. at 69 (confirming that the government is not contending that either CBP or HSI searched Robinson's phone on consent).

period of time.   And while certainly giving rise to a potentially important investigative lead at the time the hit is generated, even if the information were accurate, a single purchase of contraband does not necessarily create a reasonable suspicion that the person is in possession of such contraband three years later. Additionally, even though it was a prime hit, the TECS report does not even affirmatively state that Robinson "purchased" CSAM, but rather that he was "linked to the purchase" of CSAM.   TECS Report at 2.   A person could be "linked to the purchase" of contraband without purchasing the contraband themselves — for example, if a credit card was used without their knowledge by another member of their household.   Or a person could be the victim of credit card fraud and unaware of the fact that their stolen card was used to purchase digital contraband.   The Court notes that this is not a *de minimis* risk in the modern era: according to the Federal Trade Commission, in 2020 alone, there were 1,387,615 reports of identity theft in the United States.   *See* Office of the New York State Comptroller, *The Increasing Threat of Identity Theft* 3 Fig. 1 (May 2021), https://www.osc.ny.gov/files/reports/pdf/increasing-threat-of-identity-theft.pdf.

This is not to say that a single TECS hit linking someone to an earlier purchase of contraband, including but not limited to CSAM, could never provide reasonable suspicion that the person possessed contraband at the border.   The government's case for reasonable suspicion would be much stronger, if, for instance, the information available to the border agent was that Robinson had been linked to a purchase of CSAM in the week he was traveling abroad, especially if that purchase was connected

to an IP address in the country from which he was arriving. That was decidedly not the case in this instance. And as noted above, the government has found no case — and this Court knows of none — in which a TECS hit linking the subject to the purchase of CSAM, and nothing else, provided reasonable suspicion to conduct a warrantless search of a traveler's devices.

The age of the TECS report itself also cuts strongly against a finding of reasonable suspicion here. As the Second Circuit has long recognized, even reliable information that would otherwise provide grounds for a search can go stale. "[T]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law." *Diamondstone v. Macaluso*, 148 F.3d 113, 124 (2d Cir. 1998) (internal quotation marks omitted). While the Circuit has primarily addressed the issue of staleness in the context of probable cause, "courts in this Circuit have generally found that the information necessary to support a finding of probable cause should be no older than a year." *United States v. Bazemore*, No. 20-cr-573 (ER), 2021 WL 1719233, at *4 (S.D.N.Y. Apr. 30, 2021) (internal quotation marks omitted) (collecting cases); *cf. United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988) (noting that where the conduct is continuing, "the passage of time" becomes less significant). That probable cause benchmark provides important guidance in assessing whether a single piece of information about a traveler's purchase(s) within the United States can provide reasonable suspicion that he possesses contraband at the border three years later.

Of course, deciding whether an investigative lead into the possible purchase of

child pornography is stale requires a court to consider the nature of the contraband itself.   On this point, the Court credits the testimony of Agent Stepien that, in a substantial number of cases he has investigated or otherwise learned about, the collection of child pornography "doesn't just stop with one download.   It's usually over years of collection until either they get caught[,] or, you know, something else happens."   Hr'g Tr. at 131–32.   However, this does not mean that information related to a suspected purchase of child pornography *never* goes stale — as the Second Circuit has expressly recognized.   In *Raymonda*, the Second Circuit acknowledged that hoarding of images is common among those involved in the trade of child pornography.   *See* 780 F.3d at 115.   Nevertheless, the Court found that "nine-month-old evidence" that a user with an IP address associated with the defendant's home opened pages that had thumbnail links housing child pornography did "not create a fair probability that child pornography [would] still be found on [defendant's] computer" months later. *Id.* at 116–17.   The *Raymonda* court distinguished that case from those in other Circuits where past information regarding the suspect's interaction with digital CSAM was not stale: for example, where the suspect not only downloaded images but uploaded them as well, or where a suspect was shown to have had to "enter a decoded URL address and decrypt" a download, or where a suspect had registrations to websites and did not cancel his memberships. *See id.* at 114–15 (collecting cases).   Those are all circumstances, the Court explained, which "tend[ed] to negate the possibility that a suspect's brush with child pornography was a purely negligent or inadvertent encounter" and suggested — "as is common among persons

interested in child pornography — [the suspect] likely hoarded the images he found." *Id.* at 115.

As in *Raymonda*, the three-year-old TECS report in the instant case had nothing in it to suggest that Robinson's "brush with child pornography was [not] a purely negligent or inadvertent encounter." *Id.* Of course, the photographs and videos seized from Robinson's devices in November 2022 now strongly indicate otherwise. But reasonable suspicion is based on what was known to the officer at the time of the search. And here, Officer Nunes had no information about Robinson except for that single, three-year-old TECS hit — no criminal record, no continuing downloads, no incriminating statements, no suspicious travel history to locations known for child sexual exploitation. Thus, even assuming, *arguendo,* that the government had reasonable suspicion in 2019 that Robinson had purchased CSAM, that does not make a search of his phone upon returning from a one-time vacation abroad with his spouse three years later "reasonably related in scope to the circumstances which justified it initially." *Montoya de Hernandez*, 473 U.S. at 542.

>    iii.   *Cost of Suppression Balanced Against Deterrence Value*

In determining whether suppression is appropriate, this Court must conduct "the cost/benefit analysis required by *Herring,*" which permits the Court to exclude evidence only if "the costs of letting a guilty defendant go free" are outweighed by the "benefits of deterrence." *Julius*, 610 F.3d at 67–68 (quoting *Herring*, 555 U.S. at 141); *see also Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 368 (1998) ("We have never suggested that the exclusionary rule must apply in every circumstance in which it

might provide marginal deterrence."). Because the exclusionary rule is a means of deterring unconstitutional law enforcement conduct, "it is applicable only where its deterrence benefits outweigh its substantial social costs." *Scott*, 524 U.S. at 363 (internal quotation marks omitted). The Supreme Court has acknowledged that the exclusion of evidence comes with "substantial social costs," as "[i]t almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Davis*, 564 U.S. at 237 (internal quotation marks omitted). "Nevertheless, society must swallow this bitter pill when necessary; specifically, when the deterrence benefits of suppression . . . outweigh its heavy costs." *Lauria*, 79 F.4th at 121 (alteration in original and internal quotation marks omitted).

As a starting point, the exclusion of inculpatory evidence always comes at a cost to "truth and the public safety." *Davis*, 564 U.S. at 232. As the Supreme Court has stated, "letting guilty and possibly dangerous defendants go free . . . offends basic concepts of the criminal justice system." *Herring*, 555 U.S. at 141 (internal quotation marks omitted).

Those concerns are further heightened where, as here, a defendant is charged with an offense involving child pornography. That is true even though the instant case involves the possession of CSAM, rather than its production or sale, and even though Robinson has not been accused of any unlawful sexual contact with a minor. This is not to say that all CSAM-related charges are equivalent in terms of the harm they cause. As the Sentencing Commission has noted, "not all child pornography offenders are pedophiles, and not all child pornography offenders engage in other sex

offending." U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* (Dec. 2012), at 73; *see also United States v. R.V.*, 157 F. Supp. 3d 207, 239 (E.D.N.Y. 2016) (JBW) (citing to research finding that "for most offenders, their online offending has no behavioural link to contact sex offending" (alteration adopted) (quoting Hana Lena Merdian *et al.*, *The Three Dimensions of Online Child Pornography Offending*, 19 J. of Sexual Aggression 121, 123 (2013)).

Yet even the non-producing consumers of child pornography perpetrate extreme harm upon children. A child is victimized not only when the abuse that is depicted in CSAM first takes place; "[t]hey are further victimized each time that record is accessed." Richard Wortley & Stephen Smallbone, U.S. Dep't of Justice, Off. of Community Oriented Policing Servs., *Child Pornography on the Internet*, Problem-Oriented Guides for Police Problem-Specific Guides Series No. 41, at 15 (May 2006), https://popcenter.asu.edu/sites/default/files/child_pornography_on_the_internet.pdf. As reported by victims, this is because often "th[e] initial feelings of shame and anxiety did not fade but intensified to feelings of deep despair, worthlessness, and hopelessness." *Id.* Indeed, in the same report in which the Sentencing Commission recognized that consuming child pornography is different than other sex offenses, it also emphasized that "[c]hild pornography offenses *inherently involve* the sexual abuse and exploitation of children. Victims are harmed initially during the production of child pornography, but the perpetual nature of the distribution of images on the Internet causes a significant, *separate*, and continuing harm to victims." U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 311

(emphasis supplied).  The consumption and possession of child pornography is far from a victimless crime.  "When the pornographic images are viewed by others, the children depicted are victimized once again."  Audrey Rogers, *Child Pornography's Forgotten Victims*, 28 Pace L. Rev. 847, 853 (2008).  Thus, this Court recognizes the strong government interest in rooting out and removing CSAM from circulation, a goal achieved in part by its ability to bring criminal prosecutions that hold purchasers accountable and deter others from making such purchases.

On the other side of the equation, the Court must weigh the value of deterrence.  To warrant exclusion, "[p]olice conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *United States v. Jones*, 43 F.4th 94, 110–11 (2d Cir. 2022) (internal quotation marks omitted).  In assessing culpability, the Court can consider whether the law enforcement action was "a deliberate strategic choice" to evade the general warrant requirement.  *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013).

Importantly, "[t]he pertinent analysis of deterrence and capability is objective, not an inquiry into the subjective awareness" of the officer performing the search.  *Herring*, 555 U.S. at 145 (internal quotation marks omitted).  Thus, the inquiry does not turn on whether Officer Nunes was aware that she violated the Fourth Amendment when she searched Robinson's phone, but whether "a reasonably well trained officer would have known that the search was illegal."  *Leon*, 468 U.S. at 922 n.23.  As discussed *supra*, this Court finds that no reasonably well-trained officer

could have believed that binding appellate precedent authorized the search of Robinson's phone.  Instead, CPB instituted, and required Officer Nunes to follow, a policy of *mandatory* electronic-device searches at JFK airport based on a single TECS hit from a different division of CBP that could have been (and was) entered years earlier — no matter the traveler's personal history, itinerary, potential explanations for the TECS hit, or conduct at the airport. *See, e.g.,* Hr'g Tr. at 78 (in light of the TECS prime hit from NTC, Nunes "did not have a choice" as to whether or not to search Robinson's phone).

Testimony at the suppression hearing also revealed that a TECS hit entered by an agent at the NTC may remain in the system indefinitely.  *See* Hr'g Tr. at 117, 126.  At oral argument, the government took the position that any TECS hit such as this one, no matter how long it had been in the system, would give CBP agents the necessary reasonable suspicion to conduct a search of that traveler's cell phone, as long as the alert had not been "resolved."  *See* Oral Arg. Tr. at 70–72.  This Court disagrees.  It simply cannot be the case that an agent at the so-called "National Targeting Center" can — in entering a single "lookout" targeting a person for the suspected purchase of contraband — create the requisite reasonable suspicion that might allow the person's electronic devices to be searched upon reentry into the country for the rest of her life.

The official policies that led to this search were thus, at the very least "grossly negligent."  *Herring*, 555 U.S. at 144.  And as the Supreme Court recognized in *Herring,* deterrence may be well served "[i]n a case where systemic errors were

demonstrated." *Id.* at 146; *see also Hudson*, 547 U.S. at 604 (Kennedy, J., concurring in part and concurring in judgment) ("If a widespread pattern of violations were shown . . . there would be reason for grave concern."). This Court is indeed "gravely concern[ed]" about what appears to be a mandatory electronic-device-search policy for a sweeping category of TECS hits, of any age, even a decade after the Supreme Court made clear in *Riley* that a search of a person's cell phone represents such a vast intrusion on personal privacy that it warrants particularly demanding Fourth Amendment scrutiny. The present record also shows the absence of any controls at JFK Airport to ensure that CBP searches the electronic devices of only those travelers for whom the agency possesses particularized, non-stale evidence that may be in possession of contraband on those devices at the time they reenter the United States.

An additional factor that weighs in favor of exclusion is the inaction by law enforcement in the three years between the time the TECS report on Robinson was created and he was stopped at JFK airport. There is no indication that after generating the purportedly reliable information that led to the TECS lookout on Robinson in November 2019, law enforcement took any steps to act on it. As noted *supra*, every download, every purchase, and every viewing of child pornography causes harm to the victims who were forced to participate in its creation, and to society as a whole. And yet, after learning that Robinson may have been linked to the unlawful purchase of child pornography, it appears that neither NTC nor any other law enforcement agency took any steps to confirm that fact and seize any CSAM he may have downloaded. They did not knock on his door and attempt to interview

him about these suspicious purchase(s). They did not seek a warrant that could have led to Robinson's arrest in 2019. They did not ask if he would be willing to cooperate in a broader effort to identify the source of CSAM he illegally purchased — which could have led them to others far more directly engaged in "[t]he trade of child pornography[,] . . . a particularly vile aspect of the Internet." *Raymonda*, 780 F.3d at 120. Instead, they simply waited three years for a man who had never once left the country to go on his first trip overseas, then used the dragnet of the border search exception to compel him to surrender and provide the passcodes for the electronic devices in his possession.

The Court need not decide whether this was due to mere inertia, or a more deliberate effort "to shirk the warrant requirement that would otherwise apply to searches of cellphones for evidence of a domestic crime by directing the seizure of the phone at the airport." *Fox*, 2024 WL 3520767, at *10. But given the significant quantity of CSAM that was eventually found on Robinson's devices, the fact that the government waited three years to rely on its claimed border search authority rather than timely acting on an investigative lead likely increased the harm caused by having this material in circulation. In assessing the deterrence value of exclusion, then, the Court finds that strict application of the exclusionary rule in Robinson's case may incentivize law enforcement to take prompt action when they identify a potential purchaser of child pornography, rather than waiting years for that person to leave the country.

Thus, for the reasons discussed above, the Court finds that the good faith

exception does not apply to the initial search of Robinson's iPhone at JFK airport on November 14, 2022, and that the "corrective value" of deterrence outweighs the societal cost of excluding the seized evidence here. *Raymonda*, 780 F.3d at 117–18.

### C. Forensic Search: Reliance on Warrant

The government further argues that the fruits of HSI's subsequent forensic search of that device should not be suppressed because it was conducted by Agent Stepien pursuant to a warrant. *See* Gov't Opp at 25.

As a preliminary matter, there is no dispute that the evidence obtained from the manual search of Robinson's phone at JFK Airport (namely, the fact that agents viewed "at least five" photographs that appeared to depict CSAM, Warrant Aff. ¶¶ 7–8) is what provided the agents with probable cause to obtain the warrant. However, even if a search warrant affidavit relies in part on what a court later concludes was illegally obtained evidence (as the Court has here), if "the remaining [untainted] portions of the affidavit would support probable cause, the warrant was properly issued." *United States v. Trzaska*, 111 F.3d 1019, 1028 (2d Cir. 1997). Here, there is no colorable argument that Magistrate Judge Cho had probable cause to issue the warrant without considering the information provided by Agent Stepien about the identification of apparent CSAM on Robinson's phone by Officer Nunes and then Agent Anstee when they manually searched the device. *See* Warrant Affidavit at 2–3. Thus, had the tainted evidence been excised from Agent Stepien's search warrant affidavit, probable cause would not have existed to issue the warrant.

But this is not the end of the analysis. When probable cause depends on

tainted information, the Court must determine if the "agent who conducted the search acted in good faith reliance on the search warrant." *United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985). "[W]here a search is conducted pursuant to a judicially authorized warrant, a presumption of validity obtains with respect to the affidavit supporting the search warrant." *Lauria*, 70 F.4th at 124 (internal quotation marks omitted).

Thus, because Agent Stepien acted pursuant to a judicially authorized search warrant, his search is cloaked in a presumption of good faith. However, that cloak falls away when an officer "knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause." *Golino v. City of New Haven*, 950 F.2d 864, 871 (2d Cir. 1991). And "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis*, 564 U.S. at 238 (quoting *Herring*, 555 U.S. at 144).

The Second Circuit has identified at least four circumstances where an officer's "reliance on an invalid warrant is unreasonable." *In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147, 162 (2d Cir. 2019). At issue in this case is the circumstance "where the issuing magistrate has been knowingly misled." *Id.* (quoting *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011)). When the challenge to a warrant affidavit is not that it contained what turned out to be erroneous factual information — but rather that law enforcement's actions were themselves in violation of the Fourth Amendment — the Court must determine if law enforcement acted knowingly

or recklessly in preparing the affidavit. *See United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir.), *on reh'g*, 91 F.3d 331 (2d Cir. 1996). Specifically, the Court must determine whether the agent provided the issuing magistrate with enough information to "decide whether [law enforcement's] conduct was sufficiently illegal and in bad faith to preclude a valid warrant." *Id*. Moreover, "[t]he burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance" on a subsequently invalid warrant. *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992).

This means that even if the facts cited in support of probable cause in a warrant affidavit were the product of what was later deemed to be an illegal search, if the law enforcement officer brought all relevant information and circumstances surrounding the search to the magistrate judge, "[t]here is nothing more the officer could have or should have done," and suppression is inappropriate. *Thomas*, 757 F.2d at 1368. In *Thomas*, the Second Circuit found that a canine sniff at the defendant's door, which led to the discovery of incriminating evidence, was unconstitutional. *Id.* at 1366–68. However, the Circuit determined that because "the DEA agent brought this evidence, *including the positive 'alert' from the canine*, to a neutral and detached magistrate," and the magistrate determined there was probable cause for the warrant, "it was reasonable for the officer to rely on this determination." *Id.* at 1368 (emphasis supplied).

On the other hand, if the affidavit in support of a warrant application does not allow the issuing judge to "make a valid assessment of the legality of the warrant

that he [is] asked to issue," the good faith exception will not apply. *Reilly*, 76 F.3d at 1280. In *Reilly*, officers had illegally entered the curtilage of the defendant's property in order to obtain the evidence (marijuana plants) that supported probable cause. *Id.* at 1279. The Second Circuit found that because the concept of curtilage was clearly protected in Fourth Amendment jurisprudence at the time, "the officers undertook a search that caused them to invade what they could not fail to have known was potentially [defendant's] curtilage. *They then failed to provide [the issuing judge] with an account of what they did.*" *Id.* at 1281 (emphasis supplied). Instead, the warrant affidavit "presented only a bare-bones description" of the premises, which "was almost calculated to mislead." *Id.* at 1280. The Circuit held that because the issuing magistrate judge did not have "crucial" facts to determine if the pre-warrant search was legal, it was "the officers . . . themselves [who were] ultimately responsible for the defects in the warrant." *Id.* at 1280–81. Thus, the "the good faith exception does not apply when officers do not provide an issuing judge with details about their conduct during a pre-warrant search." *Id.* at 1280.

*Thomas* and *Reilly* provide this Court with key guideposts in assessing whether the government has met its burden of proving that Agent Stepien's reliance on the warrant is covered by the good faith exception. More recently, sitting *en banc*, the Second Circuit provided a roadmap as to how to determine if a situation is more akin to *Reilly* or *Thomas*. The Circuit indicated that a court must ask if agents "disclosed all crucial facts for the legal determination in question to the magistrate judge," then, a court must determine whether the agents preparing the affidavit had

"significant reason to believe that their predicate act was . . . unconstitutional." *Ganias*, 824 F.3d at 223 (internal quotation marks omitted); *see also id.* at 224 (finding that agent who "provided sufficient information in her affidavit to apprise the magistrate judge of the pertinent facts regarding . . . the alleged constitutional violation on which [Ganias] relies" was covered by good faith exception). In *Fox*, Judge Garaufis helpfully summarized these key components as "materiality (whether [the agent] materially misled the magistrate) and knowledge (whether [the agent] made these omissions knowingly, recklessly or with gross negligence)." 2024 WL 3520767, at *22.

Turning to Agent Stepien's warrant application, he described the events leading to the CBP and HSI searches of Robinson's phone only as follows:

> [] On November 14, 2022, ROBINSON landed at John F. Kennedy International Airport ("JFK Airport"), traveling from Cairo, Egypt, via British Airways flight BA 115 arriving from London, United Kingdom. He was stopped by United States Customs and Border Protection ("CBP") at JFK Airport for secondary inspection. A border search was conducted. During the search, ROBINSON voluntarily gave CBP officers the password for the Subject Device. Upon manually reviewing the Subject Device, CBP officers identified that there was child sexual abuse material on the subject device.

> [] At the border, a law enforcement agent with HSI conducted a preliminary review of the Subject Device and confirmed that it contained at least five photos containing child sex abuse material. Specifically, the law enforcement agent with HSI reviewed several images of what appeared to be a minor male, approximately age 13 to 16 years old, engaged in sexual activity, including anal sex and oral sex, with an adult male. There were also several images of the minor male naked, as well as close-up images of the minor male's genitalia.

Warrant Aff. ¶¶ 7–8 (footnotes omitted).

After the sentence, "A border search was conducted[,]" Agent Stepien added a

footnote, which read:

> The federal government has "broad plenary powers to conduct so-called 'routine' searches at the border even without 'reasonable suspicion that the prospective entrant has committed a crime.'" *United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015) (quoting *Tabbaa v. Chertoff*, 509 F.3d 89, 97–98 (2d Cir. 2007))

*Id.* at 3 n.1.

What Agent Stepien notably omitted from the search warrant affidavit, of course, was any mention of the November 2019 TECS hit: *i.e.,* the very reason why Robinson was referred to secondary inspection to have his devices searched. This was not because Agent Stepien was ignorant of that fact: at the suppression hearing, he confirmed that at the time he applied for the warrant, he was fully aware that the reason Robinson had been referred to secondary inspection was because Nunes was alerted to this TECS hit. *See* Hr'g Tr. at 146. And of course, the TECS hit is the very information that the government now relies upon to contend that the initial search of Robinson's iPhone was supported by reasonable suspicion. Additionally, Agent Stepien informed the magistrate judge that Robinson "voluntarily" provided the passcode to his phone, Warrant Aff. ¶ 7, while omitting the fact that he was provided with a tear sheet essentially telling him that CBP had full authority to compel him to submit to that search. *See* Tear Sheet at 2 (stating that "[a]ll persons, baggage, and merchandise arriving in, or departing from, the United States are subject to inspection, search and detention" and that Robinson was "receiving this sheet because [his] electronic device(s) have been detained for further examination").

Like the officers in *Reilly*, Agent Stepien was fully aware of the factual context

surrounding the original search, but he provided only a "bare-bones" recitation of those facts. And as in *Reilly,* he did so despite being aware of the potential Fourth Amendment implications of the facts he omitted — *i.e.,* that established caselaw distinguishes between "routine" and "nonroutine" searches, and limits the circumstances under which border agents may conduct a search that falls into the latter category. By citing to the Second Circuit case *Levy* for general propositions of law regarding "routine" border searches, and describing the search only in generic, passive-voice terminology, *see* Warrant Aff. ¶ 7 ("A border search was conducted."), Agent Stepien falsely indicated to the magistrate judge that what occurred was nothing more than a routine, suspicionless search of a randomly selected traveler.

At oral argument, the government contended that Agent Stepien had no reason to include the information regarding the TECS hit as he believed that it was a routine border search, and because no level of suspicion is necessary for a routine border search, including the TECS hit was unnecessary. *See* Oral Arg. at 64 (argument, by government counsel, that Stepien did not mention the TECS hit because "it's not necessary to include all the background about investigation when making a warrant application"); *see also id.* at 67 ("[I]t is outside the practice of search warrant drafting to include every single fact that might have led to the recovery of an electronic device that is now the subject of a search warrant."); *see also id.* at 66 ("It's impossible to include every single thing that happens in an interaction with somebody when you're writing a search warrant affidavit.").

The government is correct that an officer need not provide every detail of an

earlier search in a warrant affidavit.  However, it has been settled law in this Circuit for nearly three decades that an officer must provide *relevant* "details about their conduct during a pre-warrant search." *Reilly*, 76 F.3d at 1280.  That is particularly so where — as here — the affiant is aware of existing Fourth Amendment caselaw concerning the specific category of searches that the magistrate judge may need to apply to assess the constitutionality of the officers' earlier actions.  *Id.* at 1281 (finding officers' actions were not protected by good faith when they "undertook a search that caused them to invade what they could not fail to have known was potentially [defendant's] curtilage" and "their actions in not describing [the search] to the judge [is not] the kind of behavior to which the term good faith can be applied").  The record before this Court, including but not limited to its assessment of Agent Stepien's demeanor at the hearing, leads this Court to the firm conclusion that the omission of the TECS hit from the warrant affidavit was not inadvertent.  It is difficult to conceive how any officer acting in good faith could omit that information inadvertently, or (as the government now contends) do so in order to limit the affidavit to only necessary "context."  And it is a particularly difficult claim to credit here, since Agent Stepien included other far less relevant (or irrelevant) information, such as the airline and flight number for the plane on which Robinson arrived at JFK.  *See* Warrant Aff. ¶ 7.

Notably, at the hearing, the government did not elicit from Agent Stepien any explanation as to why he did not simply inform Magistrate Judge Cho that a TECS hit stating that Robinson was linked to the purchase of CSAM three years prior was

the actual reason for the search.  He simply agreed with the general questions from the government that he believed the observations made during the search of the phone "were lawfully obtained" because the search was a "border search."  Hr'g Tr. at 150.

Additionally, even if the Court were to credit Agent Stepien's claim that he believed this was a "routine" border search requiring no reasonable suspicion, that does not explain why he would have left the TECS report out of the affidavit — unless he did not want the issuing judge to ask questions regarding the TECS hit, its origins, its age, and anything else that might bear on whether the agents had reasonable suspicion to search Robinson's phone at the border.   If Agent Stepien sought the warrant not to sanitize the earlier warrantless search, but in a good faith effort to ensure that HSI had probable cause to conduct a forensic search, he would have certainly included the details that provided law enforcement with particularized grounds to search the phone.  The Court does not come to this view out of conjecture; it does so based on Agent Stepien's own words.  In the warrant affidavit, Agent Stepien wrote that "while HSI might already have all necessary authority to examine the Subject Device, I seek this additional warrant *out of an abundance of caution* to be certain that an examination of the Subject Device will comply with the Fourth Amendment."  Warrant Aff. ¶ 10 (emphasis supplied).  It defies common sense that Agent Stepien would prepare an entire search warrant affidavit to ensure the legality of a device search "out of an abundance of caution," but would not include key details in that affidavit that, in the government's own view, provided particularized

suspicion that Robinson had contraband on that device when he reentered the country.

Thus, in light of the foregoing record, the Court finds that Agent Stepien knowingly and intentionally omitted what he knew or should have known was material information regarding the TECS report that led to the manual search of Robinson's phone. Moreover, he falsely implied, through the statements he did include in the affidavit, that the search at issue was merely a "routine search[] at the border" of a randomly selected traveler. Warrant Aff. at 3 n.1 (internal quotation marks omitted). It would not be unreasonable to conclude that Agent Stepien did so with the specific intent to mislead the magistrate judge — *i.e.,* because he did not want Judge Cho questioning whether the initial search of Robinson's phone was routine or nonroutine, and whether it was supported by reasonable suspicion. But at the very least, it is clear that Agent Stepien acted recklessly when he presented the court with this incomplete and misleading warrant affidavit. *See Reilly*, 76 F.3d at 1280 ("We have previously held that recklessness may be inferred when omitted information was clearly critical to assessing the legality of a search." (internal quotation marks omitted)).

It is not only what Agent Stepien left out of his affidavit that leads this Court to conclude that he did not act in good faith; it is also the information he included. Agent Stepien wrote that Robinson "voluntarily gave CBP officers the password" for his phone. Warrant Aff. ¶ 7. This strongly implied that, even if the search was not valid under the border exception, it was a "consent search." While that is a well-

recognized exception to the warrant requirement, a search is not voluntary if "granted only in submission to lawful authority." *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973); *see also United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004) ("The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary."). Here, through taking Robinson into a secondary inspection area from which he was not free to leave, providing him with a tear sheet which indicated that CBP had full legal authority to search his phone, and stating, "what's the password for the phone," Hr'g Tr. at 55, Officer Nunes did not ask Robinson for his consent to examine the contents of his cell phone; she did not give Robinson any option but to consent to that search.

The government has, appropriately, not argued that this was in fact a consent search. Rather, it argues that the statement that Robinson "voluntarily gave CBP officers [his] password" in the warrant affidavit did not imply or suggest that it was a consent search; instead, it argues that Agent Stepien included this language merely to provide "context as to how this came to be a search at all." Oral Arg. Tr. at 30–31.

This argument is implausible. The warrant affidavit contains only five sentences detailing all the events that took place from when Robinson landed at JFK to when CBP officers identified CSAM on his phone. *See* Warrant Aff. ¶ 7. This Court fails to understand how the sentence that "Robinson voluntarily gave CBP officers the password for the Subject Device" was more relevant "context" than the very reason Officer Nunes testified that she was mandated by CBP policy to take Robinson to secondary screening and search his devices. When so little other information about

the search was provided, it is a fair inference that this information was included to falsely imply that the search was performed only because Robinson "voluntarily" consented to it.

For the foregoing reasons, this Court finds that Agent Stepien's material omissions from — and misrepresentations in — his warrant affidavit amounted to, at the very least, a "reckless disregard for the truth." *Lauria*, 70 F.4th at 125 (quoting *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000)).  Thus, his subsequent reliance on the search warrant is not protected by the good faith exception, and the evidence obtained from the forensic search of Robinson's iPhone following execution of the search warrant must be excluded.

## CONCLUSION

As the initial search of Robinson's iPhone was conducted without a warrant and probable cause, it violated his Fourth Amendment right to be free from unreasonable search and seizure.  Further, as the government has not shown that the officers who conducted the search had an objective, good faith basis to believe that their conduct was lawful under binding appellate precedent, all the evidence obtained from that search must be excluded.  Nor can the government rely upon evidence obtained from the subsequent judicial warrant, as the HSI agent who submitted the warrant affidavit knowingly failed to disclose to the magistrate judge the circumstances surrounding the earlier search of Robinson's phone, and exhibited what the Court concludes was, at the very least, a reckless disregard for the truth.

The Court does not come to this conclusion lightly.  Robinson's cell phone contained a substantial quantity of child pornography, the circulation and possession of which caused enormous harm to the minors depicted in those images.  But "[o]ur commitment to equal justice and the rule of law requires the courts to faithfully apply criminal laws as written . . . even when the conduct alleged is indisputably abhorrent." *Fischer v. United States*, 603 U.S. 480, 499 (2024) (Jackson, J., concurring).  Certainly, no less is required when courts are called upon to faithfully apply the Fourth Amendment's guarantees.

For these reasons, Robinson's motion to suppress the evidence recovered from his iPhone is GRANTED.

SO ORDERED.


    /s/ Nina R. Morrison
NINA R. MORRISON
United States District Judge

Dated: May 9, 2025
        Brooklyn, New York

A380

## NOTICE OF APPEAL

### UNITED STATES DISTRICT COURT

_____**Eastern**_____ District of _____**New York**_____

UNITED STATES OF AMERICA

- against -

**JASON ROBINSON,**

Defendant.

Docket Number _____**23-CR-192 (NRM)**_____

_____**The Honorable Nina R. Morrison**_____
(District Court Judge)

Notice is hereby given that _____**the United States of America**_____

appeals to the United States Court of Appeals for the Second Circuit from the:

Judgment _____ ;   Order __x__ ;   Other _____ ; _____ .
(specify)

entered in this action on _____**May 9, 2025**_____ .
(specify)

Offense occurred after November 1, 1987   Yes __X__       No _____ .

The appeal concerns: _____**suppression of evidence**_____ .

Date ____**June 3, 2025**_____        ____**Gilbert Rein, AUSA**_____
(Counsel for Appellant)

TO:    **Benjamin Yaster, Esq.**              Address:   **United States Attorney's Office - EDNY**
       **Federal Defenders of New York**                  **271-A Cadman Plaza East**
       **One Pierrepont Plaza, Brooklyn, NY 11201**        **Brooklyn, New York, 11201**
       **Telephone: (718) 330-1291**                      **Telephone:   718-254-6407**
       **E-Mail: benjamin_yaster@fd.org**                 **E-Mail: Gilbert.Rein@usdoj.gov**

   ADD ADDITIONAL PAGE IF NECESSARY

(TO BE COMPLETED BY ATTORNEY)

| ▶ QUESTIONNAIRE | ▶ TRANSCRIPT ORDER    ▶ DESCRIPTION OF PROCEEDINGS FOR WHICH TRANSCRIPT IS REQUIRED (INCLUDE DATE) |
|---|---|
| ____ I am ordering a transcript. <br> _X_ I am not ordering a transcript. <br> **Reason:** <br> ____ Daily copy is available <br> _X_ U.S. Attorney has placed order <br> ____ Other. Attach explanation | **Dates** <br> Prepare transcript of <br> ____ Pre-trial proceedings _____ <br> ____ Trial _____ <br> ____ Sentence _____ <br> ____ Post-trial proceedings _____ |

The ATTORNEY certifies that he/she will make satisfactory arrangements with the court reporter for payment of the cost of the transcript. (FRAP 10(b)) ▶ Method of payment ___ Funds ___ CJA Form 24 _X_ U.S. Attorney's Office Will Pay

| ATTORNEY'S signature: _(signature)_ | Date: June 3, 2025 |
|---|---|

▶ COURT REPORTER ACKNOWLEDGMENT       To be completed by Court Reporter and forwarded to Court of Appeals.

| Date order received | Estimated completion date | Estimated number of pages |
|---|---|---|
| | | |

Date _____        Signature _____
(Court Reporter)

COPY1 - ORIGINAL

*U.S. GPO: 2001-611-552/60002

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

– against –

23-CR-192 (NRM)

JASON ROBINSON,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

## CERTIFICATION PURSUANT TO 18 U.S.C. § 3731

      It is hereby certified pursuant to 18 U.S.C. § 3731 that this appeal is not taken for purposes of delay and that the evidence that has been ordered suppressed constitutes substantial proof of facts material in the proceeding.

Dated:      Brooklyn, New York
            June 3, 2025

                    By:   *Joseph Nocella*
                       JOSEPH NOCELLA, JR.
                       United States Attorney