# 25-1428-cr

To be argued by:
**ASHOK CHANDRAN**

_____
_____

United States Court of Appeals
For the Second Circuit

_____

Docket No. 25-1428-cr

_____

UNITED STATES OF AMERICA,

*Appellant,*

-against-

JASON ROBINSON,

*Defendant-Appellee.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____

**BRIEF OF DEFENDANT-APPELLEE
JASON ROBINSON**

_____

Federal Defenders of New York, Inc.
 Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8743

**ASHOK CHANDRAN**,
*Of Counsel*

# **TABLE OF CONTENTS**

Table of Contents ................................................................... i

Table of Authorities ............................................................. iii

Counterstatement of Jurisdiction ......................................... 1

Introduction ......................................................................... 1

Questions Presented ............................................................ 5

Counterstatement of the Case ............................................. 7

     I.    Factual Background ............................................. 7

     II.    Procedural History .......................................... 13

Summary Of Argument ...................................................... 18

Standard of Review ............................................................ 20

Argument ........................................................................... 21

     I.    The Manual Search Of Robinson's Phone During His Hourslong Detention Violated The Fourth Amendment .......... 21

          A.    Legal Framework ................................................. 21

          B.    The District Court Properly Concluded That The Search Of Robinson's Phone At JFK Was Nonroutine .................. 24

          C.    The District Court Properly Held That A Warrant Is Required To Search A Phone At The Border. ..................... 33

     II.    The District Court Correctly Found The Good Faith Exception Inapplicable To The Search At JFK. ............................... 38

A. No Binding Appellate Precedent Even Suggested That A Suspicionless Search Of A Phone Was Permissible...........39

B. The Three-Year-Old TECS Lookout Didn't Give Rise To Reasonable Suspicion. ............................................44

III. The District Court Did Not Clearly Err In Finding Stepien Knowingly Misled The Magistrate Judge....................................51

A. The Statement That Robinson "Voluntarily" Provided His Phone's Passcode And The Omission Of The TECS Lookout Were Material..........................................52

B. The District Court's Finding That Stepien Acted With Reckless Disregard For The Truth Was Not Clearly Erroneous. ..............................................................57

Conclusion.....................................................................................61

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Boyd v. United States*, 116 U.S. 616 (1886) ............................................................37

*Carpenter v. United States*, 585 U.S. 296 (2018) ...................................................26

*Cassidy v. Chertoff*, 471 F.3d 67 (2d Cir. 2006) ............................................. 31, 32

*Davis v. United States*, 564 U.S. 229 (2011)...........................................................40

*Diamondstone v. Macaluso*, 148 F.3d 113 (2d Cir. 1998).......................................44

*Hernandez v. United States*, 939 F.3d 191 (2d Cir. 2019) ......................................47

*Kyllo v. United States*, 533 U.S. 27 (2001)..............................................................22

*MacWade v. Kelly*, 460 F.3d 260 (2d Cir. 2006)......................................................56

*Missouri v. McNeely*, 569 U.S. 141 (2013) ....................................................... 22, 38

*New York v. Harris*, 495 U.S. 14 (1990)..................................................................33

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating District*,
    673 F.3d 84 (2d Cir. 2012) ...............................................................................8

*Ohio v. Robinette*, 519 U.S. 33 (1996) ....................................................................21

*Phaneuf v. Fraikin*, 448 F.3d 591 (2d Cir. 2006).....................................................56

*Riley v. California*, 573 U.S. 373 (2014)..........................................................passim

*Smith v. Ohio*, 494 U.S. 541 (1990).........................................................................55

*United States v. Aguiar*, 737 F.3d 251 (2d Cir. 2013) ............................................40

*United States v. Alisigwe*, No. 22 Cr. 425, 2023 WL 8275923 (S.D.N.Y. Nov. 30,
    2023) ................................................................................................................30

*United States v. Alisigwe*, No. 24-960 (2d Cir., argued Mar. 28, 2025).............25

*United States v. Andino*, 768 F.3d 94 (2d Cir. 2014)...............................................20

*United States v. Arango-Correa*, 851 F.2d 54 (2d Cir. 1988) ...............................42

*United States v. Arvizu*, 534 U.S. 266 (2002) .........................................................58

*United States v. Bershchansky*, 788 F.3d 102 (2d Cir. 2015)...............................60

*United States v. Caraballo*, 831 F.3d 95 (2d Cir. 2016) .........................................38

*United States v. Charleus*, 871 F.2d 265 (2d Cir. 1989) ................... 24, 27, 28, 33

*United States v. Coon*, No. 10 Cr. 110A, 2011 WL 1871165 (W.D.N.Y. May 16,
    2011) ................................................................................................................50

*United States v. Flores-Montano*, 541 U.S. 149 (2004) .........................................23

*United States v. Fox*, No. 23 Cr. 227, 2024 WL 3520767 (E.D.N.Y. July 24,
    2024) ................................................................................................................30

*United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013) ..................................... 21, 26

*United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016) ................................... 26, 53

*United States v. Gavino*, No. 22 Cr. 136, 2024 WL 85072 (E.D.N.Y. Jan. 7, 2024) ........................................................................................................... 30

*United States v. Hensley*, 469 U.S. 221 (1985) ........................................................ 47

*United States v. Irving*, 452 F.3d 110 (2d Cir. 2006) .................................. passim

*United States v. Jiau*, 734 F.3d 147 (2d Cir. 2013) ................................................ 20

*United States v. Kamaldoss*, No. 24-824 (2d Cir., argued Mar. 31, 2025) ......... 25

*United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) ......................................... 43

*United States v. Lauria*, 70 F.4th 106 (2d Cir. 2023) .................................... 51, 57

*United States v. Levy*, 803 F.3d 120 (2d Cir. 2015) ...................................... 28, 42

*United States v. Maher*, 120 F.4th 297 (2d Cir. 2024) ................................. 42, 43

*United States v. Mannino*, 635 F.2d 110 (2d Cir. 1980) ...................................... 42

*United States v. Molina-Isidoro*, 884 F.3d 287 (5th Cir. 2018) ........................... 37

*United States v. Montoya de Hernandez*, 473 U.S. 531 (1985) .......... 23, 32, 34, 35

*United States v. Murphy*, 703 F.3d 182 (2d Cir. 2012) ........................................ 20

*United States v. Patterson*, 25 F.4th 123 (2d Cir. 2022) ...................................... 44

*United States v. Peterson*, 100 F.3d 7 (2d Cir. 1996) ........................................... 53

*United States v. Place*, 462 U.S. 696 (1983) ........................................................... 31

*United States v. Ramsey*, 431 U.S. 606 (1977) ...................................................... 36

*United States v. Raymonda*, 780 F.3d 105 (2d Cir. 2015) ................................. 4, 45

*United States v. Reilly*, 76 F.3d 1271 (2d Cir.), *on rehearing*, 91 F.3d 331 (2d Cir. 1996) ................................................................................... 51, 52, 53

*United States v. Ricciardelli*, 998 F.2d 8 (1st Cir. 1993) ..................................... 50

*United States v. Sanders*, 663 F.2d 1 (2d Cir. 1981) ............................................ 28

*United States v. Silva*, 714 F. Supp. 693 (S.D.N.Y. 1989) ................................... 42

*United States v. Smith*, 673 F. Supp. 3d 381 (S.D.N.Y. 2023) ...................... 30, 36

*United States v. Smith*, 967 F.3d 198 (2d Cir. 2020) ........................................... 27

*United States v. Smith*, No. 24-1680 (2d Cir., argued June 24, 2025) .............. 25

*United States v. Sultanov*, 742 F. Supp. 3d 258 (E.D.N.Y. 2024) ...................... 30

*United States v. Wagner*, 989 F.2d 69 (2d Cir. 1993) ........................................... 44

*United States v. Whitted*, 541 F.3d 480 (3d Cir. 2008) ......................................... 47

## COUNTERSTATEMENT OF JURISDICTION

The District Court (Morrison, J.) suppressed evidence recovered from Jason Robinson's cell phone in an order dated May 9, 2025. A320–A379.[1] The government filed a notice of appeal on June 3, 2025. Robinson has moved to dismiss the appeal in part for want of jurisdiction, *see* Dkt. No. 22, and maintains those arguments.

## INTRODUCTION

After reviewing documentary evidence, holding an evidentiary hearing and observing three agents' responses and demeanor on the stand, and hearing oral argument, the District Court granted Robinson's motion to suppress evidence recovered from his cell phone in two separate searches.

The first search was conducted at John F. Kennedy International Airport without a warrant, based solely on a three-year-old, two-sentence

---

[1] Citations to "A," "ECF No.," and "Br." refer to the government's appendix, the district court docket for case number 1:23-cr-192-NRM, and the government's brief, respectively. Citations to "Dkt. No." refer to the docket in this appeal.

agency flag that "linked" Robinson to the purchase of child pornography without any further detail. In suppressing the evidence recovered from that search, the District Court held that the search of a cell phone was intrusive enough to constitute a nonroutine search at the border, which required at least reasonable suspicion. It then held that age and generality of the agency flag rendered it, standing alone, insufficient to give rise to reasonable suspicion. And finally, the District Court held that the officers who conducted the first search were not entitled to the good faith exception to the exclusionary rule because extant law from this Circuit and the Supreme Court made clear that searches of cell phones are nonroutine.

The second search was conducted pursuant to a warrant obtained via an affidavit that omitted any references to the agency flag that actually formed the basis for the encounter and instead indicated that Robinson had "voluntarily" provided his password to permit the first search. The District Court determined that officers could not rely on the subsequently issued warrant because the combination of these misrepresentations created the false impression that Robinson had consented to the search of his cell

phone. Further, based on the affiant's inability to adequately explain his choices in drafting the affidavit, the District Court determined that his misrepresentations were made with at least gross negligence towards the truth.

The government protests the District Court's decisions on both searches, but largely ignores this Court's own precedents in doing so. As to the first search, the government suggests that the search of a cell phone at the border is routine, requiring no individualized suspicion. But any search at the border that intrudes significantly into a traveler's reasonable expectation of privacy requires at least reasonable suspicion. Indeed, this Court has already held that the search of floppy disks at the border is nonroutine. *United States v. Irving*, 452 F.3d 110 (2d Cir. 2006). And the Supreme Court has long made clear that the search of a cell phone is orders of magnitude more intrusive, among the most serious infringements on privacy today. As a fallback, the government argues that the three-year-old agency flag alone created reasonable suspicion to justify the search. But the government expressly declined to offer any proof that the flag was

3

supported by reasonable suspicion when it was entered. Moreover, whatever evidentiary value the flag may have had at the time it was entered, it had long become stale by the time officers searched Robinson's phone in 2022. This Court has routinely held that information underlying a search goes stale within a matter of months, even in child pornography cases. *See, e.g.*, *United States v. Raymonda*, 780 F.3d 105 (2d Cir. 2015). The government offers no explanation as to why the gap here, many times longer, should be treated differently.

As to the second search, the government fights the District Court's factual determinations about the state of mind of the officer who prepared the affidavit underlying the warrant. None of its arguments amount to error, clear or otherwise. The government simply offers other explanations for the officer's decisions and omissions. But this Court has repeatedly held that there can be no clear error when a district court chooses between multiple permissible inferences to be drawn, especially where, as here, a district court's inference is based on a testifying witness's credibility. Given the officer's inability to explain his decisions at the hearing and the District

Court's observations of his demeanor at the hearing, it was not clearly erroneous for the District Court to determine that he acted with reckless disregard for the truth. And there was similarly no error in the District Court's determination that the collective effect of the officer's misrepresentations was to create the impression that the first search of Robinson's phone was done on consent, vitiating any need for individualized suspicion.

Because there was no error in any of the District Court's holdings, this Court should affirm in all respects.

## QUESTIONS PRESENTED

1. Robinson was taken away from his spouse to an isolated room that he was not permitted to leave, where a Customs and Border Protection (CBP) agent told him he was required to turn over his electronic devices, including his cell phone, as well as their passwords. He was kept there for over three-and-a-half hours, during which he was patted down twice and his backpack was searched, after which he was taken to a private area for a clothed, full-body inspection. The agent also searched his devices for

approximately 45 minutes in total. Did the District Court err in holding that this search was "nonroutine" and required probable cause and a warrant, or, in the alternative, at least reasonable suspicion?

2.      This Court and the Supreme Court have stressed the singular nature of modern cell phones in balancing individual rights against government interest for purposes of the Fourth Amendment. And this Court has determined that the search of floppy disks, which contain just a fraction of the data on a modern cell phone, are "nonroutine." Could the agent have nonetheless reasonably relied on precedent from this Court that *declined* to resolve whether a search of a notebook was "routine" and non-binding precedent from other circuits to determine that the search of a phone required no level of suspicion?

3.      The agent's sole basis for conducting the 45-minute search of Robinson's devices was a three-year old, two-sentence flag from CBP's National Targeting Center that "linked" him, in an unspecified way, to a purchase of child sexual abuse material (CSAM). Did that flag alone provide reasonable suspicion for the search?

4.      After hearing testimony from all of the involved CBP agents and reviewing the documentary evidence, the District Court determined that the agent who prepared a subsequent warrant application knowingly, or at least recklessly, misled a magistrate judge about the facts surrounding the search by omitting the reason Robinson was searched and suggesting his participation in the search was voluntary. Was that determination clearly erroneous?

## COUNTERSTATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

On his way back from his first-ever trip outside the country (a vacation in Egypt with his spouse) on November 14, 2022, Robinson landed at John F. Kennedy International Airport. A124, A322. He proceeded through customs upon arrival, where he was asked routine questions about his identity and travel itinerary. A322. Then, a CBP agent separated Robinson from his spouse and brought him to a separate room for a secondary inspection at approximately 5:30 pm. A322–A323; ECF No. 25-3 ¶ 3. Robinson's spouse was not permitted to enter the room, nor was

Robinson free to leave the room. He would remain in that room for nearly four more hours. *Id.* ¶ 13.

The sole reason for Robinson's secondary inspection was a "TECS lookout"[2] generated by CBP's National Targeting Center (NTC) over three years earlier, on November 11, 2019. A323–A324.[3] Although CBP has promulgated guidance indicating that TECS lookouts generated by field officers would "only be valid for one year," A189, the agency has not imposed any time limits on lookouts generated by NTC, A198—meaning that a lookout from NTC "could remain in TECS indefinitely." A353–A354. TECS lookouts are supposed to be "fill[ed] . . . out with as much

_____

[2] A "TECS lookout" is a flag that provides a CBP officer conducting a screening with any relevant information about a traveler who the agency wishes to refer to secondary screening. A101, A183.

[3] The government suggests, in a footnote, that there may have been an update to the TECS lookout a year before Robinson was detained and searched. Br. at 7 n.4. But the District Court expressly found otherwise: "there is no evidence that it was updated at any time before Robinson landed at JFK in November 2022." A352. The government doesn't assert this finding was clear error. And in any event, a one-sentence footnote wouldn't properly present such a challenge. *See, e.g., Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating District*, 673 F.3d 84, 107 (2d Cir. 2012).

information" as NTC has, A184, and the three-year-old lookout concerning Robinson consisted of just two sentences: "Subj linked to the purchase of child sexual exploitation material via FinCen. Refer to secondary for interview & media device exam to include cell phones and laptops." A323–A324.

The CBP agent conducting the secondary inspection, Shahamin Nunes, had no information about the basis for that lookout, nor any independent belief that Robinson had engaged in any criminal conduct. A141; A160–A161. Nunes asked Robinson preliminary questions about his itinerary, his connections to Egypt, and his employment. A152–A153. All of his answers were truthful, and matched information CBP had on file. A153–A154, A324. In other words, the TECS lookout was "the *only* evidence" that Robinson had ever engaged in any criminal activity. A354 (emphasis in original). Based on that lookout, however, Nunes directed Robinson to turn over his electronic devices, which he did. ECF No. 25-3 ¶ 5.

Nunes then informed Robinson that she "was going to search the devices." ECF No. 25-3 ¶ 5. She provided Robinson with a "tear sheet" informing him that his "electronic device(s) have been detained for further examination, possibly including copying data contained in the device." ECF No. 35-1 at 3. Nunes also told Robinson that she had authority to examine his devices, then directed him to provide her with all passwords associated with the devices. A324. Robinson complied. A156.

Over the next several hours, Robinson was subjected to a variety of searches by other agents. ECF No. 25-3 ¶ 8. Twice, agents patted him down and searched his backpack. *Id.* During one of those searches, agents removed an SD card and a thumb drive from his backpack. *Id.* Then, agents took him to a "holding room or cell off of the sitting area" and conducted a clothed, full-body inspection. *Id.* For her part, Nunes spent nearly an hour conducting a manual review of his electronic devices. She first inspected Robinson's laptop for approximately 30 minutes, finding nothing of note. A132–A133. She then reviewed Robinson's phone for 15 more minutes, where she discovered evidence of CSAM. A134. Nunes alerted Homeland

Security Investigations (HSI), which dispatched Agent Allen Anstee to the secondary inspection room. A325. Anstee confirmed the presence of CSAM on Robinson's phone, and contacted his colleague, Agent Richard Stepien. A205. Anstee then interviewed Robinson, telling Robinson he "had been randomly picked for further inspection." ECF No. 25-3 ¶ 11.

Stepien arrived at JFK and reviewed the reports prepared by Nunes and other CBP agents about the TECS lookout and the nature of the searches. A218. One week later, on November 21, 2022, Stepien prepared an application for a search warrant. A011–A030. In his supporting affidavit, Stepien wrote one paragraph about the search conducted by CBP at JFK, organized chronologically. A013. First, Stepien noted that Robinson landed at JFK on a flight from Cairo (via London). *Id.* Then, Stepien noted that Robinson "was stopped by [CBP] at JFK Airport for secondary screening." *Id.* At that point, "[a] border search was conducted." *Id.* And "[d]uring that search, ROBINSON voluntarily gave CBP officers the password" for his phone. *Id.* Although he later testified that he applied for the warrant "out of an abundance of caution," A210, Stepien did not say anything about CBP's

11

actual basis for the stop, the TECS lookout. A215. Nor did he explain that

Robinson had been detained, told his device had to be searched, and given

a tear sheet asserting CBP's authority to search his cell phone. A216. Based

on that description of the search and the CSAM it recovered, Magistrate

Judge James Cho signed a warrant authorizing a forensic search of

Robinson's cell phone, which revealed additional CSAM.

Based on the results of that search, Stepien prepared another affidavit

several weeks later for a warrant to search Robinson's other electronic

devices. *See* ECF No. 25-6. Though none of the facts surrounding the initial

search of Robinson's phone had changed, Stepien changed his description

of Robinson providing his password, removing the word "voluntarily"

from the sentence. *Id.* at 3. He also removed a footnote that was contained

in the earlier affidavit that asserted the government's power to conduct

"routine" searches at the border. *Id.* The warrant was issued, and the

subsequent search of the phone identified additional CSAM.

## II.    PROCEDURAL HISTORY

A grand jury indicted Robinson on May 1, 2023, for transporting and possessing child pornography. Stepien arrested Robinson a few weeks later and, during their subsequent interview, told Robinson that he had been selected "randomly" for a search. A221. Stepien later acknowledged that he "told [Robinson] something that was false" even though "there were other ways" he could have kept his investigative methods secure. A225.

As relevant here, Robinson moved to suppress all evidence recovered from his phone. ECF No. 25.[4] He argued that the search of his phone at JFK was unsupported by reasonable suspicion or probable cause, and that Stepien's subsequent warrant affidavit knowingly misled the magistrate by suggesting the search of his phone was actually consensual. ECF No. 25-1 at 4–13; ECF No. 31 at 4–5. The District Court held a hearing, where the

_____

[4] Robinson's motion also sought to suppress all material recovered from his other devices as well as certain statements he made to agents at JFK. The government subsequently clarified that it only intended to use evidence from Robinson's cell phone and opposed only that portion of the motion. The District Court thus denied Robinson's motion to suppress evidence from his other electronic devices and his statements to HSI without prejudice. A075.

13

government called three witnesses: Nunes, Stepien, and a third agent, Egbert Simon, who was not involved in the investigation but had knowledge about CBP's policies regarding TECS lookouts. The government also introduced the TECS lookout that led to Robinson's search. Although Stepien had, the week before the hearing, called NTC to inquire about the factual basis for the 2019 TECS lookout, the government chose not to elicit any testimony or evidence regarding that underlying information because, in its view, that was "beyond the scope of the hearing . . . ." A225.

The District Court then held oral argument on the motion. The government again confirmed its view that the factual basis for the 2019 lookout was "not relevant to [the Court's] consideration of" either the search of Robinson's phone at JFK or the subsequent warrant application, claiming that the fact of the three-year-old lookout alone was significant enough to create reasonable suspicion. A248. As to whether the warrant affidavit misled the magistrate judge, the District Court expressed its concern about Stepien characterizing Robinson's provision of his passwords as "voluntary," saying that it was a "straightforward" inference

14

from that language that "it's about consent to do the search." A266. When coupled with Stepien's omission of any reference to the actual reason for the search—what the government had framed as "this highly damning T.E.C.S. hit that the agent had at the time the search was conducted," A262—the District Court asked the government to explain "[w]hat possible reason" Stepien would have for preparing the affidavit as he did "if he wasn't trying to hide something from the magistrate?" A262–A263.

In response, the government agreed that "using the word 'voluntarily' implies that he wasn't threatened or coerced in some way into giving the passcodes." A266–A267. And it also agreed that that wasn't what happened here: Nunes "wasn't asking[,] she was directing [Robinson] put [sic] she had the legal authority to direct him to give up the passcode." A270. But as to both the description of the search as "voluntary" and the omission of the three-year-old TECS lookout, the government fell back to a single argument: because the search of the phone was routine, it required no suspicion, and so the actual reasons for the search and whether it was voluntary were "not necessary" to justify the phone search. A269.

15

On May 9, 2025, the District Court issued its decision, suppressing all contents of Robinson's phone. Its decision rested on four primary conclusions. *First*, the District Court determined that the search of Robinson's cell phone was nonroutine and required probable cause and a warrant. A339–A340. *Second*, the District Court determined that although the lack of a warrant rendered the search of Robinson's phone unconstitutional, the good faith exception would prevent suppression if the officers identified binding appellate precedent that they relied on in treating the search as routine. But it determined that the government hadn't identified any such precedent. A343. To the contrary, all precedent from this Court and the Supreme Court "strongly suggested" that the search of a phone was nonroutine. A348. *Third*, the District Court recognized that this Court has never required more than reasonable suspicion for a nonroutine border search, and thus determined that the officers could still make use of the good faith exception if they had reasonable suspicion that Robinson possessed contraband. A350–A351. But it determined that the two-sentence, three-year-old TECS lookout was

insufficient, standing alone, for that purpose, finding that none of the cases identified by the government involved exclusive reliance on a TECS lookout, let alone one so old and general. A354–A360. *Fourth*, the District Court explained that without the evidence obtained from the first search of Robinson's phone, there would not have been probable cause for the second search. And it determined that, based on its assessment of Stepien's inability to explain his omission of the TECS lookout and inclusion of the word "voluntarily" in the warrant affidavit, Stepien had knowingly misled the magistrate judge who issued the warrant, rendering the good faith exception inapplicable to the second search of Robinson's phone.[5] A376–A378.

The government noticed its appeal on June 3, 2025.

_____

[5] The District Court also balanced the costs of suppression against its deterrent value and held that suppression would encourage agents to act quicker on evidence of CSAM purchases, and held that suppression was warranted. A360–A367. The government does not challenge that aspect of the District Court's ruling on appeal.

17

## SUMMARY OF ARGUMENT

This Court should dismiss this appeal for lack of jurisdiction, for the reasons given in Robinson's motion to dismiss (Dkt. No. 22). If this Court proceeds to the merits, it should affirm the District Court's order in all respects.

*First*, the District Court properly determined that the search of Robinson's phone at JFK was a nonroutine search at the border, and thus required some degree of individualized suspicion. Given the severity of the privacy intrusion that search of a modern cell phone entails, the fact that digital data is a poor fit for the historical justifications for the border search exception, and the case-specific circumstances of this search—including Robinson's hourslong detention and separation from his spouse—the District Court was correct to determine that the search was nonroutine and required at least reasonable suspicion, if not probable cause and a warrant.

*Second*, the good faith exception to the exclusionary rule does not shield the officers who searched Robinson's phone at JFK because no binding appellate precedent supported the conclusion that such a search

was routine. By 2022, this Court had held that various less intrusive searches—a pat-down that briefly revealed a man's back, a search of an artificial leg, the search of a floppy disk—were nonroutine. And both this Court and the Supreme Court have made clear that searches of cell phones are far more invasive. Nor did the officers have reasonable suspicion simply by virtue of the three-year-old, two-sentence TECS lookout. This Court has recognized that evidence underlying suspicion tends to go stale within a matter of months, so the TECS lookout was of minimal value by the time of the search. Moreover, since the government offered no evidence about the basis for the TECS lookout, it was not supported by reasonable suspicion even at the time it was entered.

*Third*, and finally, the District Court's inferences about the collective effect of Stepien's misrepresentations and omissions in the warrant affidavit were not clearly erroneous. It was eminently reasonable to conclude that describing Robinson as "voluntarily" participating in the search strongly implied the search was done on consent, particularly in light of Stepien's decision not to include the actual reason Robinson was

19

searched. And Stepien's inability to explain his decisions, coupled with the

District Court's observations about his demeanor on the stand, were an

adequate basis to determine that the misrepresentations were made

knowingly or with at least gross negligence.

## STANDARD OF REVIEW

"In evaluating the grant of a motion to suppress evidence this Court

reviews the district court's factual findings for clear error, viewing them in

the light most favorable to the defendant, and its conclusions of law *de*

*novo*." *United States v. Andino*, 768 F.3d 94, 98 (2d Cir. 2014). But its review

of facts is even more deferential when "the district court's factual

determinations go[] to witness credibility." *United States v. Jiau*, 734 F.3d

147, 151 (2d Cir. 2013). In those cases, this Court gives "particularly strong

deference to a district court finding." *United States v. Murphy*, 703 F.3d 182,

189 (2d Cir. 2012). And, as in any appeal, this Court can affirm the District

Court's suppression order "on any basis for which there is a record

sufficient to permit conclusions of law, including grounds upon which the

district court did not rely." *United States v. Poller*, 129 F.4th 169, 174 (2d Cir. 2025).

**ARGUMENT**

The Fourth Amendment's fundamental inquiry is whether a search was reasonable "in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The District Court properly held that the circumstances in Robinson's case rendered unreasonable both the manual search of his phone at JFK as well as the subsequent forensic search conducted pursuant to a warrant.

## I. THE MANUAL SEARCH OF ROBINSON'S PHONE DURING HIS HOURSLONG DETENTION VIOLATED THE FOURTH AMENDMENT

### A. Legal Framework

The Fourth Amendment's reasonableness inquiry "generally requires the obtaining of a judicial warrant." *Riley v. California*, 573 U.S. 373, 382 (2014). The process of obtaining a warrant guards against "[t]he chief evil" of "indiscriminate searches and seizures" and "general, exploratory rummaging in a person's belongings." *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013); *accord Riley*, 573 U.S. at 403 (describing indiscriminate

21

searches as "one of the driving forces behind the Revolution itself"). Even as new technologies have emerged, the Supreme Court has instructed courts to "assure[] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo v. United States*, 533 U.S. 27, 34 (2001).

In the absence of a warrant, a search will comply with the Fourth Amendment "only if it falls within a specific exception to the warrant requirement." *Riley*, 573 U.S. at 382. Those exceptions are narrowly drawn, tailored to situations where "there is compelling need for official action and no time to secure a warrant." *Missouri v. McNeely*, 569 U.S. 141, 149 (2013). That determination must be made on a case-by-case basis, not an "overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." *Id.* at 158.

One exception does exist at ports of entry, where the government retains "plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and prevent the introduction of contraband into this

country." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985).
The historical purpose of this authority was "to prevent smuggling and to
prevent prohibited articles from entry." *Id.* at 537–38; *accord United States v.
Flores-Montano*, 541 U.S. 149, 152 (2004) (explaining that border search
exception exists because governmental interest in "preventing the entry of
unwanted persons and effects is at its zenith at the international border").
And that purpose governs the scope of the exception: "[w]hen these
justifications [for an exception to the warrant requirement] are absent, a
search . . . will be unreasonable" absent a warrant. *Arizona v. Gant*, 556 U.S.
332, 351 (2009); *accord Riley*, 573 U.S. at 386 (cautioning against extending a
warrant exception when doing so "would untether the rule from the
justifications underlying [it]").

So "routine" searches, such as "searches of outer clothing, luggage, a
purse, wallet, pockets, or shoes . . . do not substantially infringe on a
traveler's privacy rights," and thus can be conducted without any
individualized suspicion. *Irving*, 452 F.3d at 123. That authority doesn't
extend, however, to "nonroutine" searches—those that are "[m]ore

intrusive" into an individual's privacy. *United States v. Charleus*, 871 F.2d 265, 267 (2d Cir. 1989); *accord Irving*, 452 F.3d at 123 ("[T]he level of intrusion into a person's privacy is what determines whether a border search is routine."). Such nonroutine searches "require at a minimum reasonable suspicion of criminal activity." *Charleus*, 871 F.2d at 267. And sometimes, they may require more; "[t]o determine whether a non-routine search is reasonable, the offensiveness of the intrusion must be weighed against the level of warranted suspicion." *Irving*, 452 F.3d at 123.

## B. The District Court Properly Concluded That The Search Of Robinson's Phone At JFK Was Nonroutine.

The government first suggests that the search of Robinson's cell phone at JFK was a routine border search that required no individualized suspicion at all. Br. at 24. But this Court's precedents are clear: whether a particular search can be characterized as routine depends on the extent to which it invades a person's privacy rights. And equally clear is precedent from both this Court and the Supreme Court holding that searches of cell phones are among the most intrusive searches that the government can conduct. Particularly given the circumstances of Robinson's detention and

search, the District Court properly determined that the search of his phone was not routine.[6]

### 1. Searches of cell phones are far more intrusive than searches this Court has found to be nonroutine.

A search of a cell phone is far more intrusive than anything this Court has ever deemed routine. As the District Court properly recognized, "'[c]ell phones differ in both a quantitative and a qualitative sense from other objects' an arrestee might have on their person because they are 'in fact minicomputers' with 'immense storage capacity' that allowed an individual to carry 'every piece of mail they have received in the past several months, every picture taken, [and] every book or article that they have read." A337 (quoting *Riley*, 573 U.S. at 393–94). Given the nature of modern cell phones, "a cell phone search would typically expose to the government far *more* [information] than the most exhaustive search of a

---

[6] The level of suspicion needed to search a cell phone at the border is an issue that has also been presented to this Court in at least three other cases that remain pending. *See United States v. Alisigwe*, No. 24-960 (2d Cir., argued Mar. 28, 2025); *United States v. Kamaldoss*, No. 24-824 (2d Cir., argued Mar. 31, 2025); *United States v. Smith*, No. 24-1680 (2d Cir., argued June 24, 2025).

house . . . ." *Id.* (quoting *Riley*, 573 U.S. at 396 (emphasis and alteration in original)). As this Court has recognized, "[t]ax records, diaries, personal photographs, electronic books, electronic media, medical data, records of internet searches, banking and shopping information—all may be kept in the same device, interspersed among the evidentiary material that justifies the seizure or search." *United States v. Ganias*, 824 F.3d 199, 218 (2d Cir. 2016); *accord Galpin*, 720 F.3d at 446 (noting that computer hard drives are "akin to a residence in terms of the scope and quantity of private information it may contain"); A337–38 (same). And a cell phone doesn't just store that range of information from a fixed moment in time; "the data on a phone can date back to the purchase of the phone, or even earlier." *Riley*, 573 U.S. at 394. That "retrospective quality of the data here gives policy access to a category of information otherwise unknowable." *Carpenter v. United States*, 585 U.S. 296, 312 (2018).

These quantitative and qualitative differences between cell phones and other personal effects mean that cell phones, "as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette

pack, wallet, or a purse." *Riley*, 573 U.S. at 393. *Riley* thus explicitly puts cell phones in a different category than "wallets" and "purses"—the kinds of personal effects to which this Court has limited the border search exception. *Irving*, 452 F.3d at 123; *Charleus*, 871 F.2d at 267 (noting that "personal belongings and effects" subject to routine search "have been defined as including outer clothing and the contents of purses, wallets, or pockets"). And this Court has agreed that "search and seizure of personal electronic devices like a modern cell phone . . . implicates different privacy and possessory concerns than the search and seizure of a person's ordinary personal effects." *United States v. Smith*, 967 F.3d 198, 208 (2d Cir. 2020). The government's analogizing of a cell phone to other kinds of luggage or belongings, Br. at 23–24, thus ignores what both this Court and the Supreme Court have said about the unique nature of cell phones.

This Court's precedents on border searches confirm that searches of cell phones are nonroutine. In *Charleus*, for example, this Court considered a search wherein a customs agent placed a hand on a traveler's back and, upon feeling a "hard lump," brought the traveler to a private room and

27

"lifted up the back of his shirt" to inspect his back. 871 F.2d at 267. Even that limited contact, this Court observed, "straddles the line between the two categories of border searches"—though it ultimately concluded that the search was routine. *Id.* at 268. Similarly, in *United States v. Levy*, this Court reviewed a border search in which a CBP agent "inspected . . . a spiral-bound notebook that contained eighteen pages of Levy's handwritten notes" and "examined and photocopied the notebook." 803 F.3d 120, 121 (2d Cir. 2015). This Court noted that "[w]hether searching *and* copying the notebook here constitutes a 'routine' border search . . . is somewhat more debatable," analyzing whether the search was supported by reasonable suspicion. *Id.* at 123 (emphasis in original).

Well on the "nonroutine" side of that line, in *United States v. Sanders*, this Court considered the search of a traveler arriving at JFK airport from Venezuela. 663 F.2d 1 (2d Cir. 1981). A customs officer searched the traveler's luggage and patted down his pockets. *Id.* at 2. Thereafter, the traveler was taken to a hospital and directed to remove his artificial leg for inspection. *Id.* Although the search of his luggage and pockets was routine

and required no specific suspicion, this Court separately considered the search of his artificial leg nonroutine, requiring at least reasonable suspicion. *Id.* at 3. And most recently, in *Irving*, this Court held that the search of digital data contained on two computer diskettes (more commonly known as floppy disks) and a roll of film from a disposable camera was nonroutine and required reasonable suspicion. 452 F.3d at 124.

*Irving* controls. If searching the digital data contained on two floppy disks is invasive enough to constitute a "nonroutine" search, searching a phone certainly must be, too. As the District Court correctly observed—and as the government doesn't dispute—the modern cell phone has "approximately 44,444 times more storage than one of Irving's floppy disks." A347. Moreover, a cell phone contains qualitatively different kinds of data than a floppy disk would, serving as a "digital record of nearly every aspect of [people's] lives—from the mundane to the intimate." *Riley*, 573 U.S. at 395. No reasonable person expects to forfeit that privacy every time they leave the country for a business trip or a vacation with their family. Nearly every district court in this Circuit to consider the issue has

29

agreed. *See, e.g.*, *United States v. Sultanov*, 742 F. Supp. 3d 258 (E.D.N.Y.

2024); *United States v. Smith*, 673 F. Supp. 3d 381 (S.D.N.Y. 2023); *United*

*States v. Fox*, No. 23 Cr. 227, 2024 WL 3520767 (E.D.N.Y. July 24, 2024);

*United States v. Gavino*, No. 22 Cr. 136, 2024 WL 85072 (E.D.N.Y. Jan. 7,

2024); *United States v. Alisigwe*, No. 22 Cr. 425, 2023 WL 8275923 (S.D.N.Y.

Nov. 30, 2023). But that is precisely what the government advocates for

here. A260. ("Q: And in your view, that applies to all travellers . . . A U.S.

citizen goes abroad for a few days, a CBP officer can look at their text

messages, the[ir] personal photographs, their videos, their emails, any of

the apps on their phone so long as they're not backing it up or

downloading it . . . . A: Yes, that is our view.").

> 2. *The duration and circumstances of Robinson's detention*
> *further indicate the search was nonroutine.*

The District Court correctly determined that the strong privacy

interests in cell phones, standing alone, renders their searches nonroutine.

But while an individual's expectation of privacy is the primary factor in

determining the intrusion of a particular search, this Court additionally

considers factors such as the duration of the search or stop, the manner in

30

which government agents determine which individuals to search, and the methods employed in the search and seizure. *Cassidy v. Chertoff*, 471 F.3d 67, 78–79 (2d Cir. 2006). So even if this Court declines to adopt a per se rule that cell phone searches are nonroutine, those ancillary factors, applied to the facts of this particular case, rendered the search of Robinson's phone nonroutine.

First, the duration of Robinson's detention was significant—roughly four hours, long into the evening, during which he was searched many times over and in different ways. That hourslong detention is a far cry from the "cursory" searches "of the short duration" that are hallmarks of minimally intrusive searches. *Id.* at 79; *accord United States v. Place*, 462 U.S. 696, 709–10 (1983) (noting, in a case of airport seizure, that Supreme Court has "never approved a seizure of the person for the prolonged 90-minute period involved here"). In *Montoya de Hernandez*, for example, the Supreme Court observed that the detention and visual inspection of a traveler suspected of smuggling drugs in her alimentary canal—which would ordinarily be deemed routine—became nonroutine and required

31

individualized suspicion when the detention stretched out to a 16-hour hold. 473 U.S. at 540 (noting that there needed to be "suspicion [that] would justify a seizure of an incoming traveler for purposes other than a routine border search"). Though Robinson's detention was shorter, it involved repeated, active searches—of his luggage, his electronic devices, and his person—that underscore the degree of its intrusion.

Second, the manner in which agents decided to search Robinson presents significant concerns that agents can act in an "arbitrary manner." *Cassidy*, 471 F.3d at 79. As the District Court found, "a single lookout generated by an agent at the National Targeting Center could remain in TECS indefinitely." A353–A354. Yet the government has authorized CBP agents to conduct highly invasive searches based on TECS lookouts *of any age*. A364 (noting that, at oral argument, "the government took the position that any TECS hit such as this one, no matter how long it had been in the system, would give CBP agents the necessary reasonable suspicion to conduct a search of that traveler's phone"). Taken to its natural conclusion, the government has asserted that a single TECS lookout allows "the

person's electronic devices to be searched upon reentry into the country for the rest of her life." *Id.*

Third, and finally, Robinson was "separated from his family . . . in the dark of night" when agents separated him from his spouse and repeatedly refused to let the two reunite. *New York v. Harris*, 495 U.S. 14, 28 (1990) (Marshall, J., dissenting). Though Robinson "asked several times to see [his spouse]" over the many hours of his detention, he was repeatedly denied. ECF No. 25-3 ¶¶ 8, 13. That isolation only exacerbated the "unsettling show of authority" conveyed by Robinson's extended detention and the "unexpected intrusions on [his] privacy." *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 676 n.2 (1989).

### C. The District Court Properly Held That A Warrant Is Required To Search A Phone At The Border.

Because searches of cell phones at the border are nonroutine, they "require *at a minimum* reasonable suspicion of criminal activity." *Charleus*, 871 F.2d at 267 (emphasis added). And as discussed *infra*, Section II(B), even that level of suspicion was lacking here. That alone would be enough to affirm the District Court's decision. But should this Court opine on the

33

appropriate level of suspicion needed for cell phone searches, it should affirm the District Court's determination that they generally require probable cause and a warrant.

To determine the level of suspicion needed for a nonroutine search, this Court must balance the intrusion on Fourth Amendment rights "against [its] promotion of legitimate governmental interests in the border search context." A338 (quoting *Montoya de Hernandez*, 473 U.S. at 537) (cleaned up). As the District Court observed (and as discussed above), a search of a cell phone's contents is one of the most intrusive searches agents can perform, "'typically expos[ing] to the government far *more* [information] than the most exhaustive search of a house.'" A337 (quoting *Riley*, 573 U.S. at 396). Both "Supreme Court and Second Circuit precedent make it clear that a traveler's Fourth Amendment interest in a personal cell phone is extremely high." A338. Because the "privacy-related concerns are weighty enough" when assessing a phone search, they generally "require a warrant, notwithstanding the diminished expectations of privacy" of the person being searched. *Riley*, 573 U.S. at 392.

34

The government chides the District Court's reliance on *Riley*, arguing that the District Court "failed to recognize the difference between searches incident to arrest and those at the border." Br. at 26. But the District Court expressly acknowledged that *Riley* concerned a different exception to the warrant requirement. A338 (noting that "it is true that *Riley* concerned the search incident to arrest exception to the warrant requirement" instead of the border search exception). And it explained why *Riley* was nonetheless highly relevant to its analysis: "the Supreme Court's clear holding regarding the extent of privacy interests implicated in a cell phone search is necessary for this Court to consider when balancing a search's intrusion on the individual's Fourth Amendment interests against the search's promotion of legitimate government interests in the border search context." A338 (citing *Montoya de Hernandez*, 473 U.S. at 537) (cleaned up). This was clearly a correct statement of the law; even the government does not dispute that *Riley* defines the scope of the privacy intrusion worked by a cell phone search.

35

On the other side of the equation, the historic justifications for the border search exception are a poor fit for a search of *digital* data such as that on a cell phone. The exception is "grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *United States v. Ramsey*, 431 U.S. 606, 620 (1977). The government baldly asserts that searches of cell phones are needed to further "the government's interest in protecting its territorial integrity," Br. at 28, but doesn't explain how. Even cursory analysis shows the opposite.

Searches of physical spaces, for physical evidence, further the sovereign right to control who and what enters the country, as well as levy all due customs taxes: "[w]hen the Government indicts contraband, identifies goods subject to customs tax, or prevents someone from entering the country without authorization, it successfully stops a person or thing outside the country from unlawfully coming into it." *Smith*, 673 F. Supp. 3d at 394. Searches of digital space, by contrast, do little to stop the entry of contraband or identify goods subject to tax, since digital data can be

transferred anywhere in the world without any physical crossing of a border. *Id.*; *see also United States v. Molina-Isidoro*, 884 F.3d 287, 297 (5th Cir. 2018) (Costa, J., concurring) (observing that "an electronic search is not likely to accomplish" "the traditional justification [for the border search exception] of seizing contraband"). That distinction is of longstanding significance. *See Boyd v. United States*, 116 U.S. 616, 623 (1886) ("The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him.").

Moreover, the burden of obtaining a warrant in modern times is exceedingly minimal; "[r]ecent technological advances . . . have, in addition, made the process of obtaining a warrant itself more efficient." *Riley*, 573 U.S. at 401. As Chief Justice Roberts has observed, modern technology permits officers to "e-mail warrant requests" to judges, who can "sign[] such warrants and email[] them back to officers in less than 15

37

minutes." *McNeely*, 569 U.S. at 172 (Roberts, C.J., concurring); *accord United States v. Caraballo*, 831 F.3d 95, 105 (2d Cir. 2016) (observing that Vermont state police "would take only six hours to obtain a warrant"). Of course, there may be exigencies where even such a brief wait poses specific risks, or where "police have requested a warrant but do not receive a timely response." *McNeely*, 569 U.S. at 174 (Roberts, C.J., concurring). But the government has identified no such barriers here, so the "answer to the question of what police must do before searching a cell phone . . . is accordingly simple – get a warrant." *Riley*, 573 U.S. at 403.

## II.     THE DISTRICT COURT CORRECTLY FOUND THE GOOD FAITH EXCEPTION INAPPLICABLE TO THE SEARCH AT JFK.

The District Court appropriately considered—at length—whether the good faith exception applied. A344–A360. Its conclusion that the exception did not apply should be affirmed. As the District Court properly found, all of this Circuit's case law "strongly supported" the conclusion that a search of a cell phone at the border was nonroutine, and thus required at least reasonable suspicion. A348. The government ignores this Court's precedents in arguing otherwise, but the decisions from other Circuits that

it identifies cannot overcome what this Court has already held. While decisions from other Circuits can confirm a conclusion suggested by this Court's own precedent—or perhaps even supply an answer when this Court has said nothing—other courts' opinions do not allow officers to simply ignore this Court's decisions.

The District Court's conclusion that the search of Robinson's phone lacked even reasonable suspicion was also correct. The government doesn't dispute that its search of Robinson's phone was based entirely on a two-sentence, three-year-old TECS lookout. Nor does it dispute that, even in the context of child pornography offenses, evidence goes stale. And it doesn't engage with this Court's own precedent finding that past evidence of CSAM on a digital device couldn't justify a search of the device nine months later. Its arguments should be accordingly rejected.

## A. No Binding Appellate Precedent Even Suggested That A Suspicionless Search Of A Phone Was Permissible.

The good faith exception shields unconstitutionally obtained evidence from suppression where the search was "conducted in reasonable reliance on binding precedent . . . ." *Davis v. United States*, 564 U.S. 229, 241

(2011). In that analysis, "'binding precedent' refers to the precedent of this Circuit and the Supreme Court." *United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013). The decisions of other circuits "do not control [this Court's] analysis, but [can] support the conclusion" otherwise reached. *Id.* at 262. And the precedent must have been in effect "at the time" the search was conducted. *Id.* at 261.

The District Court properly determined that all extant case law from the Supreme Court and this Court strongly foreshadowed that a search of a cell phone was nonroutine. It began that analysis with *Irving*, which treated the search of two diskettes and the film of a disposable camera as nonroutine. A346–A347. So even before *Riley*, this Court had treated "the search of a far less substantial cache of electronic data" as nonroutine. *Id.* The District Court then held that *Riley* and *Ganias* only underscored the singular nature of cell phones, making *Irving*'s holding a clear signal to law enforcement that a cell phone search was nonroutine. A348–A349.

In faulting the District Court's analysis, the government has nothing to say about *Irving*—the most directly analogous precedent from this

Court. It offers no explanation for how a reasonable officer could believe that a search of a phone is somehow less intrusive than a search of a floppy disk—because there is none.  Even comparing the two "is like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of [storing digital data], but little else justifies lumping them together." *Riley*, 573 U.S. at 393.

Instead, the government tries a different tack, suggesting that this Court's decision in *Levy* was a good faith basis to believe that a search of a cell phone was routine. That case is largely irrelevant, but its limited value only highlights the impropriety of the search of Robinson's phone. In *Levy*, this Court considered whether the searching and copying of a physical notebook—not any digital devices—violated the Fourth Amendment. So the fact that it "was decided in 2015, one year after the Supreme Court's decision in *Riley*," Br. at 36, is of no significance. *Levy* simply had no reason to engage with the meaning of *Riley*. And the difference in items searched makes all the difference. The privacy intrusion worked by a search of a notebook is "a minimal one," *United States v. Silva*, 714 F. Supp. 693, 697

41

(S.D.N.Y. 1989), so this Court has approved of arresting agents searching a

notebook without a warrant, but incident to an arrest, *see United States v.*

*Mannino*, 635 F.2d 110, 115 (2d Cir. 1980); *United States v. Arango-Correa*, 851

F.2d 54, 59 (2d Cir. 1988) (same for inventory search conducted after arrest).

*Riley* emphatically rejected these ideas in the context of cell phones.[7] What's

more, *Levy* itself declined to resolve whether the act of copying pages from

the notebook made the search nonroutine, instead analyzing whether the

copying was supported by reasonable suspicion. There can be no question

that the privacy intrusion of an unfettered cell phone search is vastly

greater than that caused by the photocopying of eighteen pages of a

notebook.

Finding little support in this Court's precedent, the government relies

on *United States v. Maher*, 120 F.4th 297 (2d Cir. 2024), to argue that it can

---

[7] The government cites language in *Levy* that "the label of "non-routine" should generally be reserved for intrusive searches of the person (such as body-cavity searches and strip searches), not belongings." Br. at 36 (quoting *Levy*, 803 F.3d at 122 n.3). That may be true, but by its own terms doesn't limit the category to *only* those kinds of searches. Before *Levy*, this Court had applied the label to several kinds of searches of property—including digital data stores. *See generally* Section I(B)(1).

satisfy its burden solely by pointing to decisions from other circuits, and

citing three[8] courts of appeals that, as of November 2022, had held that

manual searches of cell phones at the border do not require reasonable

suspicion. Br. at 38, 41. But *Maher*'s formulation of the good-faith

exception[9] has no bearing here. *Maher* concerned a Fourth Amendment

question that "neither the Supreme Court nor this court" had provided

guidance on. 120 F.4th at 321. Here, by contrast, this Court has held that

numerous less intrusive searches are nonroutine. *See supra*, Section I(B)(1).

And *Irving* left no ambiguity: if the search of a floppy disk was nonroutine,

any search of a cell phone—manual or forensic—necessarily is as well.

---

[8] The government suggests that a fourth court had also treated manual, as opposed to forensic, cell phone searches as "routine" searches. Br. at 42 (citing *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018)). But *Kolsuz* addressed only forensic searches, and specifically cautioned that it "ha[d] no occasion to consider application of the border exception to manual searches of electronic devices . . . ." *Kolsuz*, 890 F.3d at 141.

[9] *Maher* stated that the good faith exception permits this Court to "consider not only our precedents but also those of other courts." 120 F.4th at 321. *Maher* did not address *Aguiar*'s restriction of "binding appellate law" to precedent from the Supreme Court of this Court. But this Court need not resolve any tension between *Maher* and *Aguiar* here, as this Court has itself provided the necessary guidance on the relevant Fourth Amendment question.

*Maher* does not permit officers to ignore this Court's precedents simply because other courts may have disagreed.

### B. The Three-Year-Old TECS Lookout Didn't Give Rise To Reasonable Suspicion.

Reasonable suspicion requires "facts so closely related to the time of the [search] as to justify a finding of [reasonable suspicion] *at that time.*" *Diamondstone v. Macaluso*, 148 F.3d 113, 124 (2d Cir. 1998) (emphasis in original). So a reviewing court must "determine whether the information" upon an officer acts "is current or has become stale." *Irving*, 452 F.3d at 125; *accord United States v. Patterson*, 25 F.4th 123, 139–40 (2d Cir. 2022) (applying staleness inquiry to analysis of reasonable suspicion for investigative stop). The "principal factors" governing this analysis are the "age of those facts" known to the officer and "the nature of the conduct alleged to have violated the law." *Diamondstone*, 148 F.3d at 124. Where the facts known to an officer suggest only "isolated illegal acts," *id.*, the passage of even a few weeks may vitiate reasonable suspicion. *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993) (finding that six weeks' passage rendered evidence of a single prior drug sale too stale to justify subsequent search). This Court has

routinely found that evidence becomes stale in a matter of weeks or months. *See, e.g.*, *Wagner*, 989 F.2d at 75 (six weeks); *Diamondstone*, 148 F.3d at 124–25 (four months). Even in the context of child pornography offenses, this Court has found that evidence linking a particular IP address to the accessing of child pornography was too stale to justify a search nine months later. *Raymonda*, 780 F.3d 105.

Applying this test, the District Court properly determined that the age of the TECS lookout and its lack of any specific facts about Robinson rendered it insufficient to create reasonable suspicion without more. A356–A360.[10] As for the age of the facts known, the TECS lookout was entered three years before Robinson's search. The age of that TECS lookout—orders

---

[10] The government argues that the District Court erred because "[t]he CBP officers were permitted to rely on the TECS lookout, which stated that Robinson was linked to the purchase of child pornography and his electronic devices should be searched." Br. at 43–44. Nobody disagrees that the agents were permitted to consider the TECS lookout—the District Court itself said as much. A354 ("It is true, as the government argues, that a TECS hit can factor significantly into a reasonable suspicion finding." (cleaned up)). But that's not the question; at issue is whether this particular lookout, given its age and lack of any detail, was enough to give rise to reasonable suspicion at the time of the search.

of magnitude longer than those this Court has found too remote to create reasonable suspicion—rendered it too stale to justify the search of Robinson's phone. Tellingly, the government has failed to identify *any* case to the District Court or to this Court in which three-year-old information of *any* kind was sufficient to justify a search. So the age of the lookout alone would render it insufficient to justify the search of Robinson's phone.

But here, the nature of the conduct alleged in the lookout itself also confirms the lack of reasonable suspicion. The TECS lookout simply states that Robinson was "linked to the purchase of" CSAM "via FinCen." A323. It doesn't explain that link or how it was established. In fact, the government expressly declined to introduce any evidence about the facts underlying the lookout. A225, A248. And, given the undisputed testimony that TECS lookouts are filled out with "as much information as" NTC has, A184, the District Court was permitted to infer that there was no additional evidence to support the lookout. Moreover, Nunes didn't know any information beyond the lookout, nor did she have any independent basis to think Robinson had ever done anything illegal. In fact, she testified that

Robinson answered all her questions accurately and without evasion.

A153–A154, A324.[11] Without any independent corroboration, Nunes's

reliance on the lookout would only be reasonable if the lookout itself were

based on reasonable suspicion. *See United States v. Hensley*, 469 U.S. 221, 232

(1985) (discussing reliance on a wanted flyer and holding that "[i]f the flyer

has been issued in the absence of reasonable suspicion, then a stop in the

objective reliance upon it violates the Fourth Amendment"); *Hernandez v.*

*United States*, 939 F.3d 191, 209 (2d Cir. 2019) (finding that officers could not

reasonably rely on detainer issued by another officer who lacked probable

cause to do so). But the government expressly declined to put on any

---

[11] Nunes's lack of any independent basis to suspect Robinson of illegal conduct distinguishes this case from the Third Circuit's decision in *United States v. Whitted*, 541 F.3d 480 (3d Cir. 2008), cited by the government. Br. at 45. There, border agents reasonably relied on a TECS lookout when they independently observed that the defendant took a cruise to countries that were known drug sources, had previously travelled to several other countries that were known sources of narcotics, and had paid for his ticket with cash just prior to departure. *Whitted*, 541 F.3d at 483, 490. Those facts, coupled with the TECS lookout, gave rise to reasonable suspicion. No such additional facts supported the TECS lookout here.

evidence establishing that the lookout was supported by reasonable suspicion. A225, A248.

The government further ignores *Raymonda* entirely in arguing that *no* temporal limit applies to facts underlying suspicion of child pornography offenses. In its apparent view, "only" three years passed between the TECS lookout and the search of Robinson's phone, rendering the search entirely reasonable. Br. at 46–47; *accord* A174 (agreeing that search would still be appropriate even if TECS lookout were "more than ten years old"). But the government is wrong, both in this Circuit and in the one it cites.

*Raymonda* squarely applied the staleness inquiry in the context of child pornography offenses. There, officers applied for and obtained a warrant to search Raymonda's electronics based on evidence that a user with the IP address associated with his home had downloaded CSAM nine months prior. *Raymonda*, 780 F.3d at 110. This Court found that the warrant had been improperly issued because of the staleness of the evidence underlying it. While acknowledging that child pornography offenses present unique risks of image collection and retention, this Court

48

nonetheless cautioned against reliance on such generalizations: "The alleged proclivities of collectors of child pornography . . . are only relevant if there is probable cause to believe that a given defendant *is* such a collector." *Id.* at 114 (cleaned up). And to determine whether someone is a "collector" of child pornography rather than someone who engaged in an isolated instance of illegal conduct, this Court pointed to several factors: whether anyone had identified the suspect as a "pedophile," whether the suspect had any kind of ongoing subscription, or whether the suspect has an "extended history" of possessing or receiving CSAM. *Id.* Finding that Raymonda fit none of those profiles, this Court held that there was no basis for a search of his electronics.

*Raymonda* controls here. Just like in that case, the government's only evidence linking Robinson to any illegal conduct was a three-year-old suggestion that he had been "linked to" CSAM. There was no evidence that Robinson was a collector who was likely to store CSAM for years at a time. So, to justify a search of Robinson's cell phone, "it was not enough simply to show that [Robinson] had at some point accessed thumbnails of child

49

pornography." *Id.* at 117. Recognizing that *Raymonda* forecloses its argument about the TECS lookout, the government does not even attempt to argue otherwise—indeed, it does not substantively discuss *Raymonda* in its brief.[12]

The government instead chooses to argue from a single district court opinion and a one First Circuit case. Br. at 46. But even those cases support Robinson. In *United States v. Coon*, for example, a district court found that, notwithstanding the unique nature of child pornography offenses, evidence from ten months before a search was too stale to justify it absent any additional information that the defendant was a collector of CSAM. No. 10 Cr. 110A, 2011 WL 1871165, at *4 (W.D.N.Y. May 16, 2011). And in *United States v. Ricciardelli*, the First Circuit found that a defendant's access to child pornography years prior could justify a search only in conjunction with evidence that the defendant had ordered more CSAM and had scheduled it for delivery to his home. 998 F.2d 8, 10 (1st Cir. 1993). So

---

[12] The government does cite *Raymonda* for the statement of law regarding the good-faith exception. Br. at 21, 30, 32.

together, they stand for exactly what Robinson argues: a years-old link to CSAM is stale unless there is something more to indicate some affirmative kind of collection. And because the government identified no such evidence here, the TECS lookout was stale, and the search of Robinson's phone lacked reasonable suspicion.

## III.   THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING STEPIEN KNOWINGLY MISLED THE MAGISTRATE JUDGE

Agents cannot rely on a warrant to shield an unconstitutional search "if the police are not frank with the magistrate in proceedings to obtain the warrant—proceedings that are typically *ex parte*." *United States v. Reilly*, 76 F.3d 1271, 1273 (2d Cir.), *on rehearing*, 91 F.3d 331 (2d Cir. 1996). So "suppression remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth, or in situations where an officer is grossly negligent in seeking or executing a warrant." *United States v. Lauria*, 70 F.4th 106, 121 (2d Cir. 2023) (cleaned up). That entails two related inquiries: "a state of mind requirement and a materiality requirement[.]" *Id.* at 125. The District

Court properly determined that here, Stepien's combined

misrepresentations were material, and were made with at least reckless

disregard for the truth.

### A. The Statement That Robinson "Voluntarily" Provided His Phone's Passcode And The Omission Of The TECS Lookout Were Material.

In *Reilly*, this Court held that police officers could not rely on the

good faith exception when they provided a magistrate judge "a description

that was almost calculated to mislead" about an earlier, warrantless search

upon which they based their warrant application. 76 F.3d at 1280. Where

officers "never gave [an issuing judge] a full account of what they did," *id.*,

the good faith exception has no applicability.

That's precisely what happened here. A fair presentation of the facts

would have required the issuing magistrate to determine whether (1) the

search of Robinson's cell phone at the border was "routine," and (2) if not,

whether there was at least reasonable suspicion for the search. But

Stepien's affidavit sought to deter the magistrate from engaging in those

inquiries by suggesting that the phone was searched only when Robinson

52

"voluntarily gave CBP officers the password" for it. A013. As the District Court observed, that language "strongly implied that . . . it was a 'consent search.'" A376. Because such consent would alone justify the search, the issuing magistrate would have had no reason to ask further questions about the initial search of Robinson's phone. *See United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996) (noting that "a consensual encounter . . . need not be based on suspicion"). And because the warrant affidavit contained so little other information about the search itself, the "voluntariness" was the only explanation of how agents came to search Robinson's phone. A377–A378. Because the affidavit framed the search as voluntary, the issuing magistrate had no reason to "ascertain whether the evidence on which [Stepien] relied in seeking the warrant was itself obtained illegally and in bad faith." *Ganias*, 824 F.3d at 222. Framing the search as voluntary was thus "critical to assessing the legality" of the search of Robinson's phone. *Reilly*, 76 F.3d at 1280.

Other aspects of the warrant only support the District Court's conclusion that the description of the search as "voluntary" created the

impression that the search was done on consent. As the District Court observed, Stepien omitted any description of the actual reason Robinson's phone was searched: the TECS lookout. A372. And he failed to provide "any explanation as to why he did not simply inform [the issuing magistrate] that a TECS hit . . . was the actual reason for the search." A374–A375. Particularly given Stepien's representation that he sought the warrant "out of an abundance of caution to be certain that an examination of the [phone] will comply with the Fourth Amendment," A014, "[i]t defies common sense that Agent Stepien . . . would not include key details in that affidavit that, in the government's own view, provided particularized suspicion . . . ." A375–A376.

The government asks this Court to disregard the relevant description of the search by pointing to other parts of the warrant that do not discuss the reasons for the search of the phone at all. First, the government argues that "[t]he warrant is clear that the device was searched under the border search exception to the warrant requirement." Br. at 60. Hardly so. The affidavit's single paragraph about the search proceeds in chronological

54

order and simply states that "[a] border search was conducted" without specifying *what* was searched. A013. And then the affidavit states that Robinson voluntarily provided his phone's passcode during the search. *Id*. The government ignores all of this and simply points to a footnote in the affidavit where Stepien cited *Levy* and the authority to conduct routine searches at the border. Br. at 55–56. But that footnote can't bear the weight the government assigns it. First, nothing links the search of the *phone*—the nonroutine part of the search—to that rationale. And, moreover, Stepien himself viewed the footnote as irrelevant enough that he removed it when he subsequently applied for a warrant to search the other electronic devices. ECF No. 25-6 at 3.

Next, the government cites to a later part of the affidavit where Stepien indicated that Robinson's phone had been "detained pursuant to a border search." Br. at 62 (citing A014). But the detention of the phone is different than its search. *See, e.g.*, *Smith v. Ohio*, 494 U.S. 541, 542 (1990) (noting lower standard of suspicion needed for "brief detention of property" as opposed to the probable cause generally required for "the

search of that property"). And this paragraph came long after Stepien had suggested that the border search was consensual. At a minimum, the fact that Stepien was clear about the basis for detaining the phone only renders his decision to describe the search of the phone differently all the more puzzling.

The government finally makes a semantic argument, claiming that the use of the word "voluntary" could not imply consent because the word "consent" was not itself used. Br. at 62–63. But this Court has often referred to consent searches as "voluntary." *See, e.g.*, *MacWade v. Kelly*, 460 F.3d 260, 264 (2d Cir. 2006) (describing checkpoint search program as "voluntary"); *Phaneuf v. Fraikin*, 448 F.3d 591, 594 n.3 (2d Cir. 2006) (describing parties' dispute over strip search as "whether the search of Phaneuf's bra was ordered by Fraikin or was voluntary"). The fact that Stepien didn't use the word "consent" doesn't change the plain import of what he did write: Robinson "voluntarily" participated in the search.

**B.     The District Court's Finding That Stepien Acted With Reckless Disregard For The Truth Was Not Clearly Erroneous.**

Stepien's state of mind in crafting the misleading affidavit is "a factual question best addressed by the district court, which is better situated to develop the factual record, observe the witnesses, and assess their credibility." *Lauria* 70 F.4th at 131. And after assessing Stepien's testimony and his demeanor on the stand, the District Court concluded that he crafted his affidavit with, "at the very least, a reckless disregard for the truth." A378 (cleaned up). That determination was not clearly erroneous; it was a reasonable view of Stepien's inability to explain his omission of the TECS lookout, A374, his failure to explain how Robinson "voluntarily" participated in the search, and Stepien's "demeanor at the hearing," A374—the last of which merits special deference from this Court. Particularly in light of Stepien's purported desire to obtain a warrant "out of an abundance of caution" to ensure compliance with the Fourth Amendment, A014, the District Court was entitled to be skeptical of these glaring omissions and misstatements in the affidavit. Given the District Court's "superior access to the evidence and the well-recognized inability

of reviewing courts to construct what happened in the courtroom, this Court should "give due weight to the factual inferences" the District Court drew. *United States v. Arvizu*, 534 U.S. 266, 276–77 (2002).

In fact, even more supports the District Court's conclusion. For example, Stepien had already indicated a willingness to lie about the basis for the search: he acknowledged that he lied to Robinson during their post-arrest interview by telling Robinson he'd been selected at random for a search, agreeing that he "told [Robinson] something that was false" even though there were "many different ways" he could have conducted the interview to get the same information. A225. Further, Stepien also apparently understood the import of the word "voluntarily" in his affidavit. Just two months after preparing the affidavit at issue, Stepien prepared another affidavit for a warrant to search Robinson's other electronic devices. In that affidavit, he changed his description, removing the word "voluntarily" from the sentence about Robinson's provision of his passwords. ECF No. 25-6 at 3. Instead, Stepien described Robinson as voluntarily providing his phone—which he did *before* Nunes asserted her

legal authority to search the phone and demanded the passwords. A119, ECF No. 25-3 ¶ 5. And then he simply wrote that Robinson "also provided" his password.

The government quibbles with the factual finding of the District Court, but none of its gripes show any clear error. First, the government argues that Stepien's omission of the TECS lookout was not grossly negligent because "[a] warrant affiant is never expected to include every bit of information gathered during an investigation in a warrant affidavit." Br. at 52. That's of course true—as the District Court recognized. A373–A374. But the District Court drew a different inference from Stepien's omission of the true reason for his search. That inference was not clearly erroneous in light of Stepien's willingness to lie about the basis for the search in interviewing Robinson and his affirmative misrepresentation that the search was voluntary. Second, the government argues that "[t]he magistrate judge was clearly on notice that the affiant believed the manual search was a routine search." Br. at 57. But, as discussed *supra*, Section III(A), the affidavit explicitly does *not* state that the search of Robinson's

phone was part of the routine search, instead suggesting that the phone search was conducted because Robinson "voluntarily" provided his passcode. And finally, the government argues that the omission of the TECS lookout would have only strengthened their showing of probable cause. Br. at 58. But the District Court found that the combined effect of the omission and the affirmative misrepresentation gave rise to the inference that Stepien "did not want [the issuing magistrate] questioning whether the initial search of Robinson's phone was routine or nonroutine, and whether it was supported by reasonable suspicion." A376.

At bottom, the government's arguments simply put forth a different interpretation of Stepien's conduct in preparing the affidavit. But "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous[.]" *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015). The District Court's findings about Stepien's state of mind find ample support in the record, and thus are not clearly erroneous.

## **CONCLUSION**

This Court should dismiss the appeal for lack of jurisdiction. In the

alternative, the District Court's order should be affirmed.

Dated:      New York, New York
            December 5, 2025

                    Respectfully submitted,

                    Federal Defenders of New York, Inc.
                    Appeals Bureau

                    By: <u>/s/ Ashok Chandran</u>
                    Ashok Chandran
                    Attorney for Defendant-Appellee
                        **JASON ROBINSON**
                    52 Duane Street, 10th Floor
                    New York, New York 10007
                    Tel.: (212) 417-8743

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 5, 2025, I served a true and correct copy of the foregoing opening brief via electronic notice by the ACMS system on all counsel of record.

Dated:    New York, New York
            December 5, 2025

/s Ashok Chandran

**Ashok Chandran**
Assistant Federal Defender

## <u>CERTIFICATE OF COMPLIANCE</u>

This response brief complies with the type-volume limitations of Fed. R. App. P. 27(d)(2) and Local Rule 27.1(a)(3) because it contains 12,497 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by the word-processing system used to prepare it.

This response brief complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word with 14 characters per inch in Palatino Linotype type style.

Dated:    New York, New York
          December 5, 2025

                  /s Ashok Chandran

                  **Ashok Chandran**
                  Assistant Federal Defender