# 25-1428

*To Be Argued By*:
GILBERT M. REIN

## United States Court of Appeals

### For the Second Circuit

◆◆◆

UNITED STATES OF AMERICA,

*Appellant,*

—against—

JASON ROBINSON,

*Defendant-Appellee.*

**On Appeal From The United States District Court
For The Eastern District of New York**

## REPLY BRIEF FOR THE UNITED STATES

JOSEPH NOCELLA, JR.,
*United States Attorney*,
*Eastern District of New York*
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

AMY BUSA,
GILBERT M. REIN,
*Assistant United States Attorneys*,
*Of Counsel.*

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .........................................................................ii

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ............................................................................................. 3

POINT ONE - THE BORDER SEARCH OF ROBINSON'S
                CELLPHONE WAS ROUTINE AND
                CONSTITUTIONAL ........................................................... 3

POINT TWO - THE GOOD FAITH EXCEPTION APPLIES ................. 14

    I.    Binding and Persuasive Precedent
          Supported the Search of the Cellphone................................. 14

    II.   Reasonable Suspicion Supported the
          Search of the iPhone ............................................................. 19

POINT THREE - IT WAS CLEAR ERROR TO
                 INVALIDATE THE SUBSEQUENT
                 SEARCH WARRANT ................................................. 26

CONCLUSION ....................................................................................... 38

ii

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Abidor v. Napolitano,*
990 F. Supp. 2d 260 (E.D.N.Y. 2013) .................................................... 7

*Alasaad v. Mayorkas,*
988 F.3d 8 (1st Cir. 2021) ...................................................... 5, 6, 8, 12

*Cassidy v. Chertoff,*
471 F.3d 67 (2d Cir. 2006) .................................... 7, 8, 9 & n.4, 11, 12

*City of Indianapolis v. Edmond,*
531 U.S. 32 (2000) ............................................................................. 8

*Diamondstone v. Macaluso,*
148 F.3d 113 (2d Cir. 1998) .................................................................. 20

*Frazier v. Cupp,*
394 U.S. 731 (1969) ............................................................................. 31

*Illinois v. Gates,*
462 U.S. 213 (1983) ............................................................................. 33

*Kansas v. Glover,*
589 U.S. 376 (2020) ............................................................................. 20

*MacWade v. Kelly,*
460 F.3d 260 (2d Cir. 2006) .......................................................... 35, 36

*Metzen v. United States,*
19 F.3d 795 (2d Cir. 1994) .................................................................. 27

*New York v. Harris,*
495 U.S. 14 (1990) ........................................................................ 12, 13

*Otal Investments Ltd. v. M/V CLARY,*
673 F.3d 108 (2d Cir. 2012) .................................................................. 36

*Riley v. California,*
573 U.S. 373 (2014) ....................................................................... passim

*Terry v. Ohio,*
392 U.S. 1 (1968) .................................................................................. 12

*United States v. Arnold,*
533 F.3d 1003 (9th Cir. 2008) ...................................................... 16, 17

*United States v. Arvizu,*
534 U.S. 266 (2002) ............................................................................. 24

*United States v. Canfield,*
212 F.3d 713 (2d Cir. 2000) ................................................................ 32

*United States v. Carroll,*
750 F.3d 700 (7th Cir. 2014) ............................................................... 21

*United States v. Delaney,*
No. 22-1095,
2023 WL 7103281 (2d Cir. Oct. 27, 2023) ..................................... 29, 33

*United States v. Ephron,*
No. 24-cr-418 (MMG),
2025 WL 524027 (S.D.N.Y. Feb. 18, 2025) .......................................... 35

*United States v. Falso,*
544 F.3d 110 (2d Cir. 2008) ................................................................ 37

*United States v. Gallo,*
863 F.2d 185 (2d Cir. 1988) ................................................................ 21

*United States v. Gavino,*
No. 22-CR-136 (RPK),
2024 WL 85072 (E.D.N.Y. Jan. 7, 2024) ...................................... 5 n.3, 6

*United States v. Grubbs,*
547 U.S. 90 (2006) ............................................................................... 23

iv

*United States v. Hernandez*,
   No. 22-471,
   2024 WL 47666 (2d Cir. Jan. 4, 2024) ............................................. 33-34

*United States v. Iodice*,
   525 F.3d 179 (2d Cir. 2008) ............................................................ 26-27

*United States v. Irving*,
   452 F.3d 110 (2d Cir. 2006) ......................................................... passim

*United States v. Lajeunesse*,
   85 F.4th 679 (2d Cir. 2023) ................................................................. 19

*United States v. Levy*,
   803 F.3d 120 (2d Cir. 2015) ......................................................... passim

*United States v. Maher*,
   120 F.4th 297 (2d Cir. 2024) ............................................................... 15

*United States v. Mangini*,
   No. 20-CR-162 (JPO),
   2021 WL 1268507 (S.D.N.Y. Apr. 6, 2021) ......................................... 35

*United States v. Martin*,
   157 F.3d 46 (2d Cir. 1998) ............................................................ 32, 33

*United States v. Mendez*,
   103 F.4th 1303 (7th Cir. 2024) .................................................. 5, 6, 34

*United States v. Montoya de Hernandez*,
   473 U.S. 531 (1985) ......................................................................... 6, 12

*United States v. Morales-Aldahondo*,
   524 F.3d 115 (1st Cir. 2008) ............................................................... 21

*United States v. Nelson*,
   828 F. App'x 804 (2d Cir. 2020) ......................................................... 29

*United States v. Place*,
   462 U.S. 696 (1983) ...................................................................... 11, 12

*United States v. Quarles*,
  No. 23-10377,
  2025 WL 1430866 (11th Cir. May 19, 2025)..........................................5

*United States v. Ramsey*,
  431 U.S. 606 (1977) ............................................4 & n.2, 9 n.4

*United States v. Raymonda*,
  780 F.3d 105 (2d Cir. 2015) ......................................21, 22, 24

*United States v. Sharpe*,
  470 U.S. 675 (1985) ............................................................36

*United States v. Smith*,
  9 F.3d 1007 (2d Cir. 1993) ................................................29

*United States v. Smith*,
  673 F. Supp. 3d 381 (S.D.N.Y. 2023)................................23

*United States v. Wagner*,
  989 F.2d 69 (2d Cir. 1993) ................................................21

*United States v. Waldem*,
  No. 24-CR-521 (GRB),
  2025 WL 3154359 (E.D.N.Y. Nov. 12, 2025) ....................18

*United States v. Xiang*,
  67 F.4th 895 (8th Cir. 2023) ............................................15

*Velardi v. Walsh*,
  40 F.3d 569 (1994)............................................................26

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 25-1428

UNITED STATES OF AMERICA,

*Appellant*,

-against-

JASON ROBINSON,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

REPLY BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

The government respectfully submits this brief in reply to the responsive brief of Defendant-Appellee Jason Robinson, and in further support of the government's appeal from the May 9, 2025 memorandum and order granting Robinson's motion to suppress the contents of his iPhone. The manual border search of Robinson's iPhone did not require probable cause, a warrant, or reasonable suspicion. Despite Robinson's

arguments, the district court's order runs contrary to the clear weight of authority. In addition, law enforcement agents relied in good faith on controlling precedent from this Court and additional persuasive authority in searching Robinson's iPhone. The district court's order is premised on both incorrect applications of the law and erroneous factual findings, which Robinson wrongly repeats in his responsive brief. As shown below and in the government's principal brief, Robinson's arguments in support of the district court's ruling are unpersuasive, and the district court's order should be reversed.

## ARGUMENT

## POINT ONE

## THE BORDER SEARCH OF ROBINSON'S CELLPHONE WAS ROUTINE AND CONSTITUTIONAL

Robinson gives cursory treatment to the clear weight of authority undermining his position that warrantless manual searches of cellphones at the border require individualized suspicion. Instead, Robinson and the amicus cling to the argument that the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), established a constitutional rule to the contrary. (Br.33-35).[1] In doing so, Robinson necessarily misrepresents this Court's precedents and cites to other inapposite decisions. (Br.25-29). And to avoid the legally mandated outcome of the relevant Fourth Amendment question, Robinson tries to muddy the water by claiming that *other* aspects of his border encounter—having to do with his spouse's absence, pat-downs of his clothing, and a

---

[1] "Br.," "GBr.," and "ABr." refer to Robinson's appellate brief, the government's opening brief, and the amicus's brief, respectively. All other defined terms have the meanings ascribed to them in the government's opening brief. Unless otherwise indicated, all quotations omit internal quotation marks, citations, and footnotes, and accept alterations.

4

search of his luggage—are *actually* what made the search of his cellphone non-routine.  (Br.30-31).  Those arguments are meritless.

In urging this Court to abandon the Supreme Court's historical understanding that "[t]here has never been any additional requirement that the reasonableness of a border search depend[s] on the existence of probable cause," *United States v. Ramsey*, 431 U.S. 606, 619 (1977), Robinson invites the Court to jump off the same doctrinal cliff as the district court.[2]

To justify that leap, Robinson principally argues that the district court's novel and erroneous holding is not new at all.  But that is contrary to a backdrop of uniform decisional law declining to require probable cause to "support even the most intrusive electronics search at

---

[2]    The amicus relies on the Founders' memory of the British use of bills of attainder to argue that they would not have intended for the Fourth Amendment to permit broad border search authority (ABr.7-10), however, the Supreme Court has found significant that the same Congress that proposed the Fourth Amendment had already enacted the first customs statute. *Ramsey*, 431 U.S at 616-17 ("As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as unreasonable, and they are not embraced within the prohibition of the [Fourth] [A]mendment.").

the border." *United States v. Mendez*, 103 F.4th 1303, 1309 (7th Cir. 2024). Indeed, even the district court described the relevant legal landscape in November 2022 as "unsettled" (A:348). Yet in his brief to this Court, Robinson maintains that eight years earlier, *Riley*—which commented on the unique character of digital data in the context of searches incident to arrests—actually established a constitutional rule governing border searches of cellphones.[3] (Br.35-38, 41-42 (claiming *Riley* "emphatically rejected" traditional bases supporting routine border searches "in the context of cell phones"); A:337-340). As other courts have found, however, *Riley* did no such thing. *See, e.g., United States v. Quarles*, No. 23-10377, 2025 WL 1430866, at *4 (11th Cir. May 19, 2025) (per curiam) ("these '*Riley*-based arguments' were already expressly rejected…"); *Mendez*, 103 F.4th at 1308 (*Riley* was "carefully tailored" to the search-incident-to-arrest context); *Alasaad v. Mayorkas*, 988 F.3d 8,

---

[3] Further, the amicus' argument that searches of cellphones are unrelated to the "traditional purpose and rationale of the border-search exception" (ABr.20) conflicts with judicial findings that cellphone border searches "transparently advance the public interest…at the heart of the border-search rule." *United States v. Gavino*, No. 22-CR-136 (RPK), 2024 WL 85072, at *5 (E.D.N.Y. Jan. 7, 2024).

17 (1st Cir. 2021) ("Nor does *Riley* by its own terms apply to border searches, which are entirely separate from the search[es] incident to arrest…discussed in *Riley*.").

Finding no shelter in *Riley*, Robinson attempts to justify his extreme approach by claiming that manual border searches of cellphones are akin to invasive body searches and thus ought to be considered nonroutine. *But see Alasaad*, 988 F.3d at 18 ("the bottom line is that basic border searches of electronic devices do not involve an intrusive search of a *person*"). In doing so, however, he ignores that even the most invasive physical inspections of the human body require reasonable suspicion only. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985) (border detention of an alimentary canal smuggler). And he ignores that even those courts requiring such heighted suspicion have not gone as far as to mandate a warrant and probable cause. *See, e.g.*, *Gavino*, 2024 WL 85072, at *5-6. In this regard, Robinson's analogy is as unprecedented as it is illogical, resting on the fiction that a cellphone search "should be treated as more intrusive than strip searches, alimentary canal searches, or the other intrusive searches for which reasonable suspicion has long been treated" as the appropriate standard.

7

*Id.*; *see Mendez*, 103 F.4th at 1310 (collecting cases forming a "consensus among circuits that brief, manual searches of a traveler's electronic device are 'routine' searches requiring no individualized suspicion").

Robinson's reliance on *United States v. Irving*, 452 F.3d 110 (2d Cir. 2006) (Br.29), does not alter this outcome. Despite Robinson's repeated statements to the contrary, *Irving* plainly did not "h[o]ld that the search of floppy disks at the border is nonroutine." (Br.3; *see* Br.29 ("If searching the digital data contained on two floppy disks is invasive enough to constitute a 'nonroutine' search, searching a phone certainly must be, too.")). In fact, the opposite is true. In *Irving*, this Court explicitly declined to reach the issue of whether a warrantless search of a defendant's floppy disks and undeveloped film was routine or nonroutine. *See* 452 F.3d at 124 ("Because these searches were supported by reasonable suspicion, we need not determine whether they were routine or non-routine."); *accord Abidor v. Napolitano*, 990 F. Supp. 2d 260, 281 (E.D.N.Y. 2013) (*Irving* did "not reach the issue" of whether the search was routine or nonroutine). As such, Robinson's exhortation that "*Irving* controls" (Br.29) is unpersuasive.

8

Robinson relies on *Cassidy v. Chertoff*, 471 F.3d 67, 78-79 (2d Cir. 2006), to argue that the intrusiveness of a cellphone search—and thus, whether it is routine—is informed by other, unrelated aspects of the border encounter. (Br.30-33). Like *Riley*, however, *Cassidy* is not a case about border searches. Rather, that case dealt with the so-called special needs doctrine, another distinct exception to the Fourth Amendment's warrant requirement with no application here.

While courts may consider "the character and degree of the governmental intrusion" as a factor in evaluating the reasonableness of a special-needs search, *id.* at 75, that is where the similarities end. *See id.* at 78-79 (analyzing the intrusiveness of ferry employees searching carry-on baggage of randomly selected passengers and inspecting randomly selected vehicles under the Maritime Transportation Security Act of 2002); *City of Indianapolis v. Edmond*, 531 U.S. 32, 47-48 (2000) (distinguishing border searches from traffic checkpoint for general crime control; "Our holding also does not affect the validity of border searches or searches at places like airports and government buildings, where the need for such measures to ensure public safety can be particularly acute."); *Alasaad*, 988 F.3d at 17 ("given the volume of travelers passing

through our nation's borders, warrantless electronic device searches are essential to the border search exception's purpose of ensuring that the executive branch can adequately protect the border….A warrant requirement—and the delays it would incur—would hamstring the agencies' efforts to prevent border-related crime and protect this country from national security threats").[4]

In *Cassidy*, nevertheless, Robinson evidently sees an opportunity to muddy the waters. Intrusiveness in the special needs context can be informed by "the duration of the search or stop, the manner in which government agents determine which individuals to

---

[4] As the *Cassidy* Court acknowledged, "any privacy analysis, the Supreme Court has cautioned…necessarily depend[s] on context." 471 F.3d at 76. Here, Robinson's transiting of an international border is relevant context because border searches "are reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616. In fact, the plaintiffs in *Cassidy* repeatedly distinguished the challenged searches in that case from the more permissive border-search context. *See, e.g.*, *Cassidy*, 471 F.3d at 75 ("Plaintiffs further argue that the searches…differ from searches the government conducts at international borders…because borders between countries…are obviously sensitive locations that implicate a diminished expectation of privacy."); *id.* at 77 ("Plaintiffs note that the Supreme Court has not upheld a suspicionless search regime that involved the opening and examination of motor vehicle compartments outside of the border or customs context.").

search, and the methods employed in the search." (Br.30-31; *see* Br.32). Despite citing no authority for extending these criteria to border searches, Robinson argues the 15-minute manual search of his cellphone was more intrusive than it seems because it occurred amid a lengthier detention, during which he was separated from his spouse, was patted down, and had his luggage searched. (Br.30-33). But that argument enjoys no support in the record or relevant authorities.

Consistent with *Irving*, only "the level of intrusion into a person's privacy"—that is, the level of intrusion occasioned by the brief manual search of Robinson's cellphone—"is what determines whether a border search is routine." 452 F.3d at 123. The record here shows that intrusion was minimal and brief. Based on the TECS lookout, the CBP officer was looking specifically for evidence of child sexual abuse material. (A:131). The manual search of the cellphone took only 15 minutes, and the CBP officer stopped her search once she found videos of children being sexually abused. (A:134-35). The officer described her minimal review of material in Robinson's phone as follows:

> So I unlocked it and then started looking through
> his—the photos that were on the phone…[b]ut
> then I went to…the files folder on his iPhone. And

> there was a folder in his files named My Favorites.
> And I clicked on that. And that's when I found it.

(A:133-34).

Robinson's effort to graft onto this limited testimony the overall length and conditions of his secondary inspection is unavailing. Indeed, much of that inspection occurred *after* the search of his electronic devices (A:136-39), when an officer had already observed videos on his cellphone of children being sodomized and therefore had probable cause to believe he had committed a crime.

Nor, contrary to Robinson's suggestion, was the secondary inspection arbitrary. (Br.32 (quoting *Cassidy*, 471 F.3d at 79)). The record establishes that Robinson was a "100 percent match" to the TECS lookout linking him to the purchase of child sexual abuse material. (A:117, 170-71). There are no valid concerns, as referenced in *Cassidy*, that his secondary inspection was the result of some "discriminatory or arbitrary" practice. 471 F.3d at 79. In any event, the level of intrusion of the search—not the reason for the search—determines whether it is routine. *See Irving*, 452 F.3d at 123.

12

The Supreme Court's decision in *United States v. Place*, 462 U.S. 696 (1983), is similarly inapt. That case, too, did not involve a border search but the seizure of a domestic traveler's luggage to enable law enforcement agents to conduct a narcotics investigation. *See id.* at 698-700. Therefore, the Court considered the case under *Terry v. Ohio*, 392 U.S. 1 (1968), which requires reasonable suspicion for stops in criminal investigations. *Place*, 462 U.S. at 700, 709-10. Like *Riley* and *Cassidy*, *Place* has no applicability in the border-search context.

Robinson also mischaracterizes the Supreme Court's holding in *Montoya de Hernandez*. (Br.31-32). In that case, the intrusive and lengthy detention involving the physical inspection of a traveler's body until she expelled the cocaine pellets she ingested was far different than the manual inspection of a cellphone. *See* 473 U.S. at 535-36, 544; *accord Alasaad*, 988 F.3d at 18 ("[T]he bottom line is that basic border searches of electronic devices do not involve intrusive searches of a *person*, like the search the Supreme Court held to be non-routine in *Montoya de Hernandez*.").

Finally, Robinson's reliance on the dissenting opinion in *New York v. Harris*, 495 U.S. 14 (1990), to support his argument that the

13

"circumstances" of his secondary inspection rendered it "nonroutine" (Br.30, 33) highlights the baselessness of his position. *Harris* centered around a person's privacy interests in the home and the suppression consequences flowing from the police's unwarranted entry into a home to make an arrest. *See* 495 U.S. at 21. Those circumstances are a far cry from the routine search of an international traveler's property at a recognized port of entry.

14

## POINT TWO

## THE GOOD FAITH EXCEPTION APPLIES

Having erroneously determined that the manual border search of Robinson's cellphone violated the Fourth Amendment, the district court compounded its error by finding the good faith exception was unavailable to the searching CBP officer and HSI agent. As discussed in the government's opening brief, the district court's misapprehension of the border search doctrine tainted this analysis. In seeking to defend the court's decision, Robinson repeats the same infirm arguments: (1) that all then-existing precedent signaled heightened suspicion was needed for a border search of a cellphone; (2) that reasonable suspicion was lacking in this case; and (3) that the affiant of the warrant application intentionally misled the magistrate judge to authorize a subsequent forensic search of the cellphone.

I.  Binding and Persuasive Precedent
    Supported the Search of the Cellphone

Robinson follows the same mistaken path laid by the district court when he incorrectly claims that by November 2022, this Court's precedents had "strongly supported the conclusion that the search of a cell phone at the border was nonroutine." (Br.38). That is not true. To

arrive at this conclusion, Robinson misapprehends the Court's ruling in *Irving*. Specifically, Robinson suggests that *Irving* casts doubt on the idea that "a reasonable officer could believe that a search of a phone is somehow less intrusive than a search of a floppy disk…." (Br.41). But as discussed above, no explanation is necessary, because *Irving* explicitly declined to decide whether the search in that case warranted individualized suspicion.

Robinson's impermissible reading of *Irving* undermines the remainder of his argument. Indeed, based on the flawed premise that *Irving* represents a favorable holding (it does not), Robinson wholly discounts this Court's decision in *United States v. Maher*, 120 F.4th 297, 321 (2d Cir. 2024), which instructs that, when neither this Court's precedent nor Supreme Court authority is directly on point, out-of-circuit decisional law may be relevant to assessing the reasonableness of an officer's actions. (Br.42). And the out-of-circuit law is unanimous: "[n]o Circuit has held that the government must obtain a warrant to conduct a routine border search of electronic devices." *United States v. Xiang*, 67 F.4th 895, 900 (8th Cir. 2023).

Likely because it contradicts this line of argument, Robinson (like the district court) gives short shrift to the Court's precedential decision in *United States v. Levy*, 803 F.3d 120 (2d Cir. 2015). (Br.41 (describing *Levy* as "largely irrelevant")). Unlike the decisions Robinson favors, however, *Levy* squarely addressed the crucial distinction between routine and nonroutine searches and expressed skepticism that the search of an object—as opposed to a person—could rise to the level of nonroutine, so as to warrant individualized suspicion. *See* 803 F.3d at 123 n.3 ("Like the Supreme Court…we have suggested that the label 'non-routine' should generally be reserved for intrusive border searches of the person…not belongings.").

In *Levy*, this Court explained that merely skimming a notebook during a border search "would have been routine." 803 F.3d at 122. While Robinson is correct in noting that *Levy* did not consider "any digital devices" (Br.41), he ignores that the *Levy* Court analogized the search of the notebook to the facts underlying *United States v. Arnold*, 533 F.3d 1003, 1008-09 (9th Cir. 2008), where the Ninth Circuit upheld a suspicionless border search of a laptop. *Levy*, 803 F.3d at 122. There,

as here, "CBP officers simply had the traveler boot the laptop up, and looked at what he had inside." *Id.*

Far from being "largely irrelevant," *Levy* relied on *Arnold* to identify a pertinent question: "[w]hether searching *and* copying the notebook" would involve a level of intrusiveness requiring individualized suspicion. *Id.* at 123. Or, stated otherwise, *Levy* asked whether the additional act of reproducing and preserving the notebook's content— something akin to a forensic search of a cellphone—would turn an otherwise-routine search into a nonroutine search. *Levy* grounded this question in its understanding that merely reviewing Levy's papers was well within the officer's border search authority.

As the record demonstrates, the observation in *Levy* aligns neatly with CBP officers' practice of searching electronic devices at the border. In that context, "[t]here are advanced media searches and basic." (A:107). In a basic search, the officer "manually look[s] through the phone." (*Id.*). In an advanced search, an officer "use[s] the assistance of technology to help look through the phone." (A:107-08). Consistent with these varying degrees of intrusiveness, the tear sheet provided to Robinson explained that CBP "detained" his devices "for further

18

examination, possibly including copying data contained in the device." (A:145).

This two-tiered approach was entirely consistent with the Court's precedent in *Levy*. Therefore, it was objectively reasonable for the officers inspecting Robinson at JFK to believe that a brief manual search of his cellphone, without any technological aid or reproduction of the phone's contents, was routine and permissible without individualized suspicion. *See United States v. Walden*, No. 24-CR-521 (GRB), 2025 WL 3154359, at *9 (E.D.N.Y. Nov. 12, 2025) (explaining that this Court's "decisions in *Levy* and *Irving*…provided a solid foundation for the Government's actions" in the case of a manual border search). Notably, HSI Special Agent Stepien's subsequent warrant application referenced *Levy*'s holding that routine border searches are permissible without individualized suspicion. (A:13).

As the district court recognized, this Court and the Supreme Court have not yet determined whether the manual border search of a cellphone is a routine search requiring no suspicion. (A:335). Upon *de novo* review, this Court can and should look to *Levy* and the uniform decisions of its sister circuits to answer that question affirmatively and

find that the officers in this case acted objectively reasonably and in good faith.

II.   <u>Reasonable Suspicion Supported the Search of the iPhone</u>

Even if individualized suspicion had been required (it had not), the officers in this case possessed it.  The district court reasoned to the contrary by determining the passage of time between the entry of the TECS lookout and the search of Robinson's cellphone rendered the TECs lookout "insufficient to provide a reasonable suspicion." (A:356).  But in evaluating that circumstance, the court improperly applied the higher standard for probable cause.

In the context of a border search, "[a] reasonable suspicion inquiry simply considers, after taking into account all the facts of a particular case, whether the border official had a reasonable basis on which to conduct the search." *Irving*, 452 F.3d at 124.  "Reasonable suspicion need not rise to the level required for probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Lajeunesse*, 85 F.4th 679, 687 (2d Cir. 2023).  It is a "less demanding standard" which can be satisfied "with information that is different in quantity or content than that required to

20

establish probable cause." *Kansas v. Glover*, 589 U.S. 376, 380 (2020). As the Supreme Court has instructed, "[t]he standard depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act." *Id.* Reasonable suspicion "falls considerably short of 51% accuracy…[because] to be reasonable is not to be perfect." *Id.* at 381.

In finding the TECS lookout impermissibly "stale," Robinson and the district court each analyzed that information through the lens of probable cause, rather than reasonable suspicion. In its opinion, the district court claimed that in the context of *probable cause*, local courts have generally taken the position that information supporting a warrant should not be older than one year. (A:358). It added that "benchmark provides important guidance in assessing…reasonable suspicion," but it never explained how the "benchmark" does so or why information older than one year would fail to do the same. (*Id.*).

A staleness analysis requires an assessment of "the age of [the] facts and the nature of the conduct alleged to have violated the law." *Diamondstone v. Macaluso*, 148 F.3d 113, 124 (2d Cir. 1998). But both the district court and Robinson relied on cases considering whether

probable cause supporting a search warrant—not reasonable suspicion—
was present. (*Compare* Br.44-45 (citing *United States v. Wagner*, 989
F.2d 69, 75 (2d Cir. 1993) (staleness in search warrant) and *United States
v. Raymonda*, 780 F.3d 105 (2d Cir. 2015) (same)), *with* A:358-60 (citing
*United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988) (probable cause
for wiretap) and *Raymonda*, 780 F.3d at 114-17)).

The record below established that digital evidence depicting
child sexual abuse could be expected to remain on a device for "years …
usually until [a suspect] get[s] caught." (A:204-05); *see United States v.
Carroll*, 750 F.3d 700, 705 (7th Cir. 2014) (affirming the search of a
residence based on information about defendant having child sexual
abuse material five years before). The passage of time, therefore, while
potentially relevant, must be considered in conjunction with "the nature
of the information…and the likely endurance of the information." *United
States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) (affirming
denial of suppression motion where warrant was executed three years
after developing probable cause and noting that collectors of child sexual
abuse material "do not quickly dispose of their cache").

22

Robinson's reliance on *Raymonda*—a case involving probable cause for a search warrant, not reasonable suspicion for a border search—is misplaced. In fact, *Raymonda* supports the government's position, not Robinson's. In *Raymonda*, a law enforcement agent applied for a search warrant nine months after IP logs showed someone used Raymonda's internet connection to access child pornography. 780 F.3d at 110. In finding that the information was stale, this Court held "it was not enough simply to show that the suspect had at some point accessed thumbnails of child pornography," and it explained that, for probable cause, there had to be evidence from which to infer the defendant was a "collector." *Id.* at 116-17. Critically, this court laid out examples which permit the inference that someone is a collector, including—though not discussed by Robinson—"information that the suspect paid for access to child pornography." *Id.* at 114. This Court concluded that the good faith exception applied, even though the warrant lacked the required probable cause. *Id.* at 119.

Information in the present case gives rise to the inference discussed in *Raymonda*. The TECS lookout specifically stated that Robinson was "linked to the *purchase* of Child Sexual Exploitation

Material via FinCEN" (A:234) (emphasis added), supporting the conclusion that the reasonable suspicion to search Robinson's iPhone was not stale.

Further, where only reasonable suspicion—requiring a lesser showing than probable cause—was needed, law enforcement agents acted lawfully in searching the iPhone. *See United States v. Smith*, 673 F. Supp. 3d 381, 401 (S.D.N.Y. 2023) (reasonable suspicion requires "much less" than probable cause). There was no need to show even "a fair probability that contraband or evidence of a crime will be found" in the iPhone, because that is the standard for probable cause, not reasonable suspicion. *See United States v. Grubbs*, 547 U.S. 90, 95 (2006). The TECS lookout certainly provided "a reasonable basis on which to conduct the search." *Irving*, 452 F.3d at 124. The testimony before the district court established that this was not an ordinary TECS lookout; it was placed by NTC and given more weight than the typical report. (A:120-21). It directed that, if encountered, Robinson's cellphones and laptops should be searched (A:234), and here, Robinson was in possession of both items when he approached the border (A:119). Importantly, the TECS lookout said Robinson was "linked to the

purchase of child sexual exploitation material" (A:234), which this Court has found to generate the inference that someone collects child pornography and is therefore likely to have it for an extended period of time. *See Raymonda*, 780 F.3d at 114. The common-sense inference from all this information is that Robinson did not inadvertently access child sexual abuse material, but rather intentionally obtained it. Therefore, it was reasonable for law enforcement agents to believe he would still possess the material when searched.

Robinson's argument that the TECS lookout failed to adequately link him to child pornography similarly falls flat. Law enforcement agents "need not rule out the possibility of innocent conduct" before reasonable suspicion will exist. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002). Relatedly, Robinson's argument that the government should have, but did not, introduce the facts underlying the lookout (Br.46) is disingenuous. The record reflects that, at the conclusion of Stepien's testimony, the government advised the district court that Stepien possessed knowledge of the underlying facts supporting the TECS lookout and could, if needed, testify to them. (A:225). The court stated that because the information underlying the

lookout was not known to the officers at the time of the search, however, that information was not relevant to the issues in the hearing. (A:225-26). Robinson's effort to recast this issue as a failure of proof is misleading.

### POINT THREE

### IT WAS CLEAR ERROR TO INVALIDATE
### THE SUBSEQUENT SEARCH WARRANT

The district court's findings about Stepien's purported omissions and alleged misrepresentations in the search warrant affidavit were fundamentally flawed. They are permeated by misapprehensions about the law and rely on a distorted reading of the affidavit. Robinson's efforts to defend the district court's decision fare no better.

If a defendant may not rely on "[u]nsupported conclusory allegations of falsehood or material omission" to request a hearing, *see Velardi v. Walsh*, 40 F.3d 569, 573 (1994), then a district court certainly cannot grant suppression on that basis. Here, the court did just that. Influenced by its own incorrect view of the law, the district court speculated about why the warrant affidavit did or did not contain certain material. (*See, e.g.,* A:375 ("[Stepien] did not want the issuing judge to ask questions regarding the TECS hit…that might bear on…reasonable suspicion."), 376 ("[Stepien] strongly implied that, even if the search was not valid under the border exception, it was a 'consent search.'")). It is true that "[w]here there are two permissible views of the evidence, the

factfinder's choice between them cannot be clearly erroneous," *see United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008), but where the district court's confusion about the law is entirely intertwined with its factual findings, those findings cannot stand on their own, *cf. Metzen v. United States*, 19 F.3d 795, 798 (2d Cir. 1994) ("This confusion taints the entire reasoning of the opinion leaving us with the definite and firm conviction that a mistake has been committed.").

The district court wrongly conflated the term "routine"—a term with clear legal significance—with the word "random." (GBr.53). In doing so, the court concluded that "Stepien falsely indicated to the magistrate judge that what occurred was nothing more than a routine, suspicionless search of a randomly selected traveler." (A:373). Even if this were true (it is not), the court's observation was immaterial because "the validity of a border search does not depend on whether it is prompted by a criminal investigative motive." *Irving*, 452 F.3d at 123. Therefore, the information contained in the TECS lookout report plainly had no bearing on whether the search of Robinson's cellphone was routine or nonroutine under the border search doctrine. *See id.* ("[T]he level of

intrusion into a person's privacy is what determines whether a border search is routine.").

The district court's ruling and Robinson's arguments also imply that Stepien—an HSI agent, not a lawyer—knew more about the law than the issuing magistrate judge and used that advantage to give the alleged false impression that this was a "routine" search. But the warrant affidavit is clear on its face that the property searched was a cellphone. If the magistrate judge believed that manual border searches of cellphones required reasonable suspicion, then Stepien's use of the word "routine" to describe the search would have made no difference. Contrary arguments discredit the issuing judge, whom the court implied was misled not solely about the facts but also about the law. However, the issuing judge (who presides in a district that repeatedly addresses search warrants arising from encounters by agents with travelers at the John F. Kennedy International Airport, one of the nation's busiest airports) would be expected to understand the contours of the border search exception, including the crucial distinction between routine and nonroutine searches. This Court cannot accept the district court's "implicit assumption"—upon which its holding relied—that the

magistrate judge was so easily misled. *See United States v. Smith*, 9 F.3d 1007, 1015 (2d Cir. 1993) ("Nor can we accept the determination that [a law enforcement officer] must have known more about the requirements of [a statute]…than did Judge Violante, and the implicit assumption that [the officer] should have had adequate confidence in his superior knowledge to instruct Judge Violante on the subject.").

The Court and Robinson also criticize Stepien's affidavit for its lack of additional detail. (A:377; Br.53). "However, there is no indication of deception or reckless disregard for the truth in omitting details." *United States v. Nelson*, 828 F. App'x 804, 807 (2d Cir. 2020). It is not enough that an omission has been intentional; omissions must have been "designed to mislead, or…made in reckless disregard of whether they would mislead." *Id.* Here, the affidavit's omission of TECS information could not have misled the magistrate judge because the reason for Robinson's secondary inspection had no bearing on the validity of the border search, as a matter of law. *See United States v. Delaney*, No. 22-1095, 2023 WL 7103281, at *4 (2d Cir. Oct. 27, 2023) (explaining that an omission makes reliance on an affidavit "unreasonable only

where the omitted information was clearly critical to assessing the legality of a search").

Robinson does not engage with these defects in the district court's rationale, instead claiming that the court's findings about Stepien were not clearly erroneous. (Br.57). That is wrong when the court's finding that the "omission of the TECS hit from the warrant affidavit was not inadvertent" was based on its own misunderstanding of the law, which, contrary to the court's view, holds that manual searches require no suspicion. Indeed, the court's suspicion of a motive to omit the TECS report is contradicted by this Court's prior rulings about border searches. *See, e.g., Levy*, 803 F.3d at 122 (had officers skimmed notebook and returned without copying, "we have no doubt that the inspection would have been routine"); *Irving*, 452 F.3d at 123.

The insinuation that Stepien's tactics while interviewing Robinson somehow reflect on his candor before the court is equally misplaced. (*See, e.g.*, Br.58 (claiming Stepien's explanation to Robinson about the reason for the search "indicated a willingness to lie")). As Stepien explained, it is not his standard practice to disclose law enforcement methods to suspects. (A:223). Regardless, dissembling

when interviewing a suspect is an accepted law enforcement tactic. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (discussing misrepresentations to a murder suspect). Stepien's use of an accepted law enforcement tactic cannot support an inference that a federal court was misled or that he demonstrated a "willingness to lie" to a federal judge.

Similarly unmoored from the record was the district court's assessment that Stepien's use of the word "voluntarily" to describe obtaining the password to Robinson's cellphone "strongly implied" that the search was consensual. (A:376). Although Robinson claims "Stepien's state of mind…is a factual question best addressed by the district court" (Br.57), the court's factual findings were clearly erroneous and undermined by its misunderstanding of the border search doctrine. The court's findings in this regard are inextricable from its view that Stepien believed border search authority was a suspect basis for a search and that he needed to take additional steps to secure the legal basis for the search. The court admitted as much when it reasoned that the phrase "'voluntarily gave CBP officers the password'…strongly implied that, even if the search was not valid under the border exception, it was a 'consent search.'" (A:376). In other words, the court imagined a scenario

where Stepien not only foresaw legal infirmities with his collection of evidence but also took calculated steps to avoid having to answer for his misdeeds to a magistrate judge. No fair reading of the record bears out such an improbable scenario, especially where Stepien precisely explained that Robinson consensually provided the password, but did not claim more than that.

Search warrant affidavits must be read "as a whole" and "in a commonsense manner." *United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000). In addition, a "reviewing court should not interpret supporting affidavits in 'a hypertechnical, rather than a commonsense manner. The resolution of doubtful cases should be largely determined by the preference to be accorded to warrants.'" *United States v. Martin*, 157 F.3d 46, 52 (2d Cir. 1998). Here, the district court failed to follow these commonsense instructions from this Court.

First, the language of the warrant affidavit is unambiguous. It says "[a] *border search* was conducted. *During the search*, ROBINSON voluntarily gave CBP officers the password for the Subject Device." (A:13) (emphasis added). It does not say he consented to the search of the iPhone and makes clear that the device search occurred within the

context of the ongoing border search. (*Id.*). The face of the warrant affidavit refutes Robinson's claims to the contrary. (*See* Br.59-60 (asserting the "affidavit explicitly does *not* state that the search of Robinson's phone was part of the routine search"), 55 (asserting the affidavit failed to identify the property that was searched)).

Further, the district court's and Robinson's insinuations— that the words "voluntarily gave CBP officers the password" intended to give the false impression of consent—constitute the very type of "hypertechnical," overly complex reading of a warrant affidavit that this Court and the Supreme Court have expressly rejected. *See, e.g., Illinois v. Gates,* 462 U.S. 213, 236 (1983); *Martin*, 157 F.3d at 52. Relatedly, the fact that the warrant affidavit did not describe the search as on consent means the magistrate would be expected to assume it was not on consent, *cf. Delaney*, 2023 WL 7103281, at *4 (when a warrant affidavit does not describe a person's prior criminal record, the magistrate judge would assume no record exists), and instead was conducted pursuant to a border search. Even if this Court deemed Stepien's affidavit to be "poorly worded," this at most would amount to negligence and not the weighty finding necessary to support invalidating the warrant. *See United States*

34

*v. Hernandez*, No. 22-471, 2024 WL 47666, at *3 (2d Cir. Jan. 4, 2024) ("Though the affidavit may have been 'poorly worded' and misstated peripheral details…the record does not compel a finding of bad faith.").

Second, the suggestion that Stepien would have thought deception was necessary is untethered from the reality of the legal landscape at the time of the search. Not only was Stepien's view of the law objectively reasonable, but it was also consistent with this Court's decision in *Levy* and the uniform jurisprudence of every appellate court to consider the issue. *See Mendez,* 103 F.4th at 1309-10 (collecting cases). Given these circumstances, it might have been objectively *unreasonable* for Stepien to entertain contrary views.

Far from being misleading, Stepien's description about how law enforcement agents obtained Robinson's password is factually accurate and has legal meaning. As Nunes testified, she obtained the password from Robinson without making any threats or promises. (A:127). This meets the legal definition of a "voluntary statement," which

means, in pertinent part, "[u]nconstrained by interference; not impelled by outside influence." *Voluntary*, *Black's Law Dictionary* (12th ed. 2024).

In addition to being unpersuasive and legally infirm, Robinson's attempts to rebut the government's arguments on this point are misleading. First, Robinson claims that "voluntary" could imply "consent" (Br.56), but he glosses over the fact that the affidavit used "voluntary" to describe obtaining the password, not the search of the phone. This is far from what Robinson calls a "semantic argument." (*See id*.). Courts in this Circuit have opined that providing the password for a cellphone in government custody, with no mention of consent for a search itself, is not consent to search the device. *See, e.g., United States v. Ephron*, No. 24-cr-418 (MMG), 2025 WL 524027, at *12 (S.D.N.Y. Feb. 18, 2025) (explaining that a request for a cellphone password was not "properly characterized as a request for consent"); *United States v. Mangini*, No. 20-CR-162 (JPO), 2021 WL 1268507, at *1 (S.D.N.Y. Apr. 6, 2021). Second, Robinson's attempts to conflate the terms "voluntary" and "consent" rest on his misinterpretations of cited authority. For example, Robinson cites *MacWade v. Kelly*, 460 F.3d 260 (2d Cir. 2006), and claims that "this Court has often referred to consent searches as

36

'voluntary.'" (Br.56). Once again, however, Robinson misstates this Court's rulings. *MacWade* considered not consent searches but the "special needs doctrine," which—as noted above—is an exception to the warrant requirement. *MacWade*, 460 F.3d at 267-68 (explaining the doctrine).

Robinson and the district court are both skeptical of Stepien's use of the word "voluntary," but their tortured interpretation of one sentence in the warrant affidavit demonstrates why this Court disfavors this type of second-guessing. As the Supreme Court has said, "a creative judge engaged in *post hoc* evaluation of police conduct can almost always image some alternative means by which the objectives of the police might have been accomplished." *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985).

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Otal Investments Ltd. v. M/V CLARY*, 673 F.3d 108, 113 (2d Cir. 2012) (per curiam). The district court's conjecture regarding the TECS hit and iPhone password does not make a "preliminary showing that the district

court was knowingly…misled," much less sufficient grounds upon which to base suppression. *See United States v. Falso*, 544 F.3d 110, 128 (2d Cir. 2008) (rejecting suppression where no "preliminary showing" that district court was misled"). A mistake has been made here. There can be no question that the district court misunderstood border search law and based its factual findings on that misunderstanding.

CONCLUSION

For the reasons stated above and in the government's opening brief, the district court's order suppressing the contents of Robinson's cellphone should be reversed.

Dated:     Brooklyn, New York
           December 23, 2025

                              Respectfully submitted,

                              JOSEPH NOCELLA, JR.,
                              *United States Attorney*
                              *Eastern District of New York*.

                         By:  /s/ GILBERT M. REIN
                              GILBERT M. REIN
                              Assistant U.S. Attorney

AMY BUSA,
GILBERT M. REIN,
*Assistant United States Attorneys*,
       (*Of Counsel*).

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4)(B) because the brief contains 6,606 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
         December 23, 2025

                    /s/ AMY BUSA
                    AMY BUSA
                    Assistant U.S. Attorney